## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| GARY WASHINGTON, | |
| Plaintiff | |
| v. | Case No. _____ |
| BALTIMORE POLICE DEPARTMENT, THOMAS PELLEGRINI, OSCAR REQUER, RICHARD FAHLTEICH, JOHN TEWEY, FRED CERUTI, JOHN MACGILLIVARY, UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT, AND MAYOR AND THE CITY COUNCIL OF BALTIMORE, | **JURY TRIAL DEMANDED** |
| Defendants | |

## <u>COMPLAINT</u>

Plaintiff GARY WASHINGTON, by his attorneys LOEVY & LOEVY, sues

Defendants  BALTIMORE POLICE DEPARTMENT (hereinafter "BPD"), THOMAS

PELLEGRINI, OSCAR REQUER, RICHARD FAHLTEICH, JOHN TEWEY, FRED

CERUTI, JOHN MACGILLIVARY, UNKNOWN EMPLOYEES OF THE

BALTIMORE POLICE DEPARTMENT (collectively  "Officer Defendants"), and the

MAYOR AND CITY COUNCIL OF BALTIMORE (hereinafter "The City") and

states the following:

## INTRODUCTION

1.      "Cooperate or you'll never see your mother again." With this and other pointed and repeated threats, the Officer Defendants initiated an unjust and underhanded process that led to Gary Washington being wrongfully convicted and forced to spend 31 years in prison for crimes he did not commit.

2.      Though completely innocent of the crimes charged, Plaintiff was sentenced to life imprisonment for the murder of Faheem Rafig Ali (aka Beryl Franklin), and 20 years for the use of a handgun in the commission of a crime of violence.

3.      Plaintiff's convictions were the direct result of the Officer Defendants' manipulation of witnesses, fabrication of evidence, and withholding of evidence that would have demonstrated Plaintiff's absolute innocence. The Officer Defendants' willful misconduct was taught and encouraged by BPD's policies, customs, and practices of condoning the Officer Defendants' unconstitutional behavior.

4.      From the very beginning, Plaintiff maintained his innocence. When he lost at trial, Plaintiff filed multiple appeals and continued to fight to show he had nothing to do with this crime. Ultimately, the child witness who originally testified against Plaintiff came forward and told the truth about the coercion and fabrication that led to his falsely accusing Plaintiff. After hearing from this witness, a criminal court vacated Plaintiff's convictions and ordered a new trial. Five months later, the State dismissed the charges.

5. After spending more than 31 years locked in a cage for a crime he did not commit, Plaintiff was finally cleared of the charges against him and released from custody. This lawsuit seeks redress for his injuries.

## JURISDICTION

6. This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the United States Constitution.

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367. Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district.

## THE PARTIES

8. Plaintiff is a 58-year-old resident of Baltimore, Maryland. He was born and raised in Baltimore. During his wrongful incarceration, Plaintiff obtained his GED and took college courses. Since being released from prison and exonerated, Plaintiff has been employed at a construction company.

9. At all relevant times, Thomas Pellegrini, Oscar Requer, Richard Fahlteich, John Tewey, Fred Ceruti, John McGillivary, and other unknown police personnel were police employees of the Baltimore Police Department. Plaintiff sues these defendants in their individual capacities, acting under color of law and within the scope of their employment during the investigation of the death of Faheem Ali and related events and circumstances.

10.     Defendant Baltimore Police Department is or was the employer of each of the Officer Defendants. The BPD is a person within the meaning of 42 U.S.C. § 1983.

11.     Defendant Mayor Bernard Young and Defendant City Council of Baltimore was and is a municipal corporation, organized and existing under the law of the State of Maryland. In this respect, the City acted through its agents, employees and servants, who held responsibility for the conduct of the police officers employed by the BPD.

## The Crime: The murder of Faheem Ali

12.     On December 27, 1986, at or around 7:45pm, Faheem Ali walked down the 2300 block of Barclay Street. While on the block Mr. Ali began to talk to two men. The conversation quickly escalated into an argument – an argument that led to one of the men pulling out a gun and shooting Mr. Ali in the chest. The two men fled immediately after the gun went off, and Mr. Ali died shortly thereafter.

13.     The Officer Defendants, including Officer Charles Ireland was the first officer on the scene. When he arrived he observed that a large crowd had gathered around Mr. Ali's body. The Officer Defendants, including Officer Ireland, secured the scene and waited for homicide to respond.

