**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **GARY WASHINGTON,** | * | |
| **Plaintiff,** | * | |
| **v.** | | **Civil No.: 1:19-cv-02473-SAG** |
| | * | |
| **BALTIMORE POLICE** | | |
| **DEPARTMENT,** *et al.*, | * | |
| **Defendants.** | * | |

\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*　\*

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT BALTIMORE POLICE
DEPARTMENT AND MAYOR AND CITY COUNCIL OF BALTIMORE'S MOTION
TO DISMISS THE AMENDED COMPLAINT**

Defendants Baltimore Police Department ("BPD") and the Mayor and City Council of Baltimore ("MCC"), by their attorneys and pursuant to Federal Rule of Civil Procedure 12(b)(6), or alternatively, Rule 12(b)(1), hereby submit this Memorandum of Law in Support of their Motion to Dismiss, and respectfully move this Honorable Court to dismiss the Amended Complaint because it fails to state a claim upon which relief can be granted. Alternatively, as to BPD, this Court lacks subject matter jurisdiction because BPD has immunity from suit pursuant to the Eleventh Amendment to the United States Constitution.

**INTRODUCTION**

On August 27, 2019, Plaintiff, Gary Washington ("Washington") filed a Complaint against BPD, MCC, and several individual BPD officers—Thomas Pellegrini, Oscar Requer, Richard Fahlteich, John Tewey, Fred Ceruti, John MacGillivary, and Unknown Employees of BPD's (collectively, "Officer Defendants")—who participated in a 1986 homicide investigation that resulted in Washington's conviction for the murder of Faheem Ali. ECF No. 1. Washington subsequently filed an Amended Complaint on September 5, 2019. ECF No. 5. Washington alleges

the following claims against BPD and MCC: Count V – 42 U.S.C. § 1983, *Monell* Policy Claims; and Count IX – State Law Claim for Indemnification. *Id.* at ¶¶ 119-22, 139-41.[1]

The Amended Complaint should be dismissed as to BPD and MCC because: (1) the conclusory, barebones allegations in the Amended Complaint are insufficient to state § 1983 *Monell*[2] claims; (2) BPD, as an agency of the State of Maryland, has Eleventh Amendment immunity; (3) Washington lacks standing to bring an indemnification claim; and (4) Washington cannot claim punitive damages against BPD and MCC under § 1983.

## FACTUAL ALLEGATIONS

At approximately 7:45 p.m. on December 27, 1986, Faheem Ali ("the victim") was speaking to two men in the 2300 block of Barclay Street.[3] ECF No. 5 at ¶ 12. The conversation

---

[1] Washington also asserts as Count III a claim for "42 U.S.C. § 1983, Detention without Probable Cause." ECF No. 5 at ¶ 108-113. To the extent that Count III can be construed as a false arrest or false imprisonment claim, this claim is time-barred. In *Wallace v. Kato*, 549 U.S. 384, 387 (2007), the Supreme Court analyzed when the limitations period for a § 1983 false arrest/false imprisonment claim began to run. The time at which accrual occurs is "presumptively when the plaintiff has a complete and present cause of action." *Id.* at 388 (internal quotations omitted) (citations omitted). The Supreme Court opined, "[r]eflective of the fact that false imprisonment consists of detention without legal process, a false imprisonment ends once the victim becomes held *pursuant to such process*—when, for example, he is bound over by a magistrate or arraigned on charges." *Id.* at 389. Thus, the *Wallace* Court concluded that the "petitioner's contention that his false imprisonment ended upon his release from custody, after the State dropped the charges against him, must be rejected. It ended much earlier, when legal process was initiated against him, and the statute would have begun to run from that date . . . We conclude that the statute of limitations on petitioner's § 1983 claim commenced to run when he appeared before the examining magistrate and was bound over for trial." *Id.* at 390-91. Washington was arrested and indicted on January 6, 1987. ECF No. 5 at ¶ 35. The holding in *Wallace* is clear: Washington had three years from the date he was held over for process to file suit for torts which accrued pre-process. Therefore, limitations ran on or about January 6, 1990. Washington filed suit on August 27, 2019, nearly *30 years* later. This claim is time-barred.

[2] *Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 683 (1978).

[3] For the purposes of this motion, any relevant factual allegations are contained in Washington's Amended Complaint, and BPD and MCC do not stipulate to the truthfulness, completeness, or accuracy of any of the facts as alleged.

"quickly escalated into an argument," and one of the men pulled out a gun and shot the victim in the chest. *Id*. The two men fled, and the victim died shortly thereafter. *Id*.

The Amended Complaint outlines alleged errors during the homicide investigation. *Id*. at ¶¶ 16, 20-34, 38. Washington argues that his "convictions were the direct result of the Officer Defendants' manipulation of witnesses, fabrication of evidence, and withholding of evidence." *Id*. at ¶ 3. In particular, Washington asserts that the Officer Defendants threatened and intimidated two minor witnesses and coerced them into fabricating evidence against him. *Id*. at ¶¶ 20-33. Further, he claims the Officer Defendants' "willful misconduct was taught and encouraged by BPD's policies, customs, and practices of condoning the Officer Defendants' unconstitutional behavior." *Id*. at ¶ 3. On June 16, 1987, a jury convicted Washington of all counts. *Id*. at ¶ 39.

With respect to MCC, Washington alleges that "despite being able to impact and reform the BPD's policies and practice, as well as being informed of BPD's officers' misconduct, [MCC] did not undertake any action to correct the misconduct that took place at the time of [Washington]'s arrest and conviction. To the contrary, [MCC] condoned, ratified, and/or turned a blind eye . . . and therefore was deliberately indifferent to the violation of constitutional rights . . ." *Id*. at ¶ 84. Thus, according to Washington, MCC was the proximate cause of his injuries. *Id*. at ¶ 85.

