# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GARY WASHINGTON,

      Plaintiff

    v.

BALTIMORE POLICE DEPARTMENT, *et al.,*

    Defendants

Case No. 1:19-cv-02473-GLR

Judge Stephanie Gallagher

**JURY TRIAL DEMANDED**

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS BALTIMORE POLICE DEPARTMENT AND MAYOR AND CITY COUNCIL OF BALTIMORE'S MOTION TO DISMISS

Jon Loevy, admitted *pro hac vice*
Gayle Horn, Bar No. 7182
Roshna Bala Keen, admitted *pro hac vice*
Renee Spence, admitted *pro hac vice*
LOEVY & LOEVY
311 North Aberdeen St, 3rd Floor
Chicago, IL 60607
(312) 243-5900 (tel.)
(312) 243-5902 (fax)
*Attorneys for Plaintiff*

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................................1

STATEMENT OF FACTS ............................................................................................................1

The Murder of Faheem Ali............................................................................................................1

Officer Defendants Coerce Otis Robinson into Fabricating Evidence Against Plaintiff .....................2

Officer Defendants Coerce R.D. into Fabricating Evidence Against Plaintiff.................................3

Plaintiff's Wrongful Conviction....................................................................................................4

The Baltimore Police Department's and City's Policy and Practice of Conducting Flawed

Investigations................................................................................................................................5

Plaintiff's Exoneration .................................................................................................................7

STANDARD OF REVIEW............................................................................................................7

LEGAL ARGUMENT....................................................................................................................8

    I.      PLAINTIFF HAS SUFFICIENTLY PLED A *MONELL* CLAIM AGAINST THE

           BPD ...............................................................................................................................8

    II.     PLAINTIFF HAS SUFFICIENTLY PLED A *MONELL* CLAIM AGAINST THE

           MCC ............................................................................................................................15

           A.  Defendant MCC Has Shared Policymaking Authority Over BPD ..............................15

           B.  Plaintiff Has Sufficiently Alleged MCC's Actual Or Constructive Notice of BPD's

               Unconstitutional Policies and Practices.........................................................................21

           C.  Plaintiff Has Properly Pled A *Monell* Claim Under The

               Condonation Theory.......................................................................................................22

    III.    THE BPD IS NOT ENTITLED TO ELEVENTH AMENDMENT

           IMMUNITY ...............................................................................................................23

    IV.    PLAINTIFF'S INDEMNIFICATION CLAIM IS PROPERLY PLED........................28

V.      PUNITIVE DAMAGES ....................................................................................................30

CONCLUSION ........................................................................................................................30

# TABLE OF AUTHORITIES

*Alderman v. Baltimore City Police Dep't*, 952 F. Supp. 256 (D. Md. 1997) ............................................*passim*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....................................................................................8, 11

*Balt. Police Dep't v. Cherkes*, 140 Md. App. 282 (2001) ...................................................................29

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ..........................................................................7, 8

*Bennett v. City of Slidell,* 728 F.2d 762 (5th Cir. 1984) ................................................................15

*Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397 (1997) ...................................9

*Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989) ...................................................................14

*Bowen v. Watkins*, 669 F.2d 979 (5th Cir. 1982) .................................................................... 15, 16

*Brown v. Tshamba*, No. CIV.A. RDB 11-00609, 2011 WL 2935037 (D. Md. July 18, 2011) .......... 25, 28

*Burgess*, 2014 WL 795975..............................................................................................10,13

*Burley v. Balt. Police Dept.*, 1:18-cv-01743-ELH (D. Md. Sept. 12, 2019)...........................................28

*Burley v. Baltimore Police Dep't.*, No. CV ELH-18-1743, 2019 WL 6253251

   (D. Md. Nov. 22, 2019) ........................................................................................................30

*Chin v. City of Baltimore*, 241 F.Supp.2d 546 (D. Md. 2003) ........................................................25

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)................................................................ 15, 21

*Dotson v. Chester*, 937 F.2d 920 (4th Cir. 1991) ........................................................................21

*Edwards v. City of Goldsboro,* 178 F.3d 231 (4th Cir. 1999).......................................................8, 9

*Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670 (D. Md. 2017)..........................................20

*Estate of Anderson v. Stroham*, 6 F.Supp. 639 (D. Md. 2014) ........................................................19

*Fish v. Mayor & City Council of Baltimore*, No. CV CCB-17-1438, 2018 WL 348111

   (D. Md. Jan. 10, 2018)................................................................................................... 25, 28

*Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir. 1985) ...........................................................14

*Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011) ....................................................................12

*Hall v. Baltimore City Police Dep't*, Civ. A. No. RDB-09-333, 2009 WL 3247782

(D. Md. Oct. 6, 2009) ...................................................................................................25

*Harter v. Vernon*, 101 F.3d 334 (4th Cir. 1996) ...........................................................24

*Heck v. Humphrey*, 512 U.S. 477 (1994) .......................................................................14

*Hector v. Weglein*, 558 F. Supp. 194 (D. Md. 1982) .....................................................25

*Henry v. County of Shasta*, 132 F.3d 512 (9th Cir. 1997) .............................................14

*Hill v. Jamestown-Yorktown Foundation*, 2019 WL 3084242 (E.D. Va. July 15, 2019) ...........................27

*Jackson v. Lightsey*, 775 F.3d 170 (4th Cir. 2014) ..........................................................7

*Jackson v. Pena*, 28 F. Supp. 3d 423 (D. Md. 2014) .......................................................8

*Johnson v Francis*, 239 Md. App. 530 (2018) ...............................................................29

*Jones v. Chapman*, No. CIV.A. ELH-14-2627, 2015 WL 4509871 (D. Md. July 24, 2015) ...................10

*Jordan by Jordan v. Jackson*, 15 F.3d 333 (4th Cir. 1994) ...............................................9

*Kemp v. Harris.* No. CV WDQ-08-793, 2008 WL 11363697 (D. Md. Nov. 12, 2008) ...........................25

*Kibbe v. City of Springfield*, 777 F.2d 801 (1st Cir. 1985) .............................................14

*Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit,* 507 U.S. 163 (1993) ...................8

*Lucero v. Early*, No. CV GLR-13-1036, 2019 WL 4673448 (D. Md. Sept. 25, 2019) ................... 18, 20

*Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017) ...................................................14

*Manuel v. City of Joliet, Ill.,* 903 F.3d 667 (7th Cir. 2018) ...........................................14

*McDowell v. Grimes* No. GLR-17-3200, 2018 WL 3756727 (D. Md. Aug. 7, 2018) ...........................11

*Medina v. Chicago*, 100 F. Supp. 2d 893, 896 (N.D. Ill. 2000) .........................................28

*Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658 (1978) ...................................*passim*

*Monterey v. Del Monte Dunes*, 526 U.S. 687 (1999) .......................................................27

*Munyiri v. Haduch*, 585 F.Supp.2d. 670 (D. Md. 2008) ...................................................25

*Owen v. City of Indep., Mo.*, 445 U.S. 662 (1980) .........................................................27

*Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014) ...................*passim*

*Padilla v. City of Chicago*, No. 06-C-5462, 2009 WL 4891943 (N.D. Ill. Dec. 14, 2009) ...........................14

*Parks v. Balt. Police Dept.*, 1:18-cv-03092-TDC, ECF No. 86 (D.M.D. Sept. 9, 2019) ...................*passim*

*Pembaur v. City of Cincinnati,* 475 U.S. 469 (1986)........................................................................15

*Peprah v.* Williams, 2019 WL 224245 (D. Md. Jan. 15, 2019)............................................. 10, 11

*Preiser v. Rodriguez,* 411 U.S. 475, 500 (1973) ..............................................................................14

*Presley v. City of Charlottesville*, 464 F.3d 480 (4th Cir. 2006) ....................................................7, 8

*Ram Ditta v. Maryland Nat'l Capital Park and Planning Comm.,* 822 F.2d 456 (4th Cir. 1987) ................24

*Republican Party of N.C. v. Martin*, 980 F.2d 943 (4th Cir. 1992)....................................................7

*Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518 (4th Cir. 2000)......................................9, 16

*Rockwell v. Mayor & City Council of Baltimore,* No. CIV.A. RDB-13-3049, 2014 WL 949859

    (D. Md. Mar. 11, 2014) ....................................................................................................... 25, 28

*Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) ..........................................................................14

*Sherrod v. Berry*, 827 F.2d 195 (7th Cir.1987)...............................................................................14

