**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

GARY WASHINGTON, *et al.*,                         *
                                                                           *
      **Plaintiffs,**                              *
                                                                           *
**v.**                                                                     *      **Civil Case No. SAG-19-2473**
                                                                           *
**BALTIMORE POLICE DEPARTMENT,**         *
*et al.*,                                                                *
                                                                           *
      **Defendants.**                            *
                                                                           *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION</u>

On August 27, 2019, Plaintiff Gary Washington ("Plaintiff") filed a Complaint against Thomas Pellegrini ("Pellegrini"), Oscar Requer ("Requer"), Richard Fahlteich ("Fahlteich"), John Tewey ("Tewey"), Fred Ceruti ("Ceruit"), John MacGillivary ("MacGillivary"), and other Unknown Employees of the Baltimore Police Department (collectively, "the Officer Defendants"), as well as the Baltimore Police Department ("BPD"), and the Mayor & City Council of Baltimore ("MCC") (together, "Defendants"). ECF 1.[1] Plaintiff filed an Amended Complaint on September 5, 2019. ECF 5. Each of the Officer Defendants, except for MacGillivary and the unknown Defendants, filed an Answer on December 2, 2019. ECF 28. Plaintiff, now fifty-eight years old, seeks awards of compensatory damages, punitive damages, and attorneys' fees, for the injuries he allegedly suffered stemming from his wrongful conviction over thirty-one years ago for the murder of Faheem Rafig Ali ("Ali"). *Id.*

Three motions are presently before the Court. First, on December 2, 2019, the BPD and MCC filed a Motion to Dismiss the Amended Complaint, ECF 29, along with a Memorandum of

---

[1] Plaintiff gave the BPD & MCC notice of his claims on or about May 8, 2019. ECF 5, ¶ 44.

Law in support thereof, ECF 29-1 (collectively, "the Motion to Dismiss").  Plaintiff filed an

Opposition, ECF 37, and the BPD and MCC replied, ECF 50.  Further, on December 30, 2019,

Plaintiff filed two motions:  a Second Motion for Extension of Time to Serve Defendant

MacGillivary, ECF 35 ("the Motion for Extension of Time"); and a Motion to Appoint a

Personal Representative for Deceased Defendant MacGillivary, ECF 36 ("the Motion to

Appoint").  Defendants Ceruti, Fahlteich, Pellegrini, Requer, and Tewey opposed, ECF 38, and

Plaintiff replied, ECF 45.  No hearing is necessary on any of the pending Motions.  *See* Loc. R.

105.6 (D. Md. 2018).  For the reasons that follow, the BPD's Motion to Dismiss will be granted

in part and denied in part, the MCC's Motion to Dismiss will be granted, and Plaintiff's two

motions will be denied.

## I.      THE BPD'S AND MCC'S MOTION TO DISMISS

The following facts from the Amended Complaint are accepted as true, and all reasonable

inferences are drawn in Plaintiffs' favor.  *See, e.g.*, *E.I. du Pont de Nemours & Co. v. Kolon

Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011).  At all times relevant to the Amended Complaint,

each Officer Defendant was employed as an officer with the BPD.  ECF 5, ¶ 9.

### A.      Factual Background

#### 1.      Plaintiff's Wrongful Conviction, and Subsequent Exoneration

On December 27, 1986, at about 7:45 p.m., Ali was walking in the 2300 block of Barclay

Street in Baltimore City, Maryland.  *Id.* ¶ 12.  He stopped and began speaking to two

unidentified men.  *Id.*  A twelve-year-old boy, Otis Robinson ("Robinson"), was walking on the

same street, and noticed the men, but found "nothing notable" about them, and continued

walking.  *Id.* ¶ 18.  The conversation between Ali and the two men, however, "quickly escalated

into an argument," and ended with one of the men fatally shooting Ali in the chest.  *Id.* ¶ 12.  The

two men fled before police arrived.  *Id.* ¶ 12.  Robinson also fled after hearing the gun shot, and eventually took shelter in his mother's boyfriend's home.  *Id.* ¶ 19.  R.D., a thirteen-year-old girl, was standing in the crowd when police arrived on the scene.  *Id.* ¶¶ 28-29.  Some Officer Defendant(s) questioned her about the murder, but she said that she did not know who shot Ali. *Id.* ¶ 29.  No other witness on the scene that night could identify either suspect.  *Id.* ¶ 15.

Sometime after the shooting, unspecified Officer Defendant(s) learned that Robinson may have also witnessed the shooting.  *Id.* ¶ 16.  Those Defendant(s) went to Robinson's mother's house "and threatened to take Otis away from her if she did not bring Otis to the police station within 24 hours."  *Id.* ¶ 19.  On December 29, 1986, Robinson and his mother were transported to a BPD police station, where unspecified Officer Defendant(s) separated him from his mother.  *Id.* ¶ 20.  Robinson told Pellegrini and Fahlteich that, on the night of the shooting, he heard men talking on the street and then he heard a gunshot, but he did not know who any of the men were.  *Id.* ¶ 21.  Requer later brought showed Robinson a set of pictures, one of which was Plaintiff.  *Id.* ¶ 22.  Robinson confirmed that he recognized Plaintiff, but never indicated that Plaintiff was one of the two men he saw standing with Ali.  *Id.*

Unspecified Officer Defendant(s) then began threatening Robinson, and demanding that he cooperate and identify the shooter, or else they would take him away from his mother, or worse, charge him with Ali's murder.  *Id.* ¶ 23.  Robinson then began accepting details that the unspecified Officer Defendants provided him about the shooting, and eventually, "[b]ecause of the Officer Defendants' coercion," falsely identified Plaintiff as Ali's shooter.  *Id.*  After Robinson made this identification, he was reunited with his mother.  *Id.* ¶ 23.  Robinson later returned to the station, and signed a second typewritten statement identifying Plaintiff as the shooter, on January 2, 1987.  *Id.* ¶ 25. The Officer Defendants are alleged to have known that

Robinson's statements identifying Plaintiff as the shooter were false, but they did not disclose this fact, or Robinson's initial statement denying knowledge of the shooter's identity, to the prosecutor or Plaintiff's defense attorney. *Id.* ¶¶ 23, 26-27.

The Officer Defendants had R.D. come to the station on January 3, 1987, and implemented the same practices on her as they had on Robinson. *Id.* ¶¶ 30-31. After separating R.D. from her mother, unspecified Officer Defendants threatened R.D. that they would take her away from her mother, and even arrest her. *Id.* ¶ 30. They showed R.D. a picture of Plaintiff, and she indicated that she knew who he was. *Id.* ¶ 31. The Officer Defendant(s) pressured R.D. to sign her name next to the picture, and indicate that Plaintiff was the shooter. *Id.* R.D. agreed, and was then reunited with her mother. *Id.* The Officer Defendants did not disclose R.D.'s initial statement at the scene of the murder, or their acts of coercion, to the prosecutor or Plaintiff's defense attorney. *Id.* ¶ 33.

On January 5, 1987, "under the supervision of Defendant John MacGillivary," the Officer Defendants used Robinson's and R.D.'s fabricated statements to obtain an arrest warrant for Plaintiff. *Id.* ¶ 34. At a later suppression hearing, Pellegrini falsely testified that Robinson's and R.D.'s statements and identifications had been obtained freely and voluntarily. *Id.* ¶ 36. Robinson was the only one who testified at trial, and his testimony was the only evidence linking Plaintiff to Ali's murder. *Id.* ¶ 37. A jury convicted Plaintiff of Ali's murder on June 16, 1987, for which Plaintiff received a sentence of life imprisonment, plus twenty years. *Id.* ¶¶ 39-40.

Ten years later, Robinson recanted his testimony. *Id.* ¶ 41. He explained that the Officer Defendants had coerced him into making the false statements. *Id.* On August 20, 2018, a state court judge in Baltimore City granted Plaintiff's petition for a writ of actual innocence, deeming Robinson's recantation credible. *Id.* ¶ 42. The murder charges against Plaintiff were then

dropped. *Id.* ¶ 43.  Plaintiff has filed a number of claims against the Officer Defendants under 42 U.S.C. § 1983, and Maryland state law, for the violation of his constitutional rights stemming from his wrongful conviction.  *Id.* ¶¶ 93-118, 124-38 (Counts I-IV, VI-VII).  Plaintiff has also filed a claim against the BPD directly, seeking to compel it to indemnify the Officer Defendants upon a finding of the Officer Defendants' liability.  *Id.* ¶¶ 139-41 (Count IX).

