**IN THE UNITED STATES DISTRIC COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

|  |  |  |
|---|---|---|
| | * | |
| GARY WASHINGTON, | | |
| Plaintiff, | * | CASE NO.: 1:19-cv-02473-SAG |
| v. | * | Judge Stephanie A. Gallagher |
| BALTIMORE POLICE DEPARTMENT, *et al.*, | * | Jury Trial Demanded |
| Defendants. | * | |
| | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## OFFICER DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Officer Defendants Oscar Requer, Thomas Pellegrini, Richard Fahltich, Frederick Ceruti, and John Tewey, by and through their undersigned counsel, submit the below memorandum of law in support of their motion for summary judgment.

DATE: September 15, 2022                    Respectfully submitted,

_____/S/_____
Shneur Nathan, Bar No. 20707
Avi T. Kamionski, Bar No. 20703
Neal M. Janey, Jr., Bar No. 26800
Alexander S. Rothstein, Bar No. 23228
575 South Charles Street, Suite 402
Baltimore, MD 20201
(410) 846-0057 Direct
(312) 612-1955 Main
(952) 658-3011 Facsimile
snathan@nklawllp.com
akamionski@nklawllp.com
njaney@nklawllp.cpm
arothstein@nklawllp.com

*Counsel for Officer Defendants*

## **TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND .................................................................................................. 2

LEGAL STANDARD ............................................................................................................. 9

ARGUMENT .......................................................................................................................... 9

I.    SUMMARY JUDGMENT SHOULD BE GRANTED ON THE *BRADY* CLAIM
ASSERTED IN COUNT I BECAUSE IT IS UNSUPPORTED BY THE EVIDENCE ........... 9

   A.   Attorney Polansky Did Not Retain His Case File So Plaintiff Cannot Establish That
Any Evidence Was Withheld ............................................................................................. 10

   B.   There Is No Evidence That Officer Defendants Withheld Evidence From The Office Of
the State's Attorney for Baltimore City ("SAO") ............................................................ 11

   C.   The Circumstances of Robinson's And Dorsey's Identifications Cannot Be "Withheld"
For *Brady* Purposes Because They Were Available To Plaintiff Through The Exercise Of
Reasonable Diligence ......................................................................................................... 12

II.    SUMMARY JUDGMENT SHOULD BE GRANTED ON THE FABRICATION OF
EVIDENCE CLAIM ASSERTED IN COUNT I BECAUSE IT IS UNSUPPORTED BY THE
EVIDENCE. ........................................................................................................................ 15

   A.   Any Alleged Falsity In Rosetta Dorsey's Statement Is Immaterial Because Rosetta
Dorsey's Statement Did Not Result In Any Cognizable Deprivation Of Plaintiff's Liberty
Interests .............................................................................................................................. 16

   B.   Plaintiff Cannot Demonstrate that Officer Defendants Knew That The Statement from
Otis Robinson was False .................................................................................................... 16

   C.   Plaintiff Is Collaterally Estopped From Contradicting Otis Robinson's Pretrial Motions
And Trial Testimony Because The Circuit Court For Baltimore City Considered Otis
Robinson's Recantation During Plaintiff's Post-Conviction Proceeding And Expressly
Rejected The Recantation .................................................................................................... 18

III.    OFFICER DEFENDANTS DID NOT MALICIOUSLY PROSECUTE PLAINTIFF
UNDER FEDERAL AND MARYLAND LAW BECAUSE THERE IS NO WANT OF
PROBABLE CAUSE, PLAINTIFF IS COLLATERALLY ESTOPPED FROM ATTACKING
OTIS ROBINSON'S STATEMENT, GRAND JURY, PRETRIAL MOTION AND TRIAL
TESTIMONIES, AND ANY CHALLENGE TO PLAINTIFF'S ARREST FOR UNLAWFUL
DETENTION IS TIME BARRED ........................................................................................ 20

   A.   The Investigative Facts—Including Plaintiff's Proximity to the Crime, His Shifting
Accounts, and His Failure At The Polygraph—Established Probable Cause To Prosecute . 21

   B.   Plaintiff Is Collaterally Estopped From Disputing Probable Cause Established By
Robinson ............................................................................................................................ 22

IV.     Any Claim for Detention Without Probable cause is Time-barred and Plaintiff is Collaterally Estopped from Attacking Robinson's Statements and Grand Jury and Pretrial Motions testimonies ............................................................................................................ 23

V.   BYSTANDER LIABILITY DOES NOT EXIST AGAINST OFFICER DEFENDANTS FREDERICK CERUTI AND JOHN TEWEY BECAUSE NEITHER ENGAGED IN OR IGNORED WRONGFUL CONDUCT ...................................................................................... 24

VI.     PLAINTIFF HAS NOT PLED OR DEMONSTRATED AN ACTIONABLE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER MARYLAND LAW .............................................................................................................. 26

VII.     OFFICER DEFENDANTS ARE NOT LIABLE UNDER ARTICLES 19, 24, AND 26 OF THE MARYLAND DECLARATION OF RIGHTS .......................................................... 28

VIII.    OFFICER DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ............ 29

   A.    Officer Defendants Are Entitled To Qualified Immunity Because Case Law In 1986 or 1987 Did Not Clearly Establish That They Could Not Rely Upon Robinson's Statement For Probable Cause ....................................................................................................................... 30

   B.    Officer Defendants Are Entitled To Qualified Immunity Because There Was No Clearly Established Case Law In 1986 Stating That The Alleged Actions Of The Officer Defendants Constituted Impermissible Coercion. ................................................................................... 32

CONCLUSION ......................................................................................................................... 34

## TABLE OF AUTHORITIES

**Supreme Court**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................. 9

*Ashcraft v. Tennessee*, 322 U.S. 143 (1944) ................................................................ 32

*Brady v. Maryland,* 373 U.S. 83 (1963) ........................................ 9, 10, 11, 12, 13, 14, 15

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 9

*City of Tahlequah v. Bond*, 142 S.Ct. 9 (2021) ........................................................... 34

*District of Columbia v. Wesby*, 138 S.Ct 577 (2018) ........................................ 30, 31, 34

*Haley v. Ohio*, 332 U.S. 596 (1948) .......................................................................... 33

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018) ................................................................. 30

*Montana v. United States,* 440 U.S. 147 (1979) .......................................................... 18

*Napue v. Illinois*, 360 U.S. 264 (1959) ..................................................................... 31

*Owens v. Okure*, 488 U.S. 235 (1989) ...................................................................... 16

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) .................................................. 19

*Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014) ............................................................ 30

*Reichle v. Howards*, 566 U.S. 658 (2012) .................................................................. 30

*Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4 (2021) ...................................................... 34

*Thompson v. Clark*, No. 20-659, 142 S.Ct. 1332 (2022) .............................................. 23

*United States v. Mendoza*, 464 U.S. 154 (1984) ......................................................... 18

*Wallace v. Kato,* 549 U.S. 384 (2007) ................................................................. 16, 23

*White v. Pauly*, 137 S. Ct. 548 (2017) ................................................................ 30, 31

*Ybarra v. Illinois*, 444 U.S. 85 (1979) ..................................................................... 31

**Appellate Courts**

*Bennett v. City of Grand Prairie, TX*, 883 F.2d 400 (5th Cir. 1989) .............................. 22

*Carvjal v. Dominguez*, 542 F.3d 561 (7th Cir. 2008) .................................................. 11

*Colandrea v. Wilde Lake Cmty. Ass'n, Inc.,* 761 A.2d 899 (Md. 2000) .......................... 19

*Dehn Motor Sales, LLC v. Schultz*, 96 A.3d 221(Md. 2014) ......................................... 29

*Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012) ...................................................... 20

*Exxon Corp. v. Kelly*, 381 A.2d 1146 (Md. 1978) ....................................................... 20

*Ferguson v. Boyd*, 566 F.2d 873 (4th Cir. 1977) ................................................... 33, 34

*Floor v. Juveline Serv. Admin.,* 552 A.2d 947 (Md. 1989) ........................................... 27

*Gilliam v. Sealey*, 932 F.3d 216 (4th Cir. 2019) ..................................... 10, 32, 33, 34

*Gomez v. Atkins*, 296 F.3d 25 (4th Cir. 2002) ........................................................... 22

*Harris v. Jones*, 380 A.2d 611 (Md. 1977) ................................................................ 27

*Henderson v. Simms*, 223 F.3d 267 (4th Cir. 2000) .................................................... 21

*Hoke v. Netherland*, 92 F.3d 1350 (4th Cir. 1996) ................................................ 12, 13

*Holland v. City of Chicago*. 643 F.3d 248 (7th Cir. 2011) ........................................... 12

*Jean v. Collins,* 221 F.3d 656 (4th Cir. 2000) ........................................................... 10

*Massey v. Ojaniit,* 759 F.3d 343 (4th Cir. 2014) ........................................................ 15

*Owens v. Baltimore City State's Att'y's Off.*, 767 F.3d 379 (4th Cir. 2014) ............. 10, 16

*Patterson v. State*, 930 A.2d 370 (Md. 2007) ............................................................ 29

*Petty v. City of Chicago,* 754 F.3d 416 (7th Cir. 2014) ..................................................... 13, 15, 18

*Prince George's County v. Longtin,* 419 Md. 450, 19 A.3d 859 (Md. 2011) ............................. 16

*Randall v. Prince George's County,* 302 F.3d 188 (4th Cir. 2002) ........................................... 24

*Stevenson v. City of Seat Pleasant,* 743 F.3d 411 (4th Cir. 2014) ............................................ 24

*Taylor v. Farmer*, 13 F.3d 117 (4th Cir. 1993) ........................................................................ 21

*U.S. v. 8.929 Acres of Land in Arlington Co. Va.,* 36 F.4th 240 (4th Cir. 2022) ........................ 11

*U.S. v. Moussaoui,* 591 F.3d 263 (4th Cir. 2010) ..................................................................... 14

*United States v. Parker,* 790 F.3d 550 (4th Cir. 2015) .............................................................. 10

*United States v. Prince-Oyibo*, 320 F.3d 494 (4th Cir. 2003) ................................................... 22

*United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010) ......................................................... 11

*United States v. Trenkler*, 61 F.3d 45 (1st Cir. 1995) ................................................................ 22

*United States v. Wilson*, 901 F.2d 378 (4th Cir. 1990) .............................................................. 12

