## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

GARY WASHINGTON,

               Plaintiff

      v.

BALTIMORE POLICE DEPARTMENT, *et al.*,

               Defendants

Case No. 1:19-cv-02473-SAG

Judge Stephanie Gallagher

**JURY TRIAL DEMANDED**

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jon Loevy*
Gayle Horn
Roshna Bala Keen*
Renee Spence*
LOEVY & LOEVY
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
*Admitted *pro hac vice*

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ...................................................................................................... 1

FACTS ...................................................................................................................... 2

    Gary Washington ................................................................................................. 3

    The Murder of Faheem "Bobo" Ali ..................................................................... 3

    The Police Decide On The Shooter Without Any Investigation............................ 5

    Defendants Fabricate A Statement Against Gary Washington And Force 12-year-old Otis Robinson To Sign It ..................................................................................... 6

    Otis' Original, Truthful Statement ....................................................................... 6

    Otis' Second Statement: A Fabricated Report ..................................................... 7

    Otis' Third Statement: Another Fabricated Report............................................... 10

    Defendants Fabricate A Back-Up Identification From 13-Year-Old Rozetta Dorsey....... 12

    Mr. Washington is Charged and Convicted Based on False Witness Testimony ................... 17

    Defendants Failed to Document Other Material Information............................................. 18

    Defendants' Reliance on the Polygraph Results Is Misplaced ........................................... 19

    Plaintiff's Extreme Damages ............................................................................... 20

LEGAL ARGUMENT ................................................................................................21

I.       Summary Judgment Standard ........................................................................21

II.      Genuine Disputes of Fact Require A Trial on Gary Washington's *Brady* Claims ............22

III.     Plaintiff's Fabrication Claim Must Be Decided By A Jury ...............................................27

         A.       Rozetta's False Statement Gives Rise To A Fabrication Claim ...........................28

         B.       There Is A Genuine Issue of Material Fact About Whether Defendants Knew
                  Otis'  Signed Statements Were False.....................................................................30

         C.       Plaintiff is Not Collaterally Estopped From Disputing Otis's 1987 Trial
                  Testimony ..............................................................................................................32

IV.      Plaintiff's Federal and State Malicious Prosecution Claims Must Proceed To A Jury .....34

V.       Mr. Washington's Malicious Prosecution Claims Are Not Time-Bared..........................37

VI.      Failure to intervene .........................................................................................................38

VII.     Plaintiff's IIED Claim Must Be Tried to a Jury................................................................38

         A.       Plaintiff Properly Pled His IIED Claim ................................................................39

         B.       Plaintiff Has Evidence of Sufficiently Severe Distress .......................................41

VIII.    Plaintiff's Claims Under Articles 19, 24 and 26 Must Be Tried ......................................42

IX.      The Defendants Are Not Entitled To Qualified Immunity ................................................44

CONCLUSION.....................................................................................................................46

## TABLE OF AUTHORITIES

*Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970) ................................................................. 21

*Anderson v. City of Rockford*, 932 F.3d 494 (7th Cir. 2019) .................................................. 29

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ...................................................... 21, 22

*Arbabi v. Meyers*, 205 F. Ssupp. 2d 462 (D. Md. 2002) ......................................................... 40

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................... 39

*B.N. v. K.K.*, 538 A.2d 1175 (Md. Ct. App. 1988) ..................................................................... 4

*Baltimore Luggage Co. v. Samsonite Corp.,* 727 F.Supp. 202 (D.Md.1989) ........................... 33

*Barbee v. Warden*, 331 F.2d 842 (4th Cir. 1964) ................................................................... 23

*Barnhill v. Strong*, No. JFM-07-1678, 2008 WL 544835
(D. Md. Feb. 25, 2008) ....................................................................................................... 43

*Barton v. Warden, So. Ohio Corr. Facility*, 786 F.3d 450 (6th Cir. 2016) ............................. 24

*Bies v. Sheldon,* 775 F.3d 386 (6th Cir. 2014) ....................................................................... 27

*Boss v. Pierce,* 263 F.3d 734 (7th Cir. 2001) ......................................................................... 25

*Bowen v. Maynard,* 799 F.2d 593 (10th Cir. 1986) ............................................................... 27

*Brengle v. Greenbelt Homes*, 804 F. Supp. 2d 447 (D. Md. 2011) ....................................... 40

*Brown v. Nucor Corp.*, 785 F.3d 895 (4th Cir. 2015) ............................................................ 28

*Burgess v. Baltimore Police Dep't*, No. RDB-15-0834, 2017 WL 4947004
(D. Md. Oct. 31, 2017) ................................................................................................... 30, 41

*Carter v. Maryland*, No. JKB-12-1789, 2012 WL 6021370 (D. Md. Dec. 3, 2012) ................... 43

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 21

*Clark v. Alexander*, 85 F.3d 146 (4th Cir. 1996) ................................................................... 21

*Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731 (D. Md. 2006) ................. 28

*Cole v. Cole*, 633 F.2d 1083 (4th Cir. 1980) .......................................................................... 21

## TABLE OF AUTHORITIES (cont.)

*Conley v. Gibson*, 355 U.S. 41 (1957) ....................................................................39

*Davis v. United States*, 512 U.S. 452 (1994) ..........................................................26

*Dehn Motor Sales, LLC v. Schultz*, 96 A.3d 221 (Md. 2014)....................................43

*Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451 (1992).............21

*Eriline Co. v. Johnson*, 440 F.3d 648 (4th Cir. 2006)...............................................37

*Evans v. Chalmers*, 703 F.3d 636 (4th Cir. 2012) ..................................................34

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ..................................................29

*Figueiredo-Torres v. Nickel*, 584 A.2d 69 (Md. 1991)..............................................41

*Franks v. Delaware*, 438 U.S. 154, 157, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ..........45

*Gandy v. Howard County Bd. of Ed.*, No. GLR-20-3436, 2021 WL 3911892
    (D. Md. Sept. 1, 2021) ....................................................................................40

*Gilliam v. Sealey,* 932 F.3d 216 (4th Cir. 2019) .................................................. *passim*

*Graham v. Gagnon*, 831 F.3d 176 (4th Cir. 2016) ..................................................36

*Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307 (4th Cir. 2017) ..........................28, 40

*Great N. Ins. Co. v. Recall Total Info. Mgt., Inc.*, No. JDC-13-1829, 2014 WL 3845891
    (D. Md. Aug. 1, 2014)......................................................................................39

*Hamilton v. City of New York*, No. 15 CV 4574, 2019 WL 1452013
    (E.D.N.Y. March 19, 2019) .............................................................................25

*Harris v. Jones*, 380 A.2d 611 (Md. 1977)...........................................................41, 42

*Hatfill v. New York Times Co.*, 416 F.3d 320 (4th Cir. 2005) ................................39, 41

*Hayes v. City of Seat Pleasant,* No. 10–2172, 2012 WL 836258 (4th Cir. Mar.14, 2012) ..........37

*Heck v. Humphrey*, 512 U.S. 477 (1994)...............................................................38

*Herbert v. Henneberry*, No. 94-2157, 1995 WL 371291 (4th Cir. June 20, 1995) ......................42

*Hope v. Pelzer*, 122 S.Ct. 2508 (2002) ...............................................................44

## TABLE OF AUTHORITIES (cont.)

*Howard v. City of Durham,* 487 F. Supp. 3d 377 (M.D.N.C. 2020) .............................34

*Hupp v. Cook*, 931 F.3d 307 (4th Cir. 2019) ...........................................................35, 36

*Hurt v. Wise*, 880 F.3d 831 (7th Cir. 2018) ....................................................................29

*Jean v. Collins*, 221 F.3d 656 (4th Cir. 2000)................................................................45

*Jimenez v. City of Chicago*, 830 F.Supp.2d 432 (N.D.Ill.2011) ..............................25, 32

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ................................................29

*Jones v. York*, 34 F.4th 550 (7th Cir. 2022)...................................................................34

*Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013)..............................................................29

*Kyles v. Whitley*, 514 U.S. 419 (1995)...............................................................23, 27, 22

*Lambert v. Williams*, 223 F.3d 257 (4th Cir. 2000).......................................................34

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir. 2019).................................................29

*Liberty Corp. v. NCNB Nat. Bank of South Carolina*, 984 F.2d 1383 (4th Cir. 1993).................28

*Magill v. Gulf & Western Industries, Inc.*, 736 F.2d 976 (4th Cir. 1984)......................21

*Manuel v. City of Joliet,* 137 S. Ct. 911 (2017) ......................................................37, 38

*McPherson v. Baltimore Police Dep't,* 494 F. Supp. 3d 269, 284 (D. Md. 2020) .................37, 38

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ..............................................................25

*Miller v. Pate,* 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967)..................................45

*Mills v. City of Covina*, 921 F.3d 1161 (9th Cir. 2019) ..................................................34

*Monroe v. Pape*, 365 U.S. 167 (1961) ............................................................................29

*Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) ...............45

*No E.-W. Highway Comm., Inc. v. Chandler*, 767 F.2d 21 (1st Cir. 1985) ....................34

## TABLE OF AUTHORITIES (cont.)

*Osborne v. Georgiades*, CV RDB-14-182, 2015 WL 6447503 (D. Md. Oct. 23, 2015)..............32

*Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014)......................22

*Peterson v. Heymes,* 931 F.3d 546 (6th Cir. 2019).......................................................33

*Petty v. City of Chicago*, 754 F.3d 416 (7th Cir. 2014) ................................................29

*Phillips v. City of Chicago*, 2018 WL 1309881 (N.D. Ill. Mar. 13, 2018) ...................................32

*Reagan v. Rider*, 521 A.2d 1246 (Md. Ct. Spec. App. 1987) ........................................41

*Restivo v. Hessemann*, 846 F.3d 547 (2nd Cir. 2017)....................................................32

*Rico v. Green*, GJH-18-1949, 2021 WL 1215775 (D. Md. Mar. 30, 2021) ................................41

*Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385 (4th Cir. 2014)...............................37, 40

*S–1 By and Through P–1 v. State Bd. of Educ.,* 6 F.3d 160 (4th Cir.1993) ................................33

*Schwartz v. Wellin*, No. 2:13-CV-3595-DCN, 2014 WL 12637912 (D.S.C. Aug. 14, 2014).......28

*Smith v. Cain*, 565 U.S. 73 (2012) ..........................................................................22

*Smith v. Munday*, 848 F.3d 248, (4th Cir. 2017) ...........................................................36

*Smith v. Ray*, 781 F.3d 95 (4th Cir. 2015) ..................................................................22

*Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793 (D. Md. 2001)..............................................37

*Swierkiewicz v. Sorema*, 534 U.S. 506 (2002)...............................................................39

*Tolan v. Cotton*, 134 S. Ct. 1861 (2014).......................................................22, 24, 44, 46

*United States v. Bagley*, 473 U.S. 667 (1985) ..............................................................22

*United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995)........................................................27

*United States v. Munsingwear,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950)..........................33

*Washington v. Buraker*, 322 F. Supp. 2d 702 (W.D. Va. 2004) ....................................45

## TABLE OF AUTHORITIES (cont.)

*Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005).......................................................27, 31, 45

*Wearry v. Cain*, 136 S. Ct. 1002 (2016) ................................................................22, 23, 24

*Wheelabrator v. Baltimore*, 449 F. Supp. 3d 549 (D. Md. 2020)....................................................43

*White v. Smith,* 696 F.3d 740 (8th Cir. 2012) ..............................................................................28

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) ..........................................................29

*Williams v. Wicomico County Bd. of Educ.*, 836 F. Supp. 2d 387 (D. Md. 2011)........................43

*Youngblood v. W. Virginia*, 126 S. Ct. 2188 (2006) ....................................................................23

*Youngblood v. West Virginia*, 547 U.S. 867 (2006) ....................................................................22

*Zeneca Ltd. v. Novopharm Ltd.,* 919 F. Supp. 193 (D. Md. 1996) ................................................33

**Other Statutes and Authorities**

18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4432 (3d ed.).............................................................................................34

Fed. R. Civ. P. 8(a) ........................................................................................................39

## INTRODUCTION

Faheem "Bobo" Ali was shot and killed on December 27, 1986. Tasked with solving his crime, the Defendant Baltimore Police Detectives looked around the crime scene, spoke to witnesses, and oversaw the collection of evidence. There was nobody who saw the shooter well enough to offer an identification, nor any physical evidence suggesting a suspect. In other words, no leads. Rather than conduct a homicide investigation, Defendants took a shortcut: they settled on a suspect without a single witness ever mentioning the suspect's name, nor a shred of physical evidence linking him to the crime. That suspect, Gary Washington, spent 31 years in prison for a crime he did not commit: Faheem Ali's murder.

The police case against Mr. Washington was tragically thin. With no eyewitnesses, Defendants Requer, Pellegrini, and Fahltich targeted two children from the neighborhood and turned them into witnesses. Defendants claim that twelve-year-old Otis Robinson and thirteen-year-old Rozetta Dorsey both identified Mr. Washington as the shooter, verbally and through a photo array, freely and without influence. Otis and Rozetta both say that this was a lie. They have testified that they told the Defendants they did not know who the shooter was, but that Defendants were undeterred. Instead, they wrote out statements for the children that implicated Mr. Washington and told them to sign them. The children were very scared, and Otis had even been threatened with murder charges himself, so they complied. The Defendants then passed these statements off as true, while knowing they were false, and never revealing the coercive and misleading methods they used on the children. On the basis of Otis and Rozetta's false statements and nothing more, Mr. Washington was prosecuted and convicted.

Finally in 2018, Mr. Washington obtained a writ of actual innocence, and his conviction was vacated. The State dismissed the charges. In this Section 1983 lawsuit, Mr. Washington

seeks redress for his false conviction and many years of incarceration. He has brought due process claims stemming from Defendants' manufacture of false evidence and suppression of *Brady* material, as well as failure to intervene, malicious prosecution, and related state law claims. In support of these claims, Mr. Washington has marshaled a significant amount of evidence, including sworn testimony from Otis and Rozetta.  In seeking to jettison Mr. Washington's lawsuit at summary judgment, Defendants have presented a narrative that is, at best, one-sided. They ignore all evidence of fabrication, even though it is their burden at summary judgment to establish the absence of genuine factual disputes.

This case presents two dramatically different factual universes: in one, the defendant officers credibly relied on two third-party witnesses in order to arrest and prosecute the plaintiffs; in the other, the defendant officers pressured and threatened these reluctant witnesses into falsely inculpating plaintiffs with a story defendants knew to be false. Summary judgment is therefore not appropriate, and Defendants' motion should be denied.

### FACTS

Gary Washington is a 61-year old man who resides in Baltimore.  Ex. 1 (G. Washington Dep.) at 10, 20. He lives with Theressa, the woman he was dating when he was wrongfully arrested for murder 31 years ago, and to whom he is now married. *Id.* at 21-22, 301. Their son, Gary Jr., was only three years old when Mr. Washington was arrested. *Id.* at 127.

For three decades, Mr. Washington was confined to the Maryland prison system for a crime he did not commit: the murder of Faheem Ali. *Id.* at 145 (entered the Maryland penitentiary on October 20, 1987), 87 (released October 29, 2018). He has steadfastly maintained his innocence of this crime. *See, e.g., id.* at 26, 322 ("I spent 32 years in prison for something I didn't do.").

There was no physical evidence connecting Mr. Washington to the crime, such as fingerprints, blood evidence, gun powder residue, or DNA, connecting Mr. Washington to the crime. Ex. 2 (2018 Ruling and Order) at 4.

The evidence used to convict Mr. Washington consisted solely of two statements, both taken from children, who have testified under oath repeatedly that they did not see who committed the shooting. Otis Robinson and Rozetta Dorsey were only 12 and 13 years old, respectively, when detectives prepared false statements for them to sign implicating Gary Washington in the shooting. With no credible evidence of guilt, Mr. Washington's conviction was vacated on August 20, 2018. *Id.* at 1-6. On January 15, 2019, the State dismissed the charges against Plaintiff.

### Gary Washington

Gary Washington was born on February 9, 1961. Ex. 1 (G. Washington Dep.) at 10. He grew up at 2328 Barclay Street, Baltimore, where he resided until his arrest for the Ali homicide. *Id.* at 47, 81-82.

In 1986, Mr. Washington lived with his mother, his father, his brother Ricky, and his sister Tangela. *Id.* at 48. One of Mr. Washington's close friends was Lawrence Thomas, who visited him at the Barclay house often. *Id.* at 186, 188-89. Mr. Washington had another sister named Sheila, who lived nearby with her husband Ronald Brady. *Id.* at 117, 123-124.

### The Murder of Faheem "Bobo" Ali

On December 27, 1986, Faheem "Bobo" Ali was shot and killed. Ex. 3 (Office Report) at 1.

Mr. Washington saw the shooting take place. Ex.1 (G. Washington Dep.) at 259-260. He was inside his home at 2328 Barclay when it occurred. *Id.* at 259-260.

3

Shortly before the shooting, Mr. Washington was downstairs in his basement with his friend Lawrence Thomas and his brother-in-law Ronald Brady. *Id.* at 238. At some point, Thomas had to leave, so Mr. Washington asked Brady to see Thomas out and to lock the front door afterwards. *Id.* at 242. Mr. Washington remained in the basement alone for a few minutes. *Id.* at 242.

Mr. Washington then went upstairs, intending to head to his bedroom. *Id.* at 259-60. He saw that the front door to the house had not been closed, so he went over to shut and lock it. *Id.*

When he got to the front door, he saw Lawrence, Ronald, and Bobo standing outside. *Id.* Mr. Washington saw Lawrence pull out a gun and hit Bobo. *Id.* Bobo raised his hands to shield himself. *Id.* Lawrence's gun went off. *Id.* Bobo ran across the street and collapsed, apparently having been hit with the bullet. *Id.* Lawrence and Ronald then fled toward Camp Street. *Id.* Bobo's body came to rest on the sidewalk in front of 2309 and 2311 Barclay, across the street from Mr. Washington's residence. Ex. 3 (Office Report) at 2.

Mr. Washington's brother Ricky, sisters Tangela and Sheila, and his mother were all at home when the shooting occurred and they all saw Mr. Washington inside the house. *Id.* at 280 (Rick, Sheila, Tangela, and mother, plus Ricky's girlfriend Sherry, were at home); Ex. 4 (T. Washington Trial Test.) at GW 000671, 679. Mr. Washington was shocked to see the shooting. Ex. 1 (G. Washington Dep.) at 267, 276. He called out to his brother that Bobo had just gotten shot. *Id.*; Ex. 4 (T. Washington Trial Test.) at GW 000679 (Mr. Washington was inside house when he said "Bobo just got shot"). Ricky and Tangela ran outside to check on the victim. Ex. 1 (G. Washington Dep.) at 279-280. The police arrived soon after. *Id.* at 293.

Mr. Washington did not shoot Bobo. *Id.* at 26. He had no idea Bobo was going to be shot and did not participate in that crime in any way. *Id.* at 233-234, 270-272.

**The Police Decide On The Shooter Without Any Investigation.**

The police were called to the scene. The witnesses police spoke to had heard the shot were not able to identify the shooter, and gave information only about basic characteristics and clothing. Ex. 5 (Pellegrini Dep.) at 209. The witnesses who turned up during the canvass heard the shot but could not identify a shooter. Ex. 3 (Office Report) at 2.[1]

Defendant Requer has admitted in this litigation that he set his sights on Mr. Washington as a suspect even before a single witness mentioned Mr. Washington's name, let alone identified him as being involved in the crime. Ex. 6 (Requer Dep.) at 214-215, 227-228 (agreeing that he asked a witness about Gary Washington though no witness had said they saw Gary Washington at the scene), (Q: "Sir, why do you think Gary Washington was even at the scene of the crime?" A: "I have no idea."). He could not explain why he did that or what legitimate evidence would have pointed in Mr. Washington's direction. *Id.*

At this point, all the police knew was that the victim's body was found across the street from the Washington home. Additionally, interviews at the scene indicated that the victim had been speaking with Mr. Washington's brother Ricky (but not Mr. Washington) in front of 2328 Barclay at some point earlier in the day. Ex. 3 (Office Report) at 3.

Finally, an anonymous caller had given the police department a tip that a "Gary Ward" (again, not Mr. Washington) was involved. Ex. 6 (Requer Dep.) at 224-225; Ex. 3 (Office Report) at 3. Given that the shooting occurred on Mr. Washington's street and the victim had been apparently speaking with Mr. Washington's brother at some point, this tip was all it took for Requer to set his sights on Gary Washington. Ex. 6 (Requer Dep.) at 222-228. Defendant Requer admits that he assumed Gary Ward was a mistaken reference to Gary Washington, even

---

[1] Defendants admit that when they did their canvass, they knocked on every door on the block -- except for the Washington home. Ex. 35 (Pellegrini Trial Tr.) at GW SAO SUBPOENA 001065, 1069.

though Ward and Washington sound nothing alike, and not a single person had mentioned Gary

Washington was present at the crime scene. Ex. 3 (Office Report) at 2-3; Ex. 6 (Requer Dep.) at

205, 218, 220, 228. Based on these tenuous connections, Defendants decided that Gary

Washington was the perpetrator and set about to manufacture witness statements to support their

theory.

### Defendants Fabricate A Statement Against Gary Washington And Force 12-year-old Otis Robinson To Sign It.

On the night of the murder, a 12-year-old child named Otis Robinson was at 2311

Barclay Street, at his mother's boyfriend's home. Ex. 8 (Otis '99 Tr.) at GW00019.  He received

a phone call from his mother asking him to pick up something from the store. *Id.* at GW00019.

He went outside and saw three men standing across the street in front of Gary Washington's

house, talking. Ex. 8 (Otis '99 Tr.) at GW00020. It was dark outside. *Id.*  at GW00020. As Otis

began walking towards the store, he heard a gunshot. *Id.* at GW00020.

### Otis' Original, Truthful Statement

Otis did not see any of the men's faces and could not provide the police with any

additional information about the shooting. *Id.*  at GW00019. (Q: "And these three individuals,

did you get a look at any of their faces? A: "No."). Nevertheless, Baltimore Police Department

detectives Pellegrini and Falteich took Otis and his mother to police headquarters to be

interviewed *Id.* at GW00021-22; Ex. 9 (Information Sheet for Otis Robinson) (documenting that

Robinson was interviewed on Dec. 29, 1986). He was taken into a small interview room, without

his mother present. Ex. 8 (Otis '99 Tr.) at GW00023. Detective Requer joined the interrogation.

Ex. 10 (Robinson Dep.) at 33-34. The Detectives asked Otis what he had seen, and he told them

the truth: he was visiting a friend, his mother called for him to go to the store, at which point he

left for the store. Ex. 8 (Otis '99 Tr.) at GW00024. Otis told the detectives that he saw three guys

standing across the street talking, heard the gunshot, and then ran back to 2311 Barclay. *Id.* They

asked Otis whether or not he could identify any of the men, and he answered, "no." *Id.* at

GW00024.

Otis's initial, truthful statement to the police was written down but not tape recorded. *Id.*

at GW00024-25, 31 ("They wrote two statements."). Otis testified that one of the detectives "was

sitting right there writing it down right there in front of me, but he never showed it to me *Id.*  at

GW00032. Otis observed Detective Pellegrini creating notes as well. *Id.* at GW00025.

Defendants did not present this first, truthful statement to Otis for his signature. Nor did they

disclose it to anyone else -- Otis's truthful statement that he saw the precursor to the shooting but

could not identify the shooter was never disclosed to Mr. Washington or to the prosecution. *See*

*generally* Ex. 11 (Homicide File).

### Otis' Second Statement: A Fabricated Report

Otis' signed, written statement, the one Defendants emphasize at summary judgment as

the basis for Gary Washington's prosecution, was in fact Otis <u>second</u> statement, which they

misrepresented as his first.[2] Ex. 8 (Otis '99 Tr.) at GW00026-27. That second statement is false,

and the Defendants knew it was false.

Otis had already told Requer, Fahlteich, and Pellegrini that he observed the lead-up to the

shooting but did *not* see the shooting itself, nor the shooter well enough to identify them. In

response, they accused young Otis of lying and then threatened to take him away from his mother

forever. *Id.* at GW00027. ("That's when they stated I was lying, I knew everything about the

murder, if I didn't cooperate with them that I would never see my mother again."). They even

claimed he had "set" Bobo up. Ex. 10 (Robinson Dep.) at 31-32.

---

[2] Throughout Defendants' summary judgment brief, they characterize Otis' present account as a recantation when it is not--such a characterization is possible only if Otis' first statement is entirely ignored, as they have done in violation of the summary judgment standard.

Otis insisted that he was telling the truth, but that only made the detectives get louder. *Id.* They told Otis that "they know Mr. Washington did it," referring to Gary Washington," and that "all they needed was my help. I wouldn't have to go to court, wouldn't nobody know." Ex. 8 (Otis '99 Tr.) at GW00028. They left no doubt about who they were looking to pin the murder on, asking Otis again and again about Gary Washington and his brother Ricky. Ex. 12 (6/9/2017 O. Robinson Test.) at GW1329-GW1331.

It was Defendants who told Otis to identify Mr. Washington as the shooter, not the other way around. Ex. 8 (Otis '99 Tr.) at GW00051 (Q: "You told all of that to [the detectives]; isn't that right?" A: "They told me Mr. Washington was the shooter."). Defendant Requer told Otis that he wanted to take Gary Washington off the street for a very long time. Ex. 10 (Robinson Dep.) at 39. The detectives fed Otis the "fact" that "Gary hit Bobo in the jaw, then drawed his gun." *Id.* at 48. They also fed Otis two other "facts" that were incorporated into his false written statement: that a red car left the scene and that he had overheard the men involved in the shooting "arguing over money." Ex. 8 (Otis '99 Tr.) at GW00070-71; Ex. 10 (Robinson Dep.) at 45 (one of the detectives told him to say that Gary Washington and Bobo were arguing about money). Additionally, Defendants provided Otis with the name of the victim, Bobo. *Id.* at 32. *See also Id.* at 56-57, 205, 207, 223.

In addition, Defendant Requer brought out an individual photo of Mr. Washington, followed by Ricky, and showed them to Otis while asking whether Otis thought Mr. Washington did the shooting. *Id.* Requer told Otis that he though Mr. Washington and Ricky "were bad dudes," and Fahlteich echoed this statement telling Otis that either Mr. Washington or Ricky shot Bobo.  *Id.* at 36-37. One of the Defendants said, "We know one of them did it." *Id.* at 39. They established that Otis knew Mr. Washington and Ricky from the neighborhood. *Id.* at 1329.

8

Requer kept pointing his finger on the top of Mr. Washington's picture--clearly singling him out. Ex. 10 ( Robinson Dep.) at 36. Defendants introduced a photo array of six mugshots that included Mr. Washington and Ricky's photos. Ex. 13 (12/29/86 Photo Array) at 3.[3] They told Otis that they knew "one of them did it, all you got to do is point one of them out." Ex. 10 ( Robinson Dep.) at 39. Otis understood that the Defendants "wanted [him] to go along with them." *Id.* at 40. They "kept going over" what Otis said and asking, "well, was Gary the shooter? Was Ricky the shooter?" *Id.* at 40. Otis knew Defendants wanted him to identify one of the two brothers based on what they were saying and doing *Id*. Otis selected Mr. Washington's picture because Requer kept tapping with his finger on that picture. *Id*. 40-41 (Q: "Why did you choose Gary's picture?" A: The way Requer kept plick -- pick -- pick with his finger on the picture.").

For much of this interrogation -- alternating between threats and feeding Otis facts -- Otis's mother Pamela Chavious was not present in the room with him. Ex. 10 (Robinson Dep.) at 34.  This was a violation of BPD policy, at least as Defendants understood it. Ex. 5 (Pellegrini Dep.) at 249 (he could not interview Otis without Otis' mother present); Ex. 6 (Requer Dep.) at 68-69. Alarmingly, the Defendants actually sent Otis' mother out of the interrogation room so they could question him outside her presence. Ex.14 (Chavious Deposition) at 41-44. Ms. Chavious recalled that her son was afraid, confused, and crying. *Id.*

Rather than memorialize what Otis actually saw, or the threats and blatant fact-feeding by the Defendants, the Defendants fabricated that Otis actually identified Mr. Washington as the shooter. Defendants prepared a handwritten question-and-answer style "statement," attributed to Otis, in which they falsely reported that Otis made an untained photo identification of Mr. Washington and that Otis actually saw Mr. Washington argue with and then shoot Bobo. For

---

[3] Defendants also showed Otis a picture of Lawrence Thomas and mentioned him by name, asking if Otis knew him. Ex. 8 (Otis '99 Tr.) at GW00060. Otis said he did not. *Id.*  at GW00060.

instance, rather than report that Otis was asked about his familiarity with Mr. Washington during the photo array containing Mr. Washington's picture, and that Defendants tapped on Mr. Washington's photo and said they believed Mr. Washington did the shooting, they simply reported that Otis "indicate[d] the picture of the person who shot 'Bo Bo.'" Ex. 15 (O. Robinson Dec. '86 Statement) at 4. As a result of Defendants' pressure and intimidation, on December 29, 1986, Otis signed this fabricated handwritten statement that falsely implicated Mr. Washington as Bobo's shooter. Ex. 15 (O. Robinson Dec. '86 statement); Ex. 11 (Otis Dep.) at 14.

### Otis' Third Statement: Another Fabricated Report

On January 2, 1987, Defendants brought Otis back to the station to sign a typed statement that Defendants created to formalize Otis' false account--a statement that again falsely implicated Mr. Washington even though Otis explained that he was unable to identify the shooter and only identified Mr. Washington as someone he knew from the neighborhood. Ex. 10 (Robinson Dep.) at 14-15. The typed statement was prepared by Requer. Ex. 16 (O. Robinson Jan. '87 Statement). Again, the statement contained falsehoods about Otis observing Mr. Washington arguing with the victim and ultimately seeing him shoot the victim. *Id.* Those falsehoods were supplied by the Defendants. *E.g.,* Ex. 10 (Robinson Dep.) at 56-57.

On this date, Defendants again showed Otis a different photo array that again had Mr. Washington's photograph. Ex. 17 (Supplement Report, Jan. 2, 1987) (documenting that Robinson was shown a photo array and indicating the corresponding BPI numbers for each photograph); Ex. 18 (BPI Photos from Robinson Jan 2, 1987 Photo Array) (depicting different fillers than those shown on the Dec. 29, 1986 photo array).  Otis again selected Mr. Washington because he "just wanted to get out of the police station, and [he] went along with what they said." Ex. 10 (Robinson Dep.) at 58.

As with the first false statement four day earlier, Otis adopted the Defendants' typed false statement because he was scared and he knew the Defendants were not going to release him until he "agreed to do what they --- they coerced [him] to do." *Id.* at 213; Ex. 8 (Otis '99 testimony) at GW00030. Otis testified that he was being held against his will and was not free to leave. *Id.* at GW00031; Ex. 10 (Robinson Dep.) at 213("I was under the impression that I wasn't leaving the room until I agreed to do what they -- they coerced me to do. That's what I'm saying.").

Otis again parroted this false statement at the grand jury proceeding for the same reason: Defendant Pellegrini was present, and "at the moment I jus--like I said, I was scared and, I mean, I felt as though they wasn't going to leave me alone unless I did what they wanted me to do." Ex. 8 (Otis '99 Tr.) at GW00036. Defendants did not disclose to the prosecution or to the defense the true circumstances of Otis' statement to the prosecution -- that Otis had not been able to identify the shooter, that the detectives told him who to implicate, and that he was threatened and coerced into adopting the false statement. Ex. 5 (Pellegrini Dep.) at 273-75.

Otis testified that he suffered emotionally from falsely testifying that he had seen the shooter when, in fact, he had not. Ex. 8 (Otis '99 Tr.) at GW00042. He talked with his father, who was incarcerated at the time, about that fact that he felt "as though it wasn't right." *Id.* at GW00042. Otis' father advised him to wait until he came home and then "we'll go and take care of it." *Id.* at GW00042. Otis' father was present in the courtroom when Otis testified truthfully – revealing what the BPD detectives had done – in 1999. *Id.* at GW00043. Otis again disavowed the false police statement at a hearing on Mr. Washington's writ of actual innocence ("WAI") in 2017, and at his deposition earlier this year. Ex. 12 (O. Robison Test., WAI Hearing) at GW1320, GW1327; Ex. 10 (Robinson Dep.) at 44-45, 48-49, 56-57.

Otis' initial statement -- that he did not see the shooter well enough to identify him -- is precisely the type of information Defendants were required to document and disclose to the prosecution. Ex. 5 (Pellegrini Dep.) at 254-255.

**Defendants Fabricate A Back-Up Identification From 13-year-old Rozetta Dorsey**

Defendants also manufactured an identification from a little girl named Rozetta Dorsey, who was only 13 years old at the time. She recognized the victim but could not identify the shooter, which is what she told police at the scene when she was interviewed. Ex. 19 (Dorsey Dep.) at 119-120, 135.

The day after the shooting, Defendants circulated a 24-hour-report, which alludes to a juvenile female who was interviewed at the homicide office and saw some of the incident; in particular, the report suggests that this juvenile saw a black man get out of a yellow car, shoot the victim and immediately drive off. Ex. 7 (24 Hour Report). The 24-hour-report does not identify the witness by name. It does state that the witness could give "no further description" beyond "black male." *Id.* (noting "NFD" in "Suspect/s Wanted: Two Black Males (NFD) in Yellow Car"); Ex. 6 (Requer Dep.) at 207.[4] A subsequent Office Report, submitted three days later also by Requer and Pellegrini, suggests that this witness was Rozetta Dorsey. Ex. 3 (Office Report) at 2, 3.

Neither the 24-hour report nor the Office Report attributes any physical descriptions -- let alone names -- of the shooter or car driver to Rozetta. Had Rozetta been able to provide a description or a name, there would have been no reason to omit it from the reports. Ex. 6 (Requer Dep.) at 207-208. These reports were supposed to be as detailed as possible so that the police could look out for the suspect(s). *Id.* The only plausible explanation for why the reports contain

---

[4] Defendants contend that Rozetta provided "a description of the shooter," Def. Br. at 3, but the 24-hour-report clearly disputes any description other than "black male."

no suspect name or physical description is that the juvenile witness did not know what the shooter(s) looked like, or who they were, and that she told that to the Defendants--thus "no further description" provided.

As noted above, Defendant Requer admitted that he was interested in Gary Washington from the very outset, though no witness had mentioned Gary Washington, nor had Gary Washington's name been associated with the victim or the crime in any other way. *See* supra, 5. Thus, he began asking Rozetta about Mr. Washington and his brother Ricky. Ex. 3 (Office Report) at 3. But Rozetta did not identify the shooter.

Rozetta firmly denies telling the Defendants that she could identify the shooter or knew who the shooter was. Ex. 19 (Dorsey Dep.) at 156-157, 194, 195, 269, 270. In fact, Rozetta told them the opposite. *Id*. at 32-33, 185. Her initial account -- which would obviously impeach her later statement implicating Mr. Washington -- was never disclosed to the defense or to the prosecution. *See* Ex. 11 (Homicide File) (contains no such notes).

Nor did the Defendants reveal the circumstances around their initial encounter with Rozetta--for instance, that if indeed Rozetta was interviewed at the homicide office, it was without a parent present—contrary to department policy and defendants' normal practice. Ex. 6 (Requer Dep.) at 68-69; Ex. 5 (Pellegrini Dep.) at 162; *see also* Ex. 3 (Office Report) (no mention juvenile interviewed without parent present); Ex. 7 (24 Hour Report) (same). To bury that policy violation, the Defendants committed another: They either failed to create an Information Sheet and parental consent form for Rozetta—which were both required—or created them but did not place them in the homicide file. Ex. 6 (Requer Dep) at 184 (if someone is brought to homicide office, there should be an information sheet for that person), 195 (parental consent required if Rozetta was interviewed at homicide office), 197 (information sheet required

13

if Rozetta was at homicide office); Ex. 5 (Pellegrini Dep.) at 286 (cannot explain why there is no information sheet for Rozetta) Indeed, neither an Information Sheet nor a parental consent for Rozetta are in the current homicide file. *See* Ex. 11 (Homicide File) (contains no such documents). Similarly, there are no notes whatsoever documenting what Rozetta allegedly told the Defendants. *See id.* (contains no such notes).

What is clear, however, is that Rozetta did not describe or identify the shooter when first questioned. It was not until Defendants Requer and Pellegrini brought Rozetta to the homicide unit on January 3, that they obtained a signed statement from her. *See* Ex. 20 (R. Dorsey Typed Statement) at LS 39-43. By this point, they had secured a false statement from Otis, first on December 29 (handwritten) and then on January 2 (typed). *See* pp. 6-12, *supra*. Perhaps concerned that 12-year-old Otis would not stand by his false identification and would instead tell the truth (that he could not identify Bobo's assailants), Defendants Requer and Pellegrini attempted to get a second statement by targeting another vulnerable child.[5]

Defendants arranged to pick up Rozetta and her mother on January 3 in an unmarked car. Ex. 19 (Dorsey Dep.) at 57-58. As noted above, BPD Policy required minors to be questioned with a legal guardian present, and Requer was well aware of this policy. Likewise, Requer was aware that it would have been improper to take a statement from a minor child whose parent was intoxicated or high during the interview. Ex. 6 (Requer Dep.) at 311, 312 (Q: "So you would have taken a statement from Rozetta if her mom was strung out or otherwise displayed signs of being a drug addict?" A: "I wouldn't have taken a statement from Rozetta if her mother was brought to the homicide unit office nodding and sleeping, no I wouldn't have

---

[5] Requer suggests that Rozetta was initially "hesitant" to identify the shooter and perhaps was scared to do so, but that suggestion is highly disingenuous given that Requer knew --but nowhere documented or disclosed -- that Rozetta told him she could not identify the shooter. Furthermore, Rozetta herself rejects Requer's supposition, testifying that she did not hold back from the police because she was afraid of the perpetrators. Ex. 19 (Dorsey Dep.) at 274-275.

taken a statement from her."). But that is precisely what he did with Rozetta. Rozetta's mother

was visibly high when they rode in the unmarked police car to the station on January 3, 1987.

Ex. 19 (Dorsey Dep.) at 145-146.[6] Rozetta testified that her behavior was altered and she was

nodding off in the car. *Id.* at 59, 145-146.

When they got to the station, Rozetta's mother went to a separate room with the

Defendants for twenty to thirty minutes. *Id.* at 62-63. Rozetta does not know what they

discussed. *Id.* at 280-281. Rozetta's mother and the Defendants reentered the room together, and

Defendants Requer and Pellegrini began questioning Rozetta. *Id.* at 148-149.

Rozetta told the detectives that she did not see the shooter and thus could not identify the

perpetrator. *Id.* 157, 185. Defendants had been taking notes during their interview of Rozetta, *see*

*Id.* at 267, but those were never disclosed. *See generally* Ex. 11 (Homicide File). Defendants

then presented Rozetta with a photo array, which included a photograph of Mr. Washington. Ex.

19 (Dorsey Dep.) at 74-76. Defendants admit that they knew Rozetta was familiar with Mr.

Washington from living in the neighborhood. *See* Def. Br. at 3; Ex. 21 (Search & Seizure

Affidavit) at 2 (Rozetta and Otis knew Gary Washington from living in the neighborhood); Ex.

19 (Dorsey Dep.) at 76. They asked Rozetta to select who looked familiar. *Id.* at 75-76, 153-154.

She selected Mr. Washington's photo and initialed it. *Id.* at 154-155. Rozetta never identified

Mr. Washington as the perpetrator. *Id.* (DorseyDep.) at 155.

Nevertheless, Defendants falsely characterized Rozetta's identification as being of the

shooter. *See* Ex. 21 (Search & Seizure Affidavit) at 2 (Rozetta "positively identified" the photo

of Gary Washington as the person [she] observed shoot and kill Faheem Ali, (aka BoBo)"). At

no time did they reveal the true circumstances of their interrogation, or that they had asked

Rozetta to identify a familiar-looking person, *not* the shooter. *Id.*; Ex. 22 (1.3.87 Memo)(Requer

---

[6] Rozetta Dorsey's mother is deceased and thus could not be deposed in this litigation.

and Pellegrini reporting that they will be obtaining an arrest warrant based upon "the positive photographic identification and substantial other collaborating information received from [Rozetta Dorsey and Otis Robinson]"); Ex. 11 (Homicide File) (no mention of true nature of her "identification"); Ex. 25 (Prosecution Report) at 2 (falsely representing Rozetta's anticipated trial testimony). *See also* Def. Br. at 13-14 (arguing not that Defendants disclosed their misconduct but that it would have been discovered through reasonable diligence).

Defendants followed up by giving Rozetta a typed statement to sign that identified Mr. Washington as the shooter, even though they knew the statement was false because (i) Rozetta told them she could not identify the shooter, (ii) had not described or identified the shooter previously, and (iii) was asked to pick out the person who was familiar, not who committed the crime. *Compare* Ex. 20 (R. Dorsey Typed Statement) *with* Ex. 19 (Dorsey Dep.) 75-76, 157, 185.

Rozetta was nervous. Ex. 19 (Dorsey Dep.) at 175. Her mother, who was high and had been in private contact with the detectives, told her to sign it, and so Rozetta did so without reading it. Ex. 19 (Dorsey Dep.) at 173-74. She relied on her mother and also felt she could not understand some of the words in the statement. *Id.*

The January 2 statement is Rozetta's only signed statement. Neither before nor after that statement did Rozetta ever state that she saw Mr. Washington shoot Bobo, or that she saw the shooting at all. Prior to trial when Mr. Washington's criminal defense attorney interviewed Rozetta, she gave a true account and disavowed the January 2 statement. Ex. 23 (6/4/1987 Pretrial Transcript) at 47; Ex. 24 (6/5/1987 Trial Transcript) at 2. Unsurprisingly, the State -- upon learning that Rozetta was not implicating Mr. Washington -- never called her to testify. Ex. 23(6/4/1987 Pretrial Transcript) at 63.

**Mr. Washington is Charged and Convicted Based on False Witness Testimony**

Mr. Washingon was charged and later convicted of Bobo's murder because of the false statements from these two vulnerable juveniles, and nothing more. Ex. 22 (1.3.1987 Memo) (based on "positive identifications" from Otis Robinson and Rozetta Dorsey, Requer and Pellegrini will obtain an arrest warrant for Gary Washington); Ex. 21 (Search and Seizure Warrant Affidavit) (based on the two witnesses statements, Defendant Requer believed he had probable cause for the search and seizure warrant); Ex. 25 (Prosecution Report) at 2 (falsely representing Rozetta's anticipated trial testimony).

Moreover, while the prosecutor assigned to the case no longer had a recollection of the matter, she undoubtedly relied on Otis and Rozetta's false statements to seek the indictment against Mr. Washington. This is because Defendant Requer's practice was to communicate regularly with the State's Attorney's Office about evidence being gathered -- including witness statements -- prior to arresting a suspect. Ex. 6 (Requer Dep.) at 99-101. Otis and Rozetta's signed (false) statements were contained in the police file, *see* Ex. 11 (Homicide File) at 39-43, 45-49, 52-55, and therefore would have been provided to the prosecutor prior to Mr. Washington's arrest and charging. *See* Ex. 6 (Requer Dep.) at 102-103. *See also id.* at 99 (he "constantly" updated prosecutor on any progress in the investigation). Defendants Requer and Pellegrini also submitted their Prosecution Report to the State's Attorney's Office, in which they present their false, fabricated version what Otis and Rozetta saw. Ex. 25 (Prosecution Report) at 2; Ex. 6 (Requer Dep.) at 98-99 (prosecution report is prepared by homicide unit after arrest to give the State's Attorney information relevant case information - including witnesses - to present the information to the Grand Jury to prosecute the case).

Strikingly, Defendants were apparently so comfortable falsely attributing fabricated statements to their juvenile witnesses that they created a brand new falsehood for Otis in their Prosecution Report. This time, they claimed that Otis saw Mr. Washington *get out of a car*, call out to Bobo, who then approached, after which Mr. Washington shot him. Ex. 25 (Prosecution Report) at 2. This detail, which is totally different from their earlier claim that Otis saw people arguing in front of Mr. Washington's house and never mentioned a car, appears designed to be consistent with a detail included in Rozetta's statement about a car. *Compare id.* with Ex. 16 (O. Robinson Jan. '87 statement), Ex. 20 (R. Dorsey Typed Statement).  A jury could reasonably conclude that the Defendants were polishing up these witness statements and ensuring that all details "fit" as they moved the case toward an indictment.

At no time did Defendants tell the prosecutor that they had fabricated either witness's account. Ex. 26 (Finch Dep.) at 169-170, 175.

### Defendants Failed to Document Other Material Information

Defendants' failure to document material witness statements from Otis and Rozetta was not an aberration. The police file omits other pieces of either impeachment or exculpatory evidence that should have been disclosed to the prosecution and Mr. Washington's attorneys, but were not.

For instance, Defendants took notes during their interview of 13-year-old Cecil Harris, but those notes omit that Detective Tewey tried to pressure Cecil into saying Mr. Washington murdered Bobo.  *See* Ex. 27 (Harris Dep) at 8, 11, 27-30, 53; *cf* Ex. 28 (Tewey Dep.) at 82, 83, 86-87, 89-90; Ex. 29 (Information Sheet and Interview with Cecil Harris).

Alarmingly, Defendants conducted an identification procedure with eyewitness Sylvia Harper and tried to pressure her to identify Washington's brother, Ricky Washington, as a co-

perpetrator of the Ali murder--but failed to disclose either the identification procedure itself, or their efforts to pressure her to make an identification.  Ex. 30 (Harper Dep.,) at 10-12, 13, 78-79, 80, 81, 83-84, 84:14-86:14 (describing Pellegrini's efforts to pressure Harper into falsely stating the Ricky Washington was involved in the Ali murder); Ex. 31 (Pellegrini Motion to Suppress Testimony) at 57 (admitting that Pellegrini showed Sylvia Harper a photo spread); *see* Ex. 32 (Baltimore Police Dept. Suspect Identification Procedure Policy, March 19, 1986) at Rule 8 (noting that "[i]n the event of a negative showing, the Photograph Line-up Form. . . should be retained in the member's investigative file"; *see generally* Ex. 11 (Homicide File) (lacking any documentation noting that Harper participated in an identification procedure).

Likewise, they failed to document that other witnesses were shown photo spreads and failed to make any identifications. *See* Ex. 31 (Pellegrini Motion to Suppress Testimony) at 57:6-17 (testifying that Pellegrini showed *several other witnesses* other than Otis Robinson suspect photo spreads); *cf.* Ex. 11 (Homicide File) (documenting that only Otis Robinson and Rozetta Dorsey were shown photo arrays).

### Defendants' Reliance on the Polygraph Results Is Misplaced

Defendants make much of Mr. Washington's polygraph results from an exam administrated months after his arrest but their version of events is disputed, and in any event, irrelevant.

Gary Washington told the truth at his polygraph exam and described seeing Lawrence Thomas commit the shooting. Ex. 1 (G. Washington Dep.) at 320. Defendants imply that "deception was indicated" at the question, "Did you shoot Bobo?," but that implication is false. *See* Def. Brief at 5. The examiner's statement of "deception indicated" was not connected to any particular question -- in fact, he testified that the test does not determine which specific question

Mr. Washington may or may not have lied about. Ex. 33 (Sheldon Dep.) at 85. Moreover,

Washington disputes the statements attributed to him in the polygraph examiner's summary--a

dispute that the trier of fact must resolve. Ex. 1 (G. Washington Dep.) at 318-320. The examiner

admitted that he had no notes of what Mr. Washington actually said during the pre-interview and

that his report was a summary of his own characterization of the interview, which he prepared

some time later. Ex. 33 (Sheldon Dep.) at 73-74. At no point did he show his summary to Mr.

Washington or Mr. Washington's attorney.

In any event, the polygraph exam took place on April 15, 1987, more than three months

after Mr. Washington's arrest, and thus it had no bearing on their probable cause assessment.

### Plaintiff's Extensive Damages

Plaintiff endured more than three decades in prison, during which he suffered not only

the complete loss of liberty but also contact with his family. He was unable to raise his son. He

testified that was "inhumane": He was subject to repeated lockdowns, where he could not leave

his cell at all; his cellmates were often unpredictable and suffered from severe mental illness;

correctional officers would scream at him and use violence towards him; he was subject to

repeated shakedowns and strip and cavity searches; and he was isolated from his family and

friends. Ex. 1 (G. Washington. Dep.) at 136-137, 137-138, 138-142; Ex. 34 (Pltf. Resp. to Rog.

No. 4). Since leaving prison, Plaintiff testified that he continues to suffer from sleep deprivation

and has nightmares about the inhumanity of his wrongful conviction and imprisonment. Ex. 1

(G. Washington. Dep.) at 136-137.

## LEGAL ARGUMENT

### I.   Summary Judgment Standard

"Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is appropriate only when the Court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Clark v. Alexander*, 85 F.3d 146, 150 (4th Cir. 1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986)). The burden is on the moving party to make such a showing. *Magill v. Gulf & Western Industries, Inc.*, 736 F.2d 976, 979 (4th Cir. 1984) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

"The evidence of the non-movant [here, Washington] is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Conflicting inferences are always resolved in the non-movant's favor, *Cole v. Cole*, 633 F.2d 1083, 1089 (4th Cir. 1980), and the Court draws inferences "not only depositions but also documentary materials in the light most favorable to the party opposing the motion." *Magill*, 736 F.2d at 979. "Even if there is no dispute as to the evidentiary facts, summary judgment is inappropriate if there is a dispute as to the conclusions to be drawn from such facts." *Id*. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255. Plaintiff's "version of any disputed issue of fact thus is presumed correct[.]" *Eastman Kodak Co. v. Image Technical Services, Inc.*, 504 U.S. 451, 456 (1992).

In short, at this stage the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law." *Anderson*, 477 U.S. at 251-52. In a case like this one, where virtually every material fact is hotly disputed, a jury should decide the claims. *See Smith v. Ray*, 781 F.3d 95, 103 (4th Cir. 2015) (citing *Tolan v. Cotton*, 134 S. Ct. 1861, 1866-68 (2014), for the proposition that where officers' testimony concerning an event is at odds with testimony from other witnesses, summary judgment is in appropriate).

## II.     Genuine Disputes of Fact Require A Trial on Gary Washington's *Brady* Claims

Defendants misapprehend both the crux of Mr. Washington's claims and the law that governs them. Plaintiff's *Brady* allegations are straight-forwarded: Defendants suppressed the fact that Otis and Rozetta were unable to identify the shooter when initially questioned, and the fa that threats and coercion were used to extract the statements both children ultimately signed.

There is no serious dispute that Otis and Rozetta's initial statements to the Defendants in which they denied being able to identify the shooter are material impeachment evidence and would have gutted the State's entire case. *See*, *e.g.*, *Wearry v. Cain*, 136 S. Ct. 1002, 1004-05 (2016) (holding that suppression of police and other records that could have been used to impeach a state's witness were material in a case that depended on the jury crediting "[the witness]'s account rather than [the defendant]'s alibi"); *Smith v. Cain*, 565 U.S. 73, 74-75 (2012) (deciding that police records of statements by eyewitness that he could not see a perpetrator's face that contradicted that eyewitness's later identification of the defendant at trial were material).[7] The only evidence used to charge Mr. Washington were the "eyewitness" accounts

---

[7] *See also Youngblood v. West Virginia*, 547 U.S. 867, 868-70 (2006) (holding that handwritten note shown to police that contradicted the state's theory of the case and supported the defendant's theory was material); *Kyles v. Whitley*, 514 U.S. 419, 441-42 (1995) (finding that the failure to disclose contemporaneous eyewitness statement, in which he described the shooter as someone who was "about 5'4" or 5'5", 140 to 150 pounds, medium build" was material and exculpatory, where defendant was 6 feet tall and thin because "[i]f cross-examined on this description, [the witness] would have had trouble explaining how he could have described [the defendant] . . . as a man more than half a foot shorter with a medium build"); *United States v. Bagley*, 473 U.S. 667, 683-84 (1985) (holding that undisclosed evidence that could have been used to impeach the testimony of state law enforcement officers at trial is material); *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d at 397-98 (4th Cir. 2014) (holding that officers were

from Otis and Rozetta, just as the only evidence used to convict Mr. Washington was Otis' statement. Without their statements, there was no case.

Otis and Rozetta's truthful accounts to the police were, therefore, unquestionably material. Evidence is material in the context of *Brady* claims if it "undermines confidence in the verdict." *Youngblood v. W. Virginia*, 126 S. Ct. 2188, 2190 (2006). Plaintiff need not show that the suppressed evidence "would have resulted ultimately in the defendant's acquittal." *Kyles,* 514 U.S. at 434. *Brady* claims need only satisfy a lower standard: evidence is material when there is 'any reasonable likelihood' it could have 'affected the judgment of the jury.' " *Id.* Materiality must be evaluated based on the cumulative effect of all suppressed evidence and not in isolation piece by piece. *Wearry*, 136 S. Ct. at 1006; *Kyles*, 514 U.S. at 421. Ultimately, materiality is a jury question. *See Wearry*, 136 S.Ct. at 1006-07.

Here, Otis' original statement to police certainly "undermines confidence in the verdict." The State's case rose and fell with his testimony. Had the jury heard that Otis initially told police he did not see the men involved in the altercation and thus could not identify them, it would have impeached his later "identification" of Mr. Washington and undoubtedly, would have undermined the jury's confidence in his trial testimony. As Otis' identification was the only evidence of guilt, Otis's suppressed original statement would have gutted the State's case.

Defendants do not bother to challenge the materiality of Otis' original statement. Instead, they attack it factually, denying that Otis ever said it by characterizing Otis' signed December 29 statement as his "first" one. Def. Br. at 3. This strategy is, of course, untenable to achieve summary judgment. The factual dispute about whether or not Otis told Defendants he could not identify the shooter is quintessentially a jury question, which cannot be prematurely solved at

---

liable for due process violations when they suppressed statements from the state's chief witness against the defendant); *Barbee v. Warden*, 331 F.2d 842, 846-47 (4th Cir. 1964) (holding that police violated due process when they suppressed police reports of a ballistic test that could have been used to impeach the state's theory at trial).

summary judgment. *See Smith*, 781 F.3d at 103 (citing *Tolan*, 134 S. Ct. at 1866-68, for the rule that where officers' testimony concerning an event is at odds with testimony from other witnesses, summary judgment is inappropriate). As is the question of whether that statement satisfies the materiality standard. *See Wearry*, 136 S.Ct. at 1006-07.

On these facts, moreover, Defendants' suppression argument makes little sense. Defendants do not claim to have documented Otis' original exculpatory account or disclosed it (in any form) to the prosecution. Recall that under their version of events, there was no such statement. The argument about attorney Polansky's criminal file is thus nothing but misdirection. Def. Br. at 11. It does not matter that Polansky's file no longer exists in this instance, because again, Defendants do not claim to have made the necessary documentation in the first place. So, too, for the State's Attorney's file. The absence of these files in no way impacts Plaintiff's *Brady* claim.[8] The foregoing analysis applies with equal force to Rozetta's statement that she could not identify the shooter--which Defendants also deny was made and thus cannot claim to have disclosed.

Finally, Defendants argue that Mr. Washington's attorney should have uncovered Otis' and Rozetta's coercion through "reasonable diligence," and thus any *Brady* violations on this score are apparently immaterial. As a threshold matter, Defendants cannot shift the blame for their non-compliance with *Brady* to the Plaintiff. The due process clause requires disclosure of "*all* material exculpatory and impeachment evidence to the defense. It does not require the State to simply turn over *some* evidence, on the assumption that defense counsel will find the cookie from a trail of crumbs." *Barton v. Warden, So. Ohio Corr. Facility*, 786 F.3d 450, 468 (6th Cir. 2016) (emphasis added). Police "cannot satisfy [their] *Brady* obligation … by making some evidence

---

[8] The Defendants' homicide file for the Ali investigation still exists and has been produced in this case. Ex. 11 (Homicide File). Had Defendants claimed to document Otis' first, exculpatory statement, the homicide file would presumably contain it, but of course it does not.

available and claiming the rest would be cumulative. Rather, the [police are] obligated to disclose *all* material information casting a shadow on a government witness's credibility.'" *Mellen v. Winn*, 900 F.3d 1085, 1097-98 (9th Cir. 2018) (citation omitted).

Their argument also cannot be reconciled with the facts of this case. Otis testified that he adopted the false statement because he was fearful of the police threats and afraid that his mother would be separated from him. *See* pp. 8-9, 11, *supra*. It took him becoming older, plus the support of his father once released from prison, to come forward and disclose the police coercion, as well as the falsity of his statement. *Id.*  The only reasonable inference to draw from this testimony is that any interview of 12-year-old Otis back in 1986 would have been futile. *See, e.g.*, *Jimenez v. City of Chicago*, 830 F.Supp.2d 432, 445 (N.D.Ill. 2011) (drawing reasonable inferences in favor of plaintiff required finding that witness would not have told criminal defendant something inconsistent with witness's trial testimony); *Boss v. Pierce,* , 263 F.3d 734,740 (7th Cir. 2001) ("[I]t is simply not true that a reasonably diligent defense counsel will always be able to extract all the favorable evidence a defense witness possesses. Sometimes, a defense witness may be uncooperative or reluctant."). Certainly Defendants have not offered a shred of evidence to suggest that Otis would have revealed the coercion.

What's more, Mr. Washington moved to suppress Otis' statement but could not overcome the weight of Pellegrini's testimony claiming that Otis told the officers he saw Gary Washington commit the shooting. Ex. 31 (6.4.1987 Pellegrini Test.) at GW00195. Defendants have made no showing at summary judgment that Mr. Washington's attorney could have uncovered the suppressed evidence of witness coercion simply by interviewing Otis, but even assuming *arguendo* that he had, that evidence likely would not have overcome the police officers' representations that the interrogation was above board. *See, e.g., Hamilton v. City of New York*,

No. 15 CV 4574, 2019 WL 1452013, at *17 (E.D.N.Y. March 19, 2019) ("even if [witness] told

[prosecutor] that she was coerced, a jury could conclude that [the two officers] could reasonably

foresee that [their] misconduct [would] contribute to an 'independent' decision that results in a

deprivation of liberty, perhaps because [prosecutor] would be inclined to credit their accounts

rather than [the witness's]." *Id*. (internal quotations omitted); *see also Davis v. United States*, 512

U.S. 452, 475 n.7 (1994) (Souter, J., concurring) ("As a practical matter, of course, the primary

arbiters of 'clarity' will be the interrogators themselves, who tend as well to be the courts'

preferred source in determining the precise words a suspect used. And when an inculpatory

statement has been obtained as a result of an unrecorded, incommunicado interrogation, these

officers rarely lose 'swearing matches' against criminal defendants at suppression hearings.").

As to Rozetta, the Defendants make a passing argument that reasonable diligence would

have yielded the evidence about the circumstances in which her statement was obtained, but that

argument without more does not pass muster at summary judgment. Here, too, there is no

indication that Rozetta would have disclosed the manner by which her false statement was

produced.

Finally, Defendants argue that Rozetta's coercion was not suppressed but make no

argument about the fact that Rozetta's truthful statement (that she could not identify the shooter)

gives rise to a *Brady* claim as well. The fact that the State did not introduce Rozetta's false

statement does not do anything to strip her earlier, truthful statement of its exculpatory value.

The State put on a one-witness case. That witness, moreover, was twelve years old. Evidence

that the same two detectives who secured Otis' statement -- which Mr. Washington's attorneys

argued was false -- had fabricated a highly similar false statement from another child in the case

one day later would have been extremely probative impeachment evidence that would have cast

doubt on the credibility of the detectives, and of the entire police investigation itself. *See Kyles*,

115 S. Ct. at1571 (defense could have used suppressed evidence "to throw the reliability of the

investigation into doubt and to sully the credibility of [the detective], who failed to investigate an

obvious suspect," and to attack the thoroughness and good faith of the investigation); *Bowen v.

Maynard,* 799 F.2d 593, 613 (10th Cir. 1986) ("A common trial tactic of defense lawyers is to

discredit the caliber of the investigation or the decision to charge the defendant and we may

consider such evidence in assessing a possible *Brady* violation."); *Bies v. Sheldon,* 775 F.3d 386,

401 (6th Cir. 2014) (evidence that 'would have raised opportunities to attack ... the thoroughness

and even the good faith of the investigation'" and "lessen the credibility of the State's case" was

*Brady* material) (internal citation omitted). *See also United States v. Boyd*, 55 F.3d 239, 246 (7th

Cir. 1995) (government's suppression of benefits witnesses received were material and should

have been disclosed where they may have cast doubt not only on witnesses' credibility but also

the credibility of the investigation and the strength of the prosecution's case). Defendants cite no

authority for the proposition that *Brady* material can come only from witnesses who testify.

### III.     Plaintiff's Fabrication Claim Must Be Decided By A Jury.

It is beyond dispute that fabricated evidence has no place in a criminal proceeding,

particularly where liberty interests are at stake. *See Washington v. Wilmore*, 407 F.3d 274, 283–

84 (4th Cir. 2005). The due process clause forbids a police officer from presenting false evidence

through witness statements or otherwise. Pressuring a witness to adopt a detective's theory of the

case has long been actionable. *See, e.g, Gilliam v. Sealey,* 932 F.3d 216 (4th Cir. 2019)

(fabrication claim proceeded to trial where officers met with a 16-year-old witness multiple

times and made him take a polygraph test in which he declared that he did not know anything

about the crime, marked him "as a suspect" and ordered his fingerprint analysis, witness changed

his story and testify at plaintiffs' trial that one of the plaintiffs had confessed to committing the crime); *White v. Smith,* 696 F.3d 740, 757 (8th Cir. 2012) (allowing a § 1983 fabrication claim to proceed when evidence demonstrated "that Defendants coached and manipulated" witnesses "into adopting Defendants' theory of the case").

A jury could find that Defendants are guilty of fabricating Otis and Rozetta's statements, knowing them to be untrue.

**A.  Rozetta's False Statement Gives Rise To A Fabrication Claim.**

Defendants make a single argument as to Rozetta's fabricated statement: because the statement was not introduced at the criminal trial, they contend that it cannot have contributed to Plaintiff's due process violation. All other arguments about Rozetta's fabricated statement are forfeited. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to 'develop [its] argument]—even if [its] brief takes a passing shot at the issue.") (quoting *Brown v. Nucor Corp.*, 785 F.3d 895, 923 (4th Cir. 2015); *Liberty Corp. v. NCNB Nat. Bank of South Carolina*, 984 F.2d 1383, 1390 (4th Cir. 1993) (cursory and undeveloped arguments are waived); *see also Schwartz v. Wellin*, No. 2:13-CV-3595-DCN, 2014 WL 12637912, at *3 (D.S.C. Aug. 14, 2014) ("It is not the obligation of this court to research and construct legal arguments open to parties, especially when they are represented by counsel, and . . . perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (internal quotation marks and citations omitted). It will be too late to raise such an argument in a reply brief. *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006) ("The ordinary rule in federal courts is that an argument raised for the first time in a reply brief

28

or memorandum will not be considered."). For instance, they may not argue for the first time in reply that Defendants reasonably believed Rozetta's signed statement was truthful.

Turning to sole argument they do make, Defendants take an unduly restrictive view of the law. Plaintiff's fabrication claim must proceed to the jury if the false evidence was used to deprive Mr. Washington of liberty in some way. *See Whitlock*, 682 F.3d at 580  ("We have consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to deprive the defendant of her liberty in some way."). The Fourth Circuit has explained that in evaluating whether a fabrication resulted in the deprivation of liberty, "[t]he proper inquiry . . . is whether [the plaintiff's] conviction was a reasonably foreseeable result of [the defendant's] initial act of fabrication . . . ." *Washington*, 407 F.3d at 283; *see also Monroe v. Pape*, 365 U.S. 167, 187 (1961) (recognizing the applicability to § 1983 claims of the rule of tort liability "that makes a man responsible for the natural consequences of his actions"); *Jones v. City of Chicago*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision.").[9] *See*

---

[9] The Seventh Circuit has long rejected the argument that evidence needs to be admitted in a proceeding to state a fabrication claim. *See Hurt v. Wise*, 880 F.3d 831, 843 (7th Cir. 2018), *partially abrogated on other grounds by Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir. 2019). Instead, to prove a fabrication claim a plaintiff must show the evidence was used "in some way" to deprive a plaintiff of liberty. *Anderson v. City of Rockford*, 932 F.3d 494, 510 (7th Cir. 2019) (quoting *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *Petty v. City of Chicago*, 754 F.3d 416, 421-22 (7th Cir. 2014)). That "some way" includes both "wrongful pretrial detention based on fabricated evidence" and "wrongful conviction" also based on fabricated evidence being introduced at trial. *Lewis*, 914 F.3d at 478; *see also Hurt*, 880 F.3d at 844-44 (explaining that fabrication claim "can be based on false police reports" and the constitution "forbids the State from depriving a person of liberty (including by pretrial detention) based on manufactured evidence"); *Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) ("*Fields II*") ("[T]he fabrication of evidence of evidence harmed the defendant before and not just during the trial, because it was used to help indict him"); *Julian v. Hanna*, 732 F.3d 842, 847 (7th Cir. 2013) (fabrication affects liberty interests both before and after conviction); *Jones v. City of Chicago*, 856 F.2d 985, 993-94 (7th Cir. 1988) (police officers can be liable when they "deliberately supplied misleading information that influenced the decision" of the prosecutor to pursue the case).

*also Burgess v. Balitmore Police Dep't,* No. CV RDB-15-0834, 2017 WL 4947004, at *16 (D.

Md. Oct. 31, 2017) (fabricating a police report that hid the existence of an eyewitness

foreseeably caused plaintiff's wrongful conviction even though report was not introduced at

trial).  Washington v. Boudreau, No 16-cv-01893, 2022 WL 4599708, at *21 (N.D. Ill. Sept. 30,

2022) (denying summary judgment on fabrication claim from West's statement even though

West died before Hood's trial and thus did not testify).

Here, there is no doubt that Rozetta's false statement foreseeably deprived Mr.

Washington of liberty in some way. Mr. Washington was indicted and placed into custody on the

basis of Rozetta's fabricated identification, not just Otis's. Ex. 22 (1.3.1987 Memo); Ex. 21

(Search and Seizure Warrant Affidavit) at LS78-82. In this way, he was deprived of liberty

because of false evidence manufactured by the Defendants.

### B.  There Is A Genuine Issue of Material Fact About Whether Defendants Knew Otis' Signed Statements Were False.

Defendants' self-serving assertion that they did not know Otis' signed statements were

false is impossible to square with Otis' original statement to them that he could not identify the

shooter. Defendants do not even attempt a reconciliation of these facts, notwithstanding that it is

their burden at summary judgment to prove the absence of genuine factual disputes. Otis'

original statement creates a triable issue on fabrication, and whether Defendants knew the signed

statement was false.

In defense of their reliance on Otis' signed statement, Defendants offer only that Otis

knew Gary Washington from the neighborhood. This fact is undisputed and proves nothing. Otis

knowing Mr. Washington from the neighborhood is not the same as Otis seeing Mr. Washington

commit murder. Otis's 1999 post-conviction testimony, his 2017 testimony from Mr.

Washington's writ of actual innocence, and his deposition testimony, all describe something far

different than an innocent misidentification; they describe being forced to adopt a false identification. Otis' deposition testimony elucidates this distinction: "I kept telling them I didn't see anything; I didn't know anything. And he was, like, come on, man, come on. We -- we know one of them did it, man. *All you got to do it point one of them out."* Ex. 10 (Robinson Dep.) at 39 (emphasis added).

Defendants curiously rely on this quote as well, to prove that they "believed" Mr. Washington was the perpetrator. Defendants misapprehend the nature of the fabrication being alleged. Whether or not they may have thought Mr. Washington was the shooter, what they knew was false was that Otis had seen the shooter well enough to identify him, and that Otis identified Mr. Washington from personal knowledge. At summary judgment, Plaintiff has adduced ample evidence from which a jury could conclude that Defendants (i) forced Otis to say that he could identify the shooter, when Otis kept telling him he had not, (ii) told Otis they were interested in pinning Mr. Washington for the crime and wanted Otis to implicate Mr. Washington, and (iii) knew that Otis' resulting inculpation of Mr. Washington stemmed not from personal knowledge but from Defendants' influence. *See Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (finding fabrication where "Wilmore falsely stated in his report, referring to the shirt, that Washington, when interrogated, divulged non-public information about the murder") (internal quotations omitted). When Defendants told Otis, "all you got to do is point one of them out," a jury could easily find that Defendants were telling Otis to pick one of the proposed suspects, not pick out the person he actually saw commit a crime. At bottom, Otis's deposition testimony flatly contradicts Defendants,' and only a jury can decide which account to credit.[10] *See, e.g.,*

---

[10] Defendants' brief tries to justify the detectives' offensive treatment of twelve-year-old Otis, and specifically their baseless accusation that he had "lured" the murder victim to his death, by relying on Edward Neal Ellis' observation to suggest that Otis pointed out the victim right before his death. This grossly misstates Ellis' account. According to the detective's handwritten note from the interview, Ellis said that a person pointing to Bobo was "at Ricky

*Phillips v. City of Chicago*, 2018 WL 1309881, at *26 (N.D. Ill. Mar. 13, 2018) (genuine disputes of facts as to whether Defendants knowingly manufactured evidence precluded summary judgment on fabrication claim).

So, too, could a jury weigh the Defendants' striking departures from normal practice by forcing Otis' mother out of the room as evidence that they intended to fabricate Otis' statement. *See Osborne v. Georgiades*, CV RDB-14-182, 2015 WL 6447503, at *4 (D. Md. Oct. 23, 2015), *aff'd,* 679 Fed. Appx. 234 (4th Cir. 2017) (finding that allegations that the defendant exerted pressure on victim that resulted in the fabrication of evidence against plaintiff set forth a fabrication claim particularly where the "contents of the conversations . . . are not disclosed" contrary to what one would expect); *Restivo v. Hessemann*, 846 F.3d 547, 579-80 (2nd Cir. 2017) (explaining that deviation from what a reasonable police officer would do is relevant to show recklessness or intentional misconduct by officer); *Jimenez*, 732 F.3d at 721–22 (same).

### C.  Plaintiff is Not Collaterally Estopped From Disputing Otis's 1987 Trial Testimony.

Citing the doctrine of collateral estoppel, Defendants seek to estop Plaintiff from challenging any aspect of Otis' testimony after the original criminal trial. In other words, they would like Plaintiff not to rely on Otis's 1999 testimony disavowing his testimony from Mr. Washington's criminal trial, as well as his 2017 WAI testimony, or his deposition. Plaintiff is

---

Washington's house at the front door." Def. Ex. 33 at 2. Ellis himself did *not* see Otis. *Id.* He also mentioned a rumor that someone named Quanta Martin told Cecil about Otis being with Bobo. *Id.* To be clear, Ellis never implied that Otis pointed out the victim, nor is there any other evidence to support that. Ellis' statement makes little sense in the context of the investigation, given that nobody else reported seeing a Bronco, or a person pointing.

More importantly, there is no evidence that the Defendants ever considered Otis to be involved in Bobo's death. Ex. 6 (Requer Dep.) at 259-260 (when asked whether the information in the Ellis interview "is the information that lead [*sic*] you to interview Otis Robinson," Requer answered, "No, I can't say it was. I don't know, I don't remember."). That belief cannot be invented for Defendants at summary judgment. A jury could easily conclude that their threat to charge Otis with a crime and accuse him of luring the victim was merely a ploy to scare a young child into submission.

estopped, they argue, because after the 1999 recantation, the state court affirmed Mr.

Washington's conviction and found Otis' recantation to not be credible.

Defendants' collateral estoppel argument borders on frivolous. As Defendants

acknowledge, a required element of estoppel is a final judgment on the merits. Def. Br. at 19.

The final judgment in Mr. Washington's criminal proceeding has been vacated.  Ex. 2 (2018

Ruling and Order). A judgment that has been vacated has no preclusive effect. *Zeneca Ltd. v.*

*Novopharm Ltd.,* 919 F. Supp. 193, 196 (D. Md. 1996) ("As a general rule,

a vacated judgment and the factual findings underlying it have no preclusive effect;

the judgment is a legal nullity."); *S–1 By and Through P–1 v. State Bd. of Educ.,* 6 F.3d 160, 169

(4th Cir.1993) (Wilkinson, J., dissenting), *vacated,* 21 F.3d 49 (4th Cir.), *cert. denied,* 513 U.S.

876, 115 S.Ct. 205, 130 L.Ed.2d 135 (1994); *Baltimore Luggage Co. v. Samsonite Corp.,* 727

F.Supp. 202, 209 (D.Md.1989). *See also United States v. Munsingwear,* 340 U.S. 36, 40, 71

S.Ct. 104, 107, 95 L.Ed. 36 (1950) (vacating a judgment "clears the path for future relitigation of

the issues between the parties and eliminates a judgment")."). *See also id.* ("[N]o court in the

Fourth Circuit has ever followed *Chemetron* and given collateral estoppel effect to

a vacated judgment.").

None of the factual findings reached in Plaintiff's underlying criminal proceeding have

any preclusive effect, therefore, because there is no longer any final judgment. *Id*. *See also*

*Gilliam v. Sealey*, 932 F.3d 216, 232 (4th Cir. 2019) (construing North Carolina law to find that

"Appellants have sufficiently alleged that their now-vacated state court convictions were

obtained improperly. Accordingly, collateral estoppel does not preclude Appellants from

challenging the probable cause for their arrests.").  This view is the one endorsed by several

other circuit courts of appeals. *See e.g., Peterson v. Heymes,* 931 F.3d 546, 554–55 (6th Cir.

2019); *Jones v. York*, 34 F.4th 550, 560 (7th Cir. 2022); *Mills v. City of Covina*, 921 F.3d 1161,

1169 (9th Cir. 2019); *No E.-W. Highway Comm., Inc. v. Chandler*, 767 F.2d 21, 24 (1st Cir.

1985). *See also* 18A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal

Practice and Procedure § 4432 (3d ed.) ("There is no preclusion as to the matters vacated or

reversed.").

In short, the overwhelming weight of authority rejects the premise of Defendants'

estoppel argument: that a factual finding from a vacated judgment has preclusive effect. Indeed,

Defendants' argument suffered from a logical flaw as well. If there were preclusive effect, why

would an earlier ruling (declining to rely on Otis' recantation) trump a later ruling from the same

case (relying on Otis' recantation)? In any event, collateral estoppel does not apply here. Plaintiff

may challenge Otis' signed police statements and trial testimony as false and may rely on Otis's

deposition and post-conviction testimony. Any other result would reward Defendants for their

misconduct by binding Plaintiff to a vacated factual finding procured through fraud.

## IV.    Plaintiff's Federal and State Malicious Prosecution Claims Must Proceed To A Jury.

A § 1983 malicious prosecution claim is "properly understood as a Fourth Amendment

claim for unreasonable seizure which incorporates certain elements of the common law

tort." *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (quoting *Lambert v. Williams*, 223

F.3d 257, 261 (4th Cir. 2000)). Mr. Washington must show that Defendants caused his seizure

pursuant to legal process unsupported by probable cause, and criminal proceedings terminated in

Mr. Washington's favor. *Howard v. City of Durham,* 487 F. Supp. 3d 377, 422–23 (M.D.N.C.

2020), *appeal dismissed sub nom*. *Howard v. Dowdy*, No. 20-2114, 2021 WL 1529288 (4th Cir.

Jan. 27, 2021) (internal citations omitted). The state law claim is similar: Plaintiff must show that

Defendants caused criminal proceedings to be initiated against Plaintiff, favorable termination of

those proceedings, the absence of probable cause, and malice. *Exxon Corp v. Kelly*, 381 A.2d 1146, 1149 (Md. 1978).

Defendants challenge only one element: the absence of probable cause. Defendants' success on this score rises and falls with their collateral estoppel position, which as explained above is entirely meritless. *See* Section III.C, *supra*. That is, Defendants seek to estop Mr. Washington from relying on Otis' recantation but yet wish to rely on Otis' criminal trial testimony, which Otis asserts was procured through duress and fabrication. But Defendants' estoppel argument is meritless. For purposes of assessing probable cause, a jury could find that Otis' signed police statements were knowingly fabricated by the police.

In January 1987 when Defendants initiated Mr. Washington's arrest and criminal prosecution, they had only two pieces of evidence which they claimed gave them probable cause: Otis and Rozetta's statements. Ex. 22 (1.3.1987 Memo); Ex. 21 (Search and Seizure Warrant Affidavit). Defendants manufactured both pieces of evidence, which were false as to Mr. Washington's involvement in the shooting. It is axiomatic that Defendants cannot manufacture their own probable cause. *See Hupp v. Cook*, 931 F.3d 307, 324 (4th Cir. 2019).

Without those false statements, there was not a shred of evidence that would cause a reasonable officer to believe Mr. Washington had committed the crime. *Id.* (probable cause assessed by the "overall reasonableness of the officer's actions," and lying to secure a probable cause determination is not reasonable). One need not look further than Defendants' summary judgment brief to underscore this point. None of the "undisputed investigative facts" they cite implicate Mr. Washington in the shooting. *See* Def. Br. at 21. For instance, they note that Bobo was shot in front of Mr. Washington's house, and Mr. Washington was inside his house moments before the shooting. *Id.* They further note that Otis Robinson testified at his deposition that "no

one was standing in the doorway of Plaintiff's home at the time of the shooting," in an apparent

effort to contradict Mr. Washington's statement that he was inside his home standing at the front

door when he saw the shooting. *Id.* First of all, Defendants did not have Mr. Washington's

statement nor Otis' deposition testimony about the doorway when they formulated their probable

cause.[11] Second and even more fundamentally, none of these "facts" identify Mr. Washington as

the shooter, and it cannot seriously be argued that this evidence -- without more -- was sufficient

to initiate charges. Without Otis and Rozetta's statements, Defendants were grasping at straws to

bear out their "Gary Ward" hunch.

Likewise, Defendants improperly rely on Mr. Washington's polygraph exam--which had

not taken place when Mr. Washington was charged. *See Gilliam v. Sealey*, 932 F.3d 216, 234

(4th Cir. 2019) (for probable cause inquiry, "we consider only the information the officers had at

the time of the arrest"), citing *Graham v. Gagnon*, 831 F.3d 176, 184 (4th Cir. 2016). In fact, the

exam occurred months later. As such, the Defendants cannot rely on it to shore up their probable

cause or otherwise bolster their pursuit of Mr. Washington. *Id.*  So too with Lawrence Thomas'

(self-interested) denial of guilt; this fact also did not exist at the relevant time period.[12]

Simply put, Defendants had no probable cause to arrest or initiate charges against Mr.

Washington. Nobody placed Mr. Washington at the shooting, nor was there any physical

evidence connecting him to the crime. Otis' and Rozetta's false statements, which Defendants

crafted in order to arrest Mr. Washington, legally cannot create probable cause.  *See Hupp v.*

*Cook*, 931 F.3d 307, 324 (4th Cir. 2019) ("An officer who lies to secure a probable-cause

---

[11] Factually, Defendants have not established that Otis could have seen inside Mr. Washington's front door, at night, from where he was on Barclay when Bobo was shot.

[12] It is of no moment that Defendants (self-servingly) claim they believed in Plaintiff's guilt. "[W]e do not examine the subjective beliefs of the arresting officers to determine whether they thought that the facts constituted probable cause." *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017) (quoting *Graham*, 831 F.3d at 185). *Gilliam v. Sealey*, 932 F.3d 216, 234 (4th Cir. 2019).

determination can hardly be called reasonable."). As the Fourth Circuit explained in the context

of a Section 1983 malicious prosecution claim:

> [W]here an officer provides misleading information to the prosecuting attorney or
> where probable cause is "plainly lacking," *McKinney v. Richland Cty. Sheriff's
> Dep't*, 431 F.3d 415, 419 (4th Cir. 2005), the procedural steps taken by an officer
> no longer afford a shield against a Fourth Amendment claim. This is because
> "[l]egal process has gone forward, but it has done nothing to satisfy the Fourth
> Amendment's probable-cause requirement." *Manuel*, 137 S. Ct. at 918–19.

*Id.*[13]

## V.       Mr. Washington's Fourth Amendment Claim Is Not Time-Bared.

Defendants attack Count III, Plaintiff's claim of detention without probable cause, by

stating without any explanation or legal support that "it is not an independently actionable

claim." Def. Br. at 23. This argument is so cursory that it has effectively been waived. *See

Russell v. Absolute Collection Services, Inc.*, 763 F.3d 385, 396 n.\* (4th Cir. 2014) (holding that

a brief that "does not contain any legal argument as to how the evidence . . . could support a

valid . . . defense" and does not "include any record citations or pertinent legal authority

supporting such a claim" waives the defense) (citing *Eriline Co. v. Johnson*, 440 F.3d 648, 653 n.

7 (4th Cir. 2006)). Indeed, it is not clear what is meant by "independently actionable," which

makes a response difficult to fashion.

To the extent Defendants mean that Plaintiff has no standalone Fourth Amendment claim

for detention without probable cause, they are wrong. The Supreme Court in *Manuel v. City of

Joliet,* made clear that the Fourth Amendment prohibits detention pursuant to wrongful legal

---

[13] Defendants do not challenge Plaintiff's proof of malice, but it is worth noting that malice may be shown by
demonstrating the absence of probable cause. "The Maryland Court of Appeals has long held that the "malice"
element of malicious prosecution may be inferred from a lack of probable cause." *Solis v. Prince George's Cnty.*,
153 F. Supp. 2d 793, 804 (D. Md. 2001) (internal citations omitted). Where, as here, genuine issues of material fact
exist as to whether Defendants had probable cause to arrest Mr. Washington, there a triable malicious prosecution
claim. *Hayes v. City of Seat Pleasant,* No. 10–2172, 2012 WL 836258, at \*5 (4th Cir. Mar.14, 2012).

process, or detention without probable cause. 137 S. Ct. 911, 918 (2017). *See also McPherson v. Baltimore Police Dep't,* 494 F. Supp. 3d 269, 284 (D. Md. 2020) ("In *Manuel v. City of Joliet,* —– U.S. ———, 137 S. Ct. 911, 197 L.Ed.2d 312 (2017) ("*Manuel I*"), the Supreme Court held that a Fourth Amendment claim for unlawful pretrial detention can continue after formal legal process has been initiated.").

Mr. Washington's Fourth Amendment claim accrued when he was released in 2018, as he would not have been permitted to challenge his conviction at any point before it had been vacated. *See Heck v. Humphrey,* 512 U.S. 477, 485 (1994). Thus, "for Plaintiff's cause of action to accrue at the point when [he is] "entitled to sue" per *Manuel II,* it must accrue at [his] release from detention in [2018], after [his] conviction[] [was] vacated—not decades earlier when pretrial detention ended and no ability to obtain relief existed." *McPherson,* 494 F. Supp. 3d at 285. *See also Manuel,* 137 S. Ct. at 921 & nn. 4 & 9 (noting that the Fourth Circuit and the vast majority of courts of appeals "that have recognized a Fourth Amendment claim like this have incorporated a 'favorable termination' element and so pegged the statute of limitations to the dismissal of the criminal case").

Mr. Washington's Fourth Amendment claim is not time-barred and should go to trial.

## VI.     Failure to intervene

Plaintiff does not oppose the summary judgment motion as to Defendants Ceruti and Tewey. Defendants do not seek summary judgment against Defendants Requer, Pellegrini, or Fahltich for failure to intervene, so those claims must proceed to trial.

## VII.    Plaintiff's IIED Claim Must Be Tried to a Jury

The Defendants have moved for summary judgment on Plaintiff's intentional infliction of emotional distress ("IIED") claim, making two arguments for jettisoning the claim: first, that it

38

was not sufficiently pled, and second, that the emotional distress that Plaintiff has suffered from more than three decades of wrongful imprisonment is not sufficiently severe. Neither argument has merit.

### A. Plaintiff Properly Pled His IIED Claim

First, the Defendants' argument that Plaintiff has not sufficiently pled that he suffered severe emotional distress is an odd argument to make at the summary judgment stage. The Defendants undoubtedly had notice of this element of Plaintiff's IIED claim and the facts supporting it—the purpose of pleading a complaint—as they conducted written and oral discovery on it. Fed. R. Civ. P. 8(a); *see also Swierkiewicz v. Sorema*, 534 U.S. 506, 512 (2002) (allegations sufficient if they give "fair notice of what the plaintiff's claim is and the grounds upon which it rests") (quoting *Conley v. Gibson*, 355 U.S. 41, 47. (1957)); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (complaint need not contain detailed factual matter; rather only must contain sufficient factual matter to state a claim that is plausible). Indeed, although IIED "is a matter of state law, federal pleading standards apply." *Great N. Ins. Co. v. Recall Total Info. Mgt., Inc.*, No. JDC-13-1829, 2014 WL 3845891, at *4 (D. Md. Aug. 1, 2014); *see also Hatfill v. New York Times Co.*, 416 F.3d 320, 337 (4th Cir. 2005) (Rule 8 governs pleading standards in diversity cases, including the pleading requirements for IIED claim). Those standards do not require a plaintiff to set forth detailed factual allegations but only enough content to state a plausible claim for relief. *See Iqbal*, 556 U.S. at 678. Plaintiff's allegations regarding Plaintiff's emotional distress clearly meet this threshold.

In particular, Plaintiff alleged that he was imprisoned for 31 years for a murder that he did not commit. Doc. 5, FAC ¶ 88. During those 31 years, Plaintiff "was forced to share a cell that was little bigger than the average parking space" and lived in "[a] constant atmosphere of

fear, distrust, and threats of violence . . . ." *Id.* ¶¶ 87, 88. He was isolated from family and friends, and missed out on the ability to share holidays, births, funerals and other life events. *Id.* ¶¶ 89, 90. As a result of his three-decade wrongful imprisonment, Plaintiff alleged that he had "suffered tremendous damage, including psychological and emotional distress, all caused by Defendants' misconduct." *Id.* ¶ 92. These allegations, taken together, more than suffice under Rule 8. *See Gandy v. Howard County Bd. of Ed.*, No. GLR-20-3436, 2021 WL 3911892, at *9 (D. Md. Sept. 1, 2021) (finding that allegations that plaintiff "started to suffer nightmares and separation anxiety after the incident;" "cries every time he is driven by the school;" and started therapy are sufficient to set out an IIED claim).

Nothing in Defendants' brief changes this calculus. Although the Defendants cite to *Brengle v. Greenbelt Homes*, 804 F. Supp. 2d 447 (D. Md. 2011) and *Arbabi v. Meyers*, 205 F. Supp. 2d 462 (D. Md. 2002) for the elements of an IIED claim, the Defendants provide no legal citations whatsoever for their argument that Plaintiff's allegations are insufficient. As such, any contention has been forfeited. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) (party waives an argument "by failing to develop its argument—even if its brief takes a passing shot at the issue"); *Russell v. Absolute Collection Servs., Inc.*, 763 F.3d 385, 396 (4th Cir. 2014) (failing to adduce "pertinent legal authority" supporting a claim renders an argument perfunctory, undeveloped and waived).

Nor do either *Brengle* or *Arbabi* advance the Defendants' argument. *Brengle* supports Plaintiff—and not Defendants. In *Brengle*, the court found sufficient plaintiff's allegations that she experienced "severe anxiety," "isolation," "extreme sadness," and that the distress was disabling. *Brengle*, 804 F. Supp. at 456. Those allegations are even thinner than the ones that Plaintiff lodged. As for *Arbabi*, that case is inapposite: It applied a heightened pleading standard

to the IIED claim notwithstanding the fact that the case was pending in federal court—in direct contravention of now controlling Fourth Circuit law. *See Hatfill*, 416 F. 3d at 337 ("Hatfill did not allege his emotional distress in such specific terms, but Rule 8—applicable in this diversity case—did not require him to do so.").

### B. Plaintiff Has Evidence of Sufficiently Severe Distress

Second, and related, the Defendants argue that Plaintiff has not adduced sufficient evidence at summary judgment of his emotional distress. That too fails.

To succeed on an IIED claim, Plaintiff must demonstrate that he suffered severe emotional distress. "[T]o be severe, 'emotional distress need not produce total emotional or physical disablement[,] rather 'severity must be measured in light of the outrageousness of the conduct[.]" *Rico v. Green*, GJH-18-1949, 2021 WL 1215775, at *18 (D. Md. Mar. 30, 2021) (quoting *Figueiredo-Torres v. Nickel*, 584 A.2d 69, 76 (Md. 1991)). "In appropriate cases, 'severe' emotional distress may be inferred from the extreme and outrageous nature of the defendant's conduct alone." *Reagan v. Rider*, 521 A.2d 1246, 1251 (Md. Ct. Spec. App. 1987)); *see also Rico*, 2021 WL 1215775, at *18. "[T]he extreme and outrageous character of the defendant's conduct may arise from his abuse of a position, or relation with another person, which gives him actual or apparent authority over him, or power to affect his interests." *Harris v. Jones*, 380 A.2d 611, 616 (Md. 1977); *see also B.N. v. K.K.*, 538 A.2d 1175, 1182 (Md. Ct. App. 1988).

As described above, there is sufficient evidence in the record for a reasonable jury to decide that the Defendants suppressed and fabricated material evidence in order to arrest, charge, prosecute, convict and imprison Plaintiff for decades for a murder he did not commit. *See* Sections II-III, *supra*. If proven, that is indisputably extreme and outrageous conduct. *See*

*Burgess v. Baltimore Police Dep't*, No. RDB-15-0834, 2017 WL 4947004, at *22 (D. Md. Oct. 31, 2017). A jury can infer severe emotional distress from that conduct; it is hard to imagine anything more disabling and devastating than being in prison for 31 years for a crime you did not commit. *See Harris*, 380 A.2d at 615-16.

Additionally, Plaintiff has adduced summary judgment evidence about how traumatizing Plaintiff's 31 years in prison were and how difficult it has been to adjust to life outside of prison. To that end, Plaintiff testified that prison was "inhumane": He was subject to repeated lockdowns, where he could not leave his cell at all; his cellmates were often unpredictable and suffered from severe mental illness; correctional officers would scream at him and use violence towards him; he was subject to repeated shakedowns and strip and cavity searches; and he was isolated from his family and friends, including from his 4 year-old son. Ex. 1 (G. Washington Dep.) at 136:16-137:2, 137:8-138:12, 138:22-142:3; Ex. 34 (Pltf. Resp. to Rog. No. 4). Since leaving prison, Plaintiff testified that he continues to suffer from sleep deprivation and has nightmares about the inhumanity of his wrongful conviction and imprisonment. Ex. 1 (G. Washington Dep.) at 136:16-137:2. Although Defendants try to downplay this significant and disruptive emotional distress, it is sufficient to warrant a trial on Plaintiff's IIED claim. *See Brengle*, 804 F. Supp. 2d at 456.

**VIII.   Plaintiff's Claims Under Articles 19, 24 and 26 Must Be Tried**

Defendants also seek summary judgment on Plaintiff's state law claims under Articles 19, 24 and 26 of the Maryland Declaration of Rights. That too fails.

Articles 19 and 24 of the Maryland Declaration of Rights are the state law due process analogs to the federal Constitution. To that end, courts have repeatedly held that "the due process requirements of Articles 19 and 24 are coextensive with the corresponding provisions of the

United States Constitution." *Herbert v. Henneberry*, No. 94-2157, 1995 WL 371291, at *2 (4th Cir. June 20, 1995); *see also Williams v. Wicomico County Bd. of Educ.*, 836 F. Supp. 2d 387, 395 (D. Md. 2011) (and cases cited therein). As such, because Plaintiff's federal due process claims survive summary judgment, so too do their Maryland constitutional ones. *Id.*

The Defendants' only argument to the contrary (beyond claiming, unsuccessfully, that Plaintiffs' federal due process claims due not survive summary judgment) is that for Article 19, there is no private right of action. To support that contention, the Defendants cite (misleadingly) to *Wheelabrator v. Baltimore*, 449 F. Supp. 3d 549, 565 (D. Md. 2020). But *Wheelabrator* says nothing about whether Article 19 creates a cause of action. Moreover, while the Defendants' other citation—*Dehn Motor Sales, LLC v. Schultz*, 96 A.3d 221, 237 (Md. 2014)—discusses this in passing, the Defendants have conveniently removed a word from the quoted passage, completely changing the import of *Dehn*'s statement. According to Defendants' brief, *Dehn* states that Article 19 "does not . .. support a private cause of action," when *Dehn* actually states that it "does not *necessarily* support a private cause of action." *Compare* Doc. 161-1 at 29 (Defs. Mem.) with *Dehn*, 96 A.3d at 237 (emphasis added). That is a distinction with a difference. Indeed, many courts have found that Article 19 claims are viable. *See Carter v. Maryland*, No. JKB-12-1789, 2012 WL 6021370, at *11 (D. Md. Dec. 3, 2012) (finding claims under Articles 19 and 24 "viable"); *de*, 836 F. Supp. 2d at 395 (denying motion to dismiss claims under Articles 19 and 24).

Finally, Plaintiff lodged a claim under Article 26. This is the state analog to the Fourth Amendment. *Barnhill v. Strong*, No. JFM-07-1678, 2008 WL 544835, at *3 (D. Md. Feb. 25, 2008). The only argument the Defendants make about this claim is that it fails because Plaintiff's Fourth Amendment claim fails. Doc. 161-1 at 29. Because Plaintiff has adduced sufficient

summary judgment evidence to warrant a trial on his wrongful detention claim, his Article 26 claim also survives the Defendants' challenge.

**IX. The Defendants Are Not Entitled To Qualified Immunity.**

Defendants have asserted a qualified immunity defense in two ways.

First, they argue that it was not clearly established in 1986 and 1987 that they could rely on Otis' statement. This is so because, according to them, the Defendants were not to have known that Otis' statement was false. Second, they argue that it was not clearly established in 1986 that their actions constituted impermissible coercion.

Neither argument survives scrutiny.

First, Defendants' entire qualified immunity argument entirely omits any mention of fabrication, though it is at the heart of Plaintiff's claims. Nowhere do they mention, let alone credit for purposes of qualified immunity, that Otis and Rozetta told them they could not identify the shooter, and that they nevertheless told these two children to identify Mr. Washington. By securing a statement they knew to be false -- that the witnesses had seen Mr. Washington shoot BoBo - they created false evidence that deprived Plaintiff of his liberty for more than three decades.  But they are not permitted to skip over the inconvenient facts. The correct inquiry is whether, after crediting the Plaintiff's version of facts, *see Hope v. Pelzer*, 122 S.Ct. 2508, 2513 (2002), Plaintiff makes out a constitutional violation that was clearly established by 1986. *See also Tolan*, 572 U.S. at 656 ("[U]nder either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment."). The answer is yes.

Here, it was clearly established long before 1986 that police officers could not falsify witness statements and use them to maliciously prosecute people--which is what they did with

Otis and Rozetta. *See Gilliam v. Sealey*, 932 F.3d 216, 241 (4th Cir. 2019). The Fourth Circuit's

discussion in *Gillam* is instructive:

> [T]here can be no reasonable dispute, as the district court correctly concluded, that it was clearly established in 1983 that an individual has a constitutional right not to be deprived of liberty as a result of the intentional, bad-faith withholding of evidence by an investigating officer. *See Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (holding that it was clearly established in 1982 that when police intentionally withhold or destroy evidence, or otherwise act in bad faith, their actions violate the due process rights of a criminal defendant). **The same is true for an individual's constitutional right not to be deprived of liberty as a result of the fabrication of evidence by an investigating officer.** *See Washington v. Wilmore*, 407 F.3d 274, 283–84 (4th Cir. 2005) (holding that officer's alleged fabrication of evidence, if true, violated clearly established constitutional right). Finally, as the district court concluded, "it has long been established that when law enforcement acts in reckless disregard of the truth and makes a false statement or material omission that is necessary to a finding of probable cause, the resulting seizure will be determined to be unreasonable," J.A. 317 (citing *Franks v. Delaware*, 438 U.S. 154, 157, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978)), and "it is established that a conviction obtained through the use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment," *id.* (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959)).

*Id.* (emphasis added). The Court considered it "beyond debate" that those rights were

clearly established in 1983, three years before this investigation. *See also Miller v.*

*Pate,* 386 U.S. 1, 7, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967) ("The Fourteenth Amendment

cannot tolerate a criminal conviction based on the knowing use of false evidence.");

*Washington v. Buraker*, 322 F. Supp. 2d 702, 712 (W.D. Va. 2004), *aff'd sub*

*nom. Washington v. Wilmore*, 407 F.3d 274 (4th Cir. 2005).

This applies with equal force not only to fabrication but to coercion, as it was

clearly established that officers could not coerced witnesses into giving false statements.

*Gilliam*, 932 F.3d at 240. There, appellees argued that the officers "coached or coerced

Sinclair to testify falsely, which Sinclair agreed to do only after [the officers] identified

Sinclair as a suspect and requested his fingerprints. …[T]his, combined with Sinclair's

youth (age 16), along with the other evidence of [the officers'] bad faith, suggest that

Sinclair's statements were coerced or fabricated." *Id.* The Fourth Circuit found the law

clearly established that officers could not coerce witness into giving false statements. *Id.*

Again, Defendants' argument rests entirely on their own, one-sided view of the

facts. For example, Otis alleged that the officers repeatedly threatened criminal charges

against him, accusing him of having lured the victim and contributed to his murder.   Otis

was thirteen years old at the time and without his mother present for much of the

interrogation. Those facts are similar to the coerced, false testimony from L.P. Sinclair,

who appellees allege had been "coached or coerced" into testifying falsely after the

officers identified Sinclair himself as a suspect and requested his fingerprints; "[t]his,

combined with Sinclair's youth (age 16), along with the other evidence of [the officers']

bad faith, suggest that Sinclair's statements were coerced or fabricated."

Gilliam, 932 F.3d at 240. If the jury credits Mr. Washington's facts, there is no colorable

argument that Defendants are entitled to qualified immunity.

The Supreme Court in *Tolan* recently emphasized the need to draw inferences in favor of

the nonmovant specifically in qualified-immunity cases, "even when, as here, a court decides

only the clearly-established prong of the standard." *Tolan*, 572 U.S. at 657. At summary

judgment, Plaintiff has presented ample evidence of facts that, if proven, render qualified

immunity unavailable.

## CONCLUSION

For all the reasons stated above, the Defendants' motion for summary judgment should

be denied.

Respectfully submitted,

**GARY WASHINGTON**

By:    /s/ Roshna Bala Keen
       *One of Plaintiff's Attorneys*

*Attorneys for Plaintiff*
Jon Loevy*
Gayle Horn
Roshna Bala Keen*
Renee Spence*
LOEVY & LOEVY
311 N. Aberdeen St.
Third Floor
Chicago, IL 60607
(312) 243-5900
(312) 243-5902 (fax)
roshna@loevy.com
*Admitted *pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I, Roshna Bala Keen, an attorney, hereby certify that I filed the foregoing PLAINTIFF'S

MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY

JUDGMENT via the Court's CM/ECF system on November 17, 2022, and thereby served a copy

on all counsel of record.

/s/ Roshna Bala Keen
*One of Plaintiffs' Attorneys*

47