**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| GARY WASHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:19-CV-02473-SAG |
| | ) | |
| v. | ) | |
| | ) | Honorable Stephanie A. Gallagher |
| BALTIMORE POLICE DEPARTMENT, *et al.* | ) | |
| | ) | Jury Trial Demanded |
| Defendants. | ) | |

**INDIVIDUAL DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT**

Defendants Oscar Requer, Thomas Pellegrini, Richard Fahlteich, Frederick Ceruti, and John Tewey, by and through their undersigned counsel, submit the below reply memorandum in support of their Motion for Summary Judgment.

DATED: January 20, 2023

Respectfully submitted,

_____/s/_____
Shneur Nathan, Bar No. 20707
Avi T. Kamionski, Bar No. 20703
Alexander S. Rothstein, Bar No. 23228
Nathan & Kamionski LLP
575 S. Charles St., Suite 402
Baltimore, MD 21201
Phone: (410) 885-4349
Fax: (952) 658-3011
snathan@nklawllp.com
akamionski@nklawllp.com
arothstein@nklawllp.com

*Counsel for Individual Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................. ii

I.   Plaintiff's Malicious Prosecution Claims Fail because the Undisputed Facts Establish Probable Cause for His Prosecution and the Absence of Malice ...................................... 1

   a.   Ali was shot right outside Plaintiff's house and Defendants had ample reason to believe the shooting was connected to the home. .................................................................... 3

   b.   Officer Defendants knew Ricky Washington had a brother named Gary and received information leading them to believe he was involved in the shooting. ...................................... 3

   c.   Officer Defendants had ample reason to believe Robinson observed the shooting before his interview on December 29. ................................................................................. 5

   d.   Plaintiff's Present Dispute About the Probable Cause Stemming from the Polygraph Report is Immaterial. ............................................................................................. 5

   e.   The presence of probable cause defeats any inference of malice. ....................................... 8

II.   Plaintiff has not shown that Officer Defendants mislead the indicting prosecutor by concealing or misrepresenting facts or overbore his judgment. .................................... 8

III.   Plaintiff Cannot Support His *Brady* Claim with Speculation and Inuendo and Has not shown that Robinson's and Dorsey's Initial Denials Were Suppressed ...................................... 11

   a.   Plaintiff cannot substantiate his *Brady* claim without the complete homicide file, the State's trial file, or Paul Polansky's trial file. ................................................................ 11

   b.   Robinson and Dorsey Were Available Through Reasonable Diligence and Thus *Brady* Rule Does Not Apply. ............................................................................................. 14

   c.   *Brady* and its Progeny does not Compel Officer Defendants to Disclose the Circumstances of their Investigations to the Prosecution. ................................................................. 20

IV.   The Robinson and Dorsey Statements Cannot be the Basis for a Fabrication Claim Because No Reasonable Jury Could Conclude that Defendant Officers Knew the Statements Were False ............................................................................................................. 21

V.   Dorsey's Statement is Irrelevant to a Due Process Fabrication Claim Because it was not Introduced at Trial ................................................................................................. 23

VI.   Plaintiff is collaterally estopped from arguing that Robinson's statement was unreliable. 24

VII.   Plaintiff's IIED claim fails because he failed to establish that he suffered severe emotional distress ................................................................................................................. 27

VIII.   The Other State Claims Are Contingent on the Federal Claims and Should Be Dismissed for the Same Reasons. ............................................................................................. 30

CONCLUSION ............................................................................................................. 31

## TABLE OF AUTHORITIES

**Supreme Courts**

*Banks v. Dretke*, 540 U.S. 668 (2004) ................................................................. 16, 17
*District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)................................... 2
*Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) ........................................... 19
*Exxon Corp. v. Kelly*, 281 Md. 689, 381 A.2d 1146 (1978) .................................. 8
*Illinois v Gates*, 462 U.S. 213, 243–44, n.13 (1983) .......................................... 2
*Kyles v. Whitley*, 514 U.S. 419, 433 (1995).......................................................... 20
*Montana v. United States,* 440 U.S. 147, 153 (1979) ........................................... 26
*Parklane Hosiery Co. v. Shore,* 439 U.S. 322 (1979) ........................................... 26
*U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994) .......................... 25
*United States v. Agurs*, 427 U.S. 97, 103 (1976).................................................. 20
*United States v. Mendoza,* 464 U.S. 154, 158 (1984) ........................................... 26

**Appellate Courts**

*B.N. v. K.K.*, 538 A.2d 1175, (Md. 1988) ............................................................. 29
*Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985) .............................................. 22
*Bermudez v. City of New York*, 790 F.3d 368, 372 (2nd Cir. 2015) ..................... 10
*Boss v. Pierce*, 263 F.3d 734, 743 (7th Cir. 2001)........................................... 18, 19
*Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015)........................................... 2
*Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008) ................................. 14
*Culver v. Md. Ins. Comm'rs of Frederick County*, 175 Md. App. 645, 654, 931 A.2d 537, 542
   (Md. App. 2007).................................................................................................. 27
*Dehn Motor Sales, LLC v. Schultz,* 96 A.3d 221, 237 n. 27 (Md.  2014).................................. 30
*Douglas v. State,* 31 A.3d 250 (Md. 2011) .......................................................... 27
*Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) ................................ 2, 9, 11, 24
*Figueriredo-Torres v. Nickel*, 584 A.2d 69, 76 (Md. 1991) ................................ 29
*Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002)............................................ 15
*Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir 2003) .......................................... 21
*Gilliam v. Sealy*, 932 F.3d 216, 234 (4th Cir. 2019) ........................................... 2
*Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)............................................ 9
*Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977).................................................. 28
*Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007) ......................................... 21
*Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996) ................................... 15
*Lambert v. Williams*, 223 F.3d 267, 261 (4th Cir. 2000)..................................... 2
*Lovitt v. True*, 403 F.3d 171, 184 (4th Cir. 2005)............................................... 15
*Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) ......................................... 23
*McGhie v. State*, 144 A.3d 752, 762 (Md. 2016).................................................. 27
*Microsoft Corp. Antitrust Litigation,* 355 F.3d 322, 326 (4th Cir. 2004) ............ 26
*Reagan v. Rider*, 521 A.2d 1246, 1247; 1251 (Md. Ct. Spec. App. 1987)............ 29
*Saunders-El v. Rohde, et al.*, 778 F.3d 556, 562 (7th Cir. 2015)....................... 20, 21
*Sornberger v. Knoxville*, 434 F. 3d 1006, 1029 (7th Cir. 2006) .......................... 21

*Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 557 (4th Cir. 1999) ............................. 20

*Stockton v. Murray*, 41 F.3d 920, 927 (4th Cir. 1994)............................................................. 15

*United States v. Blankenship*, 19 F.4th 685, 693-94 (4th Cir. 2021) ........................... 16, 17, 18

*United States v. Bosyk*, 933 F.3d 319, 315 (4th Cir. 2019)......................................................... 2

*United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986)................................................. 16

*United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988)..................................................... 15

*United States v. Hackley*, 164 Fed. Appx. 301, 305 (4th Cir. 2006) ....................................... 19

*United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011)....................................................... 15

*United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1979)............................................... 19

*United States v. Ortiz*, 669 F.3d 439, 444-45 (4th Cir. 2011)..................................................... 2

*United States v. Robinson¸* 627 F.3d 941, 952 (4th Cir. 2010)................................................. 14

*United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990) ............................... 14, 15, 16, 17, 18

*Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005)..................................................... 23

*Wray v. City of New York*, 490 F.3d 189, 195 (2nd Cir. 2007)................................................... 9

**District Courts**

*Blankenship v. United States*, No. 5:18-cv-00591 2020 WL 247313, *8 (S.D.V.V. Jan. 15, 2020)
.......................................................................................................................... 14, 16

*Burgess v. Baltimore Police Dep't*, No. CV RDB-15-0834, 2017 WL 4947004, at *16 (D. Md.
Oct. 31, 2017).................................................................................................. 23, 27

*Cannon v. Polk County*, 68 F.Supp. 3d 1267, 1279 (D. Or. 2014) ........................................... 14

*Carter v. Maryland*, No. JKB-12-1789, 202 WL 6021370, at *1–2 (D. Md. Dec. 3, 2012).. 30, 31

*Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010)................. 24

*Glass v. Anne Arundel Cnty.*, 38 F.Supp.3d 705, 720-21 (D. Md. 2014) ................................... 24

*Haskins v. Hawk*, 2013 WL 1314194 *15 (D. Md. March 29, 2013)......................................... 26

*Higgs v. U.S.*, 711 F.Supp.2d 479, 513 (D. Md. 2010)............................................................. 19

*Hunter v. Snee*, ADC-21-402, 2022 WL 204930, *7 (D. Md. Jan. 24, 2022) ........................... 30

*Jiminez v. City of Chicago*, 830 F.Supp.2d 432, 445 (N.D. Ill. 2011)........................................ 18

*Johnson v. Baltimore Police Dep't*, ELH-19-0698, 2022 WL 9976525, *60 (D. Md. October 14,
2022).................................................................................................................. 2, 28

*Jones v. United Health Grp.*, 2019 WL 3037854, *1 (D. Md. Jul. 11, 2019) ............................. 23

*Lee v. Queen Anne's Cty. Office of Sheriff*, No. CIV.A. RDB-13-672, 2014 WL 476233, at *16
(D. Md. Feb. 5, 2014)............................................................................................. 29

*Owens v. Baltimore City State's Attorneys Office*, GLR-11-3295 2014 WL 5452944 *5 (D. Md.
September 29. 2016) ............................................................................................... 26

*Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F.Supp.2d 751, 757 (D. Md. 2011) .............. 29

*Rico v. Green*, GJH-18-1949, 2021 WL 1215775 (D. Md. Mar. 30, 2021) ........................... 28, 29

*Tserkis v. Baltimore County,* ELH 19-202 2021 WL 3129325 *12 (D. Md. July 23, 2021)........ 24

*Washington v. Maynard*, GLR-13-3767, 2016 WL 865359, at *11 (D. Md. Mar. 7, 2016) ........ 28

*Zeneca Ltd. v. Novopharm Ltd.*, 919 F. Supp. 193, 196 (D. Md. 1996) ..................................... 25

**Statutes**

Md. Code, C.P. § 2-202(c)........................................................................................... 24

It is undisputed that Faheem Ali was shot right outside of the home of plaintiff Gary Washington ("Plaintiff"). Plaintiff admits he was not forthright with the police when he was initially interviewed about Ali's death and it is undisputed that the Maryland State Police reported to defendant officers that Plaintiff failed a polygraph examination about the incident. Today and at his trial, Plaintiff claims that his good friend and fellow drug dealer, Lawrence Thomas, actually shot Franklin. Plaintiff also puts himself within feet of where Franklin was shot. These basic facts—which are still undisputed—created probable cause for Plaintiff's prosecution.

Now, Plaintiff seeks money damages based on speculative legal theories of malicious prosecution, alleged withholding of *Brady* evidence, and alleged evidence fabrication. Hoping to avoid summary judgment, Plaintiff argues that (1) any investigative efforts as documented in the homicide file as it exists today are not reliable; and (2) any gaps in documentation contained within the present-day homicide file is evidence of bad faith on the part of defendant officers. Plaintiff's claims cannot survive summary judgment because they rest on speculation and innuendo.

After the close of discovery, however, there is no evidence to sustain Plaintiff's claims. Probable cause is fatal to any malicious prosecution claim regardless of Plaintiff's actual guilt or innocence. No *Brady* claim is viable in this case because Plaintiff has not developed evidence to show what was or was not in the files of the prosecutor or his criminal defense attorney. Similarly, the statements of Otis Robinson and Rosetta Dorsey upon which Plaintiff hinges his entire *Brady* claim were not withheld as a matter of law. Finally, the fabrication claim fails because there is no evidence that the defendant officers in this case had any personal animus toward Plaintiff or that they knew that Robinson's trial testimony, which inculpated Plaintiff, was false. Therefore, summary judgment should be granted in favor of the defendants.

**I.     Plaintiff's Malicious Prosecution Claims Fail because the Undisputed Facts Establish Probable Cause for His Prosecution and the Absence of Malice.**

1

"A 'malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort.'" *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) (citing *Lambert v. Williams*, 223 F.3d 267, 261 (4th Cir. 2000)). As this Court has recently explained, lack of probable cause is a "central component" of a malicious prosecution claim. *Johnson v. Baltimore Police Dep't*, ELH-19-0698, 2022 WL 9976525, *60 (D. Md. October 14, 2022).

Probable cause is "not a high bar."[1] *United States v. Bosyk*, 933 F.3d 319, 315 (4th Cir. 2019) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). Importantly, probable cause is determined based on the totality of the circumstances. *Gilliam v. Sealy*, 932 F.3d 216, 234 (4th Cir. 2019). It "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Illinois v Gates*, 462 U.S. 213, 243–44, n.13 (1983). An officer has probable cause to arrest when there are "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense." *Cahaly v. Larosa*, 796 F.3d 399, 407 (4th Cir. 2015) (quotation omitted).

If believed, Otis Robinson's statements identifying Plaintiff as the shooter undoubtedly established probable cause for his arrest. As explained in Defendant's Motion, Plaintiff is estopped from arguing that Officer Defendants coerced Robinson's statements. *See* ECF 161-1 at Section II(c), III(b); *see infra*, Section VI. And Plaintiff developed no evidence that Defendants had reason to believe that Robinson's statements were otherwise unreliable. *See* ECF 161-1 at II(b); *see infra*, Section IV. Because Officer Defendants reasonably relied on Robinson's statements, they had

---

[1] Probable cause requires less of a showing than the formal preponderance-of-the evidence standard. *United States v. Ortiz*, 669 F.3d 439, 444-45 (4th Cir. 2011).

probable cause for Plaintiff's arrest. But, even if Plaintiff were not estopped from arguing that Robinson was coerced, Officer Defendants still had probable cause to arrest Plaintiff.

> **a.  Ali was shot right outside Plaintiff's house and Defendants had ample reason to believe the shooting was connected to the home.**

It is indisputable that Ali was shot just outside Plaintiff's home. It is similarly indisputable that Officer Defendants discovered the connection between the home, Ricky Washington, and the shooting before they spoke to Robinson or arrested Plaintiff. On the night of the shooting the victim's father, told detectives that there was a relationship between his son and Ricky Washington. *See* Ex. 1 at GWLISHF 000084–85 (Excerpted Homicide File).[2] And several other witnesses connected Ali and Gary Washington to Ricky Washington and Washington's house. *See id.* at 000019 ("[d]uring the interviews at the scene we were told the victim was talking to Ricky Washington in front of 2328 Barclay Street prior to the shooting."); *see also id.* at 000062–63 (reflecting that on December 28, 1986 Edward Ellis told detectives that he "saw somebody at Ricky Washington's house at the front door, point to the victim as the Bronco was coming up the street just before the shot…whoever it was at the door pointed out victim to people or person i[]n [sic] Bronco."); Ex. 2 at 216:21–217:6 (Dep. of Requer) (stating that he learned that Ricky Washington had a brother named Gary from "[w]hoever I interviewed here"); Ex. 3 at 239:5–10 (Dep. of Pellegrini) (stating that he could not recall who provided him this information). The homicide file further reflects that Frederick Powell stated that he had heard that Ricky Washington was involved.[3] *See* Ex. 1 at 000060–61.

> **b.  Officer Defendants knew Ricky Washington had a brother named Gary and received information leading them to believe he was involved in the shooting.**

---

[2] GWLISHF 000001–115 is the redacted version of what remains of the homicide detectives' file.

[3] Tellingly, Plaintiff did not ask Dets. Requer or Pellegrini about this interview during their depositions.

It is undisputed that Officer Defendants quickly learned that Ricky Washington had a brother named Gary. *See* Ex. 1 GWLISHF at 000017–19 (Excerpted Homicide File); *id.* at 000019. It is also undisputed that the police received anonymous tips pertaining to the case, including an unrecorded call that identified the shooter as a "Gary Ward." *Id.*[4] Documentation about the call reflects that the "caller could have possibly said Washington instead of Ward." *Id.*; *see* Ex. 2 at 218:25–220:16 (Dep. of Requer) (explaining that the caller could have said Washington instead of Ward). At bottom, the anonymous call is evidence that contributes toward probable cause, not the other way around. Detectives continued their investigation, including continuing to identify witnesses and following up on Plaintiff's identification of Lawrence Thomas as the shooter.[5] *See* Ex. 3 at 313:8–13 (Dep. of Pellegrini); Ex. 1 at GWLISHF 000022–29.

These connections did not exist in a vacuum. The detectives were justified in relying on their experience as veteran police officers as it pertained to street-level drug trade and the violence associated with it.[6] Det. Pellegrini routinely checked the criminal records of suspects and witnesses associated with homicides. *See* Ex. 3 at 35:21–36:11 (Dep. of Pellegrini); *see also* Ex. 2 at 234:8–24 (Dep. of Requer) (stating that if he had run a record check on Ricky Washington, he would have seen his prior arrests). Plaintiff developed no evidence that Officer Defendants did not follow

---

[4] These calls were answered by an "answering clerk "associated with the number "685-GUNS." *See* Ex. 1 at GWLISHF 000019 (Excerpted Homicide File).

[5] Plaintiff's allegations of misconduct in Defendants pursuit of "their 'Gary Ward' hunch" ring hollow because *Plaintiff* identified Lawrence Thomas as the shooter on April 15, 1987, which rendered the name of Gary Ward meaningless and strengthened the existing probable cause and Defendants' belief that the caller said Washington rather than Ward. *See* Pl's Opp'n, ECF 166 at 44 of 55; *see also* Section I(d), *supra.*

[6] *See* Ex. 3 at 23:22–25:8 (Dep. of Pellegrini); Ex. 2 at 25:13–29:16, 173:20–174:12 (Dep. of Requer) (stating that he did not presently recall seeing anything "about [this case] being drug involvement" but that it "could have been a motive" if the victim was involved in illegal drug sales).

their routine investigative procedures, thereby learning the criminal histories of the individuals that were identified throughout the course of the investigation as possible suspects.

By the time the detectives spoke to Robinson on December 29, 1987, it is indisputable that they had reason to believe that the crime occurred outside Plaintiff's home, that some portion of it was orchestrated from his doorway, that the victim was associated with his brother, that the shooter's name was Gary, and that Plaintiff's and his brother's criminal histories were relevant. Furthermore, it was reasonable for them to believe in and rely upon this information based on the totality of the circumstances in their determination of probable cause.

### c. Officer Defendants had ample reason to believe Robinson observed the shooting before his interview on December 29.

On the night of the shooting, Det. Pellegrini spoke with Herb Manigault, the last person to see Otis before he stepped outside. *See* Ex. 4 at GW SAO Subpoena at 001069 (Excerpted Trial Testimony, June 8, 1987). Mr. Manigault testified that Otis left his house prior to the gunshot and came back "running in scared and shaking," stating, "some man got shot… in front of our door." *See* Ex. 5 at GW0000467 (Excerpted Trial Testimony, June 9, 1987). Mr. Manigault testified that Ali had fallen just outside his door. *Id.* By the time Det. Tewey spoke with Edward Ellis, the fact of Otis's presence at the time of the shooting was making its way around the neighborhood.[7] Otis has never disputed that he was outside at the time of the shooting. Thus, it cannot be disputed that detectives had reason to believe that Otis was an eyewitness to the shooting and could provide relevant information.

### d. Plaintiff's Present Dispute About the Probable Cause Stemming from the Polygraph Report is Immaterial.

---

[7] Det. Tewey's notes from his interview of Edward Ellis reflect Ellis as stating, "A boy named Quanta Martin told Cecil that Otis was with Bobo when the shooting happened and that Otis ran to someone's house knocking on the doors trying to get in." *See* Ex. 1 at 000062–63 (Excerpted Homicide File).

"[C]areful analysis of the polygrams collected during this test indicated that strong consistent responses [] indicative of deception were noted when **all** of the aforementioned [relevant questions] were answered by [Plaintiff]." *See* ECF 161-16 at GW 003833 (emphasis added). Based on Sheldon's conclusion that Plaintiff was deceptive along with Plaintiff's inconsistent pre- and post-test statements, informed by information learned during the investigation and the reasonable inferences drawn therefrom, Defendants and ASA Finch had ample probable cause to justify continuing the prosecution. In his Opposition, Plaintiff attempts to undermine the significance of the polygraph report by attacking its reliability on two fronts. But neither argument enables him to survive summary judgement.

First, Plaintiff cannot rely on his selective citation to Sheldon's testimony about how charts are interpreted to suggest that Officer Defendants knew that an indication of deception cannot be attributed to any single relevant question. Plaintiff's misleading offering does not begin to encompass Sheldon's full testimony on the topic. *See* Pl's Opp'n, ECF 166 at 27–28 of 55. Plaintiff entirely ignores Sheldon's testimony, that "[t]he [polygraph]…picked up deception when [Plaintiff] answered all of the relevant questions," and that Sheldon was able to confirm deception pertaining to question #10 by "[Plaintiff's] statements."[8] *See* Ex. 6 at 92:10–14 (Dep. of Sheldon). Plaintiff's attempt to muddy the waters by introducing the idea that Plaintiff might not have understood question #10 during the pretest phase fails because Sheldon stated that he "would never pose a question to someone who didn't understand it. The questions were reviewed with [Plaintiff]

---

[8] At deposition, the following exchange occurred between Examiner Sheldon and Plaintiff's counsel, "Q: And you don't know whether he was—you don't know which question deception was indicated for because that's not how the test worked; correct? A: Well, I know that he lied to question 10. I don't know how or what other deception was present other than it was deception. Q: You don't know that he lied to question 10. A: I do. Q: But you just said you didn't know which question deception was indicted on. A: Question 10 he answered…with a no in the pretest. Then he answered with a yes during the examination, and then he confirmed that in the post-test. That's deception." *See* Ex. 6 at 91:10–92:1 (Dep. of Sheldon).

with his attorney present. He acknowledged that he understood the questions."[9] *Id.* at 97:15–19. Assuming *arguendo*, that the results of a polygraph test could be undermined because of the test's inability to attribute deception to a particular question, Plaintiff has not shown that Det. Pellegrini had any awareness of such a nuance. To the contrary, Sheldon stated that he "must have" told homicide detectives that "the results of the test are that the defendant is not being truthful regarding his knowledge and involvement in this case." *Id.* at 91:3–9.

Second, Plaintiff attempts to undermine the reliability of the polygraph report by broadly asserting that he "disputes the statements attributed to him in in [Sheldon's] summary." *See* Pl's Opp'n, ECF 166 at 28 of 55. Still, even if Plaintiff could rely on his unsupported assertion that Sheldon lied in his report, Plaintiff generated no evidence that Det. Pellegrini was aware that Sheldon's report contained a disputed account. And Plaintiff's allegation against Sheldon does nothing to address Plaintiff's statement as documented in the Office Report, dated April 15, 1987.[10] *See* Ex. 1 at 000024–25 (Excerpted Homicide File).

Plaintiff attempts to box-check his way past summary judgment by disputing the contents of Sheldon's report—for the first time—approximately 34 years after its generation.[11] However, the relevant inquiry is the extent to which Officer Defendants were aware that the pretest section

---

[9] "He said no to the questions in review in the pretest. During the actual test, the charts that are collected, the questions are asked generally three times. So generally he would have said no to that in the pretest and yes to that three times. After that the test was over and I confronted him with that, and he acknowledged that yeah, he did see it. So he changed his story." *See* Ex. 6 at 98:4–11 (Dep. of Sheldon).

[10] The Office Report, dated the same day as the polygraph, reads, "It must be noted that Washington had stated earlier this date that he was in his house watching television and heard a shot, but did not see anything or anyone when he looked outside." *See* Ex. 1 at 000025.

[11] The polygraph report is dated April 15, 1987. ASA Finch filed notice with the court that she received the report on May 19, 1987 and mailed it to Mr. Polansky on the same day. *See* Ex. 7 at GBW Cert. Cir. Ct. File 000587 (State's Supplemental Disclosure, May 19, 1987). The record does not reflect Mr. Polansky, or any of Plaintiff's post-trial attorneys, raising a dispute over the report, rendering specious Plaintiff's claim that neither he nor his attorney ever saw Sheldon's summary. *See* Pl's Opp'n, ECF 166 at 28 of 55.

of Sheldon's report contained fabrications. Plaintiff offers no evidence on this point and certainly makes no effort to invalidate the fact that the surviving homicide file reflects the detectives' awareness, as of April 15, 1987—the date of the examination, of the substance of the now-disputed pretest statement.[12] Absent any evidence that Officer Defendants knew the pretest statements were subject to dispute, that Plaintiff disputes them now is irrelevant.

### e.  The presence of probable cause defeats any inference of malice.

Plaintiff's claim for malicious prosecution under Maryland law cannot survive summary judgement since "malice and lack of probable cause must concur. . . and the verdict cannot stand, whatever may be the conclusion as to probable cause, absent a showing of malice." *Exxon Corp. v. Kelly*, 281 Md. 689, 381 A.2d 1146 (1978).  Here, both Dets. Pellegrini and Requer rejected the insinuations that homicide suspects were haphazardly identified in response to generalized pressure to close cases or due to some angst enabled by the "big board" of opened/closed posted in the homicide division. *See* Ex. 2 at 78:10–85:23 (Dep. of Requer); Ex. 3 at 47:7–51:12 (Dep. of Pellegrini). Both further testified as to the high homicide rate in Baltimore during the 1980s.[13] In light of this, Plaintiff has offered no evidence of any "primary purpose in instituting the proceeding" exhibited by Officer Defendants, other than that of bringing an offender to justice. *Exxon Corp.*, 381 A.2d at 1149. Plaintiff has uncovered no evidence that Dets. Pellegrini or Requer were motivated to frame or withhold/fabricate evidence against Plaintiff. Thus, Defendant Officers are entitled to summary judgement on Plaintiff's Federal and State malicious prosecution claims.

### II.   Plaintiff has not shown that Officer Defendants mislead the indicting prosecutor by concealing or misrepresenting facts or overbore his judgment.

---

[12] Examiner Sheldon testified that he would have typed his report "anywhere from the same day to several days [or a week] after the examination." *See* Ex. 6 at 61:10–21.

[13] Det. Pellegrini stated, "…there seemed to be a lot of murders everywhere in Baltimore." *See* Ex. 3 at 26:7–8. Det. Requer estimated that annual homicide rate could "easily" have been in the hundreds. *See* Ex. 2 at 80:22–81:12.

"[A] police officer is not liable for a plaintiff's unlawful seizure following indictment 'in the absence of evidence that [the officer] misled or pressured the prosecution.'" *Evans v. Chalmers*, 703 F.3d 639, 648 (4th Cir. 2013) (citing *Wray v. City of New York*, 490 F.3d 189, 195 (2nd Cir. 2007)); (citing *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988) ("An independent intermediary breaks the chain of causation unless it can be shown that the deliberations of that intermediary were in some way tainted by the actions of the defendant."). In *Evans*, the decision by the prosecutor to seek an indictment broke the causal chain where officers briefed the prosecutor "as to the startling weaknesses in the case," and at least one officer was puzzled by the prosecutor's decision to indict. *Id.*

Here, Plaintiff has developed no evidence that defendant officers misled or pressured any prosecutor assigned to this case. Both detectives testified to their practice—and their mandate— that the entire homicide file was copied for the prosecutor. *See* Section III(a) *infra*. Plaintiff insinuates that Det. Pellegrini maintained an ominous presence over Otis while he met with ASA Michael Glushakow prior to testifying before the grand jury to ensure that Otis would remain consistent with his written statements. However, this is pure speculation.[14] *See* Pl's Opp'n, ECF 166 at 19 of 55. Plaintiff offered no evidence to suggest that it was in any way uncommon for Det. Pellegrini to accompany a witness through the grand jury process as he did in this case. Plaintiff

---

[14] At deposition, Robinson described going to the courthouse with his mother and meeting Det. Pellegrini there with the prosecutor. *See* Ex. 8 at 62:2–17. (Dep. of Robinson). He stated that Pellegrini told him to "just go ahead and say what you said" in the statement, but Robinson also stated that he could not "remember any specific words" used by Pellegrini, that Pellegrini "didn't say too much," and that he could not "remember anything that Pellegrini told [him] in the office about…meeting with [Glushakow]." *Id.; see also id.* at 243:1–244:12; *id.* at 251:13–15 (stating that he could not remember any specific things that Pellegrini or any detective told [him] at the grand jury). Robinson did not tell [Glushakow] about the threats and the false statement "because he didn't feel comfortable with him." *Id.* at 63:2. Robinson remembered the prosecutor and Pellegrini having conversations, but that he "wasn't paying attention." *Id.* at 244:1–12.

similarly developed no evidence that Det. Pellegrini attempted to exert any pressure on Robinson on January 7, 1987. To the contrary, Robinson stated that Det. Pellegrini did not threaten him while at the grand jury. *See* Exhibit 8 at 244:13–15. And Plaintiff cannot imbue any substance to the conversation between Det. Pellegrini and ASA Glushakow.

Further, Robinson's assertion that he lied to the grand jury because of his interactions with police at the station, because that was "what the police wanted me to do,"—is not grounded in the record. *Id.* at 251:17–23. There is no evidence to suggest that potential grand jury testimony was discussed at either of Robinson's visits to BPD. Robinson stated that he "didn't realize what was going on" prior to testifying before the grand jury. *Id.* at 241:20–242:11.

This case is similar to *Bermudez v. City of New York*, in which the Second Circuit agreed with the district court's finding that there were "no genuine issues of material fact" concerning Plaintiff's malicious prosecution claim. 790 F. 3d 368, 376–377 (2nd Cir. 2015). In *Bermudez*, the allegations of misconduct relevant to a group of witnesses—including Thompson and Velasquez—included: (1) allowing them to provide detectives with a collective description of the shooter; (2) allowing them to jointly sift through arrest photos and to discuss the photo selected by Velasquez; (3) ending the photo procedure once Velasquez handed detectives the photo of Bermudez; (4) and improperly advising them during the photo array procedure. *Id.* at 371, 373. The allegations of misconduct relevant to the "long" interrogation of 16-year-old, Efraim Lopez, included detectives misrepresenting the coercive circumstances surrounding Lopez's identification of Bermudez to the prosecutor.[15] *Id.* at 372. The Second Circuit stated that "[e]ven if the ADA had been misled about

---

[15] Lopez would later sign two affidavits in connection with Bermudez's post-trial collateral challenges whereby Lopez alleged that detectives showed him a photograph of Bermudez, "told [Lopez] that [Bermudez] was a drug dealer, and said to Lopez that if he did not identify Bermudez as the person who had killed Blount then Lopez would be charged as the shooter. *Bermudez v. City of New York*, 790 F.3d 368, 372 (2nd Cir. 2015).

the overly suggestive photo identification procedures and about the alleged coercion of Lopez," the subsequent interview by the ADA of Thompson and Velasquez prior to their testimony before the grand jury "provided [the ADA] with probable cause to prosecute Bermudez." *Id.* at 377.

Here, ASA Glushakow's full opportunity to interview Otis prior to his grand jury testimony broke the causal chain as Plaintiff has offered no evidence that Defendant Officers' actions influenced the indictment decision.[16] Plaintiff offered no evidence that detectives exerted any pressure on Otis related to the grand jury process at any point during the investigation or on the date of his grand jury testimony. Thus, as in *Evans*, the independent decision of ASA Glushakow to present Otis to the grand jury after reviewing his statements with him is the "intervening superseding cause[] that break[s] the causal chain between [Defendants] alleged misconduct and [Plaintiff's] unlawful seizure." *Evans*, 703 F.3d at 647.

### III. Plaintiff Cannot Support His *Brady* Claim with Speculation and Inuendo and Has not shown that Robinson's and Dorsey's Initial Denials Were Suppressed

#### a. Plaintiff cannot substantiate his *Brady* claim without the complete homicide file, the State's trial file, or Paul Polansky's trial file.

Plaintiff's argument that "[t]he factual dispute about whether or not Otis told Defendants he could not identify the shooter is quintessentially a jury question" must fail because he has not shown any evidence that Robinson's alleged initial denial was suppressed. Neither Det. Pellegrini's nor Det. Requer's deposition testimony advanced Plaintiff's claim that Robinson's alleged initial denial was suppressed. And no matter how Robinson characterizes his statements to Officer Defendants, Plaintiff offers no evidence that this denial was withheld from the State.

---

[16] At deposition, Robinson stated that he "believe[d]" he reviewed his statements with ASA Glushakow. *See* Ex. 8 at 244:16–23.

This is the sticking point where Plaintiff misjudges the consequence of the State's and Mr. Polansky's missing trial files, which Plaintiff erroneously deems "nothing but misdirection." Pl's Opp'n, ECF 166 at 32 of 55. In the absence of Polansky's file, Plaintiff speculates that his trial strategy was shaped solely by the State's discovery. And from that assumption, Plaintiff assumes that the State's alleged non-disclosure resulted strictly from Defendants' bad faith. Relegating it to a footnote, Plaintiff attempts to speak into existence the notion that the remaining homicide file offers a viable foundation upon which he may support his claim. *Id.* at n. 8.[17]

 Det. Pellegrini recognized the remaining case file as "just bits and pieces" and noted the absence of the photo identifications.[18] *See* Ex. 3 at 309:24–310:13 (Dep. of Pellegrini). He further supplemented, noting the absence of photographs referenced in a report and the statement provided by Dorsey on December 27, 1986. *See* Ex. 9 at 3–4 (Det. Pellegrini Suppl. Answer to Interrogatory No. 15). Indeed, the certified Circuit Court file bears a copy of two photo arrays and Det. Pellegrini testified that a photo array was shown to Sylvia Harper; none of these arrays are found in the present-day homicide file. *See* Ex. 10 at GW004630–33 (Photo arrays from certified court file); Ex. 11 at GW000197 (Excerpted Pretrial Testimony, June 4, 1987). Thus, Plaintiff cannot offer the remaining homicide file as a complete representation of the file as it existed in 1986–87 to support the claim that Otis's and Rozetta's alleged initial denials were suppressed.

Confronted with this fact, Plaintiff asks this Court to ignore the plain reality that any portion of the State's trial file—inclusive of the items routinely provided by detectives to

---

[17] Plaintiff makes no attempt to argue that the incomplete nature of the present-day homicide file is in any way insignificant. Rather, Plaintiff states only that the file "still exists and has been produced in this case." Pl's Opp'n, ECF 166 at 32 of 55 n. 8. Still, Plaintiff developed no evidence that the present condition of the homicide file is attributable to Officer Defendants.

[18] Det. Pellegrini stated, "35 years ago the original casefile was in the homicide office. Those files are taken and put on microfilm and a lot of stuff in the case files are thrown in the trash." *See* Exhibit 3 at 309:6–9.

prosecutors—could shed light on whether the initial denials were shared with the State.[19] ASA Ruth Finch's deposition was similarly non-illuminating. *See e.g.*, Ex. 12 at 8:19–21 (Dep. of Finch) (stating that her only memory of the case was that she remembered Plaintiff's name and the names of some of the detectives). Beyond that, it was apparent that ASA Finch could not recall basic components of a homicide file. *Id.* at 56:16–59:6 (could not recognize an information sheet or a prosecution report as types of forms she would have generally reviewed). She similarly could not recall if Robinson's written statement from December 29, 1986, was the type of document that she would review; nor did seeing this statement refresh her recollection about the case. *Id.* at 65:1–15, 68:16–69:2. Without the State's file, or ASA Finch's slightest substantive recollection about the case, Plaintiff cannot survive summary judgment simply by offering Finch's testimony that she would have remembered if defendants told her that they, *e.g.*, had fabricated portions of Robinson's statement, and that she would have disclosed it. *Id.* at 166:11–171:4.

Plaintiff similarly asks this Court to ignore the same reality as it pertains to the absence of Polansky's trial file or his lack of present recollection. *See* ECF 161-1 at 15–16 of 39, 161-20 at NK DEF 002371. It is indisputable that Polansky investigated this case, in part, by locating and interviewing Dorsey. Yet, in the absence of his trial file or any recollection, there is absolutely no evidence of any details Polansky learned from Dorsey's statement to Polansky's investigator.[20] Such clarification, nearly to a certainty, would have been contained within Polansky's trial file, along with other material reflecting his impressions of the case based on the State's disclosures and his own investigation.

---

[19] At deposition, Det. Pellegrini stated that the entire case file, including reports and "notes," would have been copied and turned over to the prosecutor. *See* Ex. 3 at 92:18–93:1 (Dep. of Pellegrini); *see also*, Ex. 2 at 127:4–136:12 (Dep. of Requer) (testifying as to his practice of turning over all evidence—whether verbally or in writing—to the prosecutor whether it supported his theory of the case or not).

[20] At deposition, Ms. Dorsey was not asked about her pretrial statement to Mr. Polansky's investigator.

A police officers' *Brady* duty is satisfied by disclosure to prosecutors. *See United States v. Robinson*¸ 627 F.3d 941, 952 (4th Cir. 2010); *Carvajal v. Dominguez*, 542 F.3d 561, 566 (7th Cir. 2008); *Cannon v. Polk County*, 68 F.Supp. 3d 1267, 1279 (D. Or. 2014) (officer fulfills *Brady* obligations through disclosure of evidence to the prosecutor even if the defense never receives it). Plaintiff cannot ground his *Brady* claim pertaining to Robinson's or Dorsey's alleged denials in any document that was irrefutably generated during the investigation, irrefutably withheld from the State, and that survives today. Without a trial file, or a basic recollection of either trial attorney, any allegation that Defendants failed to comply with their *Brady* obligations relevant to their interactions with Robinson or Dorsey is purely speculative. Plaintiff cannot survive summary judgment by asking this Court to disregard the absence of this material information, and this Court should not credit Plaintiff's speculation that such absence equates to suppressed misconduct.

### b. Robinson and Dorsey Were Available Through Reasonable Diligence and Thus *Brady* Rule Does Not Apply.

Plaintiff claims that by asserting that Paul Polansky should have uncovered Robinson's and Dorsey's alleged coercion through reasonable diligence, Defendants blame him for their non-compliance with *Brady*. Not so. Plaintiff incorrectly assumes that he was entitled to *Brady* protection in the first instance—*Brady* does not protect those who do not try to protect themselves. Because Plaintiff failed to interview witnesses who he knew had identified him, particularly after *he* elicited a recantation from one, Plaintiff cannot now assert a *Brady* claim.

The Fourth Circuit has "firmly established that where the suppressed evidence is both available to the defendant and in a source where a reasonable defendant would look, the *Brady* rule *does not apply*." *Blankenship v. United States*, No. 5:18-cv-00591 2020 WL 247313, *8 (S.D.V.V. Jan. 15, 2020) (citing *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir. 1990)) (emphasis added). Evidence is not suppressed for *Brady* purposes when it was available to the

defendant through reasonable and diligent investigation. *See United States v. Higgs*, 663 F.3d 726, 735 (4th Cir. 2011) ("[t]here is no *Brady* violation if the evidence is available to the defense from other sources or the defense already possesses the evidence"); *Fullwood v. Lee*, 290 F.3d 663, 686 (4th Cir. 2002) ("nondisclosure does not denote that no exculpatory evidence exists, but that the government possesses no exculpatory evidence that would be unavailable to a reasonably diligent defendant") (cleaned up); *Hoke v. Netherland*, 92 F.3d 1350, 1355 (4th Cir. 1996), *cert. denied*, 519 U.S. 1048 (1996) ("[t]he strictures of *Brady* are not violated [] if the information allegedly withheld by the prosecution was reasonably available to the defendant"); *United States v. Grossman*, 843 F.2d 78, 85 (2d Cir. 1988) (affirming there was no *Brady* violation when the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory evidence"); *cf Stockton v. Murray*, 41 F.3d 920, 927 (4th Cir. 1994) ("[a]ware of the existence of potentially exculpatory information, a defendant cannot sit idly by in the hopes that the prosecution will discover and disclose that information and, when the prosecution does not do so, seize upon the prosecution's conduct as grounds for habeas relief").

Particularly applicable here, the Fourth Circuit and other courts, have repeatedly found that there is no *Brady* violation where the exculpatory evidence lies with a witness who a criminal defendant would reasonably be expected to have interviewed in preparation for trial. *See Wilson*, 901 F.2d at 380–81 (affirming there was no *Brady* violation when the defendant could have interviewed a witness likely to have exculpatory evidence); *Hoke*, 92 F.3d at 1355 (affirming there was no *Brady* violation where police failed to disclose interview notes from three witnesses with potentially exculpatory information because defendant could have discovered the witnesses through reasonably diligent investigation); *Lovitt v. True*, 403 F.3d 171, 184 (4th Cir. 2005) (affirming exception to the *Brady* rule where defendant could have questioned an expert witness

about her opinion); *United States v. Davis*, 787 F.2d 1501, 1505 (11th Cir. 1986) (affirming there was no *Brady* violation where defendant knew the government's witnesses' identities before trial and had reasonable access to them so that they could have discovered inconsistent statements); *Blankenship v. U.S.*, 2020 WL 247313, at *10 ("[r]equiring a defendant to exercise reasonable diligence in interviewing potentially exculpatory witnesses does not constitute deprivation of a fair trial").

In *Wilson*, the Fourth Circuit affirmed the district court's finding that there was no *Brady* violation even though an undisclosed witness statement suggesting that there was a set-up could have helped the appellant's case. 901 F.2d at 380–81. In conducting its review, the court found that because the appellant was free to question the witness in preparation for trial, there was no *Brady* violation. *Id.* at 381. The court explained, "where the exculpatory information is not only available to the defendant but also lies in a source where a reasonable defendant would have looked, a defendant is not entitled to the benefit of the *Brady* doctrine." *Id.* The Fourth Circuit did not evaluate whether the witness would have been cooperative; that the information was not solely in the State's possession was enough to fall outside *Brady*'s protection.

In *United States v. Blankenship*, 19 F.4th 685, 693-94 (4th Cir. 2021), an appeal related to a federal habeas action, the Fourth Circuit evaluated whether *Wilson* remained good law considering the Supreme Court's decision in *Banks v. Dretke*, 540 U.S. 668 (2004). In *Banks*, the Court held that there was a *Brady* violation when prosecutors (1) suppressed information that a key government witness served as a paid police informant and had set up the defendant's arrest, (2) failed to correct the witness's misleading trial testimony, and (3) misrepresented the witness's relationship to police in postconviction filings. 540 U.S. at 677–84. The state had argued to the post-conviction court that Banks waived his claim by failing to use appropriate diligence in

16

pursuing his *Brady* claim and faulted him for failing to discover the suppressed facts earlier. *Id.* at 695. In rejecting the state's arguments, the Supreme Court explained that its decisions "lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Id.*

In *Blankenship*, the suppressed evidence fell into two categories: (1) memoranda of interviews with seven of the defendant's employees, including one who did not testify at trial and had not been designated as a witness by either party; and (2) internal government agency documents showing agency employees' hostility towards the defendant. 19 F.4th at 690. During the habeas proceedings, the district court found that the witnesses all held positions that would make them obvious and available sources of potential exculpatory information and that the agency documents favored the defendant only when cited out of context or were thoroughly and repeatedly covered during cross-examination. *Id.* at 690–91. The Fourth Circuit ultimately held that the circumstances in *Banks* did not apply because the petitioner "would not have been required to scavenge, guess, search, or seek[]" and thus the allegedly suppressed witness statements fell under the exception in *Wilson*. *Id.* at 694; *see Wilson*, 901 F.2d at 381. While "the government's need to comply with *Brady* is not obviated by the defendant's lack of due diligence[,]" "common sense should not be ignored" and a defendant "should not be allowed to turn a willfully blind eye to available evidence and thus set up a *Brady* claim[.]" *Id.*

Here, Plaintiff was not required to scavenge or guess to discover the purportedly suppressed circumstances of Robinson's and Dorsey's inculpatory statements. Plaintiff's Opposition ignores that Polansky discovered Dorsey's recantation. *See* ECF 161-9 at GW000149, ln. 4–6; GW00203, ln. 6–9. Based on Dorsey's recantation, Polansky could have, and should have, but did not ask *why* she refused to stand by her earlier statement. He similarly did not question

Robinson about the circumstances of his statement, despite having been put on notice when Dorsey walked away from her statement to police. *See* ECF 161-9 at GW000186–87, 46:11–47:9; *see also* Ex. 13 at GW000272 (Excerpted Pretrial Discussion, June 5, 1987) (Polansky confirming that he sent an investigator to Dorsey and ASA Finch noting that Dorsey's parents "didn't want her to talk to the police to begin with").

Under the Fourth Circuit's guidance in *Wilson* and *Blankenship*, Plaintiff's citation to the Seventh Circuit's decisions in *Jiminez* and *Boss*, suggesting that his defense counsel was excused from exercising due diligence, are unavailing. In *Jiminez v. City of Chicago*, the district court found that when drawing reasonable inferences in the plaintiff's favor on summary judgment, the plaintiff could not have discovered suppressed evidence because the witness did not mention police coercion when asked directly at trial why his story changed. *Jiminez v. City of Chicago*, 830 F.Supp.2d 432, 445 (N.D. Ill. 2011). From this, the court found no basis to infer that the witness would have said anything different if the plaintiff's counsel interviewed him before trial. *Id.* And in *Boss v. Pierce*, the Seventh Circuit held that reasonable diligence did not require a criminal defendant's counsel to pursue in a fishing expedition to discover exculpatory evidence that a witness would not have been expected to know. *Boss v. Pierce,* 263 F.3d 734, 743 (7th Cir. 2001). Even so, the court explained that "[d]efense counsel can certainly be expected to ask witnesses (defense or otherwise) questions relevant to what counsel understands the witness's role to be in the case." *Id.* at 741.

Under *Wilson* and *Blankenship*, the circumstances of Robinson's and Dorsey's statements cannot serve as predicates for Plaintiff's *Brady* claim because they were with sources where a reasonable defendant would have looked and could have been discovered without having to scavenge or guess. Unlike the circumstances in *Jiminez*, Robinson gave no testimony suggesting

18

that he would not have cooperated during a defense interview. And Polansky made no effort while Robinson was on the stand to probe the circumstances of his identification of Plaintiff, *vis-à-vis* whether anyone influenced him to identify Plaintiff. ECF 161-9, GW000186–87, 46:22–47:9. What is more, unlike the circumstances in *Boss*, the information that Plaintiff claims Officer Defendants suppressed was directly related to Robinson's and Dorsey's involvement in the case: their identifications of Plaintiff. And Plaintiff knew this three months before his trial began. *See* ECF 161-24 at GBW Cert. Cir. Ct. File 000597–98.

At bottom, Plaintiff roots his *Brady* claim in Dorsey's recantation, which he knew about, and Robinson's recantation testimony, an inherently unreliable source.[21] *Cf Dobbert v. Wainwright*, 468 U.S. 1231, 1233 (1984) ("Recantation testimony is properly viewed with great suspicion") (Brennan, J., dissenting); *United States v. Hackley*, 164 Fed. Appx. 301, 305 (4th Cir. 2006) ("[R]ecantation testimony 'must be looked upon with upmost suspicion"); *United States v. Johnson*, 487 F.2d 1278, 1279 (4th Cir. 1979) (finding that recantations are viewed with great skepticism); *Higgs v. U.S.*, 711 F.Supp.2d 479, 513 (D. Md. 2010) ("[G]enerally speaking, recantations are highly suspect[.]"). Plaintiff cannot now avail himself of protection under *Brady* because he knew about the importance of Dorsey's and Robinson's statements yet failed to conduct reasonable inquiries into the circumstances of them.

Plaintiff's *arguendo* suggestion that Robinson's 'truthful' testimony, had Polansky uncovered it, would not have overcome the police officers' representations that the interrogation was above board is wildly speculative and beside the point. *See* Pl. Opp'n, ECF 166 at 33 of 55. In fact, Plaintiff's premise concedes that the *Brady* rule would not apply for two reasons. First, had

---

[21] As discussed below, Judge Schwait evaluated the credibility of Robinson's recantation and found Plaintiff's assertion of police coercion to be "incredible." *See* ECF 161-29 at GW SAO Subp. 000888–90; *see infra*, §VI.

Plaintiff discovered exculpatory or impeachment evidence in time to introduce it at trial, assuming Robinson's 'truthful' testimony constituted such evidence, the evidence would not have been suppressed for *Brady* purposes. *Spicer v. Roxbury Correctional Institute*, 194 F.3d 547, 557 (4th Cir. 1999) (stating that for purposes of *Brady,* "[s]uppressed evidence is 'information which had been known to the prosecution but unknown to the defense'") (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976). Second, because the 'truthful' testimony would not have created a reasonable probability of a different result, the evidence was not material for *Brady* purposes. *See Kyles v. Whitley*, 514 U.S. 419, 433 (1995).  At any rate, Robinson and Dorsey were witnesses who Plaintiff knew about and reasonably would have been expected to interview about their role in the case. Thus, Plaintiff is not entitled to *Brady* protection as a result of his failure to exercise reasonable diligence.

### c.  *Brady* and its Progeny does not Compel Officer Defendants to Disclose the Circumstances of their Investigations to the Prosecution.

*Brady* and its progeny "do not require the creation of exculpatory evidence, nor does it compel police officers to accurately disclose the circumstances of their investigations to the prosecution." *Saunders-El v. Rohde, et al.*, 778 F.3d 556, 562 (7th Cir. 2015). In *Saunders-El*, the Seventh Circuit affirmed the district court's grant of summary judgement in favor of officers relevant to plaintiff's *Brady* claim based on the "officers silence following their alleged fabrication of the evidence—the absence of which would have altered the prosecutor's decision to go to trial."[22] *Id.* at 562. In its reasoning, the Seventh Circuit discussed multiple cases where *Brady*

---

[22] In *Saunders-El*, police officers claimed that they spotted plaintiff on the roof of a retail store, observed him jump off the building, and then apprehended him after a foot chase. *Saunders-El v. Rohde, et al.*, 778 F.3d 556, 558 (7th Cir. 2015). According to the prosecution, plaintiff broke into the store by carving a hole in the roof, but cut himself on jagged metal, leaving his blood at the scene. *Id.* Plaintiff stated that he was minding his own business when he was stopped by police, who "bludgeoned him over the head, splitting open his skull and knocking him out." *Id.* Plaintiff further stated his belief that while he was unconscious, police collected his blood and smeared it at the crime scene to the end of framing him for the burglary. *Id.*

claims were alleged "concerning accusations of police dishonesty." *See id.* (citing *Gauger v. Hendle*, 349 F.3d 354, 360 (7th Cir 2003), *overruled in part on other grounds* (rejecting the argument that "*Brady* requires police to disclose truthful versions of statements made during interrogations"); *Sornberger v. Knoxville*, 434 F. 3d 1006, 1029 (7th Cir. 2006) (holding that *Brady* cannot "serve as the basis of a cause of action against [police] officers for failing to disclose [the circumstances surrounding a coerced confession] to [a] prosecutor"); *Harris v. Kuba*, 486 F.3d 1010, 1017 (7th Cir. 2007) (upholding dismissal of a *Brady* claim premised on an argument "that an officer is 'suppressing' evidence of the truth by making a false statement to a prosecutor")).

Here, as in *Saunders*, Plaintiff's claim that officers failed to disclose their alleged coercion of Dorsey and Robinson, "is more appropriately characterized as a claim for malicious prosecution [.]" *Id.* For the reasons discussed above, Plaintiff's malicious prosecution claim fails. *Supra* Section I and II.

## IV. The Robinson and Dorsey Statements Cannot be the Basis for a Fabrication Claim Because No Reasonable Jury Could Conclude that Defendant Officers Knew the Statements Were False

Plaintiff's Opposition asserts that Defendant Officers knew that Robinson had not seen the shooter well enough to identify him and that Robinson identified Washington due to their influence, not from personal knowledge. But Plaintiff developed no evidence that supports his assertion. No evidence, physical or otherwise, shows that Officer Defendants knew that Plaintiff did not murder Faheem Ali or that they knew that Robinson had not witnessed the murder.

Plaintiff claims that Robinson's present-day assertion—that he did not know or see anything—is enough for a jury to infer that Officer Defendants knew that Robinson's inculpatory statement—that he saw Washington shoot Ali—was not truthful. But even if Robinson told Defendants that he did not see or know anything, Robinson's modern rendition of his denial

includes no detail or explanation that would have led Officer Defendants to believe that he was telling the truth, *e.g.*, it was too dark to see. In fact, Robinson's sworn statements since the trial show that he was lying if he told Officer Defendants that he did not see or know anything. *Compare* ECF 161-28 at 31:12–19; 39:6–17; *with* ECF 161-22 at 2; ECF 161-28 at 20:3–21:15. For example, in Robinson's 1996 affidavit, which was taken at Plaintiff's family home, he stated that he witnessed the murder and described what happened, though he claimed he did not recognize the shooter. ECF 161-22 at 2. In that same vein, Robinson's modern version of what he told Officer Defendants when he identified Plaintiff provided no suggestion that they should have known he was not telling the truth, *e.g.*, that any of the facts in his story did not line up with what Officer Defendants knew about the murder. In any event, Robinson never claimed that he told Officer Defendants that Plaintiff *was not* the shooter.

Finally, although Plaintiff asserts that a jury might infer from Officer Defendants "forcing" Robinson's mother out of the room as evidence that they intended to fabricate Robinson's statement, he cites no authority that asking a witness's guardian to leave the room was a "striking departure" from normal practice for a BPD detective in 1986. Plaintiff also has shown no evidence that his mother did not consent to stepping out of the room. Plaintiff cannot simply speculate to survive summary judgment.

At most, Plaintiff speculates that Officer Defendants knew that Robinson's statement was untruthful. Because a nonmoving party cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another, Officer Defendants are entitled to summary judgment on Plaintiff's claim that they fabricated Robinson's statement. *See Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985); *Jones v. United Health Grp.*, 2019 WL 3037854, *1 (D.

Md. Jul. 11, 2019) ("[t]he Court need not draw inferences in the nonmoving party's favor where those inferences would be based only on speculation, rather than the factual record").

### V.   Dorsey's Statement is Irrelevant to a Due Process Fabrication Claim Because it was not Introduced at Trial

Citing caselaw mostly from outside the Fourth Circuit, Plaintiff suggests that he can maintain a fabrication claim if false evidence was used to deprive his liberty in any way. But as the Fourth Circuit has explained, "[f]abrication of evidence alone is insufficient to state a claim for a due process violation; a plaintiff must plead adequate facts to establish that the loss of liberty—i.e., *his conviction and subsequent incarceration*—resulted from the fabrication." *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) (emphasis added). "The proper inquiry [] is whether [the plaintiff's] *conviction* was a reasonably foreseeable result of the initial act of fabrication[.]" *Washington v. Wilmore*, 407 F.3d 274, 283 (4th Cir. 2005) (emphasis added).

The lone case Plaintiff cites from inside the Fourth Circuit is *Burgess v. Baltimore Police Dep't*, No. CV RDB-15-0834, 2017 WL 4947004, at *16 (D. Md. Oct. 31, 2017). Plaintiff suggests through *Burgess* that causation exists even when the allegedly fabricated evidence is not introduced at trial. In *Burgess*, the plaintiff alleged that the officer defendant fabricated a police report that hid the existence of an eyewitness and that the fabrication foreseeably caused plaintiff's wrongful conviction. *Id.* But in that case, the suppression was of the only eyewitness account, and it would have exculpated the plaintiff. *Id.* As the *Burgess* Court explained, the conviction was a foreseeable result because the fabrication concealed the only eyewitness account that was meaningfully exculpatory. *Id.* That the allegedly fabricated police report was not introduced at trial bore no relevance in the court's analysis because the fabrication itself suppressed *Brady* material.

Here, for the reasons explained above, Plaintiff failed to generate a dispute of material fact that Officer Defendants knew Robinson's statement was false. But even if Plaintiff had generated

such a dispute, the purported fabrication of Dorsey's statement *was not* a "but for" and "proximate cause" of Plaintiff's conviction because Plaintiff was convicted without it. *See Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) ("constitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation"); *Glass v. Anne Arundel Cnty.*, 38 F.Supp.3d 705, 720-21 (D. Md. 2014) (granting summary judgment when the plaintiff offered no evidence that allegedly fabricated evidence caused the plaintiff's detention or contribute to the plaintiff's prosecution).

Plaintiff argues that because Dorsey's statement was included in the warrant under which Plaintiff was arrested, the statement deprived him of his liberty interest. But the argument suffers from a fatal flaw—Officer Defendants had probable cause to arrest Plaintiff without the warrant. *See supra* § I(a). As discussed, Officer Defendants had probable cause to arrest Gary Washington. In Maryland, an officer who has probable cause to believe a suspect has committed a felony does not need a warrant to arrest the individual. *See* Md. Code, C.P. § 2-202(c). Because Washington's arrest was supported by probable cause separate from Dorsey's statement, Dorsey statement was not a "but for" and "proximate cause" of his loss of liberty. Thus, Plaintiff's fabrication claim related to Dorsey's statement must fail.

## VI.   Plaintiff is collaterally estopped from arguing that Robinson's statement was unreliable.

Plaintiff grossly misconstrues Defendant Officers' collateral estoppel argument.  Indeed, he fails to address the substance of the argument altogether. As such, Defendant Officers' collateral estoppel argument should be treated as conceded. "Ordinarily, a plaintiff's failure to oppose an argument raised in a dispositive motion amounts to an abandonment of the relevant claim." *Tserkis v. Baltimore County,* ELH 19-202 2021 WL 3129325 *12 (D. Md. July 23, 2021) (citing *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010)).

24

Notwithstanding Plaintiff's abandonment and/or concession of collateral estoppel, Defendant Officers *did not* base their collateral estoppel argument on an assertion that Plaintiff's conviction, despite its vacatur, remains a final judgment prohibiting him from attacking Robinson's trial testimony. *See* Pl's Opp'n, ECF 166 at 41 of 55. Such an assertion is nowhere in Defendant Officers' motion for summary judgment. Thus, Plaintiff's reliance on *Zeneca Ltd. v. Novopharm Ltd.*, 919 F. Supp. 193, 196 (D. Md. 1996) is misplaced.

In *Zeneca Ltd.*, defendant Novapharm filed an application with the FDA to market a generic version of tamoxifen, a drug for which plaintiff Zeneca held the patent. *Zeneca Ltd.*, 919 F. Supp. at 194. Zeneca filed an action to prevent its approval. *Id.* Prior to discovery, Novapharm moved for summary judgment based on collateral estoppel because Zeneca's parent company, Imperial Chem. Industr. (ICI), lost an earlier trial where its tamoxifen patent was held invalid and unenforceable. *Id.* While pending appeal to the Federal Circuit, the parties reached a settlement which included the Federal Court vacating the adverse judgment below. *Id.* at 194–95. Within eighteen months of the vacated judgment, the Supreme Court repudiated the practice of negotiating vacatur of judgments by settlement.[23] *See id.* at 195. Novapharm argued that Zeneca was collaterally estopped from arguing it had a valid patent and that the court was required to ignore the fact of vacatur. *Id.* This Court rejected Novapharm's contention that the vacated judgment should be ignored and held that as a general rule, "a vacated judgment and the factual findings underlying it have no preclusive effect …." *Id.* at 196.

*Zeneca* is inapposite here. Defendant Officers seek to preclude Plaintiff from relitigating his assertions surrounding the alleged coercion of Robinson. Plaintiff already unsuccessfully argued that Robinson's testimony was coerced. *See* ECF 161-29 at GW SAO Subp. 000888–90.

---

[23] *See U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership*, 513 U.S. 18 (1994).

The Postconviction Court flatly rejected this contention in a final judgment that was upheld on appeal. *See* ECF 161-30. And Judge Peters WAI ruling did not disturb Judge Schwait's finding that Robinson's testimony that he was coerced was "incredible." *See* ECF 161-32 at GBW Cert. Cir. Ct. File 000364–66; ECF 161-29 at GW SAO Subp. 000889–90. Thus, Plaintiff is now collaterally estopped from relitigating this issue as it has already been resolved against him.

As argued in Defendant Officers' motion for summary judgment, "once a court has decided an issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation." *United States v. Mendoza*, 464 U.S. 154, 158 (1984) (citing *Montana v. United States*, 440 U.S. 147, 153 (1979)); *see also Owens v. Baltimore City State's Attorneys Office*, GLR-11-3295 2014 WL 5452944 *5 (D. Md. September 29. 2016). "The doctrine may be used defensively by a non-party to the prior litigation." *Id.* (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979); *see also Haskins v. Hawk*, 2013 WL 1314194 *15 (D. Md. March 29, 2013).

> "To apply collateral estoppel or issue preclusion to an issue or fact, [a] proponent must demonstrate that (1) the issue or fact is identical to the one previously litigated; (2) the issue or fact was actually resolved in the prior proceeding; (3) the issue or fact was critical and necessary to the judgment in the prior proceeding; (4) the judgment in the prior proceeding is final and valid; and (5) the party to be foreclosed by the prior resolution of the issue or fact had a full and fair opportunity to litigate the issue or fact in the prior proceeding."

*In re Microsoft Corp. Antitrust Litigation*, 355 F.3d 322, 326 (4th Cir. 2004). Here, the circuit court denied Plaintiff's post-conviction by expressly rejecting as "incredible" Plaintiff's assertion of police coercion. *See* ECF 161-29 at GW SAO Subp. 000888–90.

Plaintiff's contention that his success on his actual innocence petition shields him from the collateral estoppel argument is without merit. As an initial matter, Maryland "has yet to formally embrace offensive nonmutual collateral estoppel." *Haskins*, 2013 WL 1314194 at *15 (citing

*Culver v. Md. Ins. Comm'rs of Frederick County*, 175 Md. App. 645, 654, 931 A.2d 537, 542 (Md. App. 2007). Thus, any attempt to use Judge Peters' decision to accept Robinson's recantation as a basis to vacate Plaintiff's conviction against Defendant Officers fails as a matter of law.

Secondly, as argued in Defendants' Motion, the State argued collateral estoppel during Plaintiff's Actual Innocence proceedings, but the Circuit Court did not address this argument in its decision. *See* ECF 161-1 at 23–25 of 39; *see also* Judge Peters Memo. Opinion and Order, ECF 161-32 at GBW Cert. Cir. Ct. File 000362–67. The Actual Innocence court did not need to address the same argument the Post-conviction court considered and rejected. The Post-conviction court rejected Plaintiff's contention that Robinson's trial testimony was the product of coercion and fabrication. The Actual Innocence court merely applied the *McGhie v. State* principles which required the court to "look[] back to the… trial to determine the impact the new evidence—here, Robinson's recantation—would have had on the result." *See McGhie v. State*, 144 A.3d 752, 762 (Md. 2016). The Actual Innocence court never considered and/or disturbed the Post-conviction court's finding that Plaintiff's assertion that Robinson's trial testimony was the product of coercion and/or fabrication. It merely considered the fact that Robinson was recanting his testimony, not the reasons behind his earlier testimony. *See Douglas v. State,* 31 A.3d 250 (Md. 2011) (holding that §8-301 requirement to distinguish newly discovered evidence from evidence alleged in prior petitions does not extend to prior postconviction petitions). Hence, defensive collateral estoppel is a viable defense to Plaintiff's instant civil suit and Plaintiff is estopped from asserting that Robinson's earlier testimony was the product of coercion.

**VII.    Plaintiff's IIED claim fails because he failed to establish that he suffered severe emotional distress.**

Citing *Burgess v. Baltimore Police Dep't*, Plaintiff argues his IIED claim should survive summary judgment if he prevails on his claims that his conviction was based on the constitutional

violations he alleges. According to Plaintiff, he will have established that the Officer Defendants' conduct was intentional and extreme and outrageous. For the reasons discussed above, Plaintiff has not generated disputes of material fact that Officer Defendants' actions were intentionally improper, and thus his IIED claim must fail. *See, e.g.*, *Johnson v. Baltimore Police Dep't.*, ELH 19-0698, 2022 WL 9976525, *64 (D. Md. Oct. 14, 2022). But even if disputes of material fact remain over whether Officer Defendants' actions were intentional or reckless and extreme and outrageous, Plaintiff's claim still fails. Plaintiff must prove that his emotional distress was severe. *See Harris v. Jones*, 380 A.2d 611, 614 (Md. 1977). Yet the only evidence of Plaintiff's emotional distress are nights—with no indication of frequency or intensity—when he suffers from sleep deprivation and for which he sought no treatment before or following his release. *See* ECF 161-41 at 136:16–137:2; 135:22–136:12. In fact, Plaintiff does not believe he suffers from any mental illness and has resumed normal relations with his wife. ECF 161-41 at 137:3–138:18; 143:7–11.

While asking this Court to find that severe distress can be inferred from the outrageousness of a defendant's conduct and his relationship to a plaintiff, Plaintiff assumes what he must prove: that *he* suffered severe emotional distress. *See, e.g.*, *Harris v. Jones*, 380 A.2d 611, 616 (Md. 1977) (affirming dismissal of IIED claim on summary judgment despite proof of the defendant's "crystal clear" intent when the plaintiff failed to establish that he suffered a "severely disabling emotional response to the defendant's conduct"). "To be severe, emotional distress need not produce total emotional disablement, but it must render the plaintiff unable to function and tend to necessary matters." *Washington v. Maynard*, GLR-13-3767, 2016 WL 865359, at *11 (D. Md. Mar. 7, 2016). "[T]he plaintiff must show the truly *devastating effect* of the conduct he was subjected to." *Rico v. Green*, GJH-18-1949, 2021 WL 1215775 (D. Md. Mar. 30, 2021) (emphasis added) (cleaned up). Maryland courts have imposed IIED liability "sparingly and . . . limited the tort to situations

28

whether the wounds are truly severe and incapable of healing themselves." *Lee v. Queen Anne's Cty. Office of Sheriff*, No. CIV.A. RDB-13-672, 2014 WL 476233, at *16 (D. Md. Feb. 5, 2014) (citation omitted); *see also Respess v. Travelers Cas. & Sur. Co. of Am.*, 770 F.Supp.2d 751, 757 (D. Md. 2011) (explaining generally that claims for IIED are "rarely viable" under Maryland law).

In the cases Plaintiff cites to support his assertion that severe emotional distress can be inferred rather than proven, the plaintiffs each pled or proved that based on the circumstances of their cases, they suffered severe emotional effects causally related to the defendant's conduct. *See Rico v. Green*, GJH-18-1949, 2021 WL 1215775, *18-19 (D. Md. Mar. 30, 2021) (plaintiff pled that he vomited at first sight of his assailant after the attack and required mental health treatment for symptoms of PTSD and received continuing therapy because of severe emotional distress); *Reagan v. Rider*, 521 A.2d 1246, 1247; 1251 (Md. Ct. Spec. App. 1987) (plaintiff presented evidence that because of six years of sexual abuse by her stepfather, she experienced extreme embarrassment, humiliation, mortification, weight gain to the point of obesity, and severe, deteriorating depression requiring two years of therapy); *Figueriredo-Torres v. Nickel*, 584 A.2d 69, 76 (Md. 1991) (plaintiff pled that following his therapist developing a romantic relationship with plaintiff's wife and engaging in improper affectionate conduct and repeated sexual intercourse with her, the plaintiff suffered systemic hypertension and loss of visual acuity in one eye, requiring hospitalization for severe emotional distress, shock and fright to his nervous system, depression, anxiety, obsession, and impairment of his ability to form intimate relationships with women, all of which required psychological therapy and counseling); *cf B.N. v. K.K.*, 538 A.2d 1175, (Md. 1988) (holding that a plaintiff who pled that she contracted genital herpes from a sexual partner who knew that he was infected but did not tell plaintiff could prevail on IIED claim if she could establish that she suffered sufficiently severe emotional distress because of the conduct).

Plaintiff's indistinct claims of sleepless nights are not enough to support his claim that he has suffered severe emotional distress absent some evidence supporting an inference that they have kept him from functioning daily. Because no reasonable inference supports his IIED claim, it must fail. *See Hunter v. Snee*, ADC-21-402, 2022 WL 204930, *7 (D. Md. Jan. 24, 2022) (dismissing plaintiff's IIED claim on summary judgment where plaintiff failed to allege "the type of severe distress that would amount to an inability to function on a daily basis" despite alleging that she suffered severe depression and anxiety and provided a response that she had sought treatment for PTSD, anxiety, and depression and received psychiatric treatment related to stress resulting from the incident).

### VIII.    The Other State Claims Are Contingent on the Federal Claims and Should Be Dismissed for the Same Reasons.

Plaintiff does not challenge the well-settled principle that Articles 19 and 24 and are construed *in pari materia* with their federal counterparts; Plaintiff only argues the converse of Officer Defendants—that because his federal claims survive, so to must his claims under the Maryland Declaration of Rights.

Further, Plaintiff attacks Officer Defendants for what—in their view—is a "misleading[]" citation to *Dehn Motor Sales, LLC v. Schultz* to support their argument that "many courts have found that Article 19 claims are viable." *See Dehn Motor Sales, LLC v. Schultz*, 96 A.3d 221, 237 n. 27 (Md. 2014); Pl's Opp'n at 43. However, Plaintiff has made no effort to argue why his claim is among those that would, in fact, find support from Article 19. Plaintiff inexplicably cites *Carter v. Maryland*—a case where courthouse security's failure to properly accommodate the plaintiff's disability literally prevented her from twice attending her own divorce hearings.[24] *Carter v.*

---

[24] In *Carter*, plaintiff had a neuro-transmitter device surgically implanted in her spine, which required her to avoid exposure to the electromagnetic fields produced by metal detectors and metal detecting wands. No. JKB-12-1789, 202 WL 6021370, at *1–2 (D. Md. Dec. 3, 2012). On the first occasion, a sheriff's deputy,

*Maryland*, No. JKB-12-1789, 202 WL 6021370, at \*1–2 (D. Md. Dec. 3, 2012). However, the plaintiff's claim that she was denied access to the courts in violation of Articles 19 and 24 was only permitted to proceed against the deputy who "specifically disregarded the instruction," and caused her injury. *Id* at \*10; *see*, *supra*, at n. 24.

Here, Plaintiff cannot plausibly claim that he has been denied access to the courts in any way that is analogous to the plaintiff in *Carter*. Here, Plaintiff opted for a jury trial, pursued his appeal after conviction, and pursued remedies via post-conviction and his actual innocence petition. Thus, as argued in Officer Defendants Motion, Plaintiff has not shown how Article 19 provides him with a cause of action. Thus, Officer Defendants are entitled to summary judgment.

## CONCLUSION

For these reasons and the reasons in their Motion for Summary Judgment, this Honorable Court should grant Officer Defendants' motion and dismiss Plaintiff's claims against them.

---

in an attempt to accommodate the plaintiff, "insisted that she squeeze around the metal detector," which exposed her to the electromagnetic field and caused her extreme and debilitating back pain. *Id.* at \*2. On the second occasion, a sheriff's deputy blatantly disregarded the instruction of both plaintiff and another sheriff's deputy, and citing "policy," waved a metal detecting wand over plaintiff's back, resulting in plaintiff experiencing "extreme and debilitating" shocks which continued after the screening process. *Id*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 20, 2023, I caused the foregoing document to be electronically filed with the Court's CM/ECF system, which will send an electronic copy of the same to all counsel of record.

*/s/ Shneur Nathan*_____