14.     The Officer Defendants, including Defendants Detective Thomas Pellegrini and Detective Oscar Requer, arrived within a few minutes of the murder and began their investigation. The Officer Defendants, including Defendants

Pellegrini and Requer, canvassed the area and were unable to recover any items of evidentiary value.

15.     In the days that followed, the Officer Defendants, including Defendant Detective John Tewey, Detective Richard Fahlteich, Detective Pellegrini, and Detective Requer, interviewed a number of witnesses, none of whom could identify the shooter or the man who accompanied the shooter.

16.     During the investigation, the Officer Defendants, including Defendants Tewey, Fahlteich, Pellegrini, and Requer encountered two child witnesses who said they had seen two men speaking with Mr. Ali just before he was shot, but they unequivocally stated they did not know the identity of those two men. Nonetheless, the Defendants zeroed in on these vulnerable children and decided that the children would make their case.

### Child Witness #1 – Otis Robinson

17.     On the night of the shooting, Otis Robinson, a twelve-year-old seventh grader, was being babysat by his mother's boyfriend who lived a few houses away from Otis's home. Otis had lived in the neighborhood for about four years and had a friendly relationship with Plaintiff and Plaintiff's family.

18.     At or around 7:30pm, Otis's mother called and asked Otis to go to the corner store to buy a few items. Otis left the house a few minutes after the call. When Otis stepped out the front door, he casually noticed that there were unknown men standing across the street talking. Finding nothing notable about the men, Otis continued down the street towards the store.  Soon thereafter, Otis heard a

gunshot. Upon hearing the shot, Otis ran to his own house. Finding the door locked, Otis sprinted back to his mother's boyfriend's house and tumbled through the door.

19.     When Otis's mother came to pick him up, she found him shaken and afraid. As a result, Otis's mother took Otis to his grandparents' house for the night. While Otis was at his grandparents' house, Officer Defendants, having heard that Otis was outside during the shooting, went to Otis's mother's house and threatened to take Otis away from her if she did not bring Otis to the police station within 24 hours.

**The Officer Defendants coerce Otis into
fabricating evidence against Plaintiff**

20.     On the evening of December 29, 2019, two days after the shooting, Otis and his mother were transported to the police station. There, the Officer Defendants separated Otis from his mother, and brought the child witness, alone, into the homicide room for questioning.

21.     The Officer Defendants, including Defendants Pellegrini and Fahlteich, questioned Otis about what he witnessed. Otis told the truth – he had heard men talking and heard a gunshot but did not know who the men were or who fired the shot. As Otis talked, the Officer Defendants wrote down that truthful statement.

22.     During the questioning, the Officer Defendants, including Defendant Requer came in holding pictures, one of which was of Plaintiff. The Officer Defendants asked if Otis recognized the people in the pictures. Otis affirmed that he knew Plaintiff, but Otis never said Plaintiff was involved in the crime.

23.     Throughout the questioning, Otis steadfastly maintained that he did not see who shot the victim. Unsatisfied with that answer, the Officer Defendants began threatening Otis. The Officer Defendants demanded that Otis cooperate and identify the shooter or else they would take Otis away from his mother. The Officer Defendants also threatened that Otis would be charged with homicide if he did not bend to their wishes.

24.     Afraid and removed from his mother, twelve-year-old Otis crumbled under the pressure. The Officer Defendants wrote a new statement and fed Otis details about the crime. Because of the Officer Defendants' coercion, Otis agreed to the Defendants' lies, and when asked who the shooter was, Otis falsely identified Plaintiff as the shooter, an identification the Officer Defendants knew to be false. Only after he signed the fabricated statement was Otis allowed to see his mother.

25.     Five days later, on January 2, 1986, the Officer Defendants, including Defendants Requer and Fred Ceruti, had Otis come to the station to sign a typed statement. Otis, still believing the Officer Defendants would make good on their threats, signed a second fabricated statement falsely identifying Plaintiff as the shooter.

26.     The Officer Defendants knew that Otis' statement was fabricated: They had fed him the information about the shooting. And the Officer Defendants likewise knew that Otis could not identify anyone as the shooter.

27.     The Officer Defendants never disclosed any of the coercion that they used to obtain Otis's fabricated statement to the prosecutor or the defense. Further,

the Officer Defendants never disclosed Otis's initial statement denying knowledge of the shooter's identity to the prosecutor or the defense.

### Child Witness #2 – R.D.

28.     On the night of the murder, thirteen-year-old R.D. was standing in the crowd near the crime scene.

29.     When the Officer Defendants arrived on the scene, they isolated R.D. and began questioning her about what she witnessed. R.D. told the truth – she did not know who shot Faheem Ali. She affirmed that she knew Plaintiff but never said Plaintiff was involved in the crime.

### The Officer Defendants coerce R.D. into
### fabricating evidence against Plaintiff

30.     On January 3, 1987, the Officer Defendants had R.D. come to the station with her mother. Just as they had done for Otis, the Officer Defendants, including Defendants Requer and Pellegrini, isolated R.D., demanded that she "cooperate" with their investigation, and threatened to take her away from her mother and even to arrest her mother.

31.     The Officer Defendants fed R.D. lies that were consistent with the Officer Defendants' concocted theory of the case. R.D., alone and afraid, agreed to sign the fabricated statement falsely identifying Plaintiff as the shooter. The Officer Defendants presented R.D. with photographs and the Officer Defendants pressed R.D. to sign her name next to Plaintiff's picture. After R.D. complied with the Officer Defendants' wishes, she was permitted to see her mother.

32.     The Officer Defendants knew R.D. had not seen the shooter, and knew that R.D.'s statement identifying Plaintiff as the shooter was false.

33.     The Officer Defendants never disclosed any of the coercion that they used to obtain R.D.'s fabricated statement to the prosecutor or the defense. Further, the Officer Defendants never disclosed R.D.'s initial statement denying knowledge of the shooter's identity to the prosecutor or the defense.

### Plaintiff's Wrongful Conviction

34.     On January 5, 1987, under the supervision of Defendant John MacGillivary, the Officer Defendants used the two fabricated witness statements to obtain a warrant for Gary Washington's arrest.

35.     On January 6, 1987, Gary Washington was arrested and indicted for first-degree murder and using a handgun in the commission of a crime of violence, based on the two fabricated witness statements.

36.     On June 4, 1987, Defendant Pellegrini testified at a motion to suppress and committed perjury. Defendant Pellegrini knowingly misled the prosecutor, judge, Plaintiff, and Plaintiff's counsel by testifying that Otis's and R.D.'s witness statements and identifications were obtained freely and voluntarily.

37.     On June 5, 1987, Plaintiff went to trial. The only evidence that linked Plaintiff to the crime came from Otis Robinson. Otis testified consistently with his fabricated statement. The State presented no additional eyewitnesses and no physical evidence connecting Plaintiff to Mr. Ali's murder.

38.     Plaintiff's counsel was never given the original truthful statement Otis provided the Officer Defendants. Plaintiff's counsel was also never informed of the coercive tactics the Officer Defendants employed to extract the fabricated statements and untruthful identification. Consequently, Plaintiff's counsel was unable to present this information to the jury.

39.     On June 16, 1987, Plaintiff was convicted of both counts. In convicting Plaintiff, the jury relied exclusively on Otis's false testimony.

40.     Plaintiff was sentenced to life imprisonment followed by 20 years.

### Plaintiff's Exoneration

41.     After Plaintiff was wrongfully convicted, he never gave up on his innocence. Almost ten years after Plaintiff was convicted, Otis Robinson recanted his testimony, explaining that the Officer Defendants coerced him into making false statements against Plaintiff.

42.     On August 20, 2018, the Circuit Court for Baltimore City granted Plaintiff's petition for a writ of actual innocence, finding that Otis's recantation was credible.

43.     On January 15, 2019, the State dismissed the charges against Plaintiff, and Plaintiff, for the first time in over 30 years, was able to walk free.

## Baltimore Police Department's
## Policy and Practice of Conducting Flawed Investigations

44.     The constitutional violations that caused Plaintiff's wrongful

convictions were not isolated events. To the contrary, they were the result of the

BPD's longstanding policies and practices of pursuing wrongful convictions through

reliance on profoundly flawed investigations.

45.     By the time of Mr. Ali's death and the investigation that led to

Plaintiff's wrongful arrest and prosecution, those policies were firmly entrenched. In

a race to clear murder cases, the BPD cut corners and rushed to judgment.

Sometimes those constitutional errors were exposed prior to prosecution.

46.     For example, in 1988, a year after Plaintiff's convictions, nearly 10

percent of Baltimore's 234 homicides were cleared by the BPD through arrest but

later dropped by the State's Attorney's Office prior to indictment.

47.     Other times, however, the BPD's unconstitutional conduct was not

exposed until long after a prosecution and a conviction had been obtained.

48.     For example, in 1968, Walter Lomax was convicted of robbing a food

market and fatally shooting the market's evening manager. It was later discovered

that several key pieces of evidence were not disclosed to Mr. Lomax's trial attorney,

including a BPD report that showed that an eyewitness identified someone else as

the gunman. A separate police report contained notes from a witness interview in

which the witness's description of the gunman did not match Mr. Lomax.

Mr. Lomax was granted a new trial in 2014 on the basis of these violations, and the State dismissed the charges.

49.     Similarly, Wendell Griffin was convicted of the 1981 murder of James Wise. In 2011, Mr. Griffin discovered numerous documents in the BPD file that were never turned over to him, including exculpatory reports that showed that the two key witnesses in the case had failed early in the investigation to identify Mr. Griffin as the perpetrator.

50.     James Owens's February 1988 convictions for burglary and felony murder were overturned after Mr. Owens discovered that BPD detectives withheld evidence of several inconsistent statements by their star witness. In 2018, Mr. Owens settled a lawsuit against the BPD and three of its detectives for $9 million.

51.     Jerome Johnson was convicted of the 1988 murder of Aaron Taylor. In 2018, he was finally exonerated after it was learned that the key witness against him had given a dramatically different account of events on the very day the crime occurred, and a BPD officer had recorded that statement in an official report, but that report had been buried.

52.     In 1988, Anthony Coleman was tried and convicted of first-degree murder and conspiracy to commit murder. In his post-conviction proceedings, Mr. Coleman's attorney was able to elicit testimony from a BPD Homicide detective on how it was the department's practice to decide which documents to share with State prosecutors. It was found that the detectives involved in Anthony Coleman's murder

case failed to disclose exculpatory evidence to Mr. Coleman's trial counsel. The Court of Special Appeals later remanded Mr. Coleman's case after determining that evidence had been wrongfully withheld from Mr. Coleman's trial counsel.

53.     Sabein Burgess was convicted of the 1994 murder of his girlfriend. But the BPD had highly exculpatory evidence that was never turned over—in particular, exculpatory information that the FBI had provided, and a statement from the victim's son who had seen the killers and told officers that Mr. Burgess was not one of them. In 2014, Mr. Burgess's conviction was overturned. In 2017, a jury awarded him $15 million in his lawsuit against the BPD and one of its detectives. During that civil suit, BPD detectives testified to the effect that the BPD policies and practices did not require detectives to document investigative steps, record all evidence in official reports, or turn over all documents to prosecutors.

54.     Antoine Pettiford was convicted of murder in 1995. Mr. Pettiford's post-conviction counsel discovered that BPD officers failed to disclose eyewitness statements and other exculpatory evidence. Mr. Pettiford's conviction was ultimately vacated and the charges against him were dismissed.

55.     In 1998, Rodney Addison was wrongfully convicted of a 1996 murder. In October 2005, after nine years in prison, Mr. Addison was released when it was revealed that the State had withheld exculpatory witness statements, and its sole witness recanted her testimony at a post-conviction proceeding.

56.     In 1999, Malcolm Bryant was convicted of a 1998 murder and assault that he did not commit. Mr. Bryant was exonerated in 2016. Mr. Bryant's post-

conviction proceedings uncovered BPD officers' failure to disclose several key pieces of evidence exculpating Mr. Bryant and pointing to the true suspect, including undisclosed witnesses and witness statements.

57.     In 1999, Kenneth McPherson and Eric Simmons, two brothers, were convicted of conspiracy to commit murder based on eyewitness testimony. During a post-conviction investigation conducted by the Baltimore City State's Attorney's Conviction Integrity Unit, it was discovered that the police had failed to disclose that one of the eyewitnesses, who was a police confidential informant, had lied about witnessing the murder. It was also determined that the police had coerced a child witness to make a recorded statement falsely accusing Mr. McPherson and Mr. Simmons of participating in the murder.

58.     In 1999, Tyrone Jones was convicted of conspiracy to commit murder in the shooting death of a 15-year-old boy. At trial, the state presented evidence that a witness identified Jones in a photo array and that Jones had a particle of gunshot residue on his hand. During the post-conviction phase of Jones's case, his counsel discovered evidence in the BPD case file that the witness who identified Jones at trial had told a BPD officer that he had not seen the shooting or the shooter; that evidence was never disclosed to the prosecutor. Further, internal BPD documents revealed that gunshot residue results were unreliable due to widespread contamination of police department facilities. Despite requests by his counsel for exculpatory material, the documents were disclosed only after a court ordered their

production. Ultimately, Jones's conviction was vacated and the state *nolle prossequied* the charges against him.

59.     In 1999, Garreth Parks was convicted of the murder of Charles Hill. Mr. Parks was later exonerated after it came to light that BPD officers had suppressed a police report in which a man confessed to being the shooter.

60.     In Plaintiff's case, the unconstitutional fabrication of false inculpatory evidence and/or withholding of exculpatory information and/or bad-faith destruction of exculpatory or potentially exculpatory information was undertaken pursuant to, and caused by a policy and practice on the part of the BPD.

61.     The unlawful misconduct described in this Complaint occurred systematically, pursuant to policies and practices, and accordingly occurred in other cases as well.

62.     Indeed, in 2000 BPD finally acknowledged that the Homicide Unit was in a state of disarray. As such, in January 2000, then-Commissioner Daniel asked BPD officer Stephen Tabeling to prepare a report on the state of the Unit ("Tabeling Report"). In that report, Tabeling found that investigatory files were in a general state of disarray; that there was no procedure for ensuring that all material about an investigation had been recorded and filed appropriately; and that the Unit's practices with the assembly, storage, retrieval, confidentiality, and security of case folders was highly deficient.

63.     Consistent with the municipal policies and practices described in the cases referenced in the preceding paragraphs as well as others, Officer Defendants

in this case fabricated eyewitness statements and concealed exculpatory and impeachment evidence, including Otis's and R.D.'s initial truthful statements, and the coercive tactics that the Officer Defendants used on these witnesses to secure their fabricated statements. None of this evidence was disclosed to the State or to Plaintiff's trial counsel.

64.     Policymakers were deliberately indifferent to the violations of constitutional rights described herein, and they condoned the practices described above. By condoning these practices, policymakers caused Plaintiff's injuries.

65.     The BPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

## Failure to Train, Supervise, and Discipline

66.     The constitutional violations described above were also caused by the BPD's failure to train, supervise, and discipline its police employees.

67.     The BPD's failure to train, supervise, and discipline its employees effectively condoned, ratified, and sanctioned the kind of misconduct that the Officer Defendants committed against Plaintiff in this case. Constitutional violations such as those that occurred in this case were encouraged and facilitated as a result of the BPD's practices and *de facto* policies, as alleged above.

68.     Indeed, the Tabeling Report found numerous deficiencies in training, including in many basic legal and investigative concepts.

69.     For example, there was a failure during the relevant time period to train police employees on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and that case's progeny and extensions, notwithstanding the obvious necessity of such training.

70.     Additionally, the BPD failed to properly supervise and discipline its police employees. As a result, employees continued to violate citizens' rights in the manner described more fully above, with impunity.

71.     The failure to train, supervise and discipline BPD employees was consciously approved at the highest policy-making level by policymakers who were deliberately indifferent to the violations of constitutional rights described herein, and that failure was a cause of the injuries suffered here by Plaintiff.

72.     The BPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

### The City's Wrongful Conduct

73.     The Baltimore Police Department policies and practices have long been controlled by parties outside the BPD. In the 1850s, the ruling Know Nothing party used the BPD to support gang activity in order to maintain political power, which led to rampant violence throughout Baltimore City. As a direct consequence of the Know Nothing party's misuse of BPD, the Maryland General Assembly created the

Police Act of 1860, which transferred control of the BPD from the City to four Police Commissioners appointed by the Maryland General Assembly.

74.    Over time, however, the City has regained its power over the BPD. In 1976, the Maryland General Assembly gave Baltimore's Mayor the power to appoint and remove the BPD's Commissioner, subject to confirmation by the City Council. This shift in power from the Governor to the Mayor and City Council gave the City the leverage it needed to direct BPD's policies and practices.

75.    At the time of Plaintiff's arrest and conviction, the City was able to exert control over the BPD's Police Commissioner. For example, the Police Commissioner engaged in direct communication with the Mayor about the way the BPD was managing and investigating criminal cases. The Police Commissioner's job security, and by extension each homicide officer's job security, was contingent on the Police Commissioner's ability to successfully prioritize and respond to the mayor's needs. Put more bluntly, as David Simon detailed in his year-long ethnographic study of the practices of BPD's Homicide Department in the late 1980s, this required the Police Commissioner to run the police department in a way that served the Mayor "in whatever manner He [the mayor] [saw] fit".

76.    This relationship continued to persist into the 1990s. In 1999 Mayor-elect Martin O'Malley commissioned consultants to study and report on BPD's policies and practices. The consultants were also hired to advise O'Malley on his selection of the Police Commissioner. In response to the consultants' scathing report about the BPD's policies and practices, O'Malley pledged that he would reform the

BPD and rid it of its corruption. The Mayor planned to do this through his selection of, de jure, and de facto control over the Police Commissioner. By wielding this power, the Mayor was able to make BPD not only submit to being studied by consultants, with the intent of having BPD implement the consultants' recommendations.

77.    In addition, the City determines the BPD's budget and authorizes the number of the BPD's members. Through the purse strings, the Mayor is also able to control how the BPD spends its money, manages its hiring practices and complies with the Mayor's directions. For example, in 1993, then-Mayor Kurt Schmoke sent BPD a directive, instructing the BPD to cut the Academy's training program and hire 330 new officers. This directive was adopted even though many in the law enforcement community predicted that the trickle-down effect of the Mayor's directive would negatively impact the BPD's officers' ability to properly train and supervise officers.

78.    This City's power over BPD continues in a similar manner today. Mayor Stephanie Rawlings-Blake is credited for soliciting the United States Department of Justice to launch a pattern-or-practice investigation into the BPD and initiating a body-camera pilot program for officers. While working hand-in-hand with her appointed Police Commissioner, Mayor Rawlings-Blake also developed a strategic plan for the BPD and shut down a police unit that was the subject of multiple citizen complaints of harassment and use of force.

79.     In addition to being able to direct BPD's policies and practices, at the time of Plaintiff's arrest and conviction, the City was also apprised of the misconduct that took place within BPD. The City was informed of BPD officer misconduct through the City's Complaint Evaluation Board ("CEB"). The CEB was established in 1977 to review and evaluate citizen complaints regarding police actions. The CEB was comprised of representatives from seven agencies, one of which was the City Solicitor for Baltimore City. The City Solicitor was and continues to be a mayoral appointee and the head of the City's Department of Law. The Solicitor served and continues to serve as the City's legal advisor, agent, and representative.

80.     Moreover, near the time of Plaintiff's arrest and conviction, the City had access to other agencies that monitored citizen experiences with BPD officers. One such agency was the Baltimore City Community Relations Committee ("CRC"). In 1979, the CRC reported to the Mayor that it found Baltimore residents, particularly poor and Black residents, felt that BPD officers mistreated them and used excessive force against them.

81.     The City continues to be informed about police activity. By law, the Police Commissioner is required to annually apprise the City of BPD's operations and work so that the City can maintain a continuing familiarity with the programs and operations of the BPD.

82.     Finally, the City's obligation to indemnify the BPD's employees under the Local Government Torts Claim Act underscores the City's connection to the BPD. Per the statute, the local government is given notice of any potential claims and then required to provide legal defense for employees in any action resulting from tortious conduct or omissions committed within the scope of employment. The City also approves and pays for settlements and verdicts against the BPD.

83.     Nonetheless, despite being able to impact and reform the BPD's policies and practice, as well as being informed of BPD officers' misconduct, the City did not undertake any action to correct the misconduct that took place at the time of Plaintiff's arrest and conviction. To the contrary, the City condoned, ratified, and/or turned a blind eye to the problems described above, and therefore was deliberately indifferent to the violation of constitutional rights described herein.

84.     The City's failure to act in the face of repeated constitutional violations, and unconstitutional policies and practices, was the proximate cause of Plaintiff's injuries.

### Plaintiff's Damages

85.     For more than a quarter of a century, Plaintiff was forced to live in a cage and serve a punishment for crimes he did not commit.

86.     Plaintiff was required to live in conditions that would traumatize and break down the bravest of men. The *Baltimore Sun* reported that one of the facilities in which Plaintiff was held was marked by killings of inmates by other

inmates. A constant atmosphere of fear, distrust, and threats of violence from inmates permeated the prison environments.

87.     During periods of Plaintiff's wrongful incarceration, Plaintiff was forced to share a cell that was little bigger than the average parking space. For more than 31 years, Plaintiff's life was marked by a steady stream of human rights abuses.

88.     While wrongfully incarcerated, Plaintiff was stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right. He missed out on the ability to share holidays, births, funerals, and other life events with loved ones, and he was denied the fundamental freedom to live his life as an autonomous human being.

89.     Plaintiff's 31 years of wrongful incarceration forced him into a world of isolation in which he lost contact with many of his friends and family in the outside world.

90.     Plaintiff must now attempt to make a life for himself outside of prison without the benefit of more than three decades of life experiences, which normally equip adults for the task.

91.     As a result of the foregoing, Plaintiff has suffered tremendous damage, including psychological and emotional distress, all caused by the Defendants' misconduct.

## Count I – 42 U.S.C. § 1983
## Due Process (Against Officer Defendants)

92.     Each paragraph of this Complaint is incorporated as if restated fully herein.

93.     As described more fully above, the Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process.

94.     In the manner described more fully above, the Officer Defendants, individually, and/or jointly, fabricated false evidence, deliberately withheld exculpatory evidence, and destroyed exculpatory or potentially exculpatory evidence in bad faith. In doing so, the Officer Defendants violated Plaintiff's clearly established constitutional right to due process.

95.     Absent Defendants' misconduct, the prosecution of Plaintiff could not and would not have been pursued, Plaintiff would not have been convicted, and Plaintiff would have been exonerated and released sooner than he was.

96.     The Officer Defendants' misconduct directly and proximately resulted in Plaintiff's unjust and wrongful criminal conviction and lengthy wrongful imprisonment; denied him his constitutional right to a fair trial; and offended recognized fundamental principles of justice and fairness, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

97.     As a direct and proximate result of this violation of his constitutional right to a fair trial, Plaintiff suffered injuries, including but not limited to the loss of liberty and psychological and emotional distress.

98.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, in bad faith, and with willful indifference to Plaintiff's clearly established constitutional rights.

99.     The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

### Count II – 42 U.S.C. § 1983
### Federal Malicious Prosecution (Against Officer Defendants)

100.    Each paragraph of this Complaint is incorporated as if restated fully herein.

101.    As described more fully above, the Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, caused the seizure of Plaintiff by legal process.

102.    In particular, the Officer Defendants caused a criminal proceeding to be commenced and/or continued against Plaintiff that resulted in Plaintiff being deprived of his liberty, despite there being no probable cause for commencing and/or continuing that criminal proceeding, in violation of the Fourth Amendment to the United States Constitution.

103.    The proceedings against Plaintiff terminated in his favor.

104.    As a direct and proximate result of the Officer Defendants' misconduct described in this Count, Plaintiff suffered injuries, including but not limited to loss of liberty and psychological and emotional distress.

105.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and willful indifference to Plaintiff's clearly established constitutional rights.

106.    The misconduct of the Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

**Count III – 42 U.S.C. § 1983**

**Detention without Probable Cause (Against Officer Defendants)**

107.    Each paragraph of this Complaint is incorporated as if restated fully herein.

108.    In the manner described above, the Officer Defendants, while acting individually, jointly, and/or in conspiracy, as well as under color of law and within the scope of their employment, detained Plaintiff.

109.    There was no probable cause for Plaintiff's detention.

110.    As a result of the Defendants' action, Plaintiff's rights were violated, and he suffered injuries, including but not limited to loss of liberty and psychological and emotional distress.

111.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, in bad faith, and with willful indifference to Plaintiff's rights.

112.    The misconduct of the Officer Defendants described in this Count was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

### Count IV – 42 U.S.C. § 1983
### Failure to Intervene (Against Officer Defendants)

113.    Each paragraph of this Complaint is incorporated as if restated fully herein.

114.    In the manner described above, by their conduct and under color of law, during the constitutional violations described herein, the Officer Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

115.    As a direct and proximate result of the Officer Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered injuries, including but not limited to loss of liberty and psychological and emotional distress. The Officer Defendants had a reasonable opportunity to prevent this harm but failed to do so.

116.    The misconduct described in the Count was objectively unreasonable and was undertaken intentionally, in bad faith, and with willful indifference to Plaintiff's clearly established constitutional rights.

117.   The misconduct described in this Count by the Officer Defendants was undertaken pursuant to the policy and practice of the BPD, in the manner more fully described above and in Count VI below.

## Count V – 42 U.S.C. § 1983
## *Monell* Policy Claims (Against BPD and the City)

118.   Each paragraph of this Complaint is incorporated as if restated fully herein.

119.   The actions of all the Officer Defendants and other known and unknown co-conspirators were undertaken pursuant to policies and practices of the BPD, described above, which were ratified by policymakers with final policymaking authority. These policies and practices included the failure to adequately train, supervise, and discipline officers who engaged in the alleged constitutional violations, as set forth in greater detail above. The policies and practices also included the failure to turn over exculpatory evidence (both before and after a criminal trial) and reliance on fabricated evidence, including fabricated witness statements, identifications, and police reports.

120.   The policies and practices described in this Count were maintained and implemented by the BPD and the City with deliberate indifference to Plaintiff's constitutional rights.

121.   As a direct and proximate result of the BPD's and the City's actions, Plaintiff's constitutional rights were violated and he suffered injuries, including but not limited to loss of liberty and psychological and emotional distress.

122.    The BPD and the City are therefore liable for the misconduct committed by the Officer Defendants.

## Count VI – State Law Claim[1]
## Malicious Prosecution (Against Officer Defendants)

123.    Each paragraph of this Complaint is incorporated as if restated fully herein.

124.    The Officer Defendants accused Plaintiff of criminal activity knowing those accusations to be without genuine probable cause, and they made statements to prosecutors and other officials with the intent of exerting influence and instituting and continuing the judicial proceedings.

125.    The Officer Defendants caused Plaintiff to be improperly subjected to judicial proceedings for which there was no probable cause, resulting in injury.

126.    The Officer Defendants' statements regarding Plaintiff's alleged culpability were made with knowledge that the statements were false and perjured. The Officer Defendants fabricated evidence and/or withheld exculpatory evidence and/or destroyed exculpatory or potentially exculpatory evidence in bad faith. The Officer Defendants were aware that, as described more fully above, no true or reliable evidence implicated Plaintiff in the murder of Faheem Ali.

127.    The Officer Defendants intentionally withheld from and misrepresented to prosecutors facts that further vitiated probable cause against

---

[1] Plaintiff presented his state-law claims included in this Complaint to Defendants, as required by Maryland law, on May 8, 2019. The notice was served on the City Solicitor, Andre Davis and Daniel Beck, Chief of the Office of Legal Affairs for the Baltimore Police Department.

Plaintiff, as set forth above, and failed to investigate evidence that would have implicated the actual perpetrator.

128.    The misconduct described in this Count was undertaken intentionally, with malice, willfulness, and reckless indifference to the rights of others.

129.    The prosecution was eventually terminated in Plaintiff's favor.

130.    As a direct and proximate result of this misconduct, Plaintiff sustained, and continues to sustain, injuries as set forth above, including psychological and emotional distress.

## Count VII – State Law Claim
## Intentional Infliction of Emotional Distress
## (Against Officer Defendants)

131.    Each of the foregoing paragraphs is incorporated as if restated fully herein.

132.    The acts and conduct of the Officer Defendants as set forth above were extreme and outrageous. The Officer Defendants' actions were rooted in an abuse of power or authority, and they were undertaken with intent to cause, or were in reckless disregard of, the probability that their conduct would cause severe emotional distress to Plaintiff, as is more fully alleged above.

133.    As a direct and proximate result of the Officer Defendants' actions, Plaintiff suffered and continues to suffer physical injury and severe emotional distress.

## Count VIII – State Law Claim
## Directly Under the Maryland Constitution
## (Against Officer Defendants)

134.     Each paragraph of this Complaint is incorporated as if restated fully herein.

135.     As described more fully in the preceding paragraphs, the Officer Defendants violated Plaintiff's due process rights, in violation of the Maryland Declaration of Rights, including but not limited to Articles 19, 24, and 26.

136.     As a direct and proximate result of the Officer Defendants' actions, Plaintiff was wrongfully imprisoned for more than 31 years for a crime that he did not commit.

137.     As a direct and proximate result of the Officer Defendants' actions, Plaintiff suffered damages, including physical sickness and injury, and severe emotional distress, as is more fully alleged above.

## Count IX – State Law Claim
## Indemnification (Against BPD and the City)

138.     Each paragraph of this Complaint is incorporated as if restated fully herein.

139.     Maryland law provides that public entities are directed to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

140.    The Officer Defendants are or were employees of the Baltimore Police Department, who acted within the scope of their employment in committing the misconduct described herein.

WHEREFORE, Plaintiff, GARY WASHINGTON, respectfully requests that this Court enter judgment in his favor and against Defendants BALTIMORE POLICE DEPARTMENT, THOMAS PELLEGRINI, OSCAR REQUER, RICHARD FAHLTEICH, JOHN TEWEY, JOHN MACGILLIVARY, UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT, and the MAYOR AND CITY COUNCIL OF BALTIMORE, awarding compensatory damages, attorneys' fees, and costs against each Defendant, and punitive damages against each Defendant, as well as any other relief this Court deems appropriate.

## JURY DEMAND

Plaintiff, GARY WASHINGTON, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

GARY WASHINGTON

By:    /s/ Gayle Horn
       *One of Plaintiff's Attorneys*

*Attorneys for Plaintiff*
Jon Loevy*
Gayle Horn
Roshna Bala Keen*
Renee Spence*
LOEVY & LOEVY
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
gayle@loevy.com
**Pro hac vice* applications forthcoming