On August 20, 2018, the Circuit Court for Baltimore City granted Washington's petition for a writ of actual innocence. *Id*. at ¶ 42. On January 15, 2019, the State dismissed the charges against Washington. *Id*. at ¶ 43.

## STANDARD OF REVIEW

Defendants BPD and MCC move pursuant to Rule 12(b)(6) to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted. In assessing a complaint's sufficiency, the Supreme Court has established the following two-pronged analysis: (1) the

principle that the court should accept the truth of factual allegations is inapplicable to conclusory allegations; and (2) a complaint will only survive a Rule 12(b)(6) motion if it states a plausible claim for relief. FED. R. CIV. P. 8; *Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2009). Courts "are not bound to accept as true a legal conclusion couched as a factual allegation" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Under the first prong of the sufficiency test, the Fourth Circuit has determined that "we need not accept the legal conclusions drawn from the facts," nor "unwarranted inferences, unreasonable conclusions, or arguments." *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010) (quoting *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)) (internal quotation marks and citations omitted). "This approach recognizes that 'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).

Once a pleading is stripped of its allegations that are not entitled to truth, the second prong requires the lower federal court to determine if the remaining factual allegations state a plausible claim for relief. *See Iqbal*, 556 U.S. at 677-83; *Twombly*, 550 U.S. at 555-70; *Glassman*, 628 F.3d at 145-150; *Giacomelli*, 588 F.3d at 194-97. In sum, the Amended Complaint cannot survive BPD and MCC's Rule 12(b)(6) motion to dismiss because it contains nothing more than speculative and conclusory allegations that are insufficiently supported by factual allegations.

Additionally, BPD, as an agency of the State of Maryland, has Eleventh Amendment immunity. Federal Rule of Civil Procedure 12(b)(1) states that a party may assert the defense of lack of subject-matter jurisdiction. The Fourth Circuit, however, has "been unclear on whether a

dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)." *Andrews v. Daw*, 201 F.3d 521, 524 n.2 (4th Cir. 2000). However, the Fourth Circuit recently stated: "Our case law is clear that because of its jurisdictional nature, a court ought to consider the issue of Eleventh Amendment immunity at any time, even *sua sponte*." *McCray v. Md. Dep't of Transp.*, 741 F.3d 480 (4th Cir. 2015) (citation omitted). *See also Van Story v. Wash. Cty. Health Dep't*, 2019 WL 3340656, at \*3 (D. Md. 2019) (analyzing immunity under the Eleventh Amendment and stating "sovereign immunity is a jurisdictional bar . . . a court finding that a party is entitled to sovereign immunity must dismiss the action for lack of subject-matter jurisdiction.") (citing *Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 649 (4th Cir. 2019)). A motion under Rule 12(b)(1), which governs dismissal for lack of subject matter jurisdiction, raises the question of "whether [Washington] has a right to be in the district court at all and whether the court has the power to hear and dispose of [the] claim . . ." *Holloway v. Pagan River Dockside Seafood, Inc.*, 669 F.3d 448, 452 (4th Cir. 2012). Thus, the Amended Complaint fails to state a plausible claim for relief and must be dismissed with prejudice and without leave to amend.

## ARGUMENT

### I.  The Amended Complaint fails to state a claim as to BPD.

Washington fails to plead a sufficient factual basis to show that BPD had an unconstitutional policy, custom, or pattern and practice that caused his alleged constitutional deprivation, nor does he demonstrate a causal link between BPD and the purported constitutional violation. Therefore, Washington's *Monell* claim fails as a matter of law.

Section 1983 provides a remedy against "any person" who, under color of law, deprives another of rights protected by the United States Constitution. 42 U.S.C. § 1983. A municipality is

liable under § 1983 when "the unconstitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694). However, a municipality may be found liable only if two elements are met: (1) an unconstitutional policy or practice must exist, and (2) the municipality must have *caused* the constitutional violation. *See Monell*, 436 U.S. at 690; *Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403-04 (1997); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987).

To satisfy the first element, a party may show the existence of an unconstitutional "policy" or "custom" in one of four ways: (1) a formal policy, regulation or ordinance; (2) an express decision of an official with "final policymaking authority"; (3) the municipality's failure to train its employees, such that the municipality was "deliberately indifferent" to the constitutional rights of its citizens; or (4) a "persistent and widespread practice" of unconstitutional conduct by municipal employees so as to become a "custom or usage" of the municipality. *See Connick*, 563 U.S. at 60-61; *Brown*, 520 U.S. at 403-04; *Lytle*, 326 F.3d at 471; *Carter*, 164 F.3d at 218; *Spell*, 824 F.2d at 1391; *Milligan*, 743 F.2d at 229.

The second element of a *Monell* claim (causation) is a high hurdle because the complainant must prove the allegedly unconstitutional policy or custom was the "moving force" behind the violation of his or her rights. *See Connick*, 563 U.S.at 60-61; *Brown*, 520 U.S. at 404; *Carter*, 164 F.3d at 218; *see also Lytle*, 326 F. 3d at 471-74; *Spell*, 824 F.2d at 1391; *Milligan*, 743 F.2d at 230. However, liability only exists "where the municipality **itself** causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis added) (citation omitted). For this reason, federal courts apply **rigorous standards** of culpability and causation to § 1983

*Monell* claims, especially where a party is contending that either "inadequate training" or "widespread and persistent constitutional abuses" caused the violation of his or her rights. *See Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train") (citations omitted); *Brown*, 520 U.S. at 405 ("Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."). However, "local governments are responsible only for their *own* illegal acts. They are not vicariously liable under § 1983 for their employees' actions." *Connick*, 563 U.S. at 60 (citations and internal quotation marks omitted). There must be an "affirmative link" between the identified policy or custom and the specific violation that is attributable to the municipality. *Spell*, 824 F.2d at 1389.

Washington alleges municipal liability under the third and fourth types of *Monell* theories. However, Washington fails to assert facts sufficient to reasonably infer that there was a failure to train, supervise, and discipline that amounted to deliberate indifference or a condoned custom that caused a violation of his rights.

### A.  Failure to Train, Supervise, and Discipline

A municipality's *Monell* liability "is at its most tenuous where a claim turns on a failure to train." *Connick,* 563 U.S. at 61.  Liability will attach only "[i]n limited circumstances." *Id.* Where a claim is based on inadequate training, a plaintiff must establish "a ***specific deficiency*** rather than general laxness or ineffectiveness in training." *Spell*, 824 F.2d at 1390 (emphasis added). Instead, "the plaintiff must allege facts that reveal: (1) the nature of the training, (2) that the training was a deliberate or conscious choice by the municipality, and (3) that the officer's conduct resulted from

said training." *McDowell v. Grimes*, No. GLR-17-3200, 2018 WL 3756727, at \*4 (D. Md. 2018)

(citations omitted). As Judge Russell stated:

> The nature of the training element requires more than bald assertions that police officers were not properly trained. It is not sufficient to state in broad, conclusory terms and in a variety of different ways that the police department failed to train and supervise its officers. Nor is alleging a general laxness or ineffectiveness sufficient to state a claim. Instead, a plaintiff must allege a specific deficiency with the training.

*Id.* (internal citations and quotations omitted). *McDowell* ultimately dismissed the claims against

BPD to the extent that they were based on a failure to train because the plaintiff did not address

"specific aspects of [the] training program," and held that "[a]bsent any factual detail about the

training program, [plaintiff] fails to state a claim." *Id.*

Furthermore, in order to keep a §1983 *Monell* claim from collapsing into *respondeat*

*superior* liability, federal courts require plaintiffs to prove that the municipality was "deliberately

indifferent" to the specific risk of constitutional injury alleged in the pleadings. *See*, *e.g.*, *Connick*,

563 U.S.at 61; *Brown*, 520 U.S. at 411; *Canton*, 489 U.S. at 388. Deliberate indifference is an

extremely high standard of fault, *i.e.*, mere negligence and/or even gross negligence are **never**

sufficient to meet the standard. *See Connick* 563 U.S. at 61; *Brown*, 520 U.S. at 407 (finding that

"a plaintiff must demonstrate that the municipal action was taken with 'deliberate indifference' as

to its known or obvious consequences . . . [a] showing of simple or even heightened negligence

will not suffice"); *Riddick*, 238 F.3d at 524 ("A municipality is not subject to section 1983 liability

simply because a claimant is able to identify conduct attributable to the municipality. Rather, 'the

plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the

'moving force' behind the injury alleged.'") (citation omitted). Instead, a §1983 *Monell* plaintiff

must not only show that the municipality knew of the particular risk of constitutional injury, but

also that the municipality *actually drew the inference* that its response to the risk was inappropriate in light of that risk. *See Brown*, 420 U.S. at 410; *Riddick*, 238 F.3d at 525-26.

Moreover, a plaintiff must establish "that the specific deficiency or deficiencies [are] such as to make the specific violation ***almost bound to happen***, sooner or later, ***rather than merely likely*** to happen in the long run." *Spell*, 824 F.2d at 1390 (emphasis added) (internal quotation marks omitted); *Canton*, 489 U.S. at 391. "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [the local government], for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. "Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." *Id.* at 391. A single incident of misconduct by a police officer is not sufficient to state a claim for inadequate training. *See Doe v. Broderick*, 225 F.3d 440, 456 (4th Cir. 2000). Similarly, allegations of singular or isolated unconstitutional acts are insufficient to meet the "deliberate indifference" standard. *See*, *e.g.*, *Brown*, 520 U.S. 398.

In the instant case, Washington does not state a plausible claim for relief against BPD with respect to training, supervision, or discipline. He fails to identify any factual basis for these claims and does not sufficiently plead any causal link between the alleged actions of the Officer Defendants and any alleged failure in BPD's training program, supervision, or discipline which amounted to a deliberate indifference to his constitutional rights. The Amended Complaint simply states formulaic conclusions devoid of proper factual enhancement. This is insufficient to make out a claim under this theory.

With respect to training, Washington has not identified the nature of the training administered by BPD that was constitutionally deficient, or any *specific* alleged failure to train that

was a deliberate or conscious choice by BPD, or that the Officer Defendants' conduct was caused by a failure to train. Washington's assertions consistently are the archetypal conclusory and formulaic recitations prohibited under the *Iqbal/Twombly* framework. Instead of providing factual support for his allegations, Washington merely recites legal elements. For example, Washington states, "In Plaintiff's case, the unconstitutional fabrication of false inculpatory evidence and/or withholding of exculpatory information and/or bad faith destruction of exculpatory or potentially exculpatory information was undertaken pursuant to, and caused by a policy and practice on the part of the BPD." ECF No. 5 at ¶ 61. Similarly, he claims, "Policymakers were deliberately indifferent to the violations of constitutional rights described herein, and they condoned the practices described above. By condoning these practices, policymakers caused Plaintiff's injuries." *Id*. at ¶ 65. Such broad, conclusory pleading is insufficient.

Additionally, Washington alleges, generally, that there was a failure to train on *Brady v. Maryland*, 373 U.S. 183 (1963), "during the relevant time period." *Id*. at ¶ 70. This conclusory and unsupported statement is wholly insufficient. Notably, this assertion is an almost verbatim quote from an unrelated case that occurred approximately a decade after Washington's arrest and conviction. *See The Estate of Malcolm J. Bryant v. Balt. Police Dep't, et al.*, 1:19-cv-00384-ELH, filed February 8, 2019, ECF No. 1 at ¶ 104 ("For example, there was a failure during the relevant time period to train police officers on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 183 (1963), notwithstanding the obvious necessity of such training."). Not only does Washington fail to provide any factual support, but also his overly broad and conclusory allegations fail to provide notice to the Defendants as to "the relevant time period." This type of conclusory and overly broad pleading is *exactly* what the *Iqbal/Twombly* standards are meant to prevent.

Moreover, Washington fails to establish that any alleged "specific [] deficiencies [were] such as to make the specific violation ***almost bound to happen***, sooner or later, ***rather than merely likely*** to happen in the long run." *Spell*, 824 F.2d at 1390. Washington lists twelve (12) cases, several of which have not yet been adjudicated, investigated by BPD from 1968 to 2000. ECF No. 5 at ¶¶ 49-60. This is a *thirty-year* time period. As discussed more fully *supra*, this list of sporadic instances over the course of over thirty (30) years is insufficient to meet the required "deliberate indifference" standard, and cannot demonstrate that Washington's alleged constitutional deprivation of rights was "almost bound to happen." Finally, Washington relies on the so-called 2000 Tabeling report. *Id.* at ¶ 63. Yet Washington fails to sufficiently plead how the Tabeling report supports BPD's failure to train, supervise, or discipline. Additionally, such a report, authored in 2000, never could have provided notice to BPD or any policymaker at BPD of any unconstitutional patterns or practices at the time of Washington's arrest and conviction, nearly 12 years prior to the report's completion. Instead, the Amended Complaint offers only speculative and conclusory allegations with no factual or temporal connection to Washington's alleged constitutional violation.

Washington's allegations with respect to supervision and discipline similarly are conclusory and formulaic. *See id.* at 71-73. Washington provides little to no support for these allegations, and fails to allege even a single, specific incident pertaining to an officer who should have been reprimanded or disciplined but was not. Washington does not point to an unconstitutional policy or practice with respect to disciplinary proceedings that would lend any support to his failure to discipline and supervise allegations. Washington similarly fails to identify any supervisor who condoned, sanctioned, or authorized the Officer Defendants' actions, failed to discipline them, or who were aware of their alleged unconstitutional behavior and consciously

disregarded the risks of such behavior. These conclusory and speculative allegations are sufficient to provide BPD with notice of the claims alleged against it.

It is axiomatic that there is no *respondeat superior* liability in *Monell* claims. *See, e.g., City of Okla. City v. Tuttle*, 417 U.S. 808, 828-29 (1985). In other words, in order to survive a motion to dismiss, a plaintiff must plead facts which give rise to an inference that the municipality itself—not the employee—was deliberately indifferent. *See*, *e.g.*, *Connick*, 563 U.S. at 60. Washington fails to allege any facts to support an inference that BPD as an agency was deliberately indifferent or tacitly condoned, sanctioned, or authorized the alleged unconstitutional conduct of any of the Officer Defendants. He fails to show that BPD was "deliberately indifferent" in the face of the obvious consequences of inadequate or constitutionally deficient training, discipline, or supervision. These barebones, conclusory allegations are categorically insufficient because they are devoid of any factual detail and fail to establish a causal link between BPD and the alleged unconstitutional actions.

### B.  Condonation of a Persistent and Widespread Practice

Likewise, Washington fails to show that there was a "persistent and widespread practice" of unconstitutional conduct by municipal employees so as to become a "custom or usage," or that BPD was deliberately indifferent in the face of such persistent and widespread practices.

As with the "failure to train" *Monell* liability theory, allegations of isolated unconstitutional acts, are insufficient to meet the "deliberate indifference" standard. *See*, *e.g.*, *Brown*, 520 U.S. at 398; *Lytle*, 326 F.3d at 473 ("It is well settled that isolated incidents of unconstitutional conduct by subordinate employees are not sufficient to establish a custom or practice for § 1983 purposes") (citations omitted); *Carter*, 164 F.3d at 218 ("Thus, a plaintiff cannot rely upon scattershot accusations of unrelated constitutional violations to prove either that a municipality was indifferent

to the risk of her specific injury or that it was the moving force behind her deprivation."). Courts have determined that a "meager history of isolated incidents" does not "approach the widespread and permanent practice necessary to establish municipal custom." *Carter*, 164 F.3d at 220 (citations and internal quotation marks omitted).

Additionally, when a plaintiff seeks to establish a policy or custom based on "persistent or widespread practices," the court must "rigorously test the chain of causation." *See Connick*, 563 U.S. at 75; *Brown*, 520 U.S. at 415. The Fourth Circuit articulated the following analysis:

> We have recognized that, in appropriate circumstances, § 1983 liability may attach to a municipality for the misconduct of its police force. If a police force develops an unconstitutional custom or usage, i.e., a ***widespread practice*** of a ***particular unconstitutional method***, such custom or usage may be the basis for municipal liability, ***but only if*** its continued existence can be laid to the ***fault of municipal policy-makers***, and a ***sufficient casual connection between the municipal custom and usage and the specific violation can then be established***.  In order for liability to attach, (1) the municipality must have actual or constructive knowledge of the custom and usage by its responsible policy makers, and (2) there must be a failure by those policy makers, as a matter of specific intent or deliberate indifference, to correct or terminate the improper custom or usage.

*Randall v. Prince George's Cty.*, 302 F.3d 188, 210 (4th Cir. 2002) (emphasis added) (internal citations and quotations omitted). Therefore, a municipality violates § 1983 under the condonation theory of liability only when policymakers fail "to put a stop to or correct a widespread pattern of unconstitutional conduct." *Owens*, 767 F.3d at 402 (internal quotation marks omitted). The pattern of unconstitutional conduct must be "so permanent and well settled as to constitute a custom or usage with the force of law." *Carter*, 164 F.3d at 218 (internal quotation marks omitted).

Even if a plaintiff is able to provide allegations sufficient to plausibly plead a widespread and flagrant practice of constitutional violations, a complaint must contain sufficient allegations that the municipality was deliberately indifferent to, or was the moving force behind, the alleged violation of the complainant's constitutional rights. Thus, "[a] municipality is not subject to section

13

1983 liability simply because a claimant is able to identify conduct attributable to the municipality." *Riddick*, 238 F.3d at 524. Rather, a municipal actor must have consciously disregarded "a known or obvious consequence" of his action. *See Brown*, 520 U.S. at 410.

Washington fails to demonstrate a necessary persistent widespread practice or that BPD was deliberately indifferent to or consciously disregarded such a practice. Washington's conclusory allegations do not establish the type of widespread and flagrant constitutional violations the *Monell* jurisprudence contemplates. Washington claims BPD had "longstanding policies and practices of pursing wrongful convictions through reliance on profoundly flawed investigations." ECF No. 5 at ¶ 45. Further, "[b]y the time of Mr. Ali's death and the investigation that led to [Washington]'s wrongful arrest and prosecution, those policies were firmly entrenched." *Id.* at ¶ 46. However, Washington provides no factual support for this allegation, but instead makes the speculative and unsupported claim that "nearly" 10% of closed-by-arrest homicide cases were dropped by the State's Attorney's Office prior to indictment. *Id.* at ¶ 47. This is a flimsy attempt to connect this supposed statistic ("*nearly* 10%") to alleged constitutional violations when common sense dictates that cases may be dropped pre-indictment for a wide variety of reasons beyond BPD's control, e.g., lack of witness cooperation, lack of forensic evidence, or other circumstances that initially could lead to an arrest without an indictment, such as clearing a suspect due to justifiable self-defense, a legal determination typically made by the prosecutor, not the individual detective or the police agency itself.

As noted above, Washington cites in support twelve (12) cases, several of which have not yet been adjudicated, investigated by BPD *over a period of more than thirty years*—from 1968 to 2000. ECF No. 5 at ¶¶ 49-60. However, as the case law clearly establishes, "scattershot accusations of unrelated constitutional violations" fail to prove either that a municipality was indifferent to the

risk of [a plaintiff's] specific injury or that it was the moving force behind her deprivation." *Carter*, 164 F.3d at 218. The "meager history of isolated incidents" Washington presents does not "approach the widespread and permanent practice necessary to establish municipal custom." *Id.* at 220. A list of sporadic and isolated instances over the course of more than 30 years is insufficient to meet the "deliberate indifference" standard.

Importantly, all but two of the cases Washington cites occurred *after* the instant case. ECF No. 5 at ¶¶ 49-66. Indeed, one of these two cases occurred in 1968, *almost 20 years* prior to the 1986 murder of Washington's victim. Washington fails to show how a singular investigation occurring *nearly 20 years prior* to the victim's murder would have put BPD on notice *at the time of* Washington's arrest and conviction. Washington must sufficiently plead that BPD had *notice* of the unconstitutional pattern and practice *at the time* and that BPD then consciously disregarded it. Thus, this leaves only one case on which Washington relies to show there was an unconstitutional pattern and practice that BPD disregarded. A single case categorically fails to establish a *persistent and widespread* practice of which BPD would have been on notice *at the relevant time*, that is, the time period immediately leading up to Washington's arrest and conviction

As for the rest of cases Washington cites, such sporadic and isolated incidents would fail to establish the required persistent and widespread practice, let alone one that BPD actively condoned or ignored, even if they did fall within the relevant timeframe. Washington fails to plead how these examples, some of which occurred a decade or more after his arrest and conviction, are relevant to establishing that a persistent and widespread practice was present *at the time of the instant case*, let alone one that BPD actively condoned or ignored.[4]

---

[4] Notably, several of the cases upon which Washington relies are still pending; therefore, although Washington presents these cases as support in favor of BPD's alleged wrongdoing, this is vast overstatement and mischaracterization. There has been no adjudication in these cases, and

In sum, these isolated incidents do not support an inference that BPD had knowledge of and consciously disregarded a risk to the constitutional rights of its citizens. These sporadic and isolated allegations, even if assumed to be true, are insufficient to establish the widespread and prevalent abuse necessary to establish a persistent and widespread practice claim. Thus, these allegations must be dismissed.

## II.     The Amended Complaint fails to state a claim as to MCC.

Washington alleges that MCC is liable under Count V for "*Monell* Policy Claims." ECF No. 5 ¶¶ 119-23. He asserts that "As a direct and proximate result of BPD's and the City's actions, [Washington]'s constitutional rights were violated and he suffered injuries, including but not limited to loss of liberty and psychological and emotional distress." *Id.* at ¶ 122.  However, it is well-established that MCC is not liable under § 1983 (or any other law) for the actions or inactions of BPD or its members. The MCC has no authority to make policy for BPD, or to direct BPD operations—including training, hiring, discipline, and supervision.

The Commissioner is the final policymaker for BPD. This is well-rooted in Maryland law. *See St. Louis v. Praprotnik,* 485 U.S. 112, 124 (1988) ("We begin by reiterating that the identification of policy making officials is a question of state law"). As the Maryland Court of Appeals explained in *Beca v. Baltimore*:

- The authority of the Police Commissioner of Baltimore City to promulgate rules and regulations binding upon members of the Department emanates from Chapter 203 of the Laws of Maryland of 1966, now codified as §§ 16-1 through 16-40 of the Code of Public Local Laws of Baltimore City.

---

therefore, no finding of wrongdoing. *See, e.g.*, *The Estate of Malcolm J. Bryant v. Balt. Police Dep't, et al.*, 1:19-cv-00384-ELH; *Parks v. Balt. Police Dep't, et al.,* 1:18-cv-03092-TDC. Washington further mischaracterizes the Bryant case by failing to note that the conviction in Malcolm Bryant actually was overturned due to DNA testing, not failure to turn over exculpatory evidence as Washington tries to claim. *See* ECF No. 5 at ¶ 57; *Bryant v. Balt. Police Dep't*, 1:19-cv-00384-ELH, ECF No. 1 at ¶ 1, 5, 7.

- Under § 16-2 the Department is constituted as an agency of the State, although under § 16-8 its operations are funded by the City.

- The Police Commissioner of Baltimore City is designated as the chief executive officer of the Department by § 16-4 and its 'affairs and operations' are placed under his supervision and direction.

- Section 16-7 provides, with exceptions not here pertinent, that the Commissioner shall 'be vested with all the powers, rights and privileges attending the responsibility of management, and (he) may exercise the same, where appropriate, by rule, regulation, order, or other departmental directive which shall be binding on all members of the Department when duly promulgated.'

- The authority vested in the Commissioner under § 16-7 includes the power to regulate 'attendance, conduct, . . . and procedure for all members of the Department and to make all other rules, regulations and orders as may be necessary for the good government of the Department and of its members.'

- It also includes the power to 'establish and modify systems . . . (for) the administration, management and operations of the Department.' The Commissioner is empowered under § 16-7(14) 'To suspend, amend, rescind, abrogate or cancel any rule, regulation, order or other departmental directive . . . and to adopt all such other reasonable rules, regulations and orders as he may deem necessary to enable the Department effectively to discharge the duties imposed upon it by this subtitle.'

279 Md. 177, 181 (1977).

In contrast, the Baltimore City Charter makes no mention of the BPD. In fact, Article II of the Charter *forbids* City interference with BPD affairs: "no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner." *Clark v. O'Malley*, 169 Md. App. 408, 428 (2006) (citing Charter, art II, § 27). Additionally, the Maryland Court of Appeals unequivocally stated that "notwithstanding the Mayor's role in appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency" and not an agency of the City. *Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 28 (2008). The City simply "has no power" over the BPD.  *See id.* at 26.

17

With respect to training and discipline in particular, under Maryland law, while the MCC does not have power to discipline members of the BPD, the State can and has set forth rules and regulations for such internal BPD functions as training and discipline. *See, e.g.*, Pub. Loc. Laws of Md. ("PLL"), Art. 4, §§16-7(7); PLL §16-11 "Members – disciplinary proceedings"; Md. Code, Pub. Safety Art., §§ 3-101, *et seq.* ("LEOBR")). As the City has no legal authority to direct the BPD and an express prohibition against interfering with the person who does have such authority is written into the Charter, Maryland law makes it perfectly clear that, in the words of Maryland's highest state court, the City "has no power" over the BPD. *Clark*, 404 Md. at 26; *see also Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 669-70 (1988) ("As a matter of Maryland law, Baltimore City is simply not [the officers'] employer for tort liability purposes.").

Furthermore, this Court explicitly held that MCC is not liable for BPD officers' conduct under § 1983:

> Try as they may, Plaintiffs cannot avoid the mountain of law insisting the City does not sufficiently control the BPD or Baltimore police officers. Neither can this Court. Baltimore police officers are state employees free from the City's supervision and control. The City sets no policy or custom that Baltimore police officers execute, **and the City cannot be liable for the conduct of Officers Strohman, Vodarick, and Boyd under § 1983**.

*Estate of Anderson v. Strohman*, 6 F. Supp.3d 639, 646 (D. Md. 2014) (emphasis added). Judge Bennett further elaborated upon this clarification of the legal landscape:

> As the BPD is a state agency, the City simply does not exert legal control over the BPD within the ambit of Section 1983. *Id.* Earlier opinions of this Court had reached the opposite conclusion. *See, e.g.*, *Brown v. Tshamba*, Civ. A. No. RDB-11-0609, 2011 WL 2935037 (D. Md. July 18, 2011); *Humbert v. O'Malley*, Civ. A. No. WDQ-11-0440, 2011 WL 6019689 (D. Md. Nov. 29, 2011); *Mason v. Mayor & City Council of Balt.*, Civ. A. No. HAR-95-0041, 1995 WL 168037 (D. Md. Mar. 24, 1995); *Wilcher v. Curley*, 519 F. Supp. 1 (D. Md. 1980). Nevertheless, recent opinions of this Court since *Anderson* have held that the City does not sufficiently control the BPD for purposes of Section 1983. *See, e.g.*, *Holloman v. Rawlings-Blake, et al.*, Civ. A. No. CCB-14-1516, 2014 WL 7146974, at *4 (D. Md. Dec. 12,

2014); *Dale v. Mayor and City Council of Balt. City, et al.*, Civ. A. No. WDQ-14-2152, 2015 WL 5521815, at \*3-4 (D. Md. Sept. 15, 2015).

. . . .

Accordingly, this Court recognizes the weight of precedent concluding that the City of Baltimore does not exert sufficient control for purposes of *Monell* liability under Section 1983. Baltimore police officers are state employees free from the City's control. The City sets no policy nor practices for the BPD.

*Burgess v. Balt. Police Dep't*, No. RDB-15-0834, 2016 WL 795975, at \*5-6 (D. Md. Mar. 1, 2016).

As with BPD, Washington cites no policy or practice that any MCC policymaker was actually responsible for and actively condoned in the face of the risk of violating the constitutional rights of its citizens. *See* ECF No. 5 at 74-85, 119-23. This Court should dismiss the claim against MCC because the MCC is not responsible for the actions of BPD or its members and "[m]unicipal liability is limited to action for which the municipality is actually responsible." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986).

## III.    BPD is entitled to Eleventh Amendment immunity.

Defendant BPD is aware of recent decisions denying BPD Eleventh Amendment immunity. *See, e.g.*, *Burley v. Balt. Police Dept.*, 1:18-cv-01743-ELH, ECF Nos. 51, 52 (D. Md. Sept. 12, 2019); *Parks v. Balt. Police Dept.*, 1:18-cv-03092-TDC, ECF No. 86 (D. Md. Sept. 9, 2019). However, counsel for Defendant BPD believes there remains considerable uncertainty regarding liability under *Monell*, especially given the Fourth Circuit has not yet ruled upon whether Eleventh Amendment immunity applies to state agencies such as the BPD. *See Burley*, ECF No. 51 at p. 54 ("To my knowledge, the Fourth Circuit has not directly addressed this issue.").[5]

---

[5] BPD has filed interlocutory appeals in both *Parks* and *Burley*. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 141 (1993) ("The question before the Court is whether a district court order denying a claim by a State or a state entity to Eleventh Amendment immunity from suit in federal court may be appealed under the collateral order doctrine []. We conclude that it may.").

Courts generally look to four factors in determining whether an entity operates as an arm-of-the-State: (1) whether judgments against the entity will be paid by the State; (2) the degree of autonomy exercised by the entity; (3) whether the entity is involved with state concerns; and (4) how the entity is classified under state law. *See, e.g., Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 136-38 (4th Cir. 2014). Previously, the impact of an adverse judgment on the State treasury was considered the most important factor; however, the law has evolved such that no one factor should be given conclusive effect. *Owens*, 767 F.3d at 379 n.5. In fact, the Supreme Court stated that the preeminent purpose of immunity is to "accord the States the respect owed to them as joint sovereigns." *Fed. Maritime Comm'n v. S.C. State Ports Auth.*, 535 U.S. 743, 767 (2002).

As to the factors, first, BPD is a state agency under Maryland law. *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 303 (2001). Second, BPD is involved in state-wide concerns in terms of its use of statewide databases, MOUs with other Maryland police departments, and its holding and cataloging of firearms and other evidence for other police agencies. *See also* PLL § 16-2(b) (outlining duties outside the City in areas controlled or operated by the MCC). In addition, Baltimore welcomes millions of tourists, hosts events (e.g., Camden Yards, First Mariner Arena, Pier 6, National Aquarium) which attract visitors from all across the state. *See e.g.*, *Hill v. Jamestown-Yorktown Found.*, 2019 WL 3084242, at 7 (E.D. Va. Jul. 15, 2019) (finding state-wide concerns in the operation of local museums that had a role in "shaping the fundamental principles of the American constitutional system."). Third, the City does not control the BPD for the reasons stated in *Estate of Anderson v. Strohman*, 6 F. Supp.3d 639 (D. Md. 2014). Although the City

indemnifies BPD officers to the extent required by the LGTCA,[6] the BPD is entirely autonomous

from the City. Abundant legal authority supports this point. *See, e.g.*, Section IV., *supra*, *Estate of*

*Anderson*, 6 F. Supp.3d at 645-46 (stating that the City exercises no control over the actions of

BPD officers, City officials are not responsible for training or disciplining BPD officers, and BPD

officials have "very infrequent contact" with the City.)[7]; Balt. City Charter, Art. II, § 27 ("[N]o

ordinance of the City or Act of any municipal officer shall conflict, impede, obstruct, hinder or

interfere with the powers of the Police Commissioner."); *Adams v. Balt. Transit Co.*, 203 Md. 295,

311 (1953) (emphasis added) ("The power to pass ordinances in regard to the prevention and

removal of nuisances is in the Mayor and City Council but they are deprived of the power of

enforcing them. The enforcement is the duty of the police department **which is under the control**

**of the State**."); *Upshur v. Balt.*, 94 Md. 743, 756 (1902) (". . . municipal authorities have no right

to interfere with that control [of the BPD]"); *Chin v. City of Balt.*, 241 F. Supp.2d 546, 549 (D.

Md. 2003) ("[T]he Baltimore City government does not wield enough control over the Baltimore

Police Department to be subject to liability for the Baltimore Police Department's actions."). As

discussed previously, the BPD is treated as a State agency under Maryland law. Pursuant to the

---

[6] BPD is defined as a "local government" for the limited purposes of the LGTCA, *see* CJP, § 5-301(d)(21), because its employees were excluded from the MTCA. *Houghton v. Forrest*, 412 Md. 578, 589 (2010) (noting that city police are not defined as state personnel under the MTCA, codified at Md. Code, State Gov't Art., §§ 12-101, *et seq.*). This is an idiosyncratic operation of state law, which does not affect BPD's status as a state agency. *See, e.g.*, *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 323 (2001) ("[b]y adding the [BPD] to the list of local governments in the LGTCA, therefore, the General Assembly waived the [BPD's] common law state sovereign immunity only to the extent of the statutory duties to defend and indemnify. Otherwise, the [BPD's] state sovereign immunity remained intact.").

[7] Furthermore, in *Young v. City of Baltimore*, Judge Russell reiterated that "to the extent that *Wilcher* and *Hector* held otherwise, *Anderson* set new precedent and is the controlling law [. . .] the Baltimore City Police are not controlled, managed, or supervised by the City of Baltimore." No. GLR-16-1321, 2017 WL 713860, *2 (D. Md. Feb. 23, 2017).

Public Local Laws of Baltimore City, the City does not have any responsibility for the management

of the BPD and may not adopt any rules or regulations governing the BPD. *See* PLL § 16-7. Fourth,

although the City pays BPD judgments, this factor is not dispositive. *See Harter v. Vernon*, 101

F.3d 334 (4th Cir. 1996). Furthermore, the Public Local Laws allow for the appropriation of funds

by the General Assembly to defend BPD Officers. PLL § 16-13. For these reasons, just as *Monell*

claims are not cognizable for the activities of the Maryland State Police, they are not cognizable

for the activities of BPD, an agency of state government.

Accordingly, the Amended Complaint against BPD should be dismissed with prejudice

and without leave to amend

**IV.     This Court should dismiss Washington's state law claim for indemnification.**

Washington does not have standing to make a claim for indemnification at this juncture.

As noted above, BPD is a state agency, and as such enjoys sovereign immunity against all state

law claims. The Local Government Tort Claims Act ("LGTCA") waives BPD's sovereign

immunity only to the extent that it cannot avoid the duty to defend or indemnify one of its

employees under certain circumstances. Md. Code, Cts. & Jud. Proc., § 5-301 *et seq*.; *see also*

*Cherkes*, 140 Md. App. at 323 ("The sole waiver of immunity provision in the LGTCA is the

waiver of the governmental immunity to avoid the duty to defend or indemnify an employee.").

The LGTCA does not authorize any direct action against a local government covered by the statute.

*See Cherkes*, 140 Md. App. 319 ("noting that CJ '§ 5-403 does not provide a method for directly

suing the County or other local governments,' but, instead, limits 'the liability of local

governments and require[s] them to provide a defense to their employees under certain

circumstances'") (quoting *Williams v. Prince George's Cty*., 112 Md. App. 526, 552 (1996)). The

LGTCA "established a set of legal entitlements and legal obligations between the municipalities

and their employees, not between the municipalities and citizens at large." *Hansen v. City of Laurel*, 420 Md. 670, 677 n.5 (2011).

As already shown, both of Washington's *Monell* claims fail as a matter of law, and they are irrelevant to any state law claim in any event. More fundamentally, Washington's claim for indemnification arises under state law. *Johnson v. Francis*, 239 Md. App. 530 (2018), *cert. denied*, 463 Md. 155 (2019). BPD has sovereign immunity as to all state law claims, and therefore, the Court has no choice but to dismiss the claim for indemnification. *Cherkes*, 140 Md. App. at 326. Sovereign immunity can neither be waived nor abrogated by "judicial fiat." *Sharafeldin*, 382 Md. at 140 ("State agencies may not, on their own, waive sovereign immunity either affirmatively or by failure to plead it.") (citations omitted) (cleaned up). There are no exceptions; thus, state sovereign immunity bars Washington's indemnification claim.

Even if BPD were not immune from suit, the Maryland Court of Special Appeals recently explained the mechanics for the indemnification process. A plaintiff may not pursue a municipality to satisfy a judgment entered against a municipal employee unless and until: 1) the plaintiff has obtained a judgment against that employee; and 2) it is established that the employee was acting within the scope of employment during the commission of the tort. *See Johnson*, 239 Md. App. at 548-55 ("It is the plaintiff's burden to establish its right to collect from the [BPD], either through an enforcement action or some other permissible mechanism. . . . A plaintiff who obtains a judgment against a local government's employee can establish the local government's liability by filing an enforcement action against the local government. In such a proceeding, the local government can raise as a defense that the employee was not acting within the scope of his or her employment."). BPD is immune from suit, but even if that were not true, Washington lacks standing to bring an indemnification claim at this time. Washington has not obtained a judgment

23

against any of the Officer Defendants in this case; nor has it been established whether the Officer Defendants were acting within the scope of their employment. As such, Washington lacks standing to bring the indemnification claim, and this Court should dismiss it.

**V.      Washington cannot claim punitive damages against BPD or MCC under § 1983.**

Finally, Washington's claim for punitive damages against BPD and MCC must fail. As municipalities, BPD and MCC are immune from punitive damages under § 1983. *See City of Newport News v. Facts Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding a municipality is immune from punitive damages under 42 U.S.C. § 1983).

Additionally, punitive damages may be awarded in a § 1983 action only "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983). In *Kolstad v. Ada*, the Supreme Court explained the intent necessary for punitive damages: "[E]ligibility for punitive awards is characterized in terms of a defendant's motive or intent. Indeed, the justification of exemplary damages lies in the evil intent of the defendant. Accordingly, a positive element of conscious wrongdoing is always required." 527 U.S. 526, 538 (1999) (citations and internal quotation marks omitted). Thus, the case law emphasizes the need for bad motive or intent on the part of a defendant. At the very least, there must be conscious wrongdoing.

As explained above, Washington has not alleged and cannot allege *any facts* to show that a BPD custom or policy caused his injury, much less, an evil motive *on the part of BPD or MCC* or the intent *of BPD or MCC* to deprive him of due process, or anything to support a claim for punitive damages. Accordingly, Washington's claims for punitive damages against Defendants BPD and MCC, like the rest of the claims against BPD and MCC, must be dismissed.

## CONCLUSION

For the foregoing reasons, this Court should dismiss all claims against BPD and MCC in their entirety, with prejudice and without leave to amend.

Respectfully submitted,

Andre M. Davis (No. 362)
Baltimore City Solicitor

_____/s/_____
Natalie R. Amato (No. 20749)
Assistant Solicitor

Justin S. Conroy (No. 28480)
Kara K. Lynch (No. 29351)
Chief Solicitors

Baltimore City Law Department
Office of Legal Affairs
100 N. Holliday Street, Room 101
Baltimore, Maryland 21202
Telephone: (410) 396-2495
Facsimile:  (410) 396-2126
Email:  natalie.amato@baltimorecity.gov
          justin.conroy@baltimorecity.gov
          kara.lynch@baltimorepolice.org

*Attorneys for Defendants BPD and MCC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 2, 2019, a copy of the foregoing Memorandum of Law in Support of Defendants Baltimore Police Department and the Mayor and City Council of Baltimore's Motion to Dismiss was filed with the United States District Court for the District of Maryland and forwarded to all counsel of record via CM/ECF.

_____/s/_____
Natalie R. Amato (No. 20749)