*Smith v. Baltimore City Police Dep't*, No. CV MJG-13-1352, 2014 WL 12675230

    (D. Md. Mar. 25, 2014) ..............................................................................................................12

*Spell v. McDaniel*, 824 F.2d 1380 (4th Cir. 1987) .........................................................................23

*Swanigan v City of Chicago*, 775 F.3d 953 (7th Cir. 2015) .............................................................28

*United States of America v. Baltimore Police Dept. et al.,* No. JKB-17-0099 (D. Md. 2017) ..........18

*Wallace v. Kato,* 549 U.S. 384 (2007).............................................................................................15

*Wellington v. Daniels,* 717 F.2d 932 (4th Cir. 1983) ....................................................................11

*Wilcher v. Curley*, 519 F. Supp. 1 (D. Md. 1980)...........................................................................22

*Wright v. N. Carolina*, 787 F.3d 256 (4th Cir. 2015) .......................................................................7

*Wyatt v. Cole*, 504 U.S. 158 (1992).................................................................................................28

**Statutes**

42 U.S.C. § 1979.................................................................................................................................8

42 U.S.C. § 1983.......................................................................................................................*passim*

Md. Code Ann., Cts. & Jud. Proc § 5-303(b)(2) ...........................................................29

Md. Code Ann., Cts. & Jud. Proc. § 5-303(2) ...........................................................26

Md. Public Local Laws art. 4, §§ 16-5, 16-8, 16-9 ....................................................26

# INTRODUCTION

In 1987, Plaintiff Gary Washington was wrongfully convicted of the murder of Faheem Ali. By the time he was exonerated for this crime, Plaintiff had endured more than 30 years in prison. As alleged in his Complaint, Plaintiff's wrongful conviction was not the product of chance or honest mistake, but instead, the result of the Defendants fabricating evidence and coercing child witnesses to falsely identify Plaintiff as Mr. Ali's killer. Unfortunately for Plaintiff, the misconduct that led to his wrongful conviction was not an isolated instance, but the foreseeable product of the Baltimore Police Department's ("BPD") deficient training, policies, and practices. The Mayor and City Council of Baltimore ("MCC") knew about BPD's deficiencies failed to act to prevent Plaintiff from being harmed.

Plaintiff has brought this lawsuit to rectify the grave injustice he has suffered, to vindicate his constitutional rights, and to redress the loss of liberty and hardship that the Defendants have caused. Before this Court are Defendants BPD and MCC's Motion to Dismiss. ECF No. 29-1. Their motion asserts that (1) the Amended Complaint fails to sufficiently state a *Monell* claim against the BPD; (2) the Amended Complaint fails to state a claim against the MCC; (3) the BPD cannot be sued under § 1983 because of Eleventh Amendment immunity; (4) Plaintiff's detention without probable cause claim is time-barred; (5) Plaintiff lacks standing to bring an indemnification claim; and (6) Plaintiff cannot claim punitive damages against the BPD and the MCC under § 1983. None of these arguments have merit, and Plaintiff should be permitted to proceed with discovery on his municipal liability claims against BPD and MCC.

## STATEMENT OF FACTS

### The Murder of Faheem Ali

On December 27, 1986, Faheem Ali ("the victim") was conversing with two men on the 2300 block of Barclay Street when the conversation escalated into an argument. ECF No. 5 at ¶ 12.

During the argument, one of the men pulled out a gun and shot the victim in the chest. *Id.* The victim died as a result of the shooting and the two men fled. *Id.* The Officer Defendants launched an investigation shortly after the shooting took place. *Id.* at ¶ 13-14. During the investigation the officers were unable to recover items of evidentiary value or locate witnesses who could identify the shooter or the man who accompanied the shooter. *Id.* at ¶ 14-15. The Officer Defendants did, however, locate two children who said they saw two men speaking to the victim before he was shot. *Id.* at ¶ 16. Both children stated that they did not know who shot the man, however. *Id.*

**Officer Defendants Coerce Otis Robinson into Fabricating Evidence Against Plaintiff**

One of the child witnesses the Officer Defendants identified was a twelve-year-old seventh grader named Otis Robinson. *Id.* at ¶ 17. At or around 7:30pm, on the night of the shooting, Otis was outside on the way to the store. *Id.* at ¶ 18. While outside, Otis casually noticed men standing across the street talking. *Id.* Soon after noticing the men, Otis heard a gunshot. *Id.* Otis ran and was able to make it safely back into his mother's boyfriend's house. *Id.* After the incident, Otis's mother took her frightened son to his grandparents' house for the night. *Id.* at ¶ 19. While Otis was at his grandparents' house, the Officer Defendants went to his mother's house and threatened to take Otis away if she did not bring him to the station within 24 hours. *Id.*

Otis went to the police station two days after the shooting. *Id.* at ¶ 20. Once there, he was separated from his mother and put in a room alone for questioning. *Id.* Under questioning, Otis provided the Officer Defendants with a truthful statement - he had heard men talking and heard a gunshot, but did not know who the men were or who fired the shot. *Id.* at ¶21. The Officer Defendants wrote down his truthful statement. *Id.* During questioning the Officer Defendants showed Otis pictures, one of which was of Plaintiff. *Id.* at ¶ 22. The Officer Defendants asked if Otis recognized the people in the pictures. Otis affirmed that he knew Plaintiff, but Otis never said Plaintiff was involved in the crime. *Id.* Throughout the questioning, Otis steadfastly maintained that

he did not see who shot the victim. *Id.* at ¶ 23. Unsatisfied with that answer, the Officer Defendants began threatening him. *Id.* The Officer Defendants demanded that Otis identify the shooter or else they would take him away from his mother. *Id.* The Officer Defendants also threatened that Otis would be charged with homicide if he did not bend to their wishes. *Id.* Afraid and removed from his mother, the twelve-year-old crumbled under the pressure. *Id.* at ¶ 24. The Officer Defendants wrote a new statement and fed Otis details about the crime. *Id.* The Officer Defendants coerced Otis into agreeing to their lies, falsely identifying Plaintiff as the shooter, an identification they knew to be false. *Id.* at ¶ 24. Only after he signed the fabricated statement was Otis allowed to see his mother. *Id.*

Sometime after Otis gave the fabricated statement he returned to the police station. *Id.* at ¶ 25. Because Otis believed the Officer Defendants would make good on their threats, he signed a second fabricated statement. *Id.* The Officer Defendants knew they fed false statements to Otis about the shooting and knew he could not identify the shooter. *Id.* at ¶ 26. The Officer Defendants never disclosed any of the coercion that they used to obtain Otis's fabricated statement to the prosecutor or the defense. *Id.* at ¶ 27. Further, the Officer Defendants never disclosed Otis's initial statement denying knowledge of the shooter's identity to the prosecutor or the defense. *Id.*

**Officer Defendants Coerce R.D. into Fabricating Evidence Against Plaintiff**

On the night of the murder, thirteen-year-old R.D. was standing in the crowd near the crime scene. *Id.* at ¶ 28. When the Officer Defendants arrived on the scene, they isolated R.D. and began questioning her about what she witnessed. R.D. told the truth – she did not know who shot Faheem Ali. *Id.* at ¶ 29. She affirmed that she knew Plaintiff but never said Plaintiff was involved in the crime. *Id.*

On January 3, 1987, the Officer Defendants had R.D. come to the station with her mother. *Id.* at ¶ 30. Just as they had done for Otis, the Officer Defendants, including Defendants Requer and

Pellegrini, isolated R.D., demanded that she "cooperate" with their investigation, and threatened to take her away from her mother and even to arrest her mother. *Id.* The Officer Defendants fed R.D. lies that were consistent with their concocted theory of the case. *Id.* R.D., alone and afraid, agreed to sign the fabricated statement falsely identifying Plaintiff as the shooter. *Id.* The Officer Defendants presented R.D. with photographs and pressed her to sign her name next to Plaintiff's picture. *Id.* After she. complied with the Officer Defendants' wishes, she was permitted to see her mother. *Id.* The Officer Defendants knew R.D. had not seen the shooter, and knew that her statement identifying Plaintiff as the shooter was false. *Id.* at ¶ 32. The Officer Defendants never disclosed any of the coercion that they used to obtain R.D.'s fabricated statement to the prosecutor or the defense. *Id.* at ¶ 33. Further, the Officer Defendants never disclosed R.D.'s initial statement denying knowledge of the shooter's identity to the prosecutor or the defense. *Id.*

## Plaintiff's Wrongful Conviction

On January 5, 1987, under the supervision of Defendant John MacGillivary, the Officer Defendants used the two fabricated witness statements to obtain a warrant for Gary Washington's arrest. *Id.* at ¶ 34. On January 6, 1987, Gary Washington was arrested and indicted for first-degree murder and using a handgun in the commission of a crime of violence, based on the two fabricated witness statements. *Id.* at ¶ 35. On June 4, 1987, Defendant Pellegrini testified at a motion to suppress and committed perjury by testifying that Otis's and R.D.'s witness statements and identifications were obtained freely and voluntarily. *Id.* at ¶ 36. On June 5, 1987, Plaintiff went to trial where the only evidence that linked Plaintiff to the crime came from Otis Robinson. *Id.* at ¶ 37. Otis testified consistently with his fabricated statement. *Id.* The State presented no additional eyewitnesses and no physical evidence connecting Plaintiff to Mr. Ali's murder. *Id.* Because Plaintiff's counsel was never given the original truthful statement Otis provided the Officer Defendants or informed of the coercive tactics the Officer Defendants employed to extract the

fabricated statements and untruthful identification, Plaintiff's counsel was unable to present this information to the jury. *Id.* at ¶ 38. On June 16, 1987, Plaintiff was convicted of both counts. *Id.* at ¶ 39. Plaintiff was sentenced to life imprisonment followed by 20 years. *Id.* at ¶ 40.

### The Baltimore Police Department's and City's Policy and Practice of Conducting Flawed Investigations

The constitutional violations that caused Plaintiff's wrongful convictions were not isolated events. *Id.* at ¶ 45. To the contrary, they were the result of the BPD's longstanding policies and practices of pursuing wrongful convictions through reliance on profoundly flawed investigations. *Id.* By the time of Mr. Ali's death and the investigation that led to Plaintiff's wrongful arrest and prosecution, those policies were firmly entrenched. *Id.* at ¶ 46.

For example, in 1988, a year after Plaintiff's convictions, nearly 10 percent of Baltimore's 234 homicides were cleared by the BPD through arrest but later dropped by the State's Attorney's Office prior to indictment. *Id.* at ¶ 47. Other times, however, the BPD's unconstitutional conduct was not exposed until long after a prosecution and a conviction had been obtained. *Id.* at ¶ 48. Plaintiff's Amended Complaint provided detailed factual allegations about 13 other, similar wrongful convictions in which the same unconstitutional acts were taken by BPD officers--allegations which if credited at the pleadings stage, as they must be, reveal a harrowing and long-standing pattern of building false cases against criminal suspects through witness manipulation, fabrication of false evidence, and suppression of material exculpatory evidence. *Id.* at ¶¶ 49-62.

Indeed, in 2000 BPD finally acknowledged that the Homicide Unit was in a state of disarray. *Id.* at ¶ 63. As such, in January 2000, then-Commissioner Daniel asked BPD officer Stephen Tabeling to prepare a report on the state of the Unit ("Tabeling Report"). *Id.* In that report, Tabeling found that investigatory files were in a general state of disarray; that there was no procedure for ensuring that all material about an investigation had been recorded and filed appropriately; and that

the Unit's practices with the assembly, storage, retrieval, confidentiality, and security of case folders was highly deficient. *Id.* Consistent with the municipal policies and practices described in the cases referenced in the preceding paragraphs as well as others, Officer Defendants in this case fabricated eyewitness statements and concealed exculpatory and impeachment evidence, including Otis's and R.D.'s initial truthful statements, and the coercive tactics that the Officer Defendants used on these witnesses to secure their fabricated statements. *Id.* at ¶ 64. None of this evidence was disclosed to the State or to Plaintiff's trial counsel. *Id.*

Plaintiff alleged that policymakers were deliberately indifferent to the violations of constitutional rights described herein, and they condoned the practices described above. *Id.* at ¶65. By condoning these practices, policymakers caused Plaintiff's injuries. *Id.* The BPD failed to act to remedy the abuses described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. *Id.* at ¶ 66. It thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries. *Id.*

Finally, the policies and practices described above were also caused by the Department's failure to train, supervise and discipline its police officers. *Id.* at ¶67. That failure effectively condoned, ratified and sanctioned the type of misconduct that the Defendants committed against Plaintiff. *Id.* at ¶68. That failure effectively condoned, ratified and sanctioned the type of misconduct that the Defendants committed against Plaintiff. *Id.* In particular, Plaintiff alleged that BPD failed during the time period when Mr. Ali's homicide investigation was occurring to train police employees on the specific subjects of "disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and that case's progeny and extensions, notwithstanding the obvious necessity of such training." *Id.* at ¶70. BPD also failed to "properly supervise and discipline its police employees" and "[a]s a result, employees continued to violate citizens' rights" as described in the complaint.

**Plaintiff's Exoneration**

Almost ten years after Plaintiff was convicted, Otis Robinson recanted his testimony, explaining that the Officer Defendants coerced him into making false statements against Plaintiff. *Id.* at 41. On August 20, 2018, the Circuit Court for Baltimore City granted Plaintiff's petition for a writ of actual innocence, finding that Otis's recantation was credible. *Id.* at 42. On January 15, 2019, the State dismissed the charges against Plaintiff, and Plaintiff, for the first time in over 30 years, was able to walk free. *Id.* at 43.

**STANDARD OF REVIEW**

This Court should deny Defendants' motions to dismiss if Plaintiff's Complaint satisfies Rule 8's liberal pleading standard, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. ("Rule") 8(a). "Specific facts are not necessary; the statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)) (internal quotation marks omitted). The Court assumes that facts in the complaint are true and construes them in the light most favorable to Plaintiff. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Importantly, "[t]he purpose of Rule 12(b)(6) is to test the sufficiency of a complaint and not to resolve contests surrounding the facts[.]" *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (citation and internal quotation marks omitted). The Fourth Circuit recently reminded courts "not to confuse evidentiary standards that govern plaintiffs' burden at summary judgment with the liberal pleading requirements established by Rule 8(a)." *Wright v. N. Carolina*, 787 F.3d 256, n.4 (4th Cir. 2015). The Court's "task is to determine whether Plaintiffs have pled a plausible violation" of Plaintiff's rights. *Id.*

Withstanding a motion to dismiss does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This is no less true for *Monell* allegations. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993)("We granted certiorari to decide whether a federal court may apply a "heightened pleading standard"—more stringent than the usual pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure—in civil rights cases alleging municipal liability under Rev.Stat. § 1979, 42 U.S.C. § 1983. We hold it may not."); *Jackson v. Pena*, 28 F. Supp. 3d 423, 433 (D. Md. 2014) (denying BPD's motion to dismiss, which relied on *Iqbal*, and noting that a "plaintiff's municipal liability claim is not subject to a heightened pleading standard."). . And where, as here, a "defendant seeks dismissal of a civil rights complaint, '[the Court] must be especially solicitous of the wrongs alleged' and 'must not dismiss the complaint unless it appears with certainty that plaintiff would not be entitled to relief *under any legal theory which might plausibly be suggested by the facts.*'" *Presley*, 464 F.3d at 483 (quoting *Edwards v. City of Goldsboro,* 178 F.3d 231, 244 (4th Cir. 1999)) (emphasis in original). Plaintiff has plausibly pled obvious violations of his rights protected by the U.S. Constitution and Maryland law. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Plaintiff's complaint easily satisfies Rule 8's standard.

## LEGAL ARGUMENT

## VI. PLAINTIFF HAS SUFFICIENTLY PLED A *MONELL* CLAIM AGAINST THE BPD.

Plaintiff alleges that BPD is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), for policies and practices that were the moving force behind the Individual Defendants' constitutional violations that led to Plaintiff's wrongful conviction, as well as for failing to provide necessary training on certain important constitutional obligations. BPD asks for dismissal of

Plaintiff's *Monell* claims, contending that Plaintiff has not adequately pleaded facts sufficient to warrant discovery. As Fourth Circuit law holds, however, the requirements for pleading *Monell* claims are thin and Plaintiff's allegations more than meet that threshold. There is no basis for dismissal of Plaintiff's *Monell* claims.

A government entity is liable under § 1983 "if it follows a custom, policy, or practice by which local officials violate a plaintiff's constitutional rights." *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014). "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier. *Id.* at 403. Defendants' motion to dismiss Plaintiff's *Monell* claims for failure to state a claim can succeed only where the complaint is conclusory or "formulaically recites the elements of his § 1983 cause of action." *Id.* at 403. For a complaint of municipal liability under § 1983 to withstand a motion to dismiss, plaintiffs need not refer to more than a single incident of misconduct. *Jordan by Jordan v. Jackson*, 15 F.3d 333, 337 (4th Cir. 1994) ("[W]e disagree that appellants were required to allege more than one incident of misconduct in order to withstand a motion to dismiss under Rule 12(b)(6)"); *Edwards*, 178 F.3d at 245. Instead, Plaintiff must only allege an injury "caused by an identifiable municipal policy or custom." *Riddick*, 238 F.3d at 522; *see also Board of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997).

Plaintiff's *Monell* allegations satisfy these pleading requirements. Plaintiff alleges the existence of policies and practices within the BPD that led to police officers engaging in investigative practices that resulted in constitutional errors. The complaint describes BPD detectives testifying in connection with a 1994 investigation (just six years after the Ali homicide) that "BPD policies and practices did not require detectives to document investigative steps, record all evidence in official reports or turn all documents over to prosecutors"—the very misconduct Plaintiff alleged occurred in his case. *See* ECF No. 5, ¶54. Indeed, the complaint explains that former BPD officer Stephen

Tabeling conducted an audit of the homicide unit ("Tabeling Report") and discovered that the unit was in disarray: there was no way to ensure that information was recorded or disclosed to the prosecutors. *Id.* ¶ 63. Moreover, the Complaint offers thirteen individuals who were each wrongfully convicted due to the same type of misconduct by the BPD. *Id.* ¶¶ 49-60. Particularly coupled with the testimony from BPD detectives and the Tabeling Report, these examples are more than enough to satisfy Rule 8's pleading standard. *See Burgess*, 2014 WL 795975, at *12 (finding four examples in other cases sufficient for pleading *Monell* claim).

In order to state a claim on the theory that BPD Defendants failed to train, the Plaintiff must plead "facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training." *Peprah v. Williams*, No. CV GLR-18-990, 2019 WL 224245, at *6 (D. Md. Jan. 15, 2019) (quoting *Jones v. Chapman*, No. CIV.A. ELH-14-2627, 2015 WL 4509871, at *18 (D. Md. July 24, 2015)) (internal quotation marks omitted). Plaintiff must "allege a specific deficiency in the training." *Id.* BPD Defendants argue that Plaintiff has not properly stated a failure to train, discipline, and supervise *Monell* claim because he does not allege enough facts about the training program or point to any specific deficiencies in the training, but instead makes barebones and conclusory allegations. This is simply not true.

Plaintiff's Complaint not only identified the deficiencies in BPD's training, but also provided factual support for that deficiency. For instance, Plaintiff explained that the Tabeling Report found "numerous deficiencies in training, including in many basic legal and investigative concepts." *Id.* ¶ 69. For example, "there was a failure during the relevant time period to train police employees on disclosing evidence and complying with their obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and that case's progeny and extensions, notwithstanding the obvious necessity of such training." *Id.* ¶ 70. Moreover, as described above, and as further proof of the deficient training

on *Brady*, Plaintiff alleged that there were thirteen other examples of wrongful convictions that resulted from similar due process violations, and that Plaintiff's wrongful conviction was the specific result of the policies and practices, and deficient training also described above. Dckt No. 5, ¶¶ 49-68. That is more than enough specificity to state a claim under *Monell. See Owens,* 767 F.3d at 403-04; *Peprah v.* Williams, 2019 WL 224245, at *6 (D. Md. Jan. 15, 2019). At this stage -- before discovery has commenced -- Plaintiff cannot be tasked with proving his failure to train claim, but that is in essence what Defendants attempt through their motion. Finally, BPD's failure to supervise and discipline can be reasonably inferred from its widespread practice of failing to turn over exculpatory information. *See* Dckt No. 1, ¶¶ 49-68, 71-72; *see also Wellington v. Daniels,* 717 F.2d 932, 937 (4th Cir. 1983) (noting that in situations where there is a history of widespread abuse, knowledge can be inferred), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("[A] claim has facial plausibility when the pleaded content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.").

BPD's use of *McDowell v. Grimes* to support its position is inapplicable here. No. GLR-17-3200, 2018 WL 3756727 (D. Md. Aug. 7, 2018). In *McDowell*, the plaintiff was beaten and choked by the Baltimore police while walking across the street. The violent treatment resulted in plaintiff having a seizure, losing consciousness, and going to the hospital to seek medical attention for her injuries. Plaintiff filed a lawsuit and raised a *Monell* claim under multiple theories, one of which was failure to train. *Id.* at 5. To support her failure to train claim, she did not identify the deficiency in the officers' training, but instead stated that "BPD failed to adequately train its officers to not arrest without probable cause, file false charge, and use excessive force against citizens." *Id.* The court found that without factual detail about the training program, plaintiff failed to state a claim. *Id.* Those allegations are a far cry from what Plaintiff has lodged here: a failure to train claim, which specified the nature of the failure, and also is supported factually by a contemporaneous report

commissioned by the very Defendant—BPD—challenging the failure to train claim here.

Taking a step back, Defendants' arguments about both the training and custom/usage claims ignore *Owens*, the dispositive Fourth Circuit case on this issue. In *Owens*, the plaintiff alleged that the BPD had a "'custom, policy and/or practice' of condoning its officers' conduct in 'knowingly, consciously and repeatedly with[holding] and suppress[ing]' exculpatory evidence." *Id.* at 402. In support of that allegation, the plaintiff offered the following two facts: (1) "that '[r]eported and unreported cases from the period of time before and during the events complained of' establish that BPD had a custom, policy, or practice" of withholding evidence and (2) "that 'a number of motions were filed and granted during this time period,'" also demonstrating the existence of BPD's unlawful practice. *Id.* at 403.

The defendants in *Owens* sought to dismiss plaintiff's *Monell* claim arguing that it offered "nothing more than 'unadorned, the-defendants-unlawfully-harmed-me accusation[s].'" *Id.* The Fourth Circuit, however, rejected that challenge. It held that "[t]he assertions as to 'repeated and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim." *Id*; *see also id.* ("Owens has alleged facts—the existence of 'reported and unreported cases' and 'numerous successful motions'—which, if true, would buttress his legal conclusion."); *see also Haley v. City of Boston*, 657 F.3d 39, 53 (1st Cir. 2011) (finding alleged and unidentified "volume of cases" stated plausible *Monell* claim).

The same result should obtain here. Indeed, Plaintiff's *Monell* allegations go far beyond that which was offered in *Owens*. For example, Plaintiff not only alleged the existence of "other cases" in which evidence was withheld, but also identified thirteen specific incidents where this occurred. Plaintiff also alleged that BPD officers did so "in a race to clear murder cases" which required them to "cut corners and rush[] to judgment." ECF No. 5 at ¶ 46. Those allegations more than meet *Owens* threshold. *See also Smith v. Baltimore City Police Dep't*, No. CV MJG-13-1352, 2014 WL 12675230

(D. Md. Mar. 25, 2014) (finding that plaintiff alleging that there were "numerous examples in recent years of the BCPD confiscating cameras or other recording devices belonging to citizens who recorded law enforcement officials performing in their official duties in public" sufficiently stated a *Monell* claim under the policy theory), *Burgess*, 2014 WL 795975, at *12 ("In this case, Burgess' allegations sufficiently plead a policy or practice of withholding and/or fabricating evidence. He alleges that employees of BPD 'systematically suppressed *Brady* material,' as illustrated by the examples of Wendell Griffin, James Owens, and Antoine Pettiford.").

Finally, Defendants make a handful of arguments specific to the widespread practice claim, but none withstand scrutiny. First, BPD argues that Plaintiff cannot allege an unconstitutional custom by citing to a "meager history of isolated incidents." ECF No. 29-1 at 13. Plaintiff has alleged thirteen separate individuals, not including himself, who were convicted of crimes they did not commit, all based on an entrenched practice within BPD of falsifying evidence. The complaint makes clear, moreover, that these allegations are illustrative of a broader pattern and not an exhaustive list. These allegations, if credited, reflecting a staggering amount of misconduct, despite BPD's attempt at minimization.

Second, BPD disputes the accuracy of the facts alleged, a prohibited approach at the pleadings stage. *See, e.g.,* ECF No. 29-1 at 14 (characterizing plaintiff's detailed allegation that 10% of BPD's homicide arrestees did not get prosecuted as "speculative" and "unsupported").

Finally, BPD attempts to jettison several of Plaintiff's other examples of misconduct based on the date they occurred. For instance, they claim that only two examples occurred before Plaintiff's conviction. That is inaccurate. Plaintiff provided factual allegations about cases from 1968, 1981, and three convictions from 1988--all of which certainly would have involved investigations that overlapped with, or were close in time to, the Ali homicide investigation of 1986-87. ECF No. 5 at ¶¶51-53. The remaining examples all occurred within the 1990s, examples which can be used to

prove deliberate indifference, as well as the existence of customs in the late 1980s for which no corrective action was ever taken. *See, e.g., Bordanaro v. McLeod*, 871 F.2d 1151 (1st Cir. 1989); *Salvato v. Miley*, 790 F.3d 1286, 1297 (11th Cir. 2015) ("[p]ost-event evidence can shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right, " and inferences from such post-event facts "lend weight to a finding that there was a policy behind the actions which led to the constitutional violation" (quoting *Bordanaro*, 871 F.2d at1167, and *Kibbe v. City of Springfield*, 777 F.2d 801, 809 (1st Cir. 1985) (internal quotes omitted)); *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997); *Beck v. City of Pittsburg*, 89 F.3d 966, 972 (3d. Cir. 1996) (explaining that subsequent events "may have evidentiary value for a jury's consideration whether the City and policymakers had a pattern of tacitly approving the use of excessive force"); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985); *Padilla v. City of Chicago*, No. 06-C-5462, 2009 WL 4891943 at \*7 (N.D. Ill. Dec. 14, 2009) ("The Seventh Circuit has recognized that "subsequent conduct by a municipal policymaker may be used to prove preexisting disposition and policy." (citing *Sherrod v. Berry*, 827 F.2d 195, 205 (7th Cir.1987), *vacated on other grounds*, 835 F.2d 1222 (7th Cir.1988)"). [1]

---

[1] Defendants make a cursory argument that Count III is time-barred, *see* ECF No. 29-1, n. 1, but in so doing mischaracterize Plaintiff's claim. Plaintiff's claim is one for detention without probable cause purusant to legal process. This Fourth Amendment claim was most recently expaliend in *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017). Unlike a false arrest claim, which challenges a seizure alone, the "*Manuel*" claim challenges the ensuing detention pursuant to legal process. Plaintiff could not raise his Fourth Amendment detention without probable cause claim until his detention ended. *See Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973) (holding that "when a state prisoner is challenging the very fact or duration of his physical imprisonment, and the relief he seeks is a determination that he is entitled to immediate release or a speedier release from that imprisonment, his sole federal remedy is a writ of habeas corpus"); *Heck v. Humphrey*, 512 U.S. 477, 487 (1994) (instructing that "when a prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."). Plaintiff filed suit within the three-year limitations period following his release on January 15, 2019. ECF No. 5 at ¶ 43; *see Manuel v. City of Joliet, Illinois,* 903 F.3d 667 (7th Cir. 2018) (holding that because the petitioner's challenged detention was judicially authorized and he was challenging the fact of his detention, he could not sue until after he was released and thus, his claim did not accrue until after he was released).

In short, at the pleadings stage, *Owens* and the authorities cited above show that Plaintiff's allegations of municipal liability state a claim. Defendants' motion should be denied.

## VII.   PLAINTIFF HAS SUFFICIENTLY PLED A *MONELL* CLAIM AGAINST THE MCC.

The Defendants' argument that the MCC is not responsible for the actions of the BPD or the BPD's members is wrong on both the facts and the law.

### A.   Defendant MCC Has Shared Policymaking Authority Over BPD

A local government may be sued under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to present official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978).  *See also Pembaur v. City of Cincinnati,* 475 U.S. 469, 484 (1986) (defining policy as when an official(s) responsible for establishing final policy make a deliberate choice to follow a course of action in the face of alternatives); *Bowen v. Watkins,* 669 F.2d 979, 989 (5th Cir. 1982) (noting that "[w]hen an official has final authority in a matter involving the selection of goals or of means of achieving goals, his choices represent governmental policy."). "Authority to make municipal policy . . . may be delegated by an official who possesses such authority." *Id.* at 483. More germane here, "there will be cases in which policymaking responsibility is shared among more than one official or body." *City of St. Louis v. Praprotnik,* 485 U.S. 112, 126 (1988). A governing body may delegate policymaking authority through its conduct or practice which encourages or acknowledges the agent's policymaking function. *See Bennett v. City of Slidell,* 728 F.2d 762, 769 (5th Cir. 1984). When there has been a delegation of authority, the court

---

The Defendants' citation to *Wallace v. Kato,* 549 U.S. 384 (2007), is inapplicable because the reasoning in *Wallace* only pertains to cases where a defendant is detained without legal process. *See id* at 389 (noting that false arrest and false imprisonment overlap and "the tort of false imprisonment is detention *without legal process*") (emphasis original). That was not the case with Plaintiff, who was arrested, detained, and indicted on the basis of falsified evidence.

can determine whether the agent's decisions represent government policy by examining how often the governing body defers to the agent. *See Bowen v. Watkins*, 669 F.2d 979, 989 (5th Cir. 1982) (noting that if the authorized body has the power to overrule a decision but substantially defers to the original decision-maker, the original decision may be viewed as the government's policy). The court can also look to "the relevant legal materials, including state and local positive law, as well as custom or usage having the force of law." *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000) (internal quotation marks omitted).

In *Lucero v. Early*, the MCC and the BPD jointly formulated a policy that restricted the actions of protestors. *Lucero v. Early*, No. CV GLR-13-1036, 2019 WL 4673448, at *1 (D. Md. Sept. 25, 2019) (Russell, J.). The plaintiff was arrested pursuant to this policy and sued the MCC and the BPD for violating his constitutional rights under § 1983 under a theory of municipal liability. *Id.* The court found that the MCC had policymaking authority because the Chief City Solicitors (1) created the policy; (2) had final decision-making authority in-fact over matters under their purview; and (3) the BPD employees implemented or caused the policy to be implemented. *Id.* at 7. Under these facts, the court held that the plaintiff has plausibly alleged that the BPD and the MCC's collaboration made the MCC policymakers under the "custom and usage having the force of law" analysis. *Id.*

Much like in *Lucero,* Plaintiff has alleged facts that demonstrate the many ways the BPD and the MCC have collaborated to make policies, which has resulted in MCC becoming a co-policymaker. For starters, the Mayor is the person who hires and fires the Commissioner. ECF No. 5 at ¶ 75. Furthermore, at or near the time of Plaintiff's case, the Mayor directed BPD's management and investigation of homicides, ensuring that the Police Commissioner ran the Homicide Department in the manner the Mayor saw fit. ECF No. 5 at ¶ 76. In the years following Plaintiff's case, Baltimore City's mayors more publicly demonstrated their shared policymaking authority by

commissioning studies to investigate the BPD and report on the BPD's policies with the explicit goal of ridding the BPD of corruption and bringing forth reform, cutting the BPD's training program, and initiating a body camera pilot program for officers. *Id.* at ¶¶ 77-79. In all of these examples, the BPD deferred to the MCC and caused the MCC's decisions policies to be implemented.

The City determines the BPD's budget and authorizes the number of the BPD's members. *Id.* at ¶ 78. Through the purse strings, the Mayor is also able to control how the BPD spends its money, manages its hiring practices and complies with the Mayor's directions. *Id.* For example, in 1993, then-Mayor Kurt Schmoke sent BPD a directive, instructing the BPD to cut the Academy's training program and hire 330 new officers. *Id.* This directive was adopted even though many in the law enforcement community predicted that the trickle-down effect of the Mayor's directive would negatively impact the BPD's officers' ability to properly train and supervise officers. *Id.*

In addition to being able to direct BPD's policies and practices, at the time of Plaintiff's arrest and conviction, the City was also apprised of the misconduct that took place within BPD. *Id.* at ¶ 80. The City was informed of BPD officer misconduct through the City's Complaint Evaluation Board ("CEB"). *Id.* The CEB was established in 1977 to review and evaluate citizen complaints regarding police actions. *Id.* The CEB was comprised of representatives from seven agencies, one of which was the City Solicitor for Baltimore City. *Id.* The City Solicitor was and continues to be a mayoral appointee and the head of the City's Department of Law. *Id.* The Solicitor served and continues to serve as the City's legal advisor, agent, and representative *Id*

MCC's influence over BPD has persisted through the decades. Mayor Stephanie Rawling-Blake solicited the United States' Department of Justice to launch a pattern or practice investigation into the BPD. *Id.* at ¶79. This investigation led to a consent decree to which both the MCC and the BPD are parties. City of Baltimore Consent Decree, Baltimore City,

https://consentdecree.baltimorecity.gov/(2018), (last visited Jan. 4, 2019). "The purpose of the

Agreement is to ensure that the City and the Baltimore Police Department protected individuals'

statutory and constitutional rights . . . ." Ex. A., City of Baltimore Consent Decree Summary, p. 1

(2017).[2] The agreement goes on to acknowledge that prior to the consent decree's implementation,

the MCC and the BPD had already begun working together to institute critical reforms. *Id.* The

MCC has represented on its website about the consent decree that the MCC and the BPD will work

together to ensure that, *inter alia*, allegations of employee misconduct are fully investigated and that

officers received the necessary policy guidance and training.  City of Baltimore Consent Decree,

Baltimore City, https://consentdecree.baltimorecity.gov (last visited Jan. 4, 2019). The agreement

also delineates that the consent decree will be terminated "if the Court determines the City and BPD

have achieved full and effective compliance upon a showing that they have incorporated all material

requirement into policy, trained personnel accordingly, [and] ensured that the requirements are being

carried out in practice . . . ." Ex. A., p 9.  The consent decree is clear that the MCC and the BPD will

collaborate to cause specific policies, training programs, and supervisory requirements to be

implemented.

In keeping with the pattern of collaboration and shared policymaking authority, the MCC

and the BPD recently filed a motion together to approve an investigation of the BPD's now-defunct

Gun Trace Task Force. Ex. B, Mot. to Approve Investigation of the Gun Trace Task Force Scandal,

*United States of America v. Baltimore Police Dept. et al.,* No. JKB-17-0099 (D. Md. 2017).[3] The motion's

stated purpose is to reform the BPD and investigate police misconduct. It serves as another example

---

[2] Pursuant to the Federal Rules of Evidence 201(b)(2), Plaintiff, hereby requires that in considering his response in opposition to the Defendants' Motion to Dismiss, ECF 29-1, that the Court take judicial notice of this document.  The document is posted on the MCC's website and the accuracy of the document can be readily determined by visiting the website hosted by the City of Baltimore.

[3] Similarly, Plaintiff request under Federal Rules of Evidence 201)(b)(2), that the Court take judicial notice of the referenced filing. The accuracy and authenticity of the document can be readily determined through the Court's ECF system.

of the decades-long custom and practice of sharing policymaking authority between the MCC and the BPD.

Further underscoring the MCC's shared policymaking authority is the MCC's legal ties to the BPD – the obligation to provide legal defense for employees under the Local Government Torts Claim Act, and the approval and payment of settlements and verdicts against the BPD. ECF No. 5 at ¶¶82. These legal obligations make it necessary for the MCC to have co-policymaking authority in order to protect Baltimore City's coffers and protect Baltimore City from liability. Under this relationship, the BPD has to collaborate with the MCC and implement the MCC's decisions.

Despite the Defendants' argument, this shared policymaking relationship between the MCC and the BPD does not contravene the prohibition set forth in Article II of the City Charter. ECF No. 29-1 at 17. As demonstrated by the BPD's custom of collaborating and joining the MCC's decision, the MCC was not creating ordinances that conflicted, impeded, obstructed, hindered, or interfered with the powers of the Police Commission. On the contrary, the two entities were working and continue to work in tandem.

The argument Plaintiff has set forth about the MCC's co-policymaking authority differs from the one presented and rejected in *Estate of Anderson v. Stroham*, 6 F.Supp. 639 (D. Md. 2014). In *Anderson,* the plaintiff argued that the MCC controlled the BPD. Here, Plaintiff is not arguing that the MCC controls the BPD, but instead, that MCC, with the BPD's permission, shares policymaking authority with the BPD and influences BPD's policies, customs, and practices to a degree sufficient to be, in practice, a shared policymaking authority. This shared authority has been created though the BPD's custom and practice of deferring to and adopting the MCC's decisions, and jointly making decisions with the MCC. The BPD allows the MCC to have this power. The BPD delegated this authority back in the 1980s when the BPD deferred to the Mayor's will with regard to how the Homicide Unit was run, and did so again and again when the BPD permitted the Mayor to have the

BPD studied with the purpose of using the data to change the policies and practices of the BPD, when it agreed to the Mayor's initiative to implemented body-camera protocol, and when it entered a consent decree that resulted from the Mayor's request to have the BPD investigated. These examples show a pattern and continued practice of the BPD delegating and sharing is policymaking authority with the MCC. This is very same collaborative practice is challenged in *Lucero*, and this is the same collaborative practice that Plaintiff alleges was in place at or near the time of his case and caused his constitutional harm.

In *Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670, 682 (D. Md. 2017), the plaintiffs were persons who agreed to participate in an experiment run by the corporation-defendants and during the experiment were infected with syphilis without their consent. *Id.* at 678. The plaintiffs sued the corporation-defendants, claiming that the decision to infect plaintiffs without their consent, although made by the corporations' doctors and officers, represented the corporations' policy and practice of sanctioning experiments of this type. The court, in assessing plaintiffs' claim to determine if it survived a motion to dismiss, applied the *Monell* framework to identify if the doctors' and officers' decisions qualified as the decisions of a final policymaker. *Id.* at 687-93. The court held that the individuals occupied high enough positions and had decision-making authority such that their actions were decisions of a final policymaker for the corporation. *Id.* at 693 (holding that "actions taken by or directed by these individuals, if acting as servants/agents for the Defendants, could plausibly form the basis for corporate liability."). In reaching this decision, the court did not limit itself to particular statutory authority or formal delegation of power but instead, looked to the customs and actual authority of the putative policymakers. *Id.* ("Ultimately determining the actual authority of each of these individuals will involve questions of fact that need to be resolved at a later stage.").

The same reasoning holds for Plaintiff's case. Though there is no statute or formal delegation of power, the frequent and collaborative nature of the MCC and the BPD relationship suggests an act of delegation through custom and usage. BPD's acquiescence, deference, and implementation of the MCC's decisions further bolsters this argument. Taken together, Plaintiff's allegations allow the court to reasonably infer that the MCC shared policymaking authority with the BPD.

Defendant MCC devotes its motion to arguing that MCC cannot *override* the Police Commissioner and therefore is not a policymaker, but that focus misses the mark. As explained above, MCC simply ignores the picture that emerges from Plaintiff's amended complaint: the reality is that MCC has consistently has exerted substantial, undeniable influence over the Commissioner's policymaking decisions (unsurprising given the Mayor's unique authority to hire and fire the commissioner) and shapes the policies being set in such a way as to be a shared policymaking authority. *See, e.g., Praprotnik*, 485 U.S. at 125-126 (noting that questions of policymaking authority are decided by reference not just to law but also to custom and usage); *Dotson v. Chester*, 937 F.2d 920, 924 (4th Cir. 1991) (noting that the Supreme Court "cautioned against 'egregious attempts by local governments to insulate themselves from liability for unconstitutional policies'") (quoting *Praprotnik*, 485 U.S. at 127).

At the motion to dismiss stage, Plaintiff is not required to plead all the facts necessary to *prove* his case. He need only allege the facts that give rise to such a claim. His allegations--as well as the reasonable inferences that must be drawn there from--all must be credited in Plaintiff's favor at this juncture. When properly construed in this light, Plaintiff certainly makes out a *Monell* claim against MCC and dismissal would be improper.

### B. Plaintiff Has Sufficiently Alleged MCC's Actual Or Constructive Notice of BPD's unconstitutional policies and practices

A local government may be sued under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to present official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York,* 436 U.S. 658, 694 (1978). As a co-policymaker, the MCC shared the responsibility for the BPD's unconstitutional policies and practices. In Plaintiff's Complaint, Plaintiff cites to 12 cases, by way of representative examples, where the BPD's officers withheld exculpatory evidence from criminal defendants, much like was done in this case. ECF No. 5 at ¶¶ 49-60. Plaintiff also cites to the Tabeling report, commissioned by the BPD, stating that the BPD's Homicide Unit's investigatory files were in a general state of disarray, and there was no procedure to ensure that all material information from an investigation was recorded and filed appropriately. *Id.* at ¶ 63. Given the cases Plaintiff cited wherein exculpatory information was withheld, it is reasonable to infer that this disorganized and deficient filing system existed at or near the time of Plaintiff's case. As a co-policymaker, the MCC--an entity that regularly communicated with, and directed the investigation of, the Homicide Unit in the 1980s and was appraised of instances of police misconduct through the City's Complaint Evaluation Board, *Id.* at ¶¶ 76, 80-- certainly was aware of the unconstitutional policies and practices of the BPD and failed to do anything other than maintain these policies and practices. This Court has recognized that "the City exercises such substantial control over the day-to-day activities and policies of the Department that if there was something major amiss in the Department in the time period involved in these cases the City and/or the Commissioner either would or should have known about it, and would or should have taken steps toward cure of the same." *Wilcher v. Curley*, 519 F. Supp. 1, 4 (D. Md. 1980). These are the same policies and practices that led to Plaintiff being deprived of his constitutional rights. It

is due to the policy and practice of failing to disclose exculpatory information and coercing witnesses that caused Plaintiff to be wrongfully convicted and incarcerated for over three decades.

### C. Plaintiff Has Properly Pled His *Monell* Claim Under The Condonation Theory

Defendants argue that the Plaintiff has failed to cite a policy or practice the MCC condoned, which is false. Plaintiff specifically cites to a number of practices were the MCC condoned the BPD's unconstitutional conduct.

Establishing *Monell* liability under the condonation theory "requires (1) actual or constructive knowledge of [the unconstitutional practices'] existence by responsible policymakers, and (2) their failure, as a matter of specific intent or deliberate indifference, thereafter to correct or stop the practices." *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987). "Constructive knowledge may be inferred from the widespread extent of the practices . . . ." *Id.* As stated above, the Plaintiff cites to 12 instances where BPD officers withheld exculpatory evidence and failed to comply with *Brady* obligations. ECF No 5 at ¶¶ 49-60. The Plaintiff also cites to the MCC's knowledge of police misconduct through the City's Complaint Evaluation Board and the City's Community Relations Committee. *Id.* at ¶¶ 80-81. Plaintiff also points to the MCC's influence over the Homicide Unit. *Id.* at ¶ 76. Despite this knowledge, the MCC did nothing to correct or stop the practices. At the motion to dismiss stage, these citations more than sufficiently plead Plaintiff's condonation theory under *Monell* against the MCC. *See Owens*, 767 F.3d at 403 (holding that plaintiff has sufficiently alleged a *Monell* claim under the condonation theory by complaining that there were "reported and unreported cases" demonstrating the custom, policy, and practice of withholding and suppressing exculpatory evidence and "a number of motions filed and granted during this time period.").

## VIII.  THE BPD IS NOT ENTITLED TO ELEVENTH AMENDMENT IMMUNITY

BPD does not cite a single case in which it was granted the relief it seeks here: absolute sovereign immunity from §1983 lawsuits under the Eleventh Amendment. Moreover, it concedes that the courts to have considered this exact issue (most recently, *Burley* and *Parks*) ruled against BPD. BPD's position is not well-grounded: though it was created by state law, BPD certainly does not function as a state agency and it does not enjoy the benefits of *state* sovereign immunity in this case. Nowhere in that case law, nor in BPD's argument, is there an answer for how BPD qualifies for Eleventh Amendment immunity given that: (1) a settlement or judgment against BPD will not be paid from the state treasury; (2) BPD's operations are largely autonomous from the state; (3) BPD functions are local; and (4) as a matter of law, BPD has been found to operate as an arm of the City, and not the State. *Ram Ditta v. Maryland Nat'l Capital Park and Planning Comm.,* 822 F.2d 456, 457-58 (4th Cir. 1987).

BPD acknowledges the four factors but does not faithfully apply them here. For instance, the first factor courts must consider is whether or not the state treasury would be impacted if liability were found against the state agency. *Harter v. Vernon*, 101 F.3d 334, 340 (4th Cir. 1996) ("When determining if an officer or entity enjoys Eleventh Amendment immunity a court must first establish whether the state treasury will be affected by the lawsuit."). Where the state treasury will pay a judgment, Eleventh Amendment immunity is established; where the state treasury will not pay the judgment, immunity may not exist, and the court should examine three additional factors; namely, (1) whether the entity has a significant degree of autonomy from the state; (2) whether it is involved with local versus statewide concerns, and (3) how it is treated as a matter of state law. *Id.* (citing *Ram Ditta*, 822 F.2d 456 at 457-58). If the state treasury is not affected by the lawsuit, this factor "weighs heavily against Eleventh Amendment immunity." *Id.* at 340. When applying these factors to BPD, the courts have previously held that BPD is not entitled to Eleventh Amendment

immunity. *Alderman v. Baltimore City Police Dep't*, 952 F. Supp. 256, 257–58 (D. Md. 1997); *Kemp v. Harris*. No. CV WDQ-08-793, 2008 WL 11363697, at *4–5 (D. Md. Nov. 12, 2008). *See also Fish v. Mayor & City Council of Baltimore*, No. CV CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018); *Rockwell v. Mayor & City Council of Baltimore,* No. CIV.A. RDB-13-3049, 2014 WL 949859, at *11 (D. Md. Mar. 11, 2014); *Brown v. Tshamba*, No. CIV.A. RDB 11-00609, 2011 WL 2935037, at *5 (D. Md. July 18, 2011); *Hall v. Baltimore City Police Dep't*, Civ. A. No. RDB-09-333, 2009 WL 3247782, at *3 (D. Md. Oct. 6, 2009); *Munyiri v. Haduch*, 585 F.Supp.2d 670, 676 (D. Md. 2008); *Chin v. City of Baltimore*, 241 F.Supp.2d 546, 548 (D. Md. 2003); *Hector v. Weglein*, 558 F. Supp. 194, 199 (D. Md. 1982).

*Alderman* is particularly instructive on this score. *Alderman* noted that the state treasury would not be impacted by any judgment against BPD, which makes immunity less likely. *Alderman*, 952 F.Supp. at 258. Specifically, the court highlighted that the City of Baltimore has paid settlements and judgments against BPD, and adopted a resolution indemnifying all BPD employees. *Id. Alderman* then analyzed the three remaining subsidiary factors. As to the first subsidiary factor—whether the entity has a significant degree of autonomy from the state—the court noted that the City of Baltimore has a significant degree of control over BPD. *Id.* The City exerts control over hiring decisions, provides benefits, can hire and fire the Police Commissioner, and sets salaries. *Id.* The *Alderman* court concluded from these facts that BPD is autonomous from the state and should not be treated as a state agency. *Id.* As to the second subsidiary factor—if BPD's functions are local— *Alderman* found BPD's concerns are "unquestionably local" because its jurisdiction extends only to Baltimore City. *Id.* Finally, as to the third subsidiary factor—how BPD is treated under state law— the court acknowledged that BPD is established under Maryland law, but based on the above-mentioned factors, the court found that BPD operated as "an arm of the City, not the state," and thus, was not entitled to Eleventh Amendment immunity. *Id. See also Kemp*, 2008 WL 11363697 at

*4-5 (affirming the four-factor analysis the Court previously performed in *Alderman* and holding that BPD does not enjoy Eleventh Amendment immunity).

The same facts that informed the court's decision in *Alderman* exist today. The City of Baltimore continues to fund settlements and judgments against BPD. Ian Duncan, *Baltimore Poised to Pay $9M to Man who Spent 20 Years in Prison on Wrongful Murder Conviction*, The Baltimore Sun (Apr. 30, 2018), https://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-wrongful-conviction-settlement-20180430-story.html; Luke Broadwater, *Baltimore to Pay $1.1 Million to Settle 4 Lawsuits Alleging Police Misconduct*, The Baltimore Sun (Aug. 8, 2017), https://www.baltimoresun.com/news/maryland/baltimore-city/bs-md-ci-four-police-settlements-20170808-story.html. BPD is also statutorily required to defend and indemnify any employee who has been found liable under the Local Government Torts Claim Act ("LGTCA"). Md. Code Ann., Cts. & Jud. Proc. § 5-303(2). As the state treasury will not be responsible for paying for any judgment stemming from this lawsuit, the state has no interest in this case that would implicate the Eleventh Amendment.

Further, just as was true at the time of *Alderman*, BPD's operations are largely autonomous from the state. The City, and not the state, continues to exert control over BPD. Baltimore's local laws permit the City to appoint and remove the Police Commissioner, collaborate on the departmental budget, authorize the number of members the Department can hire, and set employee salaries. Md. Public Local Laws art. 4, §§ 16-5, 16-8, 16-9. The Police Commissioner is also required by law to annually apprise the Mayor and City Council of BPD's operation and work "in detail as to enable the Mayor and City Council of Baltimore to maintain a continuing familiarity with the program and operation of the Department," and in some cases, to permit the Mayor to make administrative, financial, and managerial decisions. *Id.* at § 16-19. BPD's operations are autonomous from the state and, for many important functions, it works hand in hand with the City. This close

relationship is underscored by the limitations of BPD's jurisdiction. BPD's jurisdiction is still restricted to the City of Baltimore and areas "owned, controlled, operated, or leased by the Mayor and City Council of Baltimore . . . ." *Id.* at § 16-2. Defendant BPD argues against these facts regarding City control but offers no facts indicating any degree of State control over BPD whatsoever, an omission which counsels heavily against immunity.

In support of its immunity argument, BPD argues that it is functionally a state agency because it "is involved in state-wide concerns," but the isolated examples it provides of BPD working with the state hardly transform it into a state agency; nor does BPD address the fact that the vast majority of BPD's functions are entirely local in nature, as it polices only Baltimore City. So, too, for BPD's relationship to state-wide tourism--a fact that is true not only for Baltimore but for other cities in Maryland that host out-of-state tourists, as well as for private enterprises that encourage state tourism. The only case it cites on this score, *Hill v. Jamestown-Yorktown Foundation*, 2019 WL 3084242 (E.D.Va July 15, 2019), is factually distinguishable in multiple ways, primarily that: (1) the defendant there received more than half its funding, as well as indemnification, from the State treasury; (2) the Governor and Virginia General Assembly have "substantial control" over the board that administers the defendant foundation; and (3) the two museums operated by the defendant had a state-wide focus, *in contrast to* county sheriffs' offices whose concerns are "primarily local." *Id.* at *5-7.

Finally, if this Court adopts BPD's reasoning, the Court would eliminate a meaningful remedy for civilians who have harmed by, and may be harmed in the future by Baltimore police officers. The purpose of *Monell* liability is to offer a remedy that works to ensure that the harm found is prevented from happening again. *Owen v. City of Indep., Mo.*, 445 U.S. 662, 627 (1980)("[Section 1983] was intended not only to provide compensation to victims of past abuses, but to serve as a deterrent against future constitutional deprivations[.]"); *see also Monterey v. Del Monte*

*Dunes*, 526 U.S. 687, 727 (1999); *Wyatt v. Cole*, 504 U.S. 158, 161 (1992); *Swanigan v City of Chicago*, 775 F.3d 953, 962 (7th Cir. 2015); *Medina v. Chicago*, 100 F. Supp. 2d 893, 896 (N.D. Ill. 2000). Although in practice, the BPD works in exactly the same way as any other municipal police department, BPD wants this Court to ensure that its policies, procedures, trainings, and customs are never exposed to challenge through the court system; and that citizens do not have a remedy against municipal abuse simply because the BPD was established by Maryland law.

The weight of the authority is clear: BPD is not entitled to Eleventh Amendment immunity. *See Burley v. Balt. Police Dept.*, 1:18-cv-01743-ELH, ECF Nos. 51, 52 (D.Md. Sept. 12, 2019); *Parks v. Balt. Police Dept.*, 1:18-cv-03092-TDC, ECF No. 86 (D.M.D. Sept. 9, 2019); *Fish v. Mayor & City Council of Baltimore*, No. CV CCB-17-1438, 2018 WL 348111, at *3 (D. Md. Jan. 10, 2018) ("[T]he court determines BPD is not entitled to Eleventh Amendment immunity and, as a result, is a 'person' subject to suit under § 1983."); *Rockwell v. Mayor & City Council of Baltimore,* No. CIV.A. RDB-13-3049, 2014 WL 949859, at *11 (D. Md. Mar. 11, 2014) (holding that BPD is not a state agency for the purposes of Eleventh Amendment immunity and can be held liable under §1983).*See also Brown v. Tshamba*, No. CIV.A. RDB 11-00609, 2011 WL 2935037, at *5 (D. Md. July 18, 2011) (holding that BPD's connection with the government of Baltimore City renders BPD a "person" under § 1983).

## IX.    PLAINTIFF'S INDEMNIFICATION CLAIM IS PROPERLY PLED

Plaintiff has standing to make a claim for indemnification against the BPD because his claims against the Officer Defendants are still live, which means that under Maryland law, Plaintiff can proceed against the local government, the BPD, on an indemnification claim. Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1) (stating that "[a] local government shall be liable for any judgment within the scope of employment with the local government.").

The BPD cites to *Johnson v Francis*, 239 Md. App. 530 (2018) and *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282 (2001) in support of its position, but its reliance on both cases is unavailing. Indeed, Judge Chuang recently rejected BPD's similar arguments in another wrongful conviction case, explained below.

As to immunity, the Maryland statute is clear that "a local government may not assert governmental or sovereign immunity to avoid the duty to defend or indemnify an employee . . ." Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(2). Thus, BPD may not assert immunity to avoid its indemnification duties. *See also* 9/6/2019 Transcript of Ruling on Motion to Dismiss (Chuang, J.), *Parks v. Baltimore Police Dep't et al.*, No. TDC-18-03092 at 83:20-84:4 ("First off, the waiver of immunity or the state sovereign immunity is effectively waived for claims to -- of a duty to defend or indemnify an employee under *Baltimore Police Department v. Cherkes*, [] 780 A.2d 410") ("Parks Transcript" attached hereto as Exhibit C).

Moreover, Defendant BPD's argument about the "mechanics" of indemnification is also incorrect. First, *Johnson* expressly holds that the right of indemnification runs to the plaintiff, who need not wait for an assignment from the officer. *Johnson, 239* Md. App. at 551 ("When read in context with the rest of the statute, the local government's obligation under § 5-303(b)(1) unambiguously runs directly to the underlying plaintiff."). Second, the Court in *Parks* rejected BPD's motion to dismiss the indemnification claim, noting that "the Court does not accept the notion that there are predicates to an indemnification claim that have yet to occur or have to have been asserted obviously." Ex. C at 84:15-18.

To the extent BPD is concerned with its right to challenge that the officers' actions were within the scope of their employment, here, unlike in *Cherkes*, the BPD has the opportunity to raise any and all defenses against Plaintiff's indemnification claim because it is already a party to this lawsuit. To follow the procedure the BPD has suggested would result in a waste of judicial resources

and is not required by their cited authorities. Additionally, resolving the question of indemnification is premature at this stage. *Burley v. Baltimore Police Dep't.*, No. CV ELH-18-1743, 2019 WL 6253251, at *29 (D. Md. Nov. 22, 2019) (holding that determining the issue of BPD's duty to indemnify was premature at the motion to dismiss stage). *See also* Parks Transcript (Ex. C) at 84: 18-21 ("Again, evidence must be established to lay out all of the different pieces that would lead to an indemnification claim. But the Court will deny the motion on Count Twelve."). Therefore, Plaintiff's indemnification claim against the BPD should stand and can be reviewed at a later stage in the proceedings.

## X. PUNITIVE DAMAGES

Finally, Defendants argue that Plaintiff is not entitled to punitive damages. A fair reading of Plaintiff's Complaint makes clear that Plaintiff is not seeking punitive damages from the BPD or the MCC. Accordingly, this portion of Defendants' motion should be denied as well.

## CONCLUSION

For the reasons stated herein, Defendants BPD and MCC's Motion to Dismiss should be denied.

Respectfully submitted,

GARY WASHINGTON

By: /s/ Renee Spence
*One of Plaintiff's Attorneys*

*Attorneys for Plaintiff*
Jon Loevy
Gayle Horn
Roshna Bala Keen
Renee Spence
LOEVY & LOEVY
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)

## CERTIFICATE OF SERVICE

I, <u>Renee Spence</u>, an attorney, hereby certify that I filed the foregoing Plaintiff's Response In Opposition To Defendants Baltimore Police Department And Mayor And City Council Of Baltimore's Motion To Dismiss via the Court's CM/ECF system on January 7, 2020, and thereby served a copy on all counsel of record.


<u>/s/ Renee Spence</u>
*One of Plaintiffs' Attorneys*