### 2.    The *Monell* Claim Against the BPD and MCC

As relevant to this Motion to Dismiss, Count V of the Amended Complaint seeks compensatory and punitive damages from the BPD and MCC for the violation of Plaintiff's constitutional rights, pursuant to § 1983 and the theory of liability espoused in *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978).   ECF 5, ¶¶ 119-23 (Count V). Plaintiff alleges that his wrongful conviction was "the result of the BPD's longstanding policies and practices of pursuing wrongful convictions through reliance on profoundly flawed investigations," which led investigators to "cut corners and rush[] to judgment" in "a race to clear murder cases." *Id.* ¶¶ 45-46.  These policies, Plaintiff alleges, were "firmly entrenched" during the investigation of Ali's homicide. *Id.* ¶ 46.  In support, Plaintiff recounts the wrongful murder convictions of Walter Lomax, Wendell Griffin, James Owens, Jerome Johnson, Anthony Coleman, Sabein Burgess, Antoine Pettiford, Rodney Addison, Malcolm Bryant, Kenneth McPherson, Eric Simmons, Tyrone Jones, and Garreth Parks, many of whom have been exonerated. *Id.* ¶¶ 49-60.  In each case, the BPD allegedly relied on fabricated evidence, coerced child witnesses to make false statements, and/or failed to disclose exculpatory evidence, in order to secure the individual's conviction.  *Id.*  Plaintiff alleges that policymakers within the BPD were deliberately different to these unconstitutional practices, and that the failure to remedy them led to his wrongful conviction, and the injuries he suffered therefrom.  *Id.* ¶¶ 65-66.

Plaintiff further alleges that his wrongful conviction stemmed from the BPD's failure to train, supervise, and discipline subordinate police officers. *Id.* ¶ 67. He alleges that an internal report created in January, 2000 ("the Tabeling Report") "found numerous deficiencies in training, including in many basic legal and investigative concepts." *Id.* ¶ 68. Plaintiff points specifically to the BPD's failure to train police officers on how to fully comply with their obligation to disclose exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. *Id.* ¶ 70.

Finally, Plaintiff alleges that Baltimore City's "failure to act in the face of repeated constitutional violations" by the BPD, and its failure to address the BPD's unconstitutional policies and practices, also led to his wrongful conviction, and subjects the MCC to *Monell* liability under § 1983. *Id.* ¶ 85. He alleges the following facts to demonstrate the extent of the MCC's involvement in the BPD's formulation of policy:

- The Mayor's power to appoint and remove the BPD Commissioner, *id.*, ¶ 75;

- The Commissioner's regular efforts to apprise the Mayor of BPD's operations, *id.* ¶¶ 76, 82;

- The establishment of the City's Complaint Evaluation Board ("CEB") in 1977, to review and evaluate citizen complaints regarding police actions, *id.* ¶ 80;

- The Baltimore City Community Relations Committee's ("CRC") 1979 report to the Mayor that City residents "felt that BPD officers mistreated them and used excessive force against them," *id.* ¶ 81;

- The finding of a "year-long ethnographic study" of the BPD's Homicide Department by David Simon, who found that the Commissioner was required "to run the police department in a way that served the Mayor 'in whatever manner He [the mayor] [saw] fit,'" *id.* ¶ 76;

- Then-Mayor O'Malley's successful efforts "to make the BPD submit to being studied by consultants" to weed out corruption, "with the intent of having BPD implement the consultants' recommendations," *id.* ¶ 77;

- The City's authority over the BPD's budget, which, in 1993, allowed then-Mayor Kurt Schmoke to force the BPD to cut its Academy's training program and hire 330 new officers, *id.* ¶ 78;

- The City's current, ongoing efforts to aid the BPD in remedying its unconstitutional practices in the litigation resulting from the Gun Trace Task Force ("GTTF") scandal, including signing on to the Consent Decree, *id.* ¶ 79; and

- The "City's obligation to indemnify the BPD's employees under the Local Government Torts Claim Act," *id.* ¶ 83.

**B.     Legal Standards**

The BPD and MCC have filed motions to dismiss the claims lodged against them in the Amended Complaint, in their entirety, under Federal Rule of Civil Procedure 12(b)(6).  ECF 29. A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss.  *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule 8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Id.* at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.'"); *see also Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  But, a plaintiff need not

include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555.

Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect

statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby*, 574 U.S.

___, 135 S. Ct. 346, 346 (2014) (per curiam).

Nevertheless, the rule demands more than bald accusations or mere speculation.

*Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir.

2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation

of the elements of a cause of action," it is insufficient.   *Twombly*, 550 U.S. at 555.   Rather, to

satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual

matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of

those facts is improbable and . . . recovery is very remote and unlikely." *Id.* at 556 (internal

quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual

allegations contained in the complaint" and must "draw all reasonable inferences [from those

facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d 435 at 440 (citations

omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v.

Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).  However, a court is not required to

accept legal conclusions drawn from the facts.  *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  "A

court decides whether [the pleading] standard is met by separating the legal conclusions from the

factual allegations, assuming the truth of only the factual allegations, and then determining

whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the

legal remedy sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011),

*cert. denied*, 566 U.S. 937 (2012).

In evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court ordinarily "may not consider any documents that are outside of the complaint, or not expressly incorporated therein." *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger*, 510 F.3d 442, 450 (4th Cir. 2007). However, a court may properly consider documents incorporated into the complaint or attached to the motion to dismiss, "so long as they are integral to the complaint and authentic." *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (quoting *Philips v. Pitt Cty. Memorial Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

Finally, at the motion to dismiss stage, courts generally do not "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243-44 (4th Cir. 1999) (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). Courts may only rule on an affirmative defense at the Rule 12(b)(6) stage "if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint*.'" *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (quoting *Richmond, Fredericksburg, & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)). Only "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint" will a court, under Rule 12(b)(6), dismiss a complaint based on an affirmative defense. *Goodman*, 494 F.3d at 464.

## C.     Analysis

The BPD and MCC put forth four arguments in favor of dismissal. First, both assert that Plaintiff fails to state a *Monell* claim against them. ECF 29-1 at 5-19. Second, the BPD argues that it has sovereign immunity to the *Monell* claim lodged against it. *Id.* at 19-22. Third, the BPD claims that Plaintiff's state law claim for indemnification fails as a matter of law. *Id.* at 22-

24.  Finally, the BPD and MCC argue that Plaintiff cannot claim punitive damages against them under § 1983.  *Id.* at 24-25.  Each argument is considered in turn.

### 1.  Plaintiff Sufficiently Alleges the BPD's *Monell* Liability under § 1983

Count V of the Amended Complaint alleges that the BPD (1) failed to adequately train its officers on its *Brady* obligations, and (2) condoned policies and practices of failing to turn over exculpatory evidence, and relying on fabricated evidence in investigating cases.  ECF 5, ¶¶ 119-23.  If any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a United States citizen of any constitutional right, he may be liable in a suit for money damages.  42 U.S.C. § 1983 (2018).  In *Monell v. Department of Social Services*, 436 U.S. 658, 690 (1978), the Supreme Court held that municipalities may be liable for a plaintiff's constitutional harms pursuant to § 1983.  There are three necessary elements for *Monell* liability.  First, the plaintiff must plausibly allege a constitutional harm that stems from the acts of a municipal employee "taken in furtherance of some municipal 'policy or custom.'"  *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); *see also Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987).  As interpreted by the Fourth Circuit, a "policy or custom" can exist in four ways:

> (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).  Second, the plaintiff must allege facts showing that the policy's creation is fairly attributable to the municipality.  *Spell*, 824 F.2d at 1389; *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014) ("Only if a municipality subscribes

to a custom, policy, or practice can it be said to have committed an independent act, the *sine qua non* of *Monell* liability.").  Third, the plaintiff must allege an affirmative causal link between the "policy or custom," and the particular injury suffered by the plaintiff.  *Spell*, 824 F.2d at 1389.  Before addressing whether Plaintiff has stated a *Monell* claim against the BPD, the Court first considers BPD's assertion of sovereign immunity.

### i.      The BPD Is Not Entitled to Sovereign Immunity

First, the BPD argues that it enjoys sovereign immunity to Plaintiff's § 1983 claim. ECF 29 at 19-22.  In three recent decisions, all of which are currently before the Fourth Circuit, United States District Judges in this District have rejected that contention.  *See Burley v. Balt. Police Dep't*, __ F. Supp. 3d __, No. ELH-18-1743, 2019 WL 6253251, at *27-29 (D. Md. amended Nov. 22, 2019), *appeal docketed and consolidated*, No. 19-2029 (4th Cir. Sept. 27, 2019); *Lucero v. Early*, No. GLR-13-1036, 2019 WL 4673448, at *3-5 (D. Md. Sept. 25, 2019), *appeal docketed*, No. 19-2072 (4th Cir. Oct. 4, 2019); Order, *Parks v. Balt. Police Dep't*, No. TDC-18-3092 (D. Md. Sept. 9, 2019), ECF 86, *appeal docketed and consolidated*, No. 19-2029 (4th Cir. Sept. 27, 2019).  Having deemed the rationales in those decisions persuasive, this Court hereby adopts them, and concludes that the BPD is not entitled to sovereign immunity from Plaintiff's § 1983 claims, at this stage in the litigation.  However, should the Fourth Circuit issue an opinion in those cases to the contrary, this Court will entertain a motion for reconsideration.

### ii.      Plaintiff's Failure to Train Theory

The BPD first argues that Plaintiff fails to allege *Monell* liability through a failure to train.  ECF 29-1 at 7-12.  A plaintiff can establish the requisite "policy" for *Monell* liability through a failure to train, if it "reflects a 'deliberate' or 'conscious' choice" to not do so.  *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Training policy deficiencies can include (1)

"express authorizations of unconstitutional conduct," (2) "tacit authorizations" of such unconstitutional conduct, and (3) failures to adequately "prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty." *Spell*, 824 F.2d at 1390. No matter which theory is alleged, the plaintiff must point out "a specific deficiency" in training, "rather than general laxness or ineffectiveness in training." *Id.*; *see also, e.g.*, *McDowell v. Grimes*, No. GLR-17-3200, 2018 WL 3756727, at *4 (D. Md. Aug. 7, 2018). Second, a plaintiff must establish that the municipality's failure to train showed a "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (alteration in original). Deliberate indifference is shown if "the need for more or different training is so obvious, and the inadequacy [in training is] so likely to result in the violation of constitutional rights." *Harris*, 489 U.S. at 390; *accord Jordan by Jordan v. Jackson*, 15 F.3d 333, 341 (4th Cir. 1994). Finally, the plaintiff must show that "the officer's conduct resulted from said training," or lack thereof. *McDowell*, 2018 WL 3756727, at *4 (quoting *Jones v. Chapman*, No. ELH-14-2627, 2015 WL 4509871, at *18 (D. Md. July 24, 2015)).

The BPD first argues that Plaintiff insufficiently alleges a failure to train claim because the Amended Complaint lacks specific allegations regarding the nature of BPD's training programs, and regarding the specific deficiency in training. ECF 29-1 at 9-10. This argument lacks merit. In this context, it is important to note that, oftentimes, "a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery." *Johnson v. Balt. Police Dep't*, No. ELH-19-00698, 2020 WL 1169739, at *34 (D. Md. Mar. 10, 2020). Nonetheless, Plaintiff has, in fact, alleged that the BPD's training on officers' duty to disclose exculpatory evidence pursuant to *Brady* was insufficient. ECF 5, ¶ 70.

Plaintiff has supplemented this allegation with specific examples, both before and after his wrongful conviction, demonstrating the results of that failure to train. *See id.* ¶¶ 49-60. This is sufficient to satisfy Rule 8's notice requirement, with regards to the nature of the challenged training program. *See Estate of Bryant v. Balt. Police Dep't*, No. ELH-19-384, 2020 WL 673571, at *39 (D. Md. Feb. 10, 2020) (finding that specific allegations regarding the BPD's failure to train officers on disclosing evidence pursuant to *Brady* plausibly alleged the BPD's *Monell* liability to the plaintiff for the alleged actions of evidence suppression leading to his wrongful conviction for felony murder); *Jones v. Jordan*, No. GLR-16-2662, 2017 WL 4122795, at *6-7 (D. Md. Sept. 18, 2017) (finding that allegations that the BPD's training on the use of force, de-escalation, searches and seizures, and supervising misconduct sufficiently stated a *Monell* claim); *see also Johnson*, 2020 WL 1169739, at *34 ("[A]t the motion to dismiss stage, courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy . . . ."). Indeed, contrary to the BPD's assertions, ECF 29-1 at 10, Plaintiff's allegation that the BPD insufficiently trained on officers' *Brady* obligations "during the relevant time period," ECF 5, ¶ 70, places the BPD on notice that its *Brady* training, during the investigation that led to his wrongful conviction, caused his constitutional harm.[2]

Next, the BPD argues that the Amended Complaint fails to plausibly establish the BPD's deliberate indifference to the rights of individuals such as Plaintiff. ECF 29-1 at 9-10. This argument is unpersuasive. In the context of failure to train, deliberate indifference can be shown

---

[2] The BPD does not contest that Plaintiff suffered a constitutional injury. The BPD does argue, in a footnote, that Count III, entitled "42 U.S.C. § 1983, Detention without Probable Cause," is time-barred. ECF 29-1 at 2 n.1. The BPD is not named as a Defendant in Count III, *see* ECF 5, ¶¶ 108-13, and the Officer Defendants (except for MacGillivary) have answered the claim, ECF 28, ¶¶ 108-13. Additionally, there are three other § 1983 claims against the Officer Defendants. ECF 5, ¶¶ 93-107, 114-18. Thus, the Court will not consider the BPD's statute of limitations argument.

through policymakers' choice to retain a training program, despite "'actual or constructive notice' that an omission in the program causes officers 'to violate citizens' constitutional rights.'" *Jones*, 2017 WL 4122795, at \*7 (quoting *Connick*, 563 U.S. at 61).

Here, Plaintiff has alleged that in 1981, and three times in 1988, individuals were convicted for murder in Baltimore City, and that in each of those cases, BPD officers withheld exculpatory evidence. ECF 5, ¶¶ 50-53. Two of these individuals have since been exonerated of their charges, and in the case of Anthony Coleman, originally convicted in 1988, the Maryland Court of Special Appeals determined that evidence had been wrongfully withheld from his trial counsel. *Id.* One BPD homicide detective in Coleman's post-conviction proceedings allegedly testified "how it was the department's practice to decide which documents to share with State prosecutors." *Id.* ¶ 53. Plaintiff finally asserts that BPD policymakers had "actual knowledge" of this pattern of misconduct, *id.* ¶ 66, and "consciously approved" their deficient training programs, *id.* ¶ 72, which the Court must accept as true at the pleading stage.

Considering all of this, the Court finds that Plaintiff has drawn a sufficient connection between the previous alleged incidents of *Brady* violations, and the violation that led to his wrongful conviction. *Compare with Chapman*, 2015 WL 4509871, at \*20 (dismissing a failure to train complaint because the plaintiff "failed to identify a particular BPD training practice or any specific defect," and failed to connect the plaintiff's three examples of alleged use of excessive force with the plaintiff's alleged constitutional violation). Considering even just these allegations,[3] Plaintiff has plausibly established the BPD's deliberate indifference to homicide

---

[3] The BPD takes issue with considering any instance of alleged evidence suppression occurring after Plaintiff's conviction, as well as the one instance of evidence suppression that Plaintiff alleges occurred in 1968. ECF 29-1 at 11. At the motion to dismiss stage, however, it is reasonable to infer that the three investigations leading to the convictions in 1988 occurred at around the same time as the investigation leading to Plaintiff's arrest. The Court need not decide

detectives' *Brady* violations, and its failure to modify its *Brady* training program.  *See Estate of Bryant*, 2020 WL 673571, at *39.

Finally, the BPD challenges the sufficiency of Plaintiff's allegations regarding causation. ECF 29-1 at 11.  This argument similarly fails.  As noted, Plaintiff must plausibly allege that the condoned policy or custom has an affirmative causal link to their particular constitutional violation.  *E.g.*, *Spell*, 824 F.2d at 1391.  This causal link is satisfied "if occurrence of the specific violation [alleged] was made reasonably probable by permitted continuation of the custom," such that the specific violation was "almost bound to happen, sooner or later, rather than merely likely to happen in the long run."  *Id.* (internal quotations omitted); *see also, e.g.*, *Carter*, 164 F.3d at 218 (quoting *Spell*, 824 F.2d at 1390).

Here, Plaintiff has alleged such an "affirmative link" between his wrongful conviction caused by a *Brady* violation, and the BPD's failure to address the deficiency in its *Brady* training.  *See Spell*, 824 F.2d at 1387.  Plainly, a deficient *Brady* training program has a "close fit" to a due process violation stemming from unlawfully withheld exculpatory evidence.  Of course, as has been recognized, "the Law of Large Numbers" makes it likely that, at some point, *Brady* violations may occur.  *See Connick*, 563 U.S. at 73 (Scalia, J., concurring).  However, Plaintiff's allegations, supplemented by specific examples of *Brady* violations contemporaneous with the time of his investigation and prosecution, make it plausible that the BPD's failure to address its training deficiency made Plaintiff's alleged due process violation "reasonably probable."  *See Jones*, 2017 WL 4122795, at *9 (finding a "close fit" between an alleged deficiency in the BPD's training on the use of force, de-escalation, stops, and arrests, and the

---

whether consideration of post-violation events is permissible, because these four allegations of misconduct alone suffice to satisfy Plaintiff's burden, at this stage.

officer's alleged unlawful seizure of, and use of force on, the plaintiff).  Thus, the BPD's motion to dismiss the failure to train *Monell* claim will be denied.

### iii.      Plaintiff's Condonation Theory

The BPD next seeks to dismiss Plaintiff's condonation theory of *Monell* liability.  ECF 29-1 at 12-16.  A municipality is liable under a condonation theory "if municipal policymakers fail 'to put a stop to[,] or correct[,] a widespread pattern of unconstitutional conduct.'"  *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389).  To plausibly allege *Monell* liability by condonation, a plaintiff must state facts showing "a persistent and widespread practice of municipal officials, the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their deliberate indifference."  *Id.* at 402-03 (internal alterations and quotations omitted) (quoting *Spell*, 824 F.2d at 1386-91).  In the Fourth Circuit's words: "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier."  *Id.* at 403.

The BPD first asserts that Plaintiff has failed to plausibly establish a widespread practice of *Brady* violations at the time of his wrongful conviction, and thus has failed to establish the BPD's deliberate indifference.  ECF 29-1 at 14.  This argument attempts to place far too great of a burden on Plaintiff at the pleading stage.  In *Owens*, the plaintiff – similarly claiming to have been wrongfully convicted due to the BPD's failure to turn over exculpatory evidence – plausibly alleged the BPD's *Monell* liability by condonation through two factual allegations:  (1) that "[r]eported and unreported cases from the period of time before and during the events complained of" showed a practice of knowingly suppressing exculpatory evidence; and (2) that "a number of motions were filed and granted during [the relevant] time period," demonstrating the BPD's knowledge of the practice.  767 F.3d at 403-04.  The Fourth Circuit found that

Owens's "brief, but non-conclusory, allegations" buttressed his legal conclusion that the BPD adhered to an impermissible custom. *Id.* at 403.

Plaintiff's factual allegations exceed those in *Owens*. He alleges that the BPD had a policy of fabricating evidence and suppressing exculpatory evidence, and that "[b]y the time of Mr. Ali's death and the investigation that led to Plaintiff's wrongful arrest and conviction, those policies were firmly entrenched." ECF 5, ¶¶ 45-46. He further buttresses these factual allegations with a specific example from 1981, and three examples from 1988. *Id.* ¶¶ 50-53. The BPD is alleged to have "failed to act to remedy" these wrongful acts. *Id.* ¶ 66. Plaintiff has therefore easily satisfied his burden to establish that a widespread practice of evidence fabrication and suppression existed in the BPD, and that BPD policymakers were deliberately indifferent to that practice in failing to address it. *See Owens*, 757 F.3d at 403-04; *Estate of Bryant*, 2020 WL 673571, at *41-42.

The BPD next argues that Plaintiff fails to allege the requisite causal connection between his constitutional violations and the unlawful policies the BPD allegedly condoned. ECF 29-1 at 14-16. This argument is unconvincing. As the Fourth Circuit has recognized, at the pleading stage, "[t]here is no requirement that" the plaintiff "plead the multiple incidents of constitutional violations that may be necessary at later stages to establish . . . causation." *Jordan by Jordan*, 15 F.3d at 339. Indeed, in holding that only the notice pleading requirements of Federal Rule of Civil Procedure 8 applied to *Monell* claims, the Supreme Court stated, "federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993); *accord Jordan by Jordan*, 15 F.3d at 340. Courts in this District have heeded this call, and held that a plaintiff need only allege that the municipality "was aware of ongoing

constitutional violations," and that this awareness allowed the custom of unconstitutional practices to continue developing. *Garcia v. Montgomery County*, No. JFM-12-3592, 2013 WL 4539394, at *5 (D. Md. Aug. 23, 2013); *see also, e.g.*, *McDowell*, 2018 WL 3756727, at *6; *J.A. v. Miranda*, No. PX-16-3953, 2017 WL 3840026, at *7 (D. Md. Sept. 1, 2017). Plaintiff here has done just that, *see* ECF 5, ¶¶ 45-46, 65-66, and, as noted above, supplemented these allegations with the type of specific examples that will later be necessary to establish liability, *see, e.g.*, *id.* ¶¶ 50-53. Plaintiff has therefore sufficiently alleged a condonation theory of *Monell* liability. *See Burgess v. Balt. Police Dep't*, No. RDB-15-0834, 2016 WL 795975, at *2, *12-13 (D. Md. Mar. 1, 2016) (concluding that a plaintiff wrongfully convicted in 1995 plausibly alleged a condonation theory of *Monell* liability against the BPD by including three specific examples of alleged *Brady* violations by the BPD in 1981, 1988, and 1995).

### iv.      Plaintiff's Failure to Supervise and Discipline Theory

Finally, the BPD seeks to dismiss Plaintiff's "failure to supervise and discipline" theory of *Monell* liability. ECF 29-1 at 11-12. This position also lacks merit. True, the Amended Complaint contains just three allegations regarding the BPD's "failure to supervise and discipline": (1) "[t]he BPD's failure to train, supervise, and discipline its employees effectively condoned, ratified, and sanctioned the kind of misconduct that the Officer Defendants committed against Plaintiff in this case," ECF 5, ¶ 68; (2) "[T]he BPD failed to properly supervise and discipline its police employees," *id.* ¶ 71; and (3) "The failure to train, supervise, and discipline BPD employees was consciously approved at the highest policy-making level by policymakers who were deliberately indifferent to the violations of constitutional rights described herein, and that failure was a cause of the injuries suffered here by Plaintiff," *id.* ¶ 72.

18

When read in conjunction with the other well-pleaded factual allegations, Plaintiff's failure to supervise and discipline claim properly states a claim for relief. A failure to supervise gives rise to municipal liability "only in those situations in which there is a history of widespread abuse." *Wellington v. Daniels*, 717 F.3d 932, 936 (4th Cir. 1983). Such is the case here. As described above, Plaintiff has alleged that, at the time of his wrongful conviction, the BPD condoned a widespread practice of evidence suppression and fabrication. Having had knowledge of this pattern, but failing to act to remedy it, ECF 5, ¶ 73, it is plausible that the BPD was also deliberately indifferent to the need to properly supervise and discipline the Officer Defendants for engaging in those acts. Thus, the BPD's motion to dismiss Count V will be denied.

### 2. Plaintiff's *Monell* Claim Against the Mayor & City Council of Baltimore Fails as a Matter of Law

Next, the MCC seeks to dismiss the *Monell* claim lodged against it in Count V. ECF 29-1 at 16-19; ECF 50 at 5-11. Plaintiff asserts that the MCC is a joint policymaker with the BPD, and therefore also can incur *Monell* liability for his constitutional harms. ECF 37 at 22-28. Plaintiff's argument is ultimately unavailing, even at the motion to dismiss stage.

As noted, a municipality's liability under § 1983 can flow "through the decisions of a person with final policymaking authority." *Carter*, 164 F.3d at 217; *see also Monell*, 436 U.S. at 694 (noting that the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may be said to fairly present official policy, inflicts the injury" complained of). But, "[a] government policy or custom need not have received formal approval through the municipality's official decisionmaking channels to subject the municipality to liability." *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 522 (4th Cir. 2000). Thus, a municipality may be held liable for a final policymaker's implementation of a policy through "acquiescence" to unconstitutional conduct. *Id.* at 523. The focus on *final*

policymaking authority has long been recognized as a vital inquiry in determining a municipality's liability under § 1983, for it distinguishes "acts of the municipality from acts of employees of the municipality."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis omitted); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (reiterating the *Pembaur* plurality's conclusion that "the authority to make municipal policy is necessarily the authority to make *final* policy" (citing *Pembaur*, 475 U.S. at 481-84 (plurality opinion))); *Riddick*, 238 F.3d at 523.

A "final policymaker" is a person who has "the responsibility and authority to implement final municipal policy with respect to a particular course of action."  *Riddick*, 238 F.3d at 523 (emphasis omitted); *see also Lytle v. Doyle*, 326 F.3d 463, 472 (noting that the "type of policymaking authority which can invoke § 1983 liability is 'authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government.'" (quoting *Spell*, 824 F.2d at 1386)).  The determination of who is a final policymaker is a question of state law "to be resolved by the trial judge before the case is submitted to the jury."  *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989); *see Praprotnik*, 485 U.S. at 124.  In this analysis, courts generally look to "the relevant legal materials, including state and local positive law, as well as 'custom or usage having the force of law.'"  *Jett*, 491 U.S. at 737 (quoting *Praprotnik*, 485 U.S. at 124 n.1).

In *Praprotnik*, the Supreme Court recognized that "there will be cases in which policymaking authority is shared among more than one official or body."  485 U.S. at 126.  In those cases, then, "one would have to conclude that policy decisions made" by either final policymaker would be attributable to the municipality.  *Id.*  Additionally, the Court recognized a

final policymaker may, in some cases, delegate final policymaking authority to another official, which could lead to a municipality's liability. *See id.* at 126-27.

The case law analyzing the issue of whether the Mayor of Baltimore City is liable under § 1983 for the conduct BPD officers is legion, and almost exclusively one-sided: "[Baltimore] City simply does not exert legal control over the BPD within the ambit of Section 1983." *Burgess*, 2016 WL 795975, at *5.  In *Estate of Anderson v. Strohman*, United States District Judge George L. Russell III explained that the rationales underlying previous decisions from this District, holding that the MCC could be held liable under § 1983 for the conduct of BPD officers, were unpersuasive, given the "mountain of law," both at the federal and state level, "insisting [that] the City does not sufficiently control the BPD or Baltimore police officers."  6 F. Supp. 3d 639, 646 (D. Md. 2014); *see id.* at 643-46.  Judge Russell concluded that "Baltimore police officers are state employees free from the City's supervision and control," and, therefore, the City "cannot be liable" for BPD officers' conduct under § 1983.  *Id.*  Since this decision, courts in this District have followed suit, and held the same.  *See, e.g.*, *Harrod v. Mayor & City Council Balt. City*, No. GLR-18-2542, 2019 WL 5636392, at *2-3 (D. Md. July 24, 2019); *Whetstone v. Mayor & City Council of Balt.*, No. ELH-18-738, 2019 WL 1200555, at *12-13 (D. Md. Mar. 13, 2019); *Burgess*, 2016 WL 795975, at *5-6; *Dale v. Mayor & City Council of Balt. City*, Civ. A. No. WDQ-14-2152, 2015 WL 5521815, at *3-4 (D. Md. Sept. 15, 2015); *Holloman v. Rawlings-Blake*, Civ. A. No. CCB-14-1516, 2014 WL 7146974, at *4 (D. Md. Dec. 12, 2014).

The ruling in *Estate of Anderson*, and in the cases subsequent cited above, comport with the Maryland Court of Appeals's view of the BPD's classification as a state, not local, agency:

> The decisions of this Court concerning the liability of the City of Baltimore for the acts, activity[,] and inaction of the Police Department, *over which it has no power*, have been consistent and unequivocal, premised on, and holding

uniformly, that the Baltimore Police Department is an entity of the State, and not of the City of Baltimore.

*Mayor & City Council of Balt. v. Clark*, 404 Md. 13, 26 (2008) (citations omitted) (emphasis added).  In fact, relevant to the instant suit, in 1988, the Court of Appeals rejected the argument that the Baltimore City Mayor's newfound power to appoint the BPD Commissioner impacted this longstanding principle:

> It is true that, by Ch. 920 of the Acts of 1976, the General Assembly transferred the power to appoint the Baltimore City Police Commissioner from the Governor to the Mayor of Baltimore City. At the same time, however, the General Assembly maintained the express designation of the Baltimore City Police Department as a *state* rather than a local government agency. Furthermore, the General Assembly, and not the Baltimore City Council, has continued to be the legislative body enacting significant legislation governing the Baltimore City Police Department.

*Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 669 (1988) (internal citations omitted); *see also Clark*, 404 Md. at 28 ("[N]otwithstanding the Mayor's role in appointing and removing the City's Police Commissioner, the Baltimore City Police Department is a state agency.").

In fact, "[t]he City of Baltimore, as a matter of law, is not permitted to regulate or supervise the Baltimore Police Department."  *Young v. City of Baltimore*, No. GLR-16-1321, 2017 WL 713860, at *2 (D. Md. Feb. 23, 2017).  This is because Article II, section 27 of the Baltimore City Charter explicitly provides that "no ordinance of the City or act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."  *See also Clark*, 404 Md. at 23 (reciting this provision).  And if the Police Commissioner refuses to implement the policy objectives of a Baltimore City Mayor, the Mayor cannot fire the Commissioner for that reason alone.  As the Court of Appeals explained in *Clark*, the Mayor may only remove the Commissioner for cause:  "for official misconduct, malfeasance, inefficiency or incompetency, including prolonged illness, in the manner provided by law in the

case of civil officers." *Id.* at 28.   The only body with the authority to enact significant change with regard to the BPD's structure and functions, outside of the Commissioner, is the Maryland General Assembly.   *Id.* at 25-26; *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 312-13 (2001); *Clea*, 312 Md. at 669.

Plaintiff does not appear to disagree with these well-established principles of state law, *see* ECF 37 at 26, but instead argues that the MCC has "co-policymaking authority" with the BPD, *id.*   He argues that the "MCC, with the BPD's permission, shares policymaking authority with the BPD and influences BPD's policies, customs, and practices to a degree sufficient to be, in practice, a shared policymaking authority."   *Id.*   This "shared authority," according to Plaintiff, "has been created through the BPD's custom and practice of deferring to and adopting the MCC's decisions, and jointly making decisions with the MCC."   *Id.*   Even taking all of the Amended Complaint's factual allegations in a light most favorable to Plaintiff, they are insufficient, as a matter of law, to plausibly establish that the MCC shares final policymaking authority with the BPD Commissioner, or some other final policymaker within the BPD.

Plaintiff attempts to liken his case to *Lucero v. Early*, No. GLR-13-1036, 2019 WL 4673448 (D. Md. Sept. 25, 2019), which was authored by Judge Russell, and *Estate of Alvarez v. Johns Hopkins University*, 275 F. Supp. 3d 670, 682 (D. Md. 2017).   In *Lucero*, the City and the BPD were alleged to have "jointly formulated" a policy "that restricted protestors', including leafletters', use of the side walk and plaza area surrounding the [First Mariner] Arena during the [Ringling Brothers] Circus."   2019 WL 4673448, at *1.   The plaintiff, Lucero, was arrested by a BPD officer who, at the time, "was off duty and working for his own private security company," not the BPD.   *Id.* at *1, *8.   Lucero further alleged that both the Baltimore City Chief Solicitor and "BPD Command Staff" were involved in the policy's creation, and were therefore joint

policymakers. *Id.* at *7-8.  Judge Russell held that Lucero plausibly alleged a joint policymaker theory of *Monell* liability, given that the City was directly involved in the formation of the policy, and given that Lucero was arrested by an officer working for a private security company. *Id.*  Under those circumstances, "the Court can plausibly infer that the City developed and implemented the Policy." *Id.*

In *Estate of Alvarez*, the plaintiffs sued various Johns Hopkins entities, the Rockefeller Foundation, and Bristol-Myers Squibb, under the law of Guatemala and the Alien Tort Statute, for designing, and implementing, a nonconsensual human experimentation program in Guatemala.  275 F. Supp. 3d at 677-78.  To determine whether the corporate entities were liable under the Alien Tort Statute, the court applied a *Monell*-type inquiry. *Id.* at 691.  The plaintiffs had alleged that specific doctors within Johns Hopkins, and specific individuals within the other corporate entities, were delegated decisionmaking authority by their relative entity, and that each entity "directed and encouraged" the human study to proceed. *Id.* at 692-93.  Based on these allegations, the court found that the plaintiffs plausibly alleged "that these individuals acted as decisionmakers within each of their respective entities" so as to support a claim of corporate liability under the Alien Tort Statute. *Id.* at 693.

Neither *Lucero* nor *Estate of Alvarez* advances Plaintiff's instant claims.  At most, here, Plaintiff has alleged that the Mayor, over the course of the past fifty years, has made scattershot attempts to utilize his or her political clout to influence the Commissioner's policy decisions. *See* ECF 5, ¶¶ 75-83.  In *Lucero* and *Estate of Alvarez*, however, the plaintiffs pointedly alleged facts tending to show that individuals with final decisionmaking authority were involved in the creation and implementation of a specific policy, together with some third party. *See Lucero*, 2019 WL 2019 WL 4673448, at *1, *7-8; *Estate of Alvarez*, 275 F. Supp. 3d at 692-93.  Here,

even when reading Plaintiff's allegations in a light most favorable to him, they do little to establish a "custom or usage" of the MCC as a joint policymaker with the Commissioner.  First, while the CEB and CRC, ECF 5, ¶¶ 80-81, may allow the City to stay apprised of BPD officer misconduct, the Court cannot infer the City's ability to play an equal hand in fashioning BPD policy.   Second, although the Mayor does have the authority to appoint and remove the Commissioner, *id.* ¶ 75, as noted above, the Maryland Court of Appeals has expressly rejected the argument that this makes the City a final policymaker of the BPD, *Clea*, 312 Md. at 669; *see also Clark*, 404 Md. at 28.   Third, Plaintiff points to the actions of then-Mayor Elect Martin O'Malley, who, in 1999 (twelve years after Plaintiff's wrongful conviction), sought to hire a Commissioner who would agree to allow consultants to analyze corruption issues within the BPD.  ECF 5, ¶ 77.  Even still, the Amended Complaint recognizes that the Mayor did this "*with the intent* of having BPD implement the consultants' recommendations," and it lacks any allegation that the BPD automatically deferred to those recommendations, without further scrutiny.   *Id.* (emphasis added).   Fourth, Plaintiff points to the fact that the City controls the BPD's budget, and accordingly must pay the BPD's indemnification obligations.  *Id.* ¶¶ 78, 83. However, the City's control over the BPD's budget has never been viewed as nullifying the BPD's status as a state agency, independent from the City.  *E.g.*, *Harrod*, 2019 WL 5636392, at *3.  And as the Maryland Court of Special Appeals has held, the 1997 amendment to the Local Government Torts Claim Act that made the BPD a "local government," and thus gave rise to the BPD's indemnification obligation, "did not affect the [BPD]'s status as a State agency or its State sovereign immunity, except as expressly stated in the act."  *Cherkes*, 140 Md. App. at 325-26.   Finally, the efforts of Mayor Stephanie Rawlings-Blake in the mid-2010s to solicit the United States Department of Justice's to launch an investigation into BPD misconduct, initiate a

body-camera pilot program for BPD officers, and work with the BPD to shut down the GTTF, ECF 5, ¶ 79, do little to shed light on the MCC's policymaking role in 1987.

This is not to say that, like in *Lucero* and *Estate of Alvarez*, the MCC can never be deemed a joint, final policymaker with the Commissioner in promulgating a single, *ad hoc* policy decision. *See Spell*, 824 F.2d at 1385 (noting that municipal policy actionable under § 1983 "may also be found in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy"); *see also Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (recognizing that a "governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances" so long as it possessed "final authority to create official policy"). But, as demonstrated above, Plaintiff's allegations do not allow this Court to plausibly infer that the MCC is *always* a joint policymaker for every policy decision that the Commissioner issues, particularly the operational policies that are complained of here. As the Fourth Circuit recently observed, courts "must never 'assum[e] that municipal policymaking authority lies somewhere other than where the applicable law purports to put it.'" *Hunter v. Town of Mocksville*, 897 F.3d 538, 555 (4th Cir. 2018) (quoting *Praprotnik*, 485 U.S. at 126). Plaintiff here asks the Court to do just that.

In sum, the Court finds that the established principle that the BPD is a state agency over which the MCC has no control, for the purposes of § 1983, is undisturbed by Plaintiff's allegations. Plaintiff fails to plausibly establish that the MCC was a joint policymaker of the policies that allegedly caused his constitutional harm. Accordingly, the *Monell* claim against the MCC in Count V will be dismissed, without prejudice.

### 3.    Plaintiff Properly Asserts a State Law Indemnification Claim Against the BPD

Next, the BPD argues that the indemnification claim asserted against it in Count IX, ECF 5, ¶¶ 139-41, must be dismissed.  ECF 29-1 at 22-24.  It argues first that it has state sovereign immunity to the indemnification claim, until Plaintiff obtains a judgment against at least one of the Officer Defendants.  ECF 29-1 at 22-23.  Second, the BPD asserts that Plaintiff lacks standing to assert an indemnification claim directly against the BPD, given that there is no judgment against any Officer Defendant.  *Id.* at 23-24.  Both contentions lack merit, at this stage.

The LGTCA provides that any "local government," which includes the BPD, "shall be liable for any judgment against its employee for damages resulting from tortious acts or omissions committed by the employee within the scope of employment."  Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1); *see id.* § 5-301(d)(21) (including the BPD in the LGTCA's definition of "local government").  Importantly, the LGTCA bars the relevant entity from asserting sovereign immunity as a defense to its indemnification obligation.  *See id.* § 5-303(b)(2); *Cherkes*, 140 Md. App. at 323 ("[T]he General Assembly waived the BCPD's common law State sovereign immunity only to the extent of the statutory duties to defend and indemnify.").  Further, in *Johnson v. Francis*, the Maryland Court of Special Appeals considered, and rejected, the argument that no individual plaintiff may sue the BPD directly for indemnification.  239 Md. App. 530, 549, 554-55 (2018), *cert. denied*, 463 Md. 155 (2019).  The Court of Special Appeals reasoned that "[w]hen read in the context with the statute, the local government's obligation under § 5-303(b)(1) unambiguously runs directly to the underlying plaintiff."  *Id.* at 551.  The court therefore specifically held that the LGTCA permits plaintiffs to sue local government agencies directly for indemnification of harms caused by one of the agency's employees acting within the scope of his employment.  *Id.* at 555.

27

First, the BPD's assertion of state sovereign immunity to the indemnification claim fails at this stage. The Court recognizes, of course, that issues of sovereign immunity should be decided "as soon as possible after the State asserts its immunity." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 482 & n.4 (4th Cir. 2005). Determinations of sovereign immunity at the pleading stage are most common in cases in which the entity's sovereign immunity hinges upon whether the relevant statute providing the cause of action properly waives sovereign immunity. *See, e.g.*, *Robinson v. Pa. Higher Educ. Assistance Agency*, 917 F.3d 799, 802 (4th Cir. 2019) (considering whether the Fair Credit Reporting Act contains a waiver of sovereign immunity); *Constantine*, 411 F.3d at 484-86 (considering whether Congress properly abrogated states' sovereign immunity in passing Title II of the Americans with Disabilities Act).

However, the assertion of sovereign immunity in this instance is highly fact-dependent. *See also, e.g.*, *Pele v. Pa. Higher Educ. Assistance Agency*, 13 F. Supp. 3d 518, 527-28 (E.D. Va. 2014) (deferring ruling on an assertion of "arm of the state" sovereign immunity two of the four factors in the analysis were unclear at the motion to dismiss stage); *Palmer v. Kokosing W. Va., LLC*, No., 2006 WL 890009, at *2 ("[I]t is too early in the discovery process to be able to determine whether the doctrine [of derivate sovereign immunity] should apply to each of Plaintiffs' claims because there are material issues of fact regarding the nature of the work and Kokosing's obligations under the contract."). At the Rule 12(b)(6) stage, the Court must construe all facts and reasonable inferences in Plaintiff's favor. Under that lenient standard of review, and based on the allegations in the Amended Complaint, the Court finds that it is plausible that the Officer Defendants will be found liable, and that they were acting within the scope of their employment when they committed the acts alleged. This conclusion is only bolstered by the

28

Maryland Court of Appeals's recent ruling that the BPD must indemnify the civil plaintiffs in those cases seeking damages for the harms caused by GTTF officers' unlawful conduct, because that conduct occurred within the scope of their employment. *Balt. City Police Dep't v. Potts*, Misc. No. 6, Sept. Term, 2019 & No. 51, Sept. Term, 2019, __ A.3d __, 2020 WL 1983209, at *19-27 (Md. Apr. 24, 2020). Of course, the BPD may raise its sovereign immunity defense again at a later stage if the Officer Defendants are found not liable, or if the Officer Defendants are found to have acted outside the scope of their employment. *See id.* at 27 ("We are not issuing a blanket ruling for all cases involving alleged misconduct by former members of the Department's Gun Trace Task Force.").

As to the BPD's second argument, the decision of the court in *Johnson v. Baltimore Police Department*, No. ELH-19-00698, 2020 WL 1169739 (D. Md. Mar. 10, 2020), is on all fours. In that case, an exonerated Baltimore City prisoner, Jerome Johnson, sued the BPD and four BPD detectives for his wrongful murder conviction. *Id.* at *1. Mr. Johnson brought § 1983 claims against the detectives, and a *Monell* claim against the BPD. *Id.* Mr. Johnson also pled an indemnification claim against the BPD. *Id.* The BPD argued that the indemnification claim was premature, because there was no judgment against any detective, or a finding that any detective was acting within the scope of their employment with the BPD. *Id.* at *37.

The court rejected these arguments. *Id.* at *38. Collecting a number of cases from Maryland's appellate courts, the court first concluded that there is no case law "preclud[ing] a plaintiff from *pleading* an indemnification claim before final judgment." *Id.* (citations omitted). Next, the court found that, while some courts have dismissed indemnification claims against the BPD as premature, under the circumstances of Mr. Johnson's case, "permitting [him] to plead an

indemnification claim against the BPD at the outset avoids the possibility of redundant litigation, thereby facilitating the efficient resolution of this case." *Id.* The court continued:

> Indeed, for that reason, courts in this District have permitted the BPD to file a cross-claim for indemnification against an officer under [Federal Rule of Civil Procedure] 13(g), seeking a declaration that it has no duty to indemnify despite the officer's liability not having been established. *See Bumgardner v. Taylor*, GLR-18-1438, 2019 WL 4115414, at *11 (D. Md. Aug. 29, 2019) (finding that "permitting BPD's Cross-Claim to proceed directly behind [the plaintiff's] claims serves the purposes of Rule 13(g)"); *Harrod v. Mayor & City Council of Balt.*, GLR-18-2542, 2019 WL 5636392, at *4 (D. Md. July 24, 2019) (same). That approach makes good sense where, as here, "[d]etermining whether [the] Officer Defendants were acting within the scope of their employment will, in turn, determine whether BPD is liable for [the] Officer Defendants' actions." *Bumgardner*, 2019 WL 4115414, at *11.

*Id.*

Similarly, here, Plaintiffs have lodged a *Monell* claim directly against the BPD, as well as a number of federal and state law claims against individuals allegedly employed by the BPD at the time of Plaintiff's arrest and conviction. Thus, to facilitate an efficient resolution of this case, and to avoid "the possibility of redundant litigation," the Court concludes that dismissal of Plaintiffs' indemnification claim would be improper at this time. *Id.* The motion to dismiss Count IX will therefore be denied.

### 4. Plaintiff Concedes that He Is Not Seeking Punitive Damages from the BPD or the MCC

Finally, the BPD and MCC argue that Plaintiff impermissibly seeks punitive damages from them. ECF 29-1 at 24. Plaintiff remarks, however, that "[a] fair reading of Plaintiff's [Amended] Complaint makes clear that Plaintiff is not seeking punitive damages from the BPD or the MCC." ECF 37 at 37. To be sure, the phrasing of Plaintiff's *ad damnum* clause did leave some ambiguity. *See* ECF 5 at 31 (*ad damnum* clause) (seeking an award of, *inter alia*, "punitive damages against each Defendant," after listing all Defendants, including the BPD and MCC). In

any event, since Plaintiff is now representing that he is not seeking punitive damages from the BPD and MCC, the Court will grant the motion to dismiss on this ground, to avoid future confusion.

## II.  PLAINTIFF'S MOTION TO APPOINT A PERSONAL REPRESENTATIVE & MOTION FOR EXTENSION OF TIME

As noted at the outset, Plaintiff has filed two additional procedural motions related to the service of Defendant MacGillivary – a Second Motion for Extension of Time, ECF 35, and a Motion to Appoint a Personal Representative, ECF 36.  MacGillivary is alleged to have supervised the BPD's Homicide Unit during the time period relevant to Plaintiff's lawsuit.  ECF 5, ¶ 34.  MacGillivary, however, passed away in 1996, and his estate is now closed.  *See* ECF 27, ¶ 4 (Plaintiff's First Motion for Extension of Time to Serve MacGillivary).  Plaintiff asks that the Court (1) appoint a personal representative for MacGillivary's estate, so that MacGillivary may defend Plaintiff's claims, and (2) extend the time for Plaintiff to serve the estate until thirty days after the personal representative is appointed.  ECF 36 at 7-8; ECF 35, ¶ 7.

Some brief procedural background is helpful.  Plaintiff first moved to extend the time period to serve MacGillivary on November 22, 2019.  ECF 27.  The Court granted Plaintiff the requested extension of time.  ECF 34.  It appeared to the Court, from Plaintiff's assertions in the motion, that he was actively seeking to reopen MacGillivary's estate in Maryland state court.  *See* ECF 27, ¶ 13 ("Plaintiff is asking for 35 additional days in which to effect service against Defendant MacGillivary.  In particular, Plaintiff needs the additional time to re-open Defendant MacGillivary's estate and have a personal representative appointed.").  Accordingly, given the liberal construction of Federal Rule of Civil Procedure 4(m)'s "good cause" requirement, the Court granted Plaintiff additional time to effectuate this process, notwithstanding the possibility that Plaintiff's claim against MacGillivary's estate may ultimately be time-barred.  ECF 34.

Plaintiff now asks this Court, however, to appoint a personal representative, ECF 36, which requires a more substantive analysis.[4]

Plaintiff's Motion to Appoint relies on the application of Federal Rule of Civil Procedure 25(a)(1).  That rule provides that "[i]f a *party* dies and the claim is not extinguished, the court may order substitution of the proper party."  *Id.* (emphasis added).  However, Rule 25(a)(1) only applies to *parties*, i.e., "someone who had been made a party to the action," through service of the Complaint, "*before* his death."  *Moul v. Pace*, 261 F. Supp. 616, 617-18 (D. Md. 1966) (emphasis added) (quoting *Chorney v. Callahan*, 135 F. Supp. 35, 36 (D. Mass. 1955)). Accordingly, courts cannot substitute the personal representative of a decedent's estate for a decedent named in a complaint, if the decedent's death occurred before the filing of the complaint.  *Id.*; *accord Mizukami v. Buras*, 419 F.2d 1319, 1320 (5th Cir. 1969) (per curiam); *Lacy v. Tyson*, No. 1:07-cv-00381-LJO-GSA-PC, 2012 WL 4343837, at *2 (E.D. Cal. Sept. 20, 2012), *report and recommendation adopted*, 2012 WL 5421230 (E.D. Cal. Nov. 5, 2012); *Laney v. S.C. Dep't of Corr.*, NO. CA 4:11-3487-JMC-TER, 2012 WL 4069690, at *4 (D.S.C. May 8, 2012), *report and recommendation adopted*, 2012 WL 4069590 (D.S.C. Sept. 15, 2012); *Davis v. Cadwell*, 94 F.R.D. 306, 307 (D. Del. 1982); *see also* 7C CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1951 (3d ed. 2010) ("The rule presupposes that substitution is for someone who was a party to a pending action.  Substitution is not possible if one who was named as a party in fact died before the commencement of the action." (footnotes omitted)). Here, MacGillivary's death preceded Plaintiff's Complaint by nearly 23 years.  Thus, no

---

[4] Notably, the other Officer Defendants have not demonstrated, nor is the Court convinced, that they have standing to oppose Plaintiff's requests for appointing a personal representative and for an extension of time to serve MacGillivary.  In any event, the rulings the Court makes herein are based on solely on its independent analysis of the contentions made by Plaintiff in his motions, and not on any of the Officer Defendants' arguments in opposition.

procedural mechanism exists for the Court to substitute his presence in this case for that of a personal representative of his estate.  *See Moul*, 261 F. Supp. at 617-18; *Chorney*, 135 F. Supp. at 36 (explaining that once a suit is filed against an individual who passed away before the complaint's filing, "[a]t that point the purported action [is] a nullity, for a dead man obviously cannot be named party defendant in an action").

None of the cases Plaintiff cites convinces the Court otherwise.  ECF 36 at 6 n.2.  *Hicks v. Young* comes closest to the facts of the instant case, but the defendant-decedent to be substituted there died *after* the filing of the complaint.  No. 10-C-3874, 2012 WL 1755735, at *1-2 (N.D. Ill. May 15, 2012).  In the rest of Plaintiff's cited cases – which all come from the United States District Court for the Northern District of Illinois – courts were exercising their recognized power to appoint a "special representative" for a deceased defendant *pursuant to Illinois law*.  *See, e.g.*, Unopposed Motion to Appoint and Substitute a Special Representative, ¶¶ 4-5, *Savory v. Cannon*, No. 17-C-204 (N.D. Ill. filed Mar. 8, 2017), ECF 38 (citing, *inter alia*, 735 ILCS 2/2-1008(b)(2), 5/13-209(b)(2)); *Rivera v. Lake County*, 947 F. Supp. 2d 1179, 1187, 1198-99 (N.D. Ill. 2013).  Indeed, the court in *Starks* granted a motion to appoint a "special representative" pursuant to Illinois law, even though the decedent-defendant passed away prior to the filing of the case, because Illinois law, 735 ILCS 5/13-209(c), specifically allowed courts to appoint a special representative if a plaintiff, at the time of filing the suit, lacked knowledge of the named defendant's prior death.  *See* Minute Entry, *Starks v. City of Waukegan*, No. 09-C-348 (N.D. Ill. filed Jan. 15, 2014), ECF 208.  Here, even assuming that the Court could use an analogous provision of Maryland law, Plaintiff does not cite to one, nor could the Court independently discern one.  The closest provision, which Plaintiff does cite, is section 10-104 of the Estates and Trusts Article of the Maryland Code Annotated.  That section, however, only

provides courts with the ability to appoint a personal representative "[i]f *property* is discovered after an estate has been closed," not if a party discovers a possible claim for relief against a decedent.  *Id.* (emphasis added).

Because MacGillivary's estate has been closed for some time now, Plaintiff must vindicate himself of the procedures afforded to him under Maryland state law for reestablishing a personal representative of MacGillivary's estate, and then seek leave from this Court to file a Second Amended Complaint to name that representative as a defendant.  That motion must, per Federal Rule of Civil Procedure 15, not only demonstrate that the amendment is not futile,[5] but also that the amendment relates back to the date of the original pleading, should that issue also arise.  But since, as discussed above, there is no procedural mechanism for granting Plaintiff the relief he requests, the Motion to Appoint will be denied.[6]

---

[5] The parties address an apparent statute of limitations issue arising with Plaintiff's claim against MacGillivary's estate.  Maryland law generally provides that a claim against a decedent, "whether due or to become due, absolute or contingent, . . . is forever barred against the estate, the personal representative, and the heirs and legatees, unless presented within the earlier of" (1) six months after the decedent's death, or (2) two months after the personal representative notifies the creditor of the decedent's death.  Md. Code Ann., Est. & Trusts § 8-103(a) (West 2019).  Plainly, since MacGillivary passed in 1996, Plaintiff's claim would be time barred under that provision.  Plaintiff asserts, however, that his claim is timely under section 8-104(e)(1).  That section provides that "[i]f the decedent was covered by a liability insurance policy which at the time the action is instituted provides insurance coverage for the occurrence," then Maryland's general statute of limitations provisions, not the limited one prescribed in section 8-103, control.  MacGillivary's "insurance policy," Plaintiff argues, is the BPD's statutorily required indemnification duty, *see* Md. Code Ann., Cts. & Jud. Proc. § 5-303(b)(1).  Despite the patent differences between an insurance policy and a statutory duty of indemnification, the Court need not definitively reach the issue at this stage, especially considering that the Officer Defendants do not have standing to oppose Plaintiff's instant request, as noted above.

[6] The *Moul* court, *sua sponte*, considered the plaintiff's Rule 25(a)(1) motion as a motion to amend his complaint, pursuant to Rule 15.  *See* 261 F. Supp. at 618.  This is because the plaintiff had already provided evidence of "the issuance of letters of administration to, and the qualification of, the administrator" of the decedent's estate, after learning that the named defendant died before the filing of the complaint.  *Id.* at 617.  Such a *sua sponte* ruling is not

For similar reasons, Plaintiff's Motion for Extension of Time fails. Rule 4(m) provides that if a plaintiff fails to serve the complaint on a named defendant within ninety days after the complaint is filed, the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." The rule further provides that if the plaintiff shows good cause for the failure to timely serve, "the court must extend the time for service for an appropriate period." *Id.* It is unclear whether Rule 4(m) requires Plaintiff to demonstrate good cause for his inability to timely serve MacGillivary, or whether the Court may grant a discretionary extension even in the absence of good cause. *See generally Chen v. Mayor & City Council of Balt.*, 292 F.R.D. 288, 291-93 (D. Md. 2013) (discussing the doctrinal uncertainty regarding Rule 4(m)'s good cause requirement, stemming from the Fourth Circuit's decision in *Mendez v. Elliot*, 45 F.3d 75 (4th Cir. 1995)). Regardless, Plaintiff here is not entitled to an extension of the service deadline, because his action against MacGillivary, as described above, is a legal "nullity." *See Moul*, 261 F. Supp. at 617-18; *Chorney*, 135 F. Supp. at 36. MacGillivary himself will never be properly served in this action, no matter how long of an extension Plaintiff may be granted. Plaintiff's Motion for Extension of Time will therefore be denied, and MacGillivary will be dismissed from this action, without prejudice to Plaintiff's reopening MacGillivary's estate in the state courts, and then, if successful, seeking leave to amend his complaint to add the estate's personal representative as a defendant.

## III.  CONCLUSION

For the reasons set forth above, the BPD's Motion to Dismiss, ECF 29, is GRANTED IN PART and DENIED IN PART; the MCC's Motion to Dismiss, ECF 29, is GRANTED;

---

proper here, however, because "there is neither an estate nor personal representative" for MacGillivary. ECF 35, ¶ 5.

Plaintiffs' Motion for Extension of Time, ECF 35, is DENIED; and Plaintiff's Motion to Appoint, ECF 36, is DENIED.  Plaintiff will be granted thirty days to seek leave to amend his complaint to rectify the deficiencies in the claims dismissed herein.  The Court will also dismiss MacGillivary from this case, with prejudice, and the case will proceed forward without him, unless Plaintiff seeks leave to amend to add his estate to this case as described herein.  A separate implementing Order follows.

Dated:  May 6, 2020                                             /s/
                                                    Stephanie A. Gallagher
                                                    United States District Judge