*Washington v. Wilmore,* 407 F.3d 274 (4th Cir. 2005) ............................................................. 15

*Welsh v. Gerber Products, Inc.,* 555 A.2d 486 (Md. 1989) ....................................................... 19

**District Courts**

*Arbabi v. Fred Meyers, Inc.,* 205 F.Supp.2d 462 (D. Md. 2002) ............................................... 27

*Barnhill v. Strong*, JFM 07-1678, 2008 WL 544835 *4 (D. Md. February 25, 2008) ................ 29

*Brengle v. Greenbelt Homes, Inc.,* 804 F.Supp. 2d 447 (D. Md. 2011) ..................................... 27

*Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443 (D. Md. 2010)
.......................................................................................................................................... 16

*Burley v. Balto. Police Dep't.,* 422 F.Supp. 3d 986 (D. Md. 2019)....................................... 12, 24

*Cannon v. Polk County,* 68 F.Supp.3d 1267 (D. Or. 2014) ....................................................... 11

*Farasat v. Paulikas,* 32 F.Supp. 2d 244 (D Md 1997)............................................................... 27

*Johnson v. Balto. Police Dep't.,* 500 F.Supp. 3d 454 (D. Md. 2020)......................................... 10

*Martin v. Conner,* 882 F. Supp. 2d 820 (D. Md. 2012) ............................................................ 15

*Owens v. Baltimore City State's Attorneys Office,* GLR-11-3295, 2014 WL 5452944 *5 (D. Md.
September 29. 2016) ......................................................................................................... 19

*Shaw v. Maryland,* ELH–18–782, 2019 WL 4447256 *22 (D. Md. September 16, 2019) .......... 16

*Wheelabrator Baltimore, L.P. v. Mayor and City Council of Balto.,* 449 F.Supp.3d 549 (D. Md.
2020) ............................................................................................................................... 29

**Statutes**

42 U.S.C. § 1983.................................................................................................... 8, 16, 20, 23

**Rules**

Fed. R. Civ. P. 56(c) ................................................................................................................. 9

## INTRODUCTION

In 1987, a Baltimore City jury convicted Gary Washington ("Plaintiff") of the murder of Faheem Ali. The murder occurred on December 27, 1986, just outside the Washington family home in the 2300 block of Barclay Street. Detective Oscar Requer, assisted by Detective Thomas Pellegrini, led the Baltimore Police Department ("BPD") investigation. Detectives interviewed residents of the neighborhood and Plaintiff was identified as the shooter by two eyewitnesses, 12-year-old Otis Robinson and 13-year-old Rosetta Dorsey.  Even after Plaintiff's arrest, BPD continued to pursue leads which only strengthened the existing probable cause, including continuing to interview witnesses and following up on an alternative suspect offered by Plaintiff during a polygraph examination.

Otis Robinson testified for the State and was cross-examined by Plaintiff's trial counsel about what he saw and his interactions with BPD detectives. Plaintiff's defense, including his own testimony, focused on an alternative suspect. Plaintiff's own testimony placed him footsteps from the shooting. Ultimately, the jury credited Otis Robinson's testimony that Plaintiff shot and killed Ali and rejected Plaintiff's defense.

Nearly ten years later, in August of 1996, Otis Robinson was escorted to the Washington family home by Plaintiff's sister and, in the presence of some members of Plaintiff's family, recanted his statement and testimony that he saw Plaintiff shoot Ali. This led to two recantations of Robinson's identification which contradicted his December 1986 and January 1987 statements to BPD and his testimonies before the grand jury, pretrial suppression court, and trial jury.

During Plaintiff's postconviction hearings in 1998 and 1999, Robinson alleged that BPD separated him from his mother, ignored his denial that he could identify the shooter, and coerced

1

him to identify Plaintiff as the suspect in Ali's murder.  The postconviction court denied Plaintiff's petition, finding Robinson's recantation "incredible."

In November 2016, Plaintiff filed a Petition for Writ of Actual Innocence wherein he alleged that Robinson's recantation constituted new evidence and he was entitled to a new trial. Despite the State's objection, the court granted Plaintiff's petition. As a result, the State dismissed the charges.

Plaintiff now sues the BPD and its detectives based on allegations that went suspiciously unmentioned until 1996, despite a myriad of opportunities for their revelation including: (1) before the grand jury and the trial court; (2) to the prosecutor; or (3) to Plaintiff's criminal defense attorney. Plaintiff seeks to exploit the impact of the passing three decades as it pertains to the preservation of the BPD homicide file, now incomplete, by alleging that investigators failed to disclose documents to which he was entitled. Plaintiff, however, cannot substantiate the allegation. Neither his trial counsel nor the State retained their original files. Thus, Plaintiff cannot point to a single document within what remains of the homicide file – nor can he point to any document that once may have been part of the file – to support the allegation that it was withheld from the State.

As described more fully below, there was probable cause for Plaintiff's arrest and prosecution.  He has no evidence that would create a genuine issue of fact that would support his claims.  BPD detectives are entitled to qualified immunity and Plaintiff is collaterally estopped from using Otis Robinson's recantation to support the instant lawsuit.

## FACTUAL BACKGROUND

On December 27, 1986, at about 7:45 p.m., BPD broadcast a call for a shooting in the 2300 block of Barclay Street.  Faheem Ali, a.k.a. Beryl "Bobo" Franklin ("Bobo") was in front of 2309 Barclay Street suffering from a gunshot wound.  Ex. 1 – 24 Hour Crime Report at GW Legal

Images Scan Homicide File ("GWLISHF") at 000012.  Medical personnel arrived and Bobo was pronounced dead.  *Id*.  BPD homicide detectives Oscar Requer ("Requer") and Thomas Pellegrini ("Pellegrini") responded to the scene as assigned investigators.[1] *Id.* At the scene, detectives learned that 13-year-old Rosetta Dorsey ("Dorsey") observed the shooting.  Ex. 2 – 12/30/1986 BPD Office Report GWLISHF at 000018–19.  That night, Dorsey provided Pellegrini a description of the shooter but stated that she could not identify him.[2] One week later, on January 3, 1987, Requer and Pellegrini interviewed Dorsey in the presence of her mother at BPD headquarters.  Ex. 3 – 1/3/1987 R. Dorsey Signed Statement GWLISHF at 000039–43.  Dorsey stated that Plaintiff, with whom she was familiar, shot Bobo.  *Id*. at. 000040.[3] Pellegrini then showed Dorsey a photo array. *Id.* at 000042. Dorsey identified Plaintiff as the shooter. *Id.* Dorsey stated she was reluctant to name anyone at the scene because she was afraid. *Id.* at 000040.

Detectives also learned that 12-year-old Otis Robinson ("Robinson"), a neighbor, observed the shooting as well.  Ex. 7 – 6/8/1987 Trial Testimony at GW SAO Subp. 001022–23. On December 29, 1986, Pellegrini brought Robinson and his mother to BPD for the first of two interviews. Ex. 8 – 12/29/2986 O. Robinson Info Sheet, Signed Statement at GWLISHF 000050–55. Robinson stated:

> [I] was walking up the street toward 24th Street, I heard Gary Washington and Bobo arguing and Gary asked about some money, and "Bobo" said I'll get it when I'm ready to get it. Then Gary hit Bobo in his jaw then he drawed [sic] his gun, and shot

---

[1] Requer did not testify at trial.

[2] On December 30, 1986, Requer and Pellegrini submitted an office report to command. *See* Ex. 2 – 12/30/1986 Office Report at 000018-19.  Therein, detectives noted their belief that Dorsey knew the name of the shooter. *Id.*

[3] Dorsey retracted her statements prior to Plaintiff's criminal trial. Ex. 6 - 6/4/1987 Pretrial Transcript at GW000149, 203 (ASA Finch stating, "[C]onsidering what Mr. Polansky has told me, that [she] now has recanted her statement, I doubt that I would even use her."); *see also* Ex. 15 – 6/5/1987 Pretrial Transcript GWLISHF 000272 at 2:15-17 (Mr. Polansky stated, "I didn't know what [she] said to anybody before I sent the investigator out.")  Dorsey also recanted her observations in her affidavit dated 9/22/2020, and during her deposition on 5/5/2020. *See* Ex. 4 – Deposition of R. Dorsey at 64:12-69:22; *see also* Ex 5 – 9/22/2020 Affidavit of R. Dorsey at GW 002851-52.

"Bobo." Then "Bobo" ran across the street tripped on the curb and fell on the sidewalk.

*Id.* at 000052–53.[4]  Pellegrini then asked Robinson, "[i]f I show you a photo lineup of six people will you indicate the picture of the person who shot Bobo if that person's picture is among the group?" *Id.* at 000055. Robinson said, "yes." *Id.* He then identified Plaintiff in a photo array as the person he saw shoot Bobo. *Id.* On January 2, 1987, Robinson and his mother returned to the BPD for a second interview. Ex. 9 – 1/2/1987 O. Robinson Signed Statement at GWLISHF 000045–49.  Robinson recounted where he was prior to the shooting and what he saw.  *Id.* at 000045. Robinson again described Plaintiff's clothing, and again named him as the shooter. *Id.* at 000046.  Det. Pellegrini then showed Robinson a photo array, asking if "the person who shot and thereby caused the death of [Mr.] Ali [was] among them." *Id.* at 000048.  Robinson again identified the photograph of Plaintiff.  *Id.*

On January 6, 1987, Plaintiff was arrested.  Ex. 10 – 1/6/1987 BPD Homicide Suppl. Report at GWBPD 001235.  On January 7, 1987, Robinson testified before the Grand Jury. Ex. 11 – 1/7/1987 Robinson Grand Jury Testimony.[5] There, he stated:

> I stepped out the door. I saw Gary Washington and a boy named Bobo arguing about some money and Gary told him he better have his money and Bobo say he will wait. And Gary quickly hit him in his jaw and dragged [sic] his gun and he shot 'em.

*Id.* at 3. Robinson affirmed that he knew Plaintiff for 2-3 years. *Id.* at 3–4. On February 4, 1987, the Grand Jury indicted Plaintiff.  Ex. 12 - MD Court System Case History.  He was arraigned in the Circuit Court for Baltimore City on March 3, 1987. *Id.*

---

[4] Officer Defendants acknowledge that Robinson recanted portions of his statements and testimonies in August of 1996. However, as argued *infra*, Officer Defendants contend that Plaintiff is collaterally estopped from disputing these statements and testimonies. *See* Section II(C) *infra*; *see also* Ex 26 – Judge Schwait's Memo Opinion.

[5] Again, Officer Defendants acknowledge that Robinson recanted this testimony.  However, as argued *infra,* Officer Defendants contend that Plaintiff is collaterally estopped from recanting the testimony. *See* Section II(C) *infra*; *see also* Ex 26 – Judge Schwait's Memo Opinion.

On April 15, 1987, Plaintiff, at his own request and with counsel, sat for a polygraph examination conducted by the Maryland State Police. Ex. 13 – MSP Polygraph Report at GW003832–34. The examiner, Sergeant Richard Sheldon ("Sheldon"), asked Plaintiff if he did "actually shoot Bobo" and if he did "actually shoot Bobo with a gun." *Id.* at 003833; *see also* Ex. 28 – Deposition of R. Sheldon at 32:11-34:12. Plaintiff denied shooting Bobo. *Id.* Sheldon concluded that Plaintiff's response "showed deception." Ex. 13 – MSP Polygraph Report at GW003832–34; *see also* Ex. 28 – Deposition of R. Sheldon at 59:13-18, 66:17-19, 67:5-25, 71:1-15. Sheldon's report reflected that Plaintiff then claimed that he saw the shooting from his window and that an individual named Lawrence Thomas ("Thomas") shot Bobo. *Id.* On May 3, 1987, detectives followed up with Thomas based on Plaintiff's statement. Ex. 16 – 5/3/1987 BPD Follow-up Report, Thomas Immunity. Assistant State's Attorney ("ASA") Ruth Finch ("Finch") met with Thomas at her office where he was read his *Miranda* rights and offered immunity from prosecution in exchange for a truthful statement. *Id.* Thomas denied being in the area at the time of the shooting and denied having any firsthand knowledge of it. *Id.*[6]

On June 4, 1987, Plaintiff's criminal proceedings began with pre-trial motions in the Circuit Court for Baltimore City. His jury trial commenced on June 8, 1987. Paul Polansky, Esquire ("Polansky") represented Plaintiff in both proceedings. During the pre-trial motions hearing, Polansky moved to suppress Robinson's identification of Plaintiff. He argued that the identification was "tainted" and suggestive. Ex. 6 – 6/4/1987 Pretrial Transcript GW000143 at 3:1-4:5, GW000196 at 56:12-35. Polansky called Pellegrini to testify.[7] *Id* at GW000190–206.

---

[6] Also on May 3, 1987, detectives reported that on April 27, 1987, Robinson, in the company of his mother, advised ASA Finch that Ricky Washington, Plaintiff's brother, was attempting to influence his upcoming testimony. Ex. 14 – BPD Follow-up Threat Report at GWLISHF 000026-27. As reported by detectives, Robinson advised that Ricky Washington told him that, "[w]hen it came time that he had better say the right thing." *Id.*

[7] Polanski also called Robinson to testify. Ex. 6 – 6/4/1987 Pretrial Transcript at GW000159–187. Robinson testified that he heard an argument between Plaintiff and "Bobo" about money. *Id.* at 000174. He said that he observed Plaintiff

Pellegrini testified that he first interviewed Robinson with his mother on December 29, 1986, at 9:15 p.m. *Id.* at GW000194. Pellegrini stated that Robinson named Plaintiff as the shooter. *Id.* at GW000195. Polansky asked Pellegrini directly if he "suggest[ed] to [Robinson] at all which picture he should choose." *Id.* at GW000196. The circuit court sustained the State's objection before Pellegrini could answer. *Id.* Polansky abandoned any further questions about Robinson's identification of Plaintiff. The circuit court subsequently denied Plaintiff's motion to suppress.

At trial, Robinson testified on June 8 and 9, 1987. *See* Ex. 7 – 6/8/1987 Trial Transcript at 97:21-122:25. He testified that he was familiar with Plaintiff and his family, and that he would see Plaintiff regularly. *Id.* at 98:4-100:2. Robinson stated that he observed Plaintiff smack Bobo in the face and then shoot him.[8] *Id.* at 105:10-115:7. He stated that he recognized Plaintiff's voice during the argument. *Id.* Robinson testified that he went to police headquarters two days later, gave a statement, and identified Plaintiff in a photo array. *Id.* at 116:20-122:25. He recalled that he was shown a single page which contained six photographs. Robinson selected Plaintiff's picture as the person who shot Bobo. He identified the photo array that he viewed on December 29, 1986. Robinson did not, at any point during his testimony, allege any misconduct on the part of the officers with whom he interacted.

On June 16, 1987, the jury found Plaintiff guilty of murdering Bobo. Ex. 24 – 6/16/1987 Trial Transcript at 122:1-123:9. The Court of Special Appeals of Maryland subsequently upheld Plaintiff's conviction. Ex. 31 – CoSA Opinion Affirming Convictions.

---

strike "Bobo" with his right hand then draw his gun from his coat pocket and shoot him "near the heart." *Id.* at 000179. Officer Defendants acknowledge that Robinson has now recanted this testimony. However, as argued *infra*, Officer Defendants contend that Plaintiff is collaterally estopped from arguing that Robinson's identification was unreliable.

[8] Again, Officer Defendants acknowledge that Robinson recanted this testimony. However, as argued *infra*, Officer Defendants contend that Plaintiff is collaterally estopped from arguing that Robinson's trial testimony is unreliable.

Nearly ten years later, on August 2, 1996, Plaintiff's investigator located Robinson and interviewed him at Plaintiff's family home with Plaintiff's family members present. Ex. 40 – 3/2/1998 Post-Conviction Testimony at H-19, 23. Robinson refuted portions of his prior statements and testimonies to Plaintiff's investigator. Ex. 19 – 8/2/1996 Written Statement of O. Robinson at GW Biddle Subp. 000877–81. Robinson altered his account of the homicide by now stating that he was present when Bobo was shot but could not identify the shooter. *Id.* On February 24, 1997, Plaintiff filed a post-conviction petition in the Circuit Court for Baltimore City. Ex. 26 – Judge Schwait's Memorandum Opinion. The court heard related testimony on March 2, 1998, and December 6, 1999. On December 6, 1999, Robinson testified that his trial testimony from June of 1987 was false. Ex. 39 12/9/1999 Post-Conviction Testimony at H-12. He said that he had no personal knowledge that Plaintiff was involved in the shooting. *Id.* Robinson also accused Pellegrini and Requer of separating him from his mother while he was interviewed, disregarding his initial statement that he could not identify the shooter, and threatening him that he would not see his mother again unless he cooperated. *Id.* at H-18–20, H-22–24.

On December 10, 1999, the Circuit Court for Baltimore City denied Plaintiff's post-conviction petition. The court expressly rejected Plaintiff's assertion that police coerced Robinson's statement and identification of Plaintiff by stating:

> Before and throughout [Plaintiff's] trial, Mr. Robinson maintained that his statement that [Plaintiff] committed the murder was true; Mr. Robinson gave that statement, which he and his mother signed, to the Police and repeated that statement as sworn testimony before the Grand Jury, during pretrial motions, and at [Plaintiff's] trial. His identification of [Plaintiff] … remained unchanged throughout the entire trial process. Only today, over thirteen years later, does Mr. Robinson change his story. This Court finds Mr. Robinson's testimony incredible.

Ex. 26 – Judge Schwait's Memorandum Opinion.  On April 9, 2002, the Court of Special Appeals of Maryland affirmed the circuit court's denial of Plaintiff's post-conviction petition. Ex. 27 – CoSA Opinion Affirming Judge Schwait.

Nearly fourteen years later, on November 28, 2016, Plaintiff filed a Petition for Writ of Actual Innocence in the Circuit Court for Baltimore City.  Ex. 29 – 8/20/2018 Judge Peters' Memorandum Opinion at GBW Cert. Cir. Ct. File 000362. He argued that he was entitled to a new trial because of Robinson's recantation and because Thomas allegedly confessed to his jailhouse companion, Norman Cook, and to a man named Steven Reynolds. *Id.* at 000362–63. Plaintiff argued that Maryland law required a new trial under the circumstances.  The State opposed Plaintiff's petition. *Id.* at 000364.  On August 20, 2018, the circuit court granted Plaintiff a new trial.[9] *Id.* at 000362, 367.  On January 15, 2019, the State dismissed the charges against Plaintiff.

On August 27, 2019, Plaintiff filed the instant lawsuit in the United States District Court for the District of Maryland.  *See generally* Compl. (ECF # 1).  On September 5, 2019, Plaintiff filed an Amended Complaint asserting the following counts: (1) Due Process violation under 42 U.S.C §1983; (2) Malicious Prosecution under 42 U.S.C §1983; (3) Detention without Probable Cause under 42 U.S.C §1983 ; (4) Failure to Intervene under 42 U.S.C §1983; (5) *Monell* claim under 42 U.S.C §1983; (6) Malicious Prosecution under Maryland law; (7) Intentional Infliction of Emotional Distress under Maryland law; (8) violation of Articles 19, 24, and 26 of the Maryland Declaration of Rights; and (9) Indemnification claim under Maryland law.  Am. Compl. (ECF # 5) at 23-30.

---

[9] The court did not rule on Thomas' alleged confession.

## LEGAL STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To determine whether there is a genuine issue of material fact, courts construe the record in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute of material fact is only "genuine" if sufficient evidence favoring the nonmoving party exists for the trier of fact to return a verdict for that party. *Id.* at 248-49. If a plaintiff is unable to satisfy the legal requirements necessary to establish a cognizable claim, summary judgment is not only proper, but mandated. *See Celotex*, 477 U.S. at 322.

## ARGUMENT

I.   **SUMMARY JUDGMENT SHOULD BE GRANTED ON THE *BRADY* CLAIM ASSERTED IN COUNT I BECAUSE IT IS UNSUPPORTED BY THE EVIDENCE**

In Count I of the Amended Complaint, Plaintiff contends that Officer Defendants violated his due process rights under the United States Constitution by withholding *Brady* evidence. *See* Am. Compl. (ECF # 5) at 23.   Judgment should be granted in favor of Officer Defendants because Plaintiff cannot point to a single piece of evidence that was withheld since the files of the prosecutor and defense counsel no longer exist. In addition, the circumstances of Robinson's and Dorsey's identifications cannot serve as the predicate for a *Brady* claim because any reasonably

diligent defense attorney would have interviewed them about the circumstances of their identifications.

To prove a *Brady* claim against Officer Defendants, Plaintiff must establish "(1) that the evidence at issue was favorable to him; (2) the Officers suppressed the evidence in bad faith; and (3) prejudice ensued." *Owens v. Baltimore City State's Att'y's Off.*, 767 F.3d 379, 396-97 (4th Cir. 2014); *Gilliam v. Sealey*, 932 F.3d 216, 283 (4th Cir. 2019) (citing *Brady v. Maryland,* 373 U.S. 83, 87 (1963)). "Evidence is material if there is a reasonable probability that its disclosure would have produced a different result." *Id.* (quoting *United States v. Parker,* 790 F.3d 550, 558 (4th Cir. 2015)). "Unlike prosecutors … police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Id.* (citing *Owens,* 767 F.3d at 396 & n.6, 401; *see also Jean v. Collins,* 221 F.3d 656, 662 (4th Cir. 2000) (A *Brady* violation … requires that the officer have intentionally withheld evidence for the purpose of depriving the plaintiff of the use of that evidence during his criminal trial.); *see also Johnson v. Balto. Police Dep't.,* 500 F.Supp. 3d 454, 462 (D. Md. 2020). Here, there is no evidence that Officer Defendants suppressed evidence. Moreover, even if evidence was suppressed, something Officer Defendants do not concede, there is no evidence it was suppressed in bad faith.

## A. Attorney Polansky Did Not Retain His Case File So Plaintiff Cannot Establish That Any Evidence Was Withheld

Officer Defendants subpoenaed Plaintiff's criminal defense attorney, Polansky, for "[a]ny and all documents … relating to [his] representation of Gary Washington in Baltimore City Circuit Court…" *See* Ex. 17 – 9/2/2020 Polansky Resp. to Subp.  He responded that he had no documents and/or recollection relative to Plaintiff's criminal case. *Id.* Thus, Plaintiff's assertion that evidence was withheld from him during his criminal trial is nothing more than rank speculation. Without Plaintiff's defense counsel's file, Plaintiff cannot demonstrate what evidence was or was not

disclosed to him during the criminal proceedings. Nor has Plaintiff provided any other evidence to establish that any specific document was withheld. *See U.S. v. 8.929 Acres of Land in Arlington Co. Va.,* 36 F.4th 240, 252 (4th Cir. 2022) (The nonmoving party must rely on more than conclusory allegations [and] mere speculation ….)).

**B.  There Is No Evidence That Officer Defendants Withheld Evidence From The Office Of the State's Attorney for Baltimore City ("SAO")**

A police officers' *Brady* duty is satisfied through disclosure to prosecutors. *See United States v. Robinson*, 627 F.3d 941, 952 (4th Cir. 2010); *Carvjal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008); *Cannon v. Polk County*, 68 F.Supp.3d 1267, 1279 (D. Or. 2014) (police officer fulfills *Brady* obligation through disclosure of evidence to the prosecutor even if the defense never receives it). Because the SAO file does not exist, Plaintiff cannot demonstrate that the Officer Defendants failed to disclose evidence to the SAO.

On June 22, 2017, the SAO - via then-Assistant State's Attorney Andrea Mason - advised Plaintiff that, "no State's file ha[d] been located." *See* Ex. 18 – Email, 6/22/2017, ASA Mason to Mr. Biddle. During her deposition, Ms. Mason stated that it was not uncommon for case files to get lost. *See* Ex. 20 – Deposition of A. Mason at 31:3–8. She testified that "[f]iles, they weren't electronic back then - [meaning the 1980s] - it was all paper, and so you'd have to find the file." *Id.* Ms. Mason testified to a myriad of circumstances, including "flood and fire," multiple storage locations across multiple buildings, and the lack of a "routine," or even "common practice" in place to ensure effective file preservation, which led to lost files.  *Id.* at 33–40.

As it pertained to Plaintiff's criminal proceedings, Ms. Mason testified that she did not remember where she searched for the State's file within the SAO. *Id.* at 34:8–12. She emphasized that files got moved from "place to place" and that she had no "specific recollection" of the State's file pertaining to Plaintiff. *Id.* at 35:1–9; 39:12–40:1. Ms. Mason stated that she did not remember

whether "the full set of discovery that was exchanged during the original criminal proceedings" was within the documents she reviewed to defend against Plaintiff's Petition for Writ of Actual Innocence. *Id.* at 41:19-42:7, 168:16-21. Thus, without the State's complete case file, as it existed in 1987, Plaintiff's assertion that material exculpatory evidence was withheld from him is unsupported.[10]

### C.  The Circumstances of Robinson And Dorsey's Identifications Cannot Be "Withheld" For *Brady* Purposes Because They Were Available To Plaintiff Through The Exercise Of Reasonable Diligence

Plaintiff cannot claim that the circumstances of Robinson and Dorsey's identifications were withheld from him in violation of *Brady* because they were available through the exercise of reasonable diligence. There is no *Brady* violation when the alleged exculpatory material is available to the Plaintiff from "a source where a reasonable [criminal] defendant would have looked." *Burley v. Balto. Police Dep't.,* 422 F.Supp. 3d 986, 1027 (D. Md. 2019) (quoting *United States v. Wilson*, 901 F.2d 378, 380–81 (4th Cir. 1990)); *see also Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) (The strictures of *Brady* are not violated … if the information allegedly withheld by the prosecution was reasonably available to the defendant … [or] where the exculpatory information … also lies in a source where a reasonable defendant would have looked….)).

Any reasonably diligent criminal defense attorney would have interviewed Robinson and Dorsey about the circumstances of their identifications as demonstrated by the Seventh Circuit's ruling in *Holland v. City of Chicago*. 643 F.3d 248, 255 (7th Cir. 2011). In *Holland*, the plaintiff's rape charges were vacated based on DNA evidence. *Id*. The plaintiff was identified by the victim

---

[10] Notably, Pellegrini testified at deposition that the Homicide File that he reviewed was incomplete.  *See* Ex. 37 – Deposition of Pellegrini at 308:19-310:14.

at a show-up at a hospital and plaintiff alleged that the police coerced and unduly influenced the victim's identification through highly suggestive identification procedures. *Id*. The court explained that there was no *Brady* violation because the details of the police interview and the victim's identification were available to the plaintiff through a reasonably diligent interview. *Id*. at 256.

The Fourth Circuit earlier reached a similar conclusion in *Hoke,* 92 F.3d at 1355-56.  In *Hoke*, a defendant who was convicted of rape, argued that the State committed a *Brady* violation by not disclosing interviews with three men who admitted to having had sexual contact with the victim. *Id.* at 1354. The Fourth Circuit reversed the grant of a writ of *habeas corpus*, holding that had the defendant undertaken a reasonable and diligent investigation, he would have learned of the witnesses and their relationships with the victim. *Id.* at 1355.

Here, the criminal trial record fails to support any claim that material exculpatory evidence was withheld from Plaintiff and unavailable at trial. As stated, *supra*, Polansky sought to suppress Robinson's pretrial identification, but abandoned further inquiry into suggestiveness when the Court sustained the State's objection.  *See* Ex. 6 – 6/4/1987 Pretrial Transcript GW 000196:12-16 at 3:1-8. Had he engaged in any follow-up questioning or inquired of the Court as to why it sustained the objection, he could have explored the circumstances surrounding Robinson's identification of Plaintiff. *See e.g.*, *Petty v. City of Chicago,* 754 F.3d 416, 423–24 (7th Cir. 2014) (*Brady* was not violated where criminal defendant knew of witness treatment before his trial began, had an opportunity to explore the topic at trial, and could have subpoenaed officers to compel their testimony)).

Further, during the pretrial motion to suppress the identification of Plaintiff as the shooter, the trial court permitted Mr. Polansky to examine Det. Pellegrini about Dorsey's positive identification of Plaintiff. *See* Ex. 6 – 6/4/1987 Pretrial Transcript at GW 000202-03 62:17-63:5

[11] However, Polansky voluntarily abandoned this inquiry. *Id.* at 62:8-10 ("All right. I will withdraw the question, Your Honor. It's not worth arguing about [it] at this point."). Moreover, the circumstances of Dorsey's identification cannot serve as the basis for a *Brady* claim because she did not testify at Plaintiff's trial. *See U.S. v. Moussaoui,* 591 F.3d 263, 285 (4th Cir. 2010) (The *Brady* right … is a trial right.) Thus, any assertion that Plaintiff had no ability to learn the circumstances surrounding Dorsey's identification of Plaintiff and pertinent statements to police is unfounded.

If anything, the record confirms that Plaintiff questioned Dorsey and learned of her proposed testimony prior to trial.  After the court made clear to Plaintiff it was inviting further questions about Dorsey's pre-trial identification of Plaintiff, the State conceded that it would not call Ms. Dorsey as a witness because "[P]olansky told [the State] that [] Dorsey … has recanted her statement, [and the State] doubt[s] that [it] would even use her."  Ex. 6 – 6/4/1987 Pretrial Transcript GW000203 at 63:1-9.  The next day – June 5, 1987 – the State advised the court that Plaintiff's "defense counsel has been able to obtain a statement from [Dorsey] recanting her story."  *See* Ex 15 – 6/5/1987 Trial Transcript GW000272 at 2:9-11.  Plaintiff's counsel confirmed the State's proffer to the court.  *Id.* at 2:16-17.

Furthermore, Plaintiff and his counsel was invited to "inspect, copy, and photograph any books, papers, documents, recordings, photographs, or tangible objects which the State intend[ed] to use at a hearing or trial."  *See* Ex. 21 – State's Discl., on 3/3/1987 at GBW Cert. Cir. Ct. File 000598, ¶ 6; *see also* Ex. 22 – State's Discl., on 4/7/1987 at GBW Cert. Cir. Ct. File 000571, ¶ 6. There is no evidence that Plaintiff sought to inspect the State's file. Hence, any suggestion of a

---

[11] Judge Hubbard stated, "I am not going to preclude questions about [] Dorsey, since if she does come forward, we are going to have to have a hearing. So we might as well exact whatever testimony we can from [] Pellegrini right now…" Ex. 6 – 6/4/1987 Pretrial Transcript GW 000202 at 62:17-23

*Brady* violation is unfounded. There is no evidence that materially exculpatory evidence was withheld from Plaintiff.  Officer Defendants are entitled to summary judgment on Plaintiff's *Brady* claim.

## II.    SUMMARY JUDGMENT SHOULD BE GRANTED ON THE FABRICATION OF EVIDENCE CLAIM ASSERTED IN COUNT I BECAUSE IT IS UNSUPPORTED BY THE EVIDENCE.

Another claim asserted in Count I of the Amended Complaint is that the Officer Defendants allegedly violated Plaintiff's Fourteenth Amendment due process rights by "fabricat[ing] evidence" in bad faith."  *See* Am. Compl. (ECF # 5) at 23.  This claim merely recasts the same assertions about the circumstances of Robinson's and Dorsey's identifications; as such, it also fails. There is no evidence that Officer Defendants knew the statements of Robinson and Dorsey were false and, in any event, Dorsey's identification was not introduced at trial.

The Fourth Circuit has "recognized a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Massey v. Ojaniit,* 759 F.3d 343, 354 (4th Cir. 2014) (quoting *Washington v. Wilmore,* 407 F.3d 274, 282 (4th Cir. 2005)). To prove a fabrication claim, a plaintiff must show that "(1) the defendants fabricated evidence, and (2) the fabrication resulted in a deprivation of [Plaintiff's] liberty." *Martin v. Conner,* 882 F. Supp. 2d 820, 847 (D. Md. 2012). However, as explained by the Seventh Circuit, fabricated evidence is evidence that is false, and its falsity must be known to the person offering the evidence. *Petty*, 754 F.3d at 423. ("Fabricated testimony is testimony that is made up … [and] known to be untrue by the witness and by whoever cajoled or coerced the witness to give it.")  Here, Plaintiff has no evidence that Officer Defendants knew that the statements of Otis Robinson and Rosetta Dorsey were false.

**A. Any Alleged Falsity In Rosetta Dorsey's Statement Is Immaterial Because Rosetta Dorsey's Statement Did Not Result In Any Cognizable Deprivation Of Plaintiff's Liberty Interests**

As stated, Dorsey was not called as a witness for the State. Therefore, nothing in Ms. Dorsey statement can provide the basis for Plaintiff's fabrication of evidence claim. Her statement did not contribute to Plaintiff's conviction. Further, any deprivation of liberty interest premised on an alleged false arrest, false imprisonment, or unlawful detention theory is time-barred.[12] *See Wallace v. Kato,* 549 U.S. 384, 390 (2007) (A false imprisonment claim begins to accrue when legal process initiated, not when charges are dropped).[13] Plaintiff was arraigned on March 3, 1987. *See* Ex 12 – MD Court System Case History.  As such, the statute of limitations expired on March 3, 1990. Thus, there is no fabrication of evidence claim stemming from Dorsey's statement.

**B. Plaintiff Cannot Demonstrate That Officer Defendants Knew That The Statement from Otis Robinson was False.[14]**

Any fabrication of evidence claim premised on Robinson's statements and testimony must also fail.  Plaintiff cannot demonstrate that Officer Defendants believed the statement and/or

---

[12] *See Wallace,* 549 U.S. at 388 (Claims for false arrest and false imprisonment overlap).

[13] "A suit filed pursuant to 42 U.S.C. §1983 constitutes a personal injury action." *Owens v. Okure,* 488 U.S. 235, 249-50 (1989). To determine whether a claim was timely filed, "courts look to the statute of limitations from the most analogous state-law cause of action." *Owens,* 767 F.3d at 388. "Under Maryland law, a civil action shall be filed within three years from the date [the cause of action] accrues…." *Shaw v. Maryland,* ELH–18–782 – 2019 WL 4447256 *22 (D. Md. September 16, 2019). "[A] plaintiff's cause of action accrues when the plaintiff knows or reasonably should have known of the wrong." *Id.* (quoting *Brown v. Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.*, 731 F. Supp. 2d 443, 449 (D. Md. 2010)). "[I]n … cases where the plaintiff has been arrested, held, tried, and convicted, only to be released years later, courts have commenced the statute of limitations at the formal start of criminal proceedings." *Id.* (citing *Prince George's County v. Longtin,* 419 Md. 450, 476-77, 19 A.3d 859, 874-75 (2011); *see also Wallace,* 549 U.S. at 390–92 (the statute of limitations for false imprisonment … commenced to run when Plaintiff appeared before the examining magistrate and was bound over for trial and not when he was released five years later after his conviction was overturned.).

[14] Likewise, any deprivation of liberty interest premised on an alleged false arrest, false imprisonment, or unlawful detention theory is time-barred pertaining to Otis Robinson's statement.

testimony given by Mr. Robinson was false. During his deposition, Plaintiff asked Defendant Requer the following:

> Q.     And then it says that Gary hit Bobo and eventually shot Bobo, do you see that?
>
> A.     Yeah, I do.
>
> Q.     Do you ever know, sir, whether or not that is a true statement?
>
> ─────────────────────────────
>
> [A.]    Let's look again. I don't know whether it's true or not. I would assume it's true, yes. I just assumed it's true.

*See* Ex. 23 – Deposition of O. Requer at 265:17–266:1. Robinson confirmed that he had known the Plaintiff for four years and would see him in the block at least once a day. *See* Ex. 7 – 6/8/1987 Trial Transcript at 98:21–25, 99:1–100:2; *see also* Ex. 25 - Deposition of O. Robinson at 16:14–20. He confirmed that he was outside when Bobo was shot and killed. Ex. 25 - Deposition of O. Robinson at 20:1-6.  The investigating detectives had every reason to believe that Robinson had the requisite knowledge to accurately identify Plaintiff as the shooter.

Even when Robinson changed his testimony, he still confirmed that Pellegrini and Detective Fahlteich believed he knew the identity of the shooter.[15] During his deposition, Robinson stated that the detectives responded to his claim that he did not know the identity of the shooter by accusing him of involvement in the shooting.[16] *Id.* at 31:21–32:7. He testified that Pellegrini and

─────────────────────────────

[15] Robinson testified "[a]nd I kept telling them I didn't see anything; I didn't know anything. And he was, like, come on, man, come on.  We – we know one of them did it, man.  All you got to do is point one of them out." *See* Ex. 25 Deposition of O. Robinson at 39:6–17.

[16] On 12/28/1986, Edward Neal Ellis told Defendant Tewey that he heard two shots and saw a Bronco speed away. *See* Ex. 33 – E. Ellis Witness Info Sheet with Notes at GWLISHF 000062–63. However, before the Bronco appeared, he saw someone at Ricky Washington's front door (Plaintiff's home), and, just before the shot, point to Bobo in an apparent effort to alert the Bronco's occupants to Bobo's presence. *Id.* Ellis also advised detectives of his belief that Robinson was outside at the time of the shooting. *Id.* Requer and Pellegrini believed the shooting had a connection to Plaintiff's home and knew that Robinson was outside at the time. It would not have been unreasonable to consider whether Robinson had some role in luring - wittingly or otherwise - Bobo to the scene.

Fahlteich[17] did not believe that he did not know the identity of the shooter. *Id.* at 33:3–7. Robinson further stated that during his interview, he heard Pellegrini and Fahlteich having a conversation between themselves "[l]ike, they knew [Plaintiff or his brother Ricky Washington] had something to do with the shooting." *Id.* at 37:3-25.

Accordingly, Robinson's recantation, even if believed, does not establish that the Officer Defendants knew that Robinson's identification of Plaintiff was false. "[T]he true nature of the claim matters and [Plaintiff] should be precise in his terminology." *Petty,* 754 F.3d at 423. "Manufactured false evidence and false identification are not magic talismans that will transform a coercion case into an evidence fabrication case and give rise to a cognizable claim where one does not exist." *Id.* As such, Officer Defendants are entitled to summary judgment on Plaintiff's fabrication of evidence claim. There is no evidence that Officer Defendants knew that Robinson's identification of Plaintiff as the shooter was false.[18]

### C. Plaintiff Is Collaterally Estopped From Contradicting Otis Robinson's Pretrial Motions And Trial Testimony Because The Circuit Court For Baltimore City Considered Otis Robinson's Recantation During Plaintiff's Post-Conviction Proceeding And Expressly Rejected The Recantation

Plaintiff is also collaterally estopped from placing Otis Robinson's grand jury, pretrial motion, and trial testimony into material dispute. "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza,* 464 U.S. 154, 158 (1984) (citing *Montana v. United States,* 440 U.S. 147, 153 (1979)); *see also Owens v.*

---

[17] Robinson testified that Requer came into the interview room later, after Pellegrini and Fahlteich told him that they believed he had some involvement in the shooting. *See* Ex. 25 – Deposition of O. Robinson at 33:15–34:1.

[18] Furthermore, Pellegrini was present when Plaintiff failed the polygraph examination on April 15, 1987. *See* Ex. 13 – MSP Polygraph Report at GW 003833. As discussed, *infra,* this revelation would have only strengthened detectives' existing belief that Plaintiff shot Bobo. *See* discussion, *infra,* at III(A).

*Baltimore City State's Attorneys Office,* GLR-11-3295 2014 WL 5452944 *5 (D. Md. September 29. 2016). "The doctrine may be used defensively by a non-party to the prior litigation." *Id.* (citing *Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979)). "Defensive use of nonmutual collateral estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against a different party." *Id.* (citing *Welsh v. Gerber Products, Inc.,* 555 A.2d 486, 489 n. 6 (Md. 1989)). "In Maryland, a party asserting collateral estoppel must satisfy four conditions: (1). [w]as the issue decided in the prior adjudication identical with the one presented in the action in question? (2). [w]as there a final judgment on the merits? (3). [w]as the party against whom collateral estoppel is asserted a party … to the prior adjudication? [and] (4). [w]as the party against whom collateral estoppel is asserted given a fair opportunity to be heard on the issue?" *Id.* (citing *Colandrea v. Wilde Lake Cmty. Ass'n, Inc.,* 761 A.2d 899, 909 (Md. 2000)).

Robinson's first in-court recantation occurred nearly twelve years after Plaintiff's conviction. Plaintiff's accusation of coercive conduct was one of the reasons he argued he was entitled to a new trial at his post-conviction proceeding.  Ex. 26 – Judge Schwait's Memo Opinion at 1-2.[19] As stated, *supra,* the circuit court denied Plaintiff's post-conviction petition, expressly rejecting as "incredible" Plaintiff's assertion of police coercion.[20] *Id.*   As such, Plaintiff is collaterally estopped from relitigating Robinson's statements and/or testimonies thirty plus years

---

[19] Plaintiff argued that he "was denied due process of law under … the United States Constitution when Baltimore City Police Officers coerced [Robinson], then age 13, to testify falsely that [Plaintiff] had committed the murder."

[20] Judge Schwait's decision was affirmed on appeal. Ex. 27 – CoSA Unreported Op., 4/9/2002 at GBW Cert. Cir. Ct. File 000670–89 ([T]here was ample evidence that impeached Otis Robinson's recantation. He had many opportunities to recant … [y]et he did not do so … before the [g]rand [j]ury, when no police officers were present, or … during the trial.)

later.[21]  Officer Defendants are entitled to summary judgment on Plaintiff's fabrication of evidence

due process claim.

### III.  OFFICER DEFENDANTS DID NOT MALICIOUSLY PROSECUTE PLAINTIFF UNDER FEDERAL AND MARYLAND LAW BECAUSE THERE IS NO WANT OF PROBABLE CAUSE, PLAINTIFF IS COLLATERALLY ESTOPPED FROM ATTACKING OTIS ROBINSON'S STATEMENT, GRAND JURY, PRETRIAL MOTION AND TRIAL TESTIMONIES, AND ANY CHALLENGE TO PLAINTIFF'S ARREST FOR UNLAWFUL DETENTION IS TIME BARRED

In Counts II and VI of the Amended Complaint, Plaintiff asserts claims of malicious

prosecution under 42 U.S.C. § 1983 and Maryland law. *See* Am. Compl. (ECF # 5) at 24, 28.  To

establish his claim under § 1983, Plaintiff must show that Officer Defendants "caused a seizure of

the plaintiff pursuant to legal process unsupported by probable cause, and criminal proceedings

terminated in plaintiff's favor." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012). The

elements under Maryland law are (1) a criminal proceeding instituted or continued by the

defendant against the plaintiff; (2) a termination of the proceeding in favor of the accused; (3) the

absence of probable cause for the proceeding; and (4) "malice, or a primary purpose in instituting

the proceeding other than that of bringing an offender to justice." *Exxon Corp. v. Kelly*, 381 A.2d

1146, 1149 (Md. 1978).

Probable cause is "defined in terms of facts and circumstances sufficient to warrant a

prudent man in believing that the suspect had committed or was committing an offense."

---

[21] On February 2, 2017, the State opposed Plaintiff's Petition for Writ of Actual Innocence and argued that Plaintiff was collaterally estopped from asserting that Otis Robinson's statements to police and previous testimonies were false and the product of coercion. *See* Ex. 32 – State's Opposition to Pl's Writ of Actual Innocence GBW Cert. Cir. Ci. File 000085-86 at 7-8.  The State argued that Plaintiff raised this argument in his post-conviction hearing before Judge Schwait.  *Id.*  The circuit court never addressed the State's collateral estoppel argument.  *See generally* Ex. 29 – Judge Peters' Memorandum Opinion.  Instead, it merely applied that *McGhie v. State* principles which required the court to "look[] back to the … trial to determine the impact the new evidence – here, Robinson's recantation – would have had on the result."  *McGhie v. State,* 144 A.3d 752, 762 (Md. 2016).  The Writ of Actual Innocence court obviously believed that it was precluded from considering evidence raised in Plaintiff's post-conviction proceedings.  *See Douglas v. State,* 31 A.3d 250 (Md. 2011) (holding that §8-301 requirement to distinguish newly discovered evidence from evidence alleged in prior petitions does not extend to prior postconviction petitions.)

*Henderson v. Simms*, 223 F.3d 267, 271 (4th Cir. 2000). "Probable cause does not require officials to possess an airtight case before taking action, and officers 'must be given leeway to draw reasonable conclusions' from information." *Taylor v. Farmer*, 13 F.3d 117, 121-22 (4th Cir. 1993).

### A. The Investigative Facts—Including Plaintiff's Proximity to the Crime, His Shifting Accounts, and His Failure At The Polygraph—Established Probable Cause To Prosecute

Even if Robinson's account is discounted for purposes of summary judgment, the other undisputed investigative facts established probable cause to prosecute Plaintiff for Bobo's murder. It is undisputed that Bobo was shot in front of Plaintiff's house. Ex. 25 - Deposition of O. Robinson at 21-22, 78, 162, 164-165. According to Robinson's deposition testimony, two people were talking in front of Plaintiff's house when he heard a gunshot. *Id.* at 164-69. Plaintiff testified that he was doing cocaine and heroin with Thomas in Plaintiff's basement minutes before the shooting. Ex 38 - Deposition of Plaintiff at 238:6-9, 241:14-15.   Plaintiff further contends that Thomas went upstairs, then Plaintiff went to the doorway of his own home and saw Thomas shoot Bobo. *Id.* at 264:17-268:22. However, Robinson testified that no one was standing in the doorway of Plaintiff's home at the time of the shooting. Ex. 25 - Deposition of O. Robinson at 176:2-7.

After Plaintiff's indictment, he sat for a polygraph examination conducted by Sgt. Sheldon of the Maryland State Police. Ex. 13 - Polygraph Report at GW003832–34. During the polygraph, Plaintiff showed deception when he denied shooting Bobo. *Id.* at 003833; *see also* Ex. 28 – Deposition of R. Sheldon at 59:13-18, 66:17-19, 67:5-25, 71:1-15. It was at this point that Plaintiff claimed that it was Thomas who was the shooter. *Id.* However, when ASA Finch interviewed Thomas after granting him immunity, Thomas denied being the shooter. Ex. 16 – 5/3/1987 BPD Immunity Follow-up Report.  Based on these circumstances, there was probable cause to pursue a

prosecution against Plaintiff even if the court considers Robinson's actual identification of Plaintiff to be a disputed fact.

"While polygraph results are generally not admissible at trial, such tests are a well-recognized law enforcement technique, and a reasonable officer might take their results into account in assessing probable cause." *Gomez v. Atkins*, 296 F.3d 25, at n. 8 (4th Cir. 2002) (citing *United States v. Trenkler*, 61 F.3d 45, 58 (1st Cir. 1995) (recognizing that law enforcement officers rely on polygraph examinations even though they are generally not admissible)); *see also United States v. Prince-Oyibo*, 320 F.3d 494 at n. 1 (4th Cir. 2003) (citing *Bennett v. City of Grand Prairie, TX*, 883 F.2d 400, 405-06 (5th Cir. 1989) (holding that magistrates may consider polygraph evidence when determining whether probable cause to issue an arrest warrant exists)).

Even assuming, *arguendo*, that the identifications of Plaintiff as the shooter were not believable, the results of Plaintiff's polygraph examination justified the continued prosecution of Plaintiff. Pellegrini and ASA Finch considered the impact of the polygraph results along with Plaintiff's own conflicting pre- and post-test statements. They were entitled to disbelieve Plaintiff's alleged alibi and conclude that Plaintiff shot Bobo, since his denial of same was labeled deceptive.

Moreover, as stated *supra*, detectives furthered the investigation by bringing Thomas to ASA Finch's office, whereby he was offered immunity in exchange for a truthful statement. Cloaked with immunity, Thomas denied any knowledge of the incident. Ex. 16 – 5/3/1987 BPD Immunity Follow-up Report.  Thus, Plaintiff's conflicting accounts, as reflected in Sgt. Sheldon's polygraph report, the indications of deception noted therein, and Thomas' denial of involvement after receiving immunity, supported the probable cause determination in this case.

## B. Plaintiff Is Collaterally Estopped From Disputing Probable Cause Established By Robinson

Furthermore, as argued *supra* in Section II(C), Plaintiff is collaterally estopped from disputing the probable cause established by Robinson's December 29, 1986, January 2, 1987, statements, and his Grand Jury, criminal pretrial motion, and criminal trial testimony. The Circuit Court for Baltimore City expressly rejected Plaintiff's contention that Robinson's statements and testimony were false and coerced during his 1996 post-conviction proceeding. *See* Ex. 26 – Judge Schwait's Memorandum Opinion. As such, he cannot argue that Robinson's statements and/or previous testimonies were false or coerced. Officer Defendants are entitled to summary judgment on Plaintiff's malicious prosecution claims.

## IV. Any Claim for Detention Without Probable cause is Time-barred and Plaintiff is Collaterally Estopped from Attacking Robinson's Statements and Grand Jury and Pretrial Motions testimonies

In Count III of the Amended Complaint, Plaintiff contends that Officer Defendants are liable for detention without probable cause. *See* Am. Compl. (ECF # 5) at 25. Summary judgment should be granted in Officer Defendants favor because it is not an independently actionable claim and, in any event, the existence of probable cause defeats any such a claim.

Officer Defendants incorporate by reference their argument in Section II(A) and footnote twelve *supra* and restate the argument herein. *See Kato*, 549 U.S. at 389. Any claim for false arrest, false imprisonment, and unlawful detention, whether a theory pursued under 42 U.S.C. § 1983 or state law, is time barred by the statute of limitations. Plaintiff was required to bring his unlawful detention cause of action no later than March 3, 1990. Alternatively, probable cause existed for the detention as argued above. *See Thompson v. Clark*, No. 20-659, 142 S.Ct. 1332, 1337 (2022) (analyzing a Fourth Amendment detention claim as a claim for malicious prosecution). As such, Officer Defendants are entitled to summary judgment.

## V.   BYSTANDER LIABILITY DOES NOT EXIST AGAINST OFFICER DEFENDANTS FREDERICK CERUTI AND JOHN TEWEY BECAUSE NEITHER ENGAGED IN OR IGNORED WRONGFUL CONDUCT

In Count IV of the Amended Complaint, Plaintiff contends that Officer Defendants are liable for a failure to intervene.  *See* Am. Compl. (ECF # 5) at 26.  Defendants Frederick Ceruti ("Ceruti") and John Tewey ("Tewey") were only minimally involved in the investigation and were not involved in Robinson's statements at issue. Therefore, Ceruti and Tewey should be dismissed on summary judgment.

"The Fourth Circuit has recognized a cause of action for failure to intervene, or bystander liability, as premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." *Burley*, 422 F. Supp. 3d at 1030 (citing *Stevenson v. City of Seat Pleasant,* 743 F.3d 411, 416–17 (4th Cir. 2014) (quoting *Randall v. Prince George's County,* 302 F.3d 188, 203 (4th Cir. 2002)). "Such a duty attaches when an officer observes or has reason to know that a constitutional violation [is being] committed by other officers and possesses a realistic opportunity to intervene to prevent the harm from occurring." *Id.* "The theory of bystander liability permits relief against an officer who (1) is confronted with a fellow officer's illegal act, (2) possesses the power to prevent it, and (3) chooses not to act." *Id.* On the other hand, "if the bystander lacks … specific knowledge, he cannot be a participant in the unlawful acts, and the imposition of personal liability is impermissible." *Id.* at 1030–31.

Ceruti and Tewey were not the primary or secondary detectives in the underlying criminal investigation.[22] *See* Ex. 30 - Deposition of F. Ceruti at 93:3–11. Ceruti testified that he has no

---

[22] Ceruti explained that a primary detective does most of the investigation with help from the secondary detective. *See* Ex. 30 – Deposition of F. Ceruti at 107:19–108:5. When asked about the role of the "assisting officers" that help with the homicide investigation, Ceruti explained that "when a homicide first occurs and witnesses are … identified … they are sent into the homicide unit … [a]nd basically they fill out the … information sheet … [and] as far as whoever's in the office asking them any questions, that's not going to take place because they don't know the … particulars of what happened out on the street." *Id.* at 108:15–109:17. Ceruti clarified that the term "interview" as it pertains to the

knowledge about the instant case because he had little to no involvement in the investigation and had only recently been assigned to the homicide unit. *Id.* at 12:5–15, 14:9–12, 91:24–92:13, 93:3–5. He had no recollection of meeting and/or interviewing Robinson or Dorsey.[23] *Id.* at 38:1-25, 100:12-14, 101:5-11.  He had no recollection of interacting with Pellegrini or Requer regarding the case. *Id.* at 100:15–22. Ceruti had no recollection speaking to the prosecutor handling Plaintiff's murder case. *Id.* 101:12-18, 142:10-145:20. He has never met or interacted with Plaintiff. *Id.* at 102:8–16.

Tewey's involvement in Plaintiff's underlying criminal investigation was similarly *de minimis.* He completed witness information intake forms for Deloris Smith, Cecil Harris, and Edward Neal Ellis. *See* Ex. 33 – E. Ellis Witness Information Sheet at GWLISHF 000063; *see also* Ex. 34 – Deposition of J. Tewey at 27:4–30:25; Ex. 35 – D. Smith Witness Information Sheet at GWLISHF 000056; Ex. 36 – C. Harris Witness Information Sheet at GWLISHF 000057–58.  None of these potential witnesses implicated Plaintiff in the underlying crime, nor contributed to his prosecution or conviction. Like Ceruti, Tewey's involvement in the criminal investigation was unremarkable and he lacked any memory of it.[24] *See* Ex. 34 – Deposition of J. Tewey at 31:19–

---

role of "assisting officers" merely means the taking of basic information from prospective witnesses when discussing the role of "assisting officers," such as himself.  *Id.*

[23] Plaintiff's counsel attempted to demonstrate that Ceruti observed Requer interview Robinson. *See* Ex. 30 at 122:1–130:25. However, Ceruti maintained that while his name appeared typed on the document, his signature was not present and therefore his name might have been typed in error. *Id.* He was adamant that it was his practice to sign any statement he witnessed. *See* Ex. 30 – Deposition of Ceruti at 122:1–130:25.

Ceruti also repudiated his answers to interrogatories 5 and 6, which stated that he was present for Robinson's January 2, 1987, interview with Requer and that he believed Plaintiff murdered Faheem Ali.  Under oath at deposition, he corrected his answers by stating that he never said he witnessed Robinson's interview and that he had never seen the answers prior to the deposition and that it must have been procured over the telephone, and that language used in answer number 6 was not something that he would have said.  *Id.* at 145:1–155:5.

[24] *See, supra,* at n. 22 – Defendant Ceruti's explanation about the clerical task in having potential witnesses complete the information sheet.

32:4, 61:22–62:3, 68:25–69:3.[25] Tewey provided ancillary, but otherwise disinterested, assistance to Pellegrini and Requer. *Id.* at 48:19–49:24, 59:4–60:25.

Simply stated, there is no evidence that Ceruti or Tewey engaged in and/or ignored any wrongful conduct violative of Plaintiff's constitutional rights. Neither served in a supervisory role, nor had any meaningful roles in the underlying investigation such that knowledge of any alleged misconduct could be imputed to them.  Neither had any contact with Dorsey.  Tewey had no contact with Robinson. Ceruti denied having contact with Robinson.[26] Tewey's completion of witness intake information sheets was nothing more than insignificant contact with potential witnesses who provided no evidence implicating Plaintiff of a crime.  Neither engaged in wrongful conduct, nor had the opportunity to learn of any alleged wrongful conduct or prevent it. Ceruti and Tewey are entitled to summary judgment.

## VI.   PLAINTIFF HAS NOT PLED OR DEMONSTRATED AN ACTIONABLE INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIM UNDER MARYLAND LAW

In Count VII of the Amended Complaint, Plaintiff contends that Officer Defendants are liable for intentional infliction of emotional distress under Maryland Law.  Am. Compl. (ECF # 5) at 29.  His claim fails for two reasons: (1) it is insufficiently pled; and (2) his alleged injuries are insufficient as a matter of Maryland law to constitute the tort.

---

[25] At deposition, Det. Tewey responded to the statement, "[y]ou were in the Homicide Division … working on the Ali investigation," by stating,"[i]f you call this working on the investigation … I don't think I actually worked on the investigation.  I think I pitched in. It looks … to me like I pitched in and …. Did some of the initial … information sheets, possibly to help the detectives who may have been doing other thing[s]. But, this sort of level of involvement, we would not consider that to be participation." Ex. 34 – Deposition of Tewey at 31:19-32:4. Det. Tewey further explains that his review of the documents informed his belief that his role in the Ali investigation was minimal, stating "these documents are sort of preliminary. So, it appears that they are simply initial notes … to inform the investigator – whoever the chief investigator was …." *Id.* at 62:1–12; *see also* 63:8–17.

[26] Defendant Ceruti explains that while his name appears as a witnessing detective during Robinson's January interview, he believes that his name appears in error because he never signed the witness statement indicating his actual presence, as was his practice. *See* Ex. 30 – Deposition of Ceruti at 122:1–130:25.

"In order to establish a *prima facie* case for [intentional infliction of emotional distress], a plaintiff must allege and prove facts showing that … the emotional distress was severe." *Arbabi v. Fred Meyers, Inc.,* 205 F.Supp.2d 462, 465-66 (D. Md. 2002) (citing *Harris v. Jones,* 380 A.2d 611, 614 (Md. 1977)). In Maryland, "the tort of intentional infliction of emotional distress is rarely viable." *Id.* (quoting *Farasat v. Paulikas,* 32 F.Supp. 2d 244, 247 (D Md. 1997)). "Each element [of the tort] must be pled and proved with specificity." *Id.* (citing *Floor v. Juveline Serv. Admin.,* 552 A.2d 947, 959 (Md. 1989)). "To satisfy the fourth element of the tort, "one must [plead and actually] suffer a severely disabling emotional response to the defendant's conduct." *Brengle v. Greenbelt Homes, Inc.,* 804 F.Supp. 2d 447, 453 (D. Md. 2011) (quoting *Harris,* 380 A.2d at 616)).

Plaintiff's pleading is devoid of any facts demonstrating that he suffered severe emotional distress. *See* Am. Compl. (ECF # 5) at 29.  He does not state with specificity what psychological and emotional distress he sustained, nor does he plead facts demonstrating its severity.  Plaintiff states that he "was forced to share a cell that was little bigger than the average parking space … [and that] [f]or more than 31 years, [his] life was marked by a steady stream of human rights abuses." *Id.* at 22. He never described the alleged abuses or his emotional distress from them. He has not provided any evidence that he sought care from a mental health professional at any time following his arrest. Plaintiff only states that he "suffered tremendous damage, including psychological and emotional distress,' which alone, is insufficient to meet Maryland's pleading standard for intentional infliction of emotional distress.  This alone entitles Officer Defendants to summary judgment.

Furthermore, the evidence of emotional distress is insufficient to satisfy the tort. Plaintiff testified that "there's nights and stuff where [he] suffer[s] from sleep deprivation because [he has] dreams that [he is] in prison subjected to some of the most inhumane treatment." *See* Ex. 38–

Deposition of Plaintiff at 136:16–137:2. He described the inhumane treatment as being strip searched by prison guards. *Id.* at 138:22–140:9. Plaintiff explained that while in prison, he was subjected to strip searches and shakedowns, especially when he would receive outside visitors, and he equated the treatment to sexual assaults, although he knew the two were not equivalent. *Id.* Plaintiff testified that he would tell family members to stop visiting so that he would avoid the searches. *Id.* He also testified that he considered being confined to his cell and not being allowed to shower as other examples of inhumane treatment he endured while in prison. *Id.* at 140:10-21. Plaintiff testified that he endured officers screaming at him, pushing him against walls, and placing him in handcuffs. He also cited being away from family, lack of companionship, and being told when, where, and how long to eat as examples of inhumane treatment he endured.  *Id.* at 141:7-142:3.

Significantly, Plaintiff testified that he never sought the assistance of any mental health professional. *Id.* at 135:22-136:12. He did not seek mental health treatment while he was in prison nor after he was released. *Id.* Plaintiff testified that since his release, he has been able to have normal relations with his wife. *Id.* at 143:7–11. Plaintiff stated that he did not believe he suffered from a mental illness.  *Id.* at 137:3-7. He explained that he had "quite a few cellmates" that were treated for psychological disorders and that he knew he did not suffer from one. *Id.* at 137:10-38:18. Accordingly, the evidence of Plaintiff's emotional state in this case is insufficient as a matter of law to constitute intentional infliction of emotional distress. Officer Defendants are entitled to summary judgment.

### VII.   OFFICER DEFENDANTS ARE NOT LIABLE UNDER ARTICLES 19, 24, AND 26 OF THE MARYLAND DECLARATION OF RIGHTS

In Count VIII, Plaintiff contends that Officer Defendants are liable for violating his rights under Articles 19, 24, and 26 of the Maryland Declaration of Rights.  Am. Compl. (ECF # 5) at 30.  His claim lacks merit.

"Article 19 states that every person who suffers either personal or property damage ought to have remedy by the course of the Law of the Land, and ought to have justice and right, freely without sale, fully without any denial, and speedily without delay." *Wheelabrator Baltimore, L.P. v. Mayor and City Council of Balto.,* 449 F.Supp.3d 549, 565 (D. Md. 2020). "Article 19 guarantees an opportunity to seek judicial redress of a wrong." *Id.* (citing *Dehn Motor Sales, LLC v. Schultz,* 96 A.3d 221, 237 n.27 (Md. 2014)). "Article 19 … does not … support a private cause of action and monetary remedies." *Id.* As such, Plaintiff has no Article 19 cause of action against Officer Defendants.  Furthermore, his assertion that he was wrongfully convicted because of the evidence introduced at his criminal trial does not qualify as a predicate wrong for redress under Article 19 in this case.  Plaintiff alleges that his criminal trial is the alleged wrong.  Thus, there is no evidence that Officer Defendants denied him an opportunity to seek judicial redress of the alleged wrong. Plaintiff was afforded his appeal, post-conviction, and civil remedies after his conviction. Officer Defendants are entitled to summary judgment on Plaintiff's Article 19 claim.

As for Plaintiff's cause of action under Articles 24 and 26 of the Maryland Declaration of Rights, Officer Defendants are entitled to summary judgment for the same reasons articulated in Sections I – VI *supra.*  "[I]t is well-settled that Article [24 and ]26 [are] construed *in pari materia* with [federal jurisprudence] …." *Barnhill v. Strong,* JFM 07-1678, 2008 WL 544835, *4 (D. Md. February 25, 2008) (quoting *Patterson v. State,* 930 A.2d 370-71 (2007)).

## VIII.   OFFICER DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct" *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Recently, the Supreme Court has emphasized that 'clearly established law' refers to law that is particularized to the facts of the case.  If no case can be identified wherein an officer acting under similar circumstance was held to have violated the constitution, the officer is entitled to qualified immunity. *See White v. Pauly*, 137 S. Ct. 548, 551–52 (2017); *Kisela v. Hughes*, 138 S. Ct. 1148, 1153-54 (2018) (per curiam)). Indeed, the Supreme Court has "repeatedly stressed that courts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *District of Columbia v. Wesby*, 138 S.Ct 577, 590 (2018) (quoting *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014)).

### A. Officer Defendants Are Entitled To Qualified Immunity Because Case Law In 1986 or 1987 Did Not Clearly Establish That They Could Not Rely Upon Robinson's Statement For Probable Cause

Plaintiff's allegations are largely centered around Robinson's witness interviews.[27]  He alleged that Officer Defendants separated Robinson from his mother during the interview. Am. Compl. (ECF # 5) at 6.  Plaintiff alleged that after Robinson initially denied knowing the identity of the shooter, Officer Defendants demanded that he cooperate and threatened that if he did not do so, they would take him away from his mother. *Id.* at 7.  He further alleged that Officer Defendants threatened Robinson that he risked being charged with the homicide if he did not cooperate. *Id.*

---

[27] Plaintiff also takes issue with Dorsey's witness statement. On January 3, 1987, Plaintiff alleged that Dorsey and her mother came down to the police station. Am. Compl. (ECF # 5) at 8, ¶ 30. He alleged that, as he did with Robinson, Officer Defendants demanded that Dorsey cooperate with the investigation under the threat to take her away from, and possibly arrest, her mother. *Id.* Plaintiff alleged that Dorsey agreed to sign a statement identifying Plaintiff as the shooter based on this coercion. *Id.* at 8, ¶ 31. Officer Defendants allegedly pressed Dorsey to sign her name next to Plaintiff's picture and she did so. *Id.* However, Dorsey never testified in Plaintiff's criminal case. As such, there is no casual connection to Plaintiff's due process or malicious prosecution claims.  And, as stated in Section II(A) and footnote 12 *supra,* any claim premised on unlawful detention is time barred by the applicable statute of limitations.

Although Robinson knew Plaintiff for approximately four years prior to the homicide, Plaintiff also claimed that Officer Defendants' identification procedures were impermissibly suggestive because Requer tapped on the photograph of Plaintiff. Officer Defendants then drew up statements which Robinson reviewed and signed. *Id*. at 7.

Officer Defendants deny Plaintiff's assertions of wrongdoing. However, even if Plaintiff's allegations were true, Officer Defendants are entitled to qualified immunity. No police officer in 1986 and 1987 "would [know] that what [they were] doing was unlawful" if accused of such tactics. *Wesby*, 138 S.Ct. at 590. There was no clearly established law in similar circumstances putting Officer Defendants on notice that that their actions, as alleged by Plaintiff and if determined to be true, violated any statutory or constitutional right.

Officer Defendants acknowledge that it was clearly established at the time of Plaintiff's criminal trial in 1987 "that a conviction obtained through the use of false evidence, known to be such by representatives of the State, [was unconstitutional] under the Fourteenth Amendment." *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). However, none of Plaintiff's allegations established that Officer Defendants knew Robinson's statements were false. *See* Section II *supra*. And, while it was clearly established that a coerced confession could not form the basis of probable cause for an arrest, - *see Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) - it was not clearly established that the conduct Robinson now attributes to Pellegrini and Requer was unconstitutional.

There are clear differences between a suspect/defendant and a non-party witness and case law governing one does not necessarily govern or provide guidance to the other. "While [the Supreme] Court's case law does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *White*, 137 S. Ct. 548, 551. The pressures and stress of an individual in custody and under

imminent threat of arrest and/or prosecution cannot be reasonably compared to those of a witness undergoing a non-custodial interrogation. At a minimum, the legal issue was not "beyond debate" in 1986 or 1987 that Officer Defendants should have assumed simply because there was clearly established law stating that coerced confessions could not be used to form the basis of probable cause, that alleged coerced witness statements could not be used for the same. As such, Officer Defendants are entitled to qualified immunity for any allegations arising from their interrogations of Robinson and Dorsey.

**B.  Officer Defendants Are Entitled To Qualified Immunity Because There Was No Clearly Established Case Law In 1986 Stating That The Alleged Actions Of The Officer Defendants Constituted Impermissible Coercion.**

But, assuming *arguendo*, that a court today could extrapolate that the case law for coerced confessions could be ascribed to coerced non-party statements, Officer Defendants are still entitled to qualified immunity because there was no clearly established law in December 1986 or January of 1987 stating that the alleged actions of Officer Defendants constituted coercion. In *Gilliam v. Sealey*, the Fourth Circuit surveyed the case law regarding coerced and fabricated confessions that were clearly established during the same period as the instant case. *See Gilliam,* 932 F.3d at 234-37.  Specifically, the Fourth Circuit identified three cases that clearly established the law regarding impermissibly coercive interrogations. The first of these was in *Ashcraft v. Tennessee*, 322 U.S. 143 (1944). The suspect in Ashcroft was subjected to 36 hours of continuous interrogation without sleep. *Id*. at 149-53. This case is sufficiently different from the instant case, such that it would not place the alleged conduct here as unconstitutional "beyond debate." Here, Robinson testified that he was questioned by Officer Defendants outside of his mother's presence for approximately five to seven minutes.  *See* Ex 39 – 12/06/1999 Post-Conviction Transcript at H24:2-25. Similarly, the length of Robinson's interview and the presence of a parent is distinguishable from the second

case reviewed in *Gilliam*, which was *Haley v. Ohio*, 332 U.S. 596 (1948).  In *Haley,* a confession of a 15-year-old suspect was found to be coercive where the child was questioned alone for about five hours.  *Id*. at 598.  Otis Robinson was neither a suspect nor is there any allegation that he was questioned alone for anywhere near five hours.

The third case reviewed in *Gilliam* was *Ferguson v. Boyd*, 566 F.2d 873 (4th Cir. 1977). In that case, the prosecutor and police, after learning of the plaintiff's concern for his detained girlfriend, "set the stage for a week's exploitation of the relationship between the [plaintiff] and his girlfriend," which included interrogating the plaintiff when he had been drinking and was not entirely lucid and without regard for Miranda rights. *Id*. at 875-78.  There the plaintiff gave a confession after six days of incarceration and after police allegedly promised the plaintiff that his girlfriend, whose two young children were left without her for a week, would be released if he confessed. *Id*. As a result of these actions, among others, the Fourth Circuit held that "[t]he totality of the circumstances ma[de] it abundantly plain that [the] acknowledgement of guilt was involuntarily exacted as a consequence of undue psychological coercion and calculated pressures brought to bear through clever manipulation…." *Id*. at 879.

*Boyd* cannot place Officer Defendants on notice that their alleged actions, as alleged by Plaintiff and if determined to be true, violated clearly established constitutional or statutory rights during Robinson's witness interview.  Again, Robinson was not a suspect as the plaintiff in *Boyd.* He was a third-party witness.  But, even if the threats regarding the *Boyd* plaintiff's girlfriend might be reasonably compared to the alleged threats to Robinson regarding separation from his mother, the remaining factors considered in *Boyd* are not at all like the facts in the instant case. Robinson was not intoxicated during his interview, he was lucid.  He never asserted a right to remain silent, which was a factor considered in *Boyd.*  Neither Robinson nor his mother were under

imminent threat as compared to the plaintiff and his girlfriend in *Boyd,* who were both arrested and readied for criminal prosecution. In short, the coercion cases analyzed in *Gilliam* were not sufficiently similar to the Plaintiff's case to put the unconstitutionality of the alleged actions of Officer Defendants, as alleged by Plaintiff and if determined to be true, "beyond debate" and provide a basis for denying them qualified immunity.

The Supreme Court has "repeatedly [instructed] [district] courts not to define clearly established law at too high a level of generality." *See City of Tahlequah v. Bond*, 142 S.Ct. 9, 11 (2021). "It is not enough that a rule be suggested by then-existing precedent; the rule's contours must be so well-defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Wesby*, 138 S.Ct. at 590; *see also Rivas-Villegas v. Cortesluna*, 142 S.Ct. 4, 8 (2021). As of January 1987, there was no clearly established case law regarding the unconstitutionality of coercive non-party witness interrogations. Officer Defendants are entitled to summary judgment based on qualified immunity.

**CONCLUSION**

For the reasons advanced in the Officer Defendants motion for summary judgment and Accompanying memorandum of law, Officer Defendants respectfully request this Court grant summary judgment in their favor.