## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **GARY WASHINGTON,** | * <br> * <br> * |
| **Plaintiff,** | * <br> * |
| **v.** | * |
| **BALTIMORE POLICE DEPT.,** *et al.*, | *      **Civil Case No. SAG-19-2473** <br> * <br> * |
| **Defendants.** | * <br> * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Gary Washington filed an Amended Complaint against the Baltimore Police Department ("BPD") and several of its former homicide detectives, Thomas Pellegrini, Oscar Requer, Richard Fahlteich, John Tewey, and Fred Ceruti (collectively, "the Officer Defendants"), seeking damages resulting from Plaintiff's thirty-two-year incarceration for a homicide he alleges he did not commit. ECF 5. Discovery has now concluded and the Officer Defendants have filed a motion seeking summary judgment.[1] ECF 161. Plaintiff opposed the motion, ECF 166, the Officer Defendants filed a reply, ECF 179, and Plaintiff filed a surreply with leave of court. ECF 193. This Court has considered those filings, the attached exhibits, and the supplemental exhibits and arguments filed by the parties. ECF 188, 189, 190. This Court also held a motions hearing on February 27, 2023. After considering all of those filings, exhibits, and arguments, this Court will grant the Officer Defendants' motion for the reasons described herein.

---

[1] This Court bifurcated Plaintiff's *Monell* claims against the BPD, which will be addressed separately. ECF 68.

I.       **FACTUAL AND PROCEDURAL HISTORY**

The chronology of events in this case, and the content of the statements made by various witnesses at different times, are not in dispute, although there is present disagreement about what actually happened during interactions between the Officer Defendants and various witnesses in 1986 and 1987. This summary, then, will focus on the statements, testimony, and undisputed facts documented in the record.

On the evening of December 27, 1986, Faheem Ali, known as "Bobo," was fatally shot in the 2300 block of Barclay Street in Baltimore City. ECF 166-4.The Officer Defendants, with some other colleagues, responded to the scene to investigate the homicide. *Id.* An anonymous caller to the police station reported that "Gary Ward" was responsible for Ali's shooting. *Id.* at 3. The officers conducted brief interviews with several persons they encountered in the vicinity of the homicide, including a thirteen-year-old witness, Rozetta Dorsey. *Id.* Detectives Requer and Pellegrini's subsequent report stated:

> Rozetta Dorsey the thirteen year old witness was interviewed and it appears she know [sic] the name of the person responsible for the death of Faheem Rafig Ali. . . . Rozetta Dorsey was asked if she knew Ricky or Gary Washington. She knew both of them and remembered seeing the victim talking to Ricky before he was shot. She said, Ricky went into his house leaving the victim on his steps. "A car came around the corner and one of its occupants a man in a long tan coat called BoBo (victim) and he walked to the man and he shot him." Ricky was not the person who did the shooting. I asked her if Gary was the person who shot BoBo, she hesitated and said she was not sure. It appears she know [sic] the identity of the suspect but is affraid.[sic]. She will be re-interviewed at a later date.

*Id.* Through their interviews, the police discovered that another young boy, Otis Robinson, may have been out on the street at the time of the shooting and may have relevant information. ECF 161-10 at 3.

Robinson and his mother were transported to the police station two days after Ali's shooting. *Id.* at 3–4. There is a signed handwritten statement from Robinson in the record, documenting that it was "taken in the homicide office large interview room on 29 Dec 86 at 2210 hrs." ECF 166-16 at 1. In that handwritten statement, which appears in question-and-answer format, Robinson stated:

> I was in the living room with Mr. Herb at 2311 Barclay St., he gave me a dollar to go get a Coke & B.C. so I stepped out the door, I was walking up the street toward 24th Street, I heard Gary Washington and "Bo Bo" arguing and Gary asked about some money, and "Bo Bo" said I'll get it when I'm ready to get it. Then Gary hit Bo Bo in his jaw then he drawed his gun, and shot "Bo Bo" then "Bo Bo" ran across the street tripped on the curb and fell on the sidewalk, ~~on the other side of the street~~. Then I tried to get into my house but the door was locked so I ran back down to Herb's house. When I was running down to Mr. Herb's house I saw Gary Washington run up to Camp Street and meet up with a boy that was driving the red car. Gary got in the car and I saw them drive up 24th Street.

*Id.* at 1–2 (strikeouts in original). He also said that the other boy "was sitting on the steps next door to Ricky Washington's house, then when Gary pulled the gun out he shot 'Bo Bo' real fast then the other boy started running up to Camp Street to get the car." *Id.* at 2. Robinson answered "yes" to the question, "You are giving this statement voluntarily and have not been threatened and your mother Pamela Chavious is present during this statement, is that true and correct?" *Id.* at 4. After Robinson interlineated and initialed certain changes to the factual statements written by the officer, Robinson and his mother, Chavious, signed the statement.[2] *Id.* Their signatures were witnessed by Detectives Pellegrini and Fahlteich. *Id.*

The record also contains a typed statement from Robinson, "taken at the Homicide Unit Office by Detective Oscar Requer in the presence of Detective Ceruti on January 2, 1987 at 1930." ECF 166-17 at 1. When asked to "tell me again what happened," Robinson responded:

---

[2] For example, the officer had written that the victim "fell on the sidewalk, on the other side of the street" and Robinson crossed out "on the other side of the street." ECF 166-12 at 00052.

> I was at my mother's friend house at 2311 Barclay Street, his name is Herb. Mr. Herb gave me a dollar and asked me to go and get a coke and a B.C. I went out side and that's when I saw Gary Washington and Bo Bo standing in front of Gary's house. Gary was fussing with Bo Bo about some money. Gary asked him where was his money, and Bo Bo said "I'll get it when I'am [sic] ready." Gary hit him (Bo Bo) in his jaw, Bo Bo grabbed his jaw and Gary pulled out his gun real fast and pulled the triger. [sic] Gary threw the gun toward my side of the street (Odd side of the street). This other guy ran up the street to get the car. Then Gary ran toward the car and got in it and they drove toward Camp Street. Bo Bo was running and he tripped on the curve, I ran back to my house and banged on the door but couldn't get in, so I ran down to Mr. Herb's house. I told Mr. Herb that a boy was in front of his door was shot and I think he is dying.

*Id.* During the course of the question-and-answers documented in the typed statement, Detective Pellegrini showed a photo array to Robinson, who identified Gary Washington when asked to identify "the person you seen shoot Bo Bo." *Id.* at 4; ECF 188-1 at 13 (report of photo array). That typed statement containing the photo identification is also signed by Robinson, and was again witnessed by Robinson's mother, Chavious, and Detective Requer. ECF 166-17 at 4–5.

The other juvenile witness, Dorsey, came to the police station with her mother on January 3, 1987. There is a written statement "taken at the Homicide Unit Office on 3 January 1987 at 1920 hours by Detective Oscar Requer in the presence of Detective Thomas Pellegrini." ECF 166-21 at 1. During the typed statement, Officer Requer asks about an interview of Dorsey on the street on the night of the murder, during which Dorsey denied knowing the person that shot "Bo Bo." *Id.* Dorsey admitted that Gary Washington shot "Bo Bo," but stated that she did not tell Detective Pellegrini on December 27, 1986 because she was afraid. *Id.* at 2. During the course of the question-and-answer, Detective Pellegrini showed Dorsey a photo array and Dorsey picked a photo of Gary Washington as "the person who shot and killed Bo Bo." *Id.* at 4; ECF 188-1 at 12 (report of photo array). Dorsey signed the typed statement to indicate that the pages "contain a true and

correct statement of facts just given us by you." ECF 166-21 at 5. The statement was also witnessed and signed by Detectives Pellegrini and Requer, along with Dorsey's mother, Bridget Scott. *Id.*

On January 5, 1987, the Officer Defendants sought a search warrant for Plaintiff's residence, on the basis of the written statements and eyewitness identifications from Robinson and Dorsey, along with the location of the homicide in front of Plaintiff's home. ECF 166-12 at 78–82.

On January 7, 1987, Robinson testified before a grand jury and told a story consistent with his written eyewitness statements, again identifying Plaintiff as the person he saw shoot Ali. ECF 161-14. He told the grand jury, "I saw Gary Washington and a boy named Bobo arguing about some money and Gary told him he better have his money and Bobo say he will wait. And Gary quickly hit him in his jaw and drawed a gun and he shot 'em. Then Bobo ran across the street and tripped on a curb at 2311 and Gary Washington tossed the gun he shot Bobo with up on the roof." *Id.* at 3. Robinson testified that initially he had seen three men talking but just before the shooting, the third man "ran up and backed the car out of Camp Street and was waiting for Gary Washington." *Id.* He also testified he had known Bobo "about a year." *Id.* at 4.

On April 27, 1987, during an interview at the State's Attorney's Office, Robinson's mother, Pamela Chavious, told Detectives Requer and Pellegrini that Ricky Washington, Plaintiff's brother, had approached Robinson and "told him when it came time, that he better say the right thing" and that he is giving Robinson "hard looks" when he sees him. ECF 166-11 at 239–40; ECF 166-12 at 26. Based on that information, the States Attorney's Office agreed to relocate Robinson and his mother. *Id.*

The state court held a motions hearing in Plaintiff's criminal case on June 4, 1987. ECF 161-9. Robinson also again testified, consistent with his witness statements and grand jury

testimony, that Plaintiff shot Ali. *Id.* at 24.[3] Specifically, Robinson testified that he knew the victim, "Bobo," also "by his Moslem name, but I can't pronounce it." *Id.* at 8. He testified that when he walked outside he saw three people: Plaintiff, Bobo, and some other boy. *Id.* at 13. They were on the sidewalk in front of Plaintiff's house. *Id.* Robinson testified that he heard an argument between "Gary and Bobo." *Id.* at 17. Bobo was wearing a brown bomber jacket and Plaintiff had a long tan coat. *Id.* at 18. They were standing sideways towards Robinson. *Id.* at 22. Robinson testified that he saw Plaintiff hit Bobo in the face with the palm of his hand one time. *Id.* at 23–24. Then, "[h]e drawed his gun and shot him." *Id.* at 24. About a minute before the shooting occurred, the third boy Robinson had seen ran up to Camp Street. *Id.* at 25. Plaintiff threw the gun on the roof, and then he met up with the boy on Camp Street and they rode to 24th Street. *Id.* at 25. Robinson testified that Plaintiff was limping. *Id.* at 29. He affirmed that he told the police "pretty much" what he was testifying to in Court. *Id.* at 32. Detective Pellegrini also testified at the motions hearing, explaining that he interviewed Robinson on December 29 and eventually showed him a photo array after Robinson had identified Plaintiff as the shooter. *Id.* at 39–41. After considering the testimony, the judge denied Plaintiff's motion to suppress the eyewitness identification of Plaintiff as the perpetrator. *Id.* at 50.

Plaintiff's trial began on June 5, 1987. During the trial, Robinson again testified consistent with all of his prior statements:

> I heard an argument. As I started out the door, and as I got past my house, it got a little louder. I started looking at Gary Washington and Bo Bo, who was sitting on the steps next door. I heard an argument over some money. Then Gary Washington smacked Bo Bo and his partner ran up Camp Street. Gary quickly shot Bo Bo. They drove up Camp Street and I started banging on my door.

---

[3] Unless noted otherwise, page number references to this and other exhibits refer to the ECF pagination at the top of the page.

ECF 161-10 at 12. Robinson testified that Plaintiff was wearing "a long tan coat and I didn't see his pants." *Id.* at 17. He testified that the gun was silver. *Id.* at 19. He testified that "the partner" ran and backed up the car, and when Plaintiff got in the car it "drove up 24th Street." *Id.* at 20. He described the car as "a red car with antenna in the back" and "something like a Prelude." *Id.* at 22–23. He also testified that Plaintiff "had a little limp" while running and that he knew Bobo "from being around that area." *Id.* at 21, 24. On June 16, 1987, after hearing Robinson's testimony and other evidence, the jury convicted Plaintiff of Ali's murder. ECF 161-27. He received a sentence of life in prison plus twenty years. ECF 161-34 at 2.

Almost ten years after Plaintiff's conviction, when affirmatively contacted by an investigator hired by Plaintiff, ECF 161-43 at 3, Robinson recanted his repeated sworn testimony. In a written declaration dated August 2, 1996, taken at Plaintiff's family's house at 2328 Barclay Street in the presence of Plaintiff's investigator, John Traut, Robinson stated for the first time that the Officer Defendants had coerced him into implicating Plaintiff. ECF 161-22; ECF 161-22 at 256–57. Robinson said, in his own handwriting when asked, "Describe what you saw":

> Three men standing in front of 2328 Barclay St. talking when one
> of the men shot another man standing curbside along the street the
> guy that got shot ran toward 2311 and collapsed on the pavment [sic]
> while the other two men walked up Barclay and turned down Camp
> St. and drove off in a red car and went up Barclay St.

ECF 161-22 at 2. Robinson stated that he knew Plaintiff but that he did not see him on the street that night and that Plaintiff did not shoot the victim. *Id.* at 3.

Armed with that recantation, Plaintiff filed a post-conviction proceeding in the Circuit Court for Baltimore City. Plaintiff sought to set aside his conviction on the grounds that the officers' fabrication and coercion of Robinson's testimony violated his constitutional rights. ECF 161-29 at 2, 3. The judge assigned to the petition, Judge Allen L. Schwait, held an evidentiary

hearing. On December 6, 1999, Robinson testified at that hearing that his 1987 testimony was untrue and that he has no personal knowledge that Plaintiff shot Ali because he saw three men in front of Plaintiff's house but could not identify them. ECF 166-9 at 12, 16.[4] He testified that he went to the police station with his mother, Pamela Chavious, and went to the homicide unit where he met with Detectives Pellegrini and Fahlteich. *Id.* at 16–17. His mother was not in the room, and he told the detectives that he saw three men but could not identify anyone. *Id.* at 18–20. After he said that, they showed him a photo lineup with six mugshots and asked him if he knew Gary or Ricky Washington and he said yes. *Id.* at 20–21. They gave him the photos with the lineup and he pointed at Plaintiff because he "knew him." *Id.* The written statement of questions and answers was taken after the identification. *Id.* at 21. When asked during the identification if Plaintiff committed the murder, he said no, but the detectives "stated I was lying, I knew everything about the murder, if I didn't cooperate with them that I would never see my mother again." *Id.* at 22. They told him they know Plaintiff "did it" and all they needed was his help and he would not have to go to court. *Id.* at 23. They kept showing him the pictures and he finally agreed that Plaintiff was the shooter because he was scared. *Id.* at 24–25. He summarized that the only details that the officers made him falsely say were the identity of the shooter, that they were arguing over money, and that a red car was involved. *Id.* at 48, 66. He did not recall ever signing a similar statement saying the same thing on another occasion. *Id.* at 27. He also testified that in 1987, he told the police that he had seen a red car earlier that day but denied having seen it leave the scene of the murder. *Id.* at 65. Robinson admitted that he did not tell the prosecutor he was lying when he went before the grand jury because, "I felt as though they wasn't going to leave me alone unless I did what they wanted me to do." *Id.* at 31. He also did not tell the other prosecutor, who interviewed

---

[4] The page number references to this exhibit eliminate the preceding "H-."

him several times before the trial, that his statement was false. *Id.* at 32. He came to court for the trial with his mother and was interviewed by the state's attorney before he testified. *Id.* at 33. He confirmed that the December 1986 written interview statement bears his signature and the signature of his mother. *Id.* at 50–51. He also confirmed that he did not come forward to recant until Plaintiff's investigator approached him. *Id.* at 57. As of 1999, Robinson testified that he still sees Plaintiff's family every once in a while. *Id.* at 58, 59. At the conclusion of the hearing, Judge Schwait deemed Robinson's recantation testimony and the suggested coercion "incredible." ECF 161-29 at 3–4. He therefore denied relief on Plaintiff's coercion-based claim. *Id.* at 4.

The then-Court of Special Appeals issued an opinion on April 9, 2002, affirming Judge Schwait's finding. ECF 161-30. The appellate court reasoned:

> In the case at bar, there was ample evidence that impeached Otis Robinson's recantation. He had many opportunities to recant. Yet he did not do so (1) when he was testifying before the Grand Jury, when no police officers were present, or (2) during the trial. He stated that he never informed his mother that the police had coerced him or that he had lied. Although he claimed that he had told his father about his false statement, he never sought to recant his testimony until he was contacted by appellant's private investigator. We are persuaded that Judge Schwait was not clearly erroneous in rejecting a recantation that occurred 12 years after the witness testified at trial.

*Id.* at 20.

Another fifteen years later, in 2016, Plaintiff filed a petition for writ of actual innocence in his criminal case. ECF 161-32 at 1. Baltimore City Circuit Judge Charles J. Peters held an evidentiary hearing, at which Robinson testified that as he came out of his house, he saw two people across the street talking but could not identify either of them. ECF 166-13 at 1321, 1360. [5] As he was walking to the store, he heard a gunshot and ran back to his house for safety. *Id.* at 1319.

---

[5] The page number references to this exhibit reflect those in the document.

He did not look over or see anything happen, but on his way to his house he saw the victim he did not know running south and collapsing in front of the home that Robinson was running towards. *Id.* at 1320, 1323. Robinson testified that he saw a red car circling the block earlier in the day but did not see it at the time of the murder. *Id.* at 1354. Several days after the shooting, police came and picked up him and his mother and drove to headquarters. *Id.* at 1326–27. His mother left the room and he told the officers the same story he just recounted about not having seen anything. *Id.* at 1327–28. Detective Fahlteich then "started getting louder" and said Robinson was with the victim before the shooting and would be charged with first degree murder if he did not cooperate. *Id.* at 1328. Detective Fahlteich left the room and Detective Requer came in and asked whether Robinson knew the Washingtons. *Id.* at 1329. Robinson said yes and Requer showed a photo, which Robinson identified as Gary Washington. *Id.* Requer left again and Pellegrini was asking Robinson if the Washingtons were "pretty bad dudes" or "drug dealers." *Id.* Robinson said he did not know, as Pellegrini was taking notes. *Id.* Requer came back with a picture of Ricky Washington and asked Robinson whether he knew him, to which he said yes. *Id.* at 1329.  The officers asked, "You think Gary shot this guy?" *Id.* at 1330. They showed Robinson a third picture of a person he did not know. *Id.* at 1330. "It wasn't until the end of the fabricated statement they showed me the photo array. Two, possibly three times." *Id.* Pellegrini was asking, "you think Gary shot this guy?" "You think Ricky shot this guy?" *Id.* at 1331. When Pellegrini again asked, "did you recognize any of them?", Robinson said "Gary Washington." *Id.* He explained that he chose Plaintiff because it was the "first picture that I'm going along with." *Id.* at 1331–32. Once he identified Plaintiff, the officers asked about the other guy and Robinson reiterated, "I don't know who he was." *Id.* Then Pellegrini asked, "who pulled the gun?" and Robinson said, "Gary pulled the gun." *Id.* When Pellegrini asked "how many shots was it?", Robinson said "one shot." *Id.* at 1333. Robinson also

told them that the "only suspicious thing I seen was a red car riding around my block that I never

seen before." *Id.* at 1334. The officers asked, "well, you think that's the car Gary got into" and

Robinson went "along with it." *Id.* After that, the detectives brought in one of possibly three photo

arrays during the first interview. *Id.* at 1379. Robinson testified that Pellegrini's handwritten

"original statement" for Robinson, which documented that he did not see anything, was sitting on

the table but he had no opportunity to review or sign it. ECF at 1370. During the hearing before

Judge Peters, Robinson again did not testify about a second interview with the detectives. He

identified his signature on the December 1986 handwritten statement. *Id.* at 1343–44.

Following the hearing, Judge Peters granted Plaintiff's petition for writ of actual innocence,

ordering a new trial. ECF 166-3. Judge Peters reasoned, in part, "This Court is left with the

inescapable conclusion that multiple recantations of the uncorroborated testimony by the sole

eyewitness in Petitioner's case have to create a substantial possibility of a different result." *Id.* at

5–6. Instead of retrying the murder case, the State dismissed the charges against Plaintiff on

January 15, 2019. At that time, Plaintiff had been incarcerated for more than three decades. This

lawsuit ensued later in 2019.

Discovery in this case has revealed the present state of the documentary and testimonial

evidence. As of September 2, 2020, Paul Polansky, Plaintiff's defense lawyer at the time of his

criminal prosecution in 1987, represented:

> Unfortunately, I have absolutely no documents or information that
> still exists relative to the above captioned case. This case happened
> twenty-five (25) to thirty (30) years ago and those files were
> destroyed some years ago. Furthermore, I have very little
> recollection of the specifics of this case and do not believe that I
> could provide you with any relevant information.

ECF 161-20 at 1.

Dorsey gave an affidavit to Plaintiff's private investigators on September 22, 2020, about one year after this case was filed. ECF 161-8. In that affidavit, Dorsey says she did not see anything on the date of the murder and she only signed the written statement summarizing her interview with police "because I was a kid and my mother told me to." *Id.* ¶ 33. She also says in the affidavit that in the car on the way to the station she "saw the officer give my mother money" and that "the police knew [her mother] was an addict." *Id.* ¶ 19, 20.

The prosecutor in Plaintiff's case, Ruth Finch, was deposed in 2021. She testified that "the only independent recollection that I have is that I remember the name Gary Washington and I remember the names of some of the detectives." ECF 179-13 at 3. None of the documents shown refreshed her recollection about this case. *See generally id.* She did say if she had received any exculpatory information she would have disclosed it to the defense. *Id.* at 11–14.

Robinson was deposed on May 12, 2021, years after his testimony at Plaintiff's post-conviction and actual innocence hearings. ECF 161-28; 166-11. Unlike in his prior recantation testimony, this time, Robinson recalls going to the police station on a second occasion and signing a typed statement. ECF 166-11 at 14. He again testified about the night of the murder, saying it was dark and he could not see anyone. *Id.* at 20. He testified he had seen a red car earlier that day but the shooter did not get into it. *Id.* at 203–04. He said that during the interview with the police, he was just agreeing with leading questions like "did he have a tan coat on?" or "Was it a Stanza or Prelude?" *Id.* at 208–09. He claims he did not recognize the victim as anyone he knew and only learned the victim's name was "Bobo" later from Detective Fahlteich. *Id.* at 22, 32. He said that the police brought him and his mother to the police station and that after introductions, his mom left the room with another officer, leaving Detectives Pellegrini and Fahlteich. *Id.* Detective Pellegrini was taking notes when Robinson said he did not see anything, but the detectives alleged

that he set Bobo up and would be taken away from his mother. *Id.* at 31–32. Detective Requer then came in the room and showed Robinson mugshots of Plaintiff and then Ricky Washington. *Id.* Detective Requer kept pointing his finger at the top of Plaintiff's picture. *Id.* at 35. The officers' voices kept getting louder and they said that the Washingtons were "pretty bad dudes" and "drug dealers" *Id.* at 36. Detective Requer said he "want[s] to take Gary Washington off the street for a very long time." *Id.* at 39. They kept saying "we know one of them did it, man. All you got to do is point one of them out." *Id.* When Detective Pellegrini gave Robinson the written statement to sign, he also showed the notes to Robinson that he had been taking during his original statement, but did not ask him to sign those. *Id.* at 52, 97–98. Those notes accurately reflected that Robinson could not see the shooter. *Id.* at 53. Robinson testified that he went back to the police station with his mom a few days later. *Id.* at 53. This time they gave him a photo array, and he "just wanted to get out of the police station and I went along with what they said." *Id.* at 58. The detectives did not say anything to him when they showed him the six photos. *Id.* at 59. He then went to the grand jury with his mother. *Id.* at 60–61. He did not tell his mother that he had been threatened by the police at any point. *Id.* at 61. He also did not tell the prosecutor he met before he went to the grand jury, because he "didn't feel comfortable with him." *Id.* at 63. He met with the trial prosecutor several times before trial, but never told her that his statement identifying Plaintiff was false because he "didn't feel comfortable with it" and "they weren't going to leave me alone until they got what they got." *Id.* at 64. He says nobody from Plaintiff's family ever threatened him from time of the shooting through the trial. *Id.* at 65. He says he only told his father, who was deceased by the time of his deposition, that the police had threatened him. *Id.* at 67. He testified that a neighbor told him once that Plaintiff had gotten shot, but he never noticed at any point in time that

he had any problem walking or had a limp. *Id.* at 148. He does not remember Plaintiff limping and does not remember testifying that he limped after the shooting. *Id.* at 149.

Detective Pellegrini was deposed on November 2, 2021. ECF 166-6. He remembers working as a homicide detective in the case, but does not remember if he was the lead detective. *Id.* at 9.[6] He testified that, "A parent or guardian should always be with a juvenile for an interview or statement." *Id.* at 133. His practice was to make sure there was always an adult responsible for the child present when he interviewed a child. *Id.* at 135. He testified that he never obtained a statement from a child outside the presence of a parent, guardian or relative. *Id.* at 162. Pellegrini had little recollection of what happened at the crime scene or of the details of the investigation. *Id.* at 180–88, 195–200, 215 ("And if the case was real fresh and I had a good recollection of it, I could answer your questions better, but I'm at a disadvantage when I don't recall, *id.* at 215."). He does not recall speaking to Dorsey at the scene of the homicide. *Id.* at 238–43. He does not recall speaking with Robinson or interviewing him at the station. *Id.* at 245, 247. He identified his own handwriting on Robinson's handwritten statement, but did not recall writing it. *Id.* at 250–51. He testified he would not have threatened to take Robinson away from his mother or pressured him to give a different version of events. *Id.* at 255. He has no recollection of showing the photo array to Robinson. *Id.* at 260–65. If Robinson had been threatened or interviewed outside the presence of his mother, Pellegrini would have disclosed it to the prosecutor. *Id.* at 276. He also has no recollection of showing a photo array to Dorsey. *Id.* at 293–96. He testified that before the deposition he reviewed the "bits and pieces" that were left of "the case file," because the files are

---

[6] Page references for this exhibit refer to the page numbers of the deposition transcript.

put on microfilm and "a lot of stuff in the case files are thrown in the trash." *Id.* at 308–09. He

testified that what he reviewed "wasn't a complete case file." *Id.* at 310.[7]

Detective Requer was deposed on November 9, 2021. ECF 166-7.[8] He testified that "a

juvenile, a person ten, twelve, eleven, whatever, you don't interview them unless they have a parent

or guardian present, adult there." *Id.* at 68. He stated "[f]irst of all, a detective, especially me,

wouldn't try to interview a child without their parent being there, whether they be scared or not,

they got to have an adult there for me to even talk to them, period. No exception." *Id.* at 71. He

testified that a State's Attorney would review the entire folder and decide what reports they wanted.

*Id.* at 101–02. He testified that he turned over "whatever I had for that homicide case . . . of course

we turned it over." *Id.* at 127. Detective Requer had no present recollection of this investigation.

*See generally id.*; *see, e.g.*, *id.* at 238 ("How do you know I didn't do anything? I really don't

remember."). He testified that it would be inappropriate to point out one of the photos in a photo

array to suggest to the person who he should select. *Id.* at 287. He also testified that he does not

remember having interactions with Dorsey's mother, Bridget Scott, and did not know she was on

illegal drugs. *Id.* at 308–09. He testified that he would not have interviewed a child supervised by

"a junkie." *Id.* at 310–12. He also testified that if he had given money to Dorsey's mother, there

would be some record somewhere of him having obtained police funds because, "I wouldn't give

her money myself cause I don't even have the money to give her." *Id.* at 313. He denied threatening

---

[7] Detective Pellegrini's Answers to Interrogatories further illuminate some of the specific items missing from the present-day version of the "homicide file." *See* ECF 179-10 at 3–4 (noting that Polaroid photographs and a written statement from Dorsey are no longer in the file that was preserved).

[8] Page references for this exhibit refer to the page numbers of the deposition transcript.

Robinson's mother in any way. *Id.* at 316. He does not specifically recall any interaction with the trial prosecutor, Ms. Finch. *Id.* at 346.[9]

The prosecutor who handled Plaintiff's actual innocence proceeding in 2016, Andrea Mason, was deposed on April 12, 2022. ECF 161-23. She testified about the file keeping practices of the homicide unit and the State's Attorney's Office ("SAO"). She had no specific recollection about whether she ever found an SAO file for Plaintiff's case. *Id.* at 9. She remembers seeing some documents but does not know whether they were from the police department files or the SAO. *Id.* at 11. She did not remember whether she ever had the full set of discovery that the parties had exchanged. *Id.* at 11–12. And she did not know whether whatever file she reviewed is the same file that existed in 1987. *Id.* at 13.

Robinson's mother, Pamela Chavious, was also deposed on April 12, 2022. ECF 166-15.[10] She testified that Robinson was crying and upset after the homicide. *Id.* at 29. He kept telling her that his friend Bobo got killed and he "worked up at the stadium with him." *Id.* at 61. She said, "All he kept saying was his friend, his friend." *Id.* Robinson was so upset that he asked to stay with his grandparents away from the block where the murder occurred. *Id.* at 29–30. A couple of days later, though, the police came and told her that if she did not bring her son home, they would lock her up. *Id.* at 32–34. She said that while they were at the police station, the police asked her to step out of the room while they talked to Robinson. *Id.* at 38. She does not know how long she was outside the room. *Id.* at 44. Robinson was crying the whole time at the police station. *Id.* at

---

[9] The record also contains deposition excerpts from Detectives Tewey and Ceruti, who had less direct involvement in this investigation and who likewise have almost no recollection of this case. *See* ECF 161-33; ECF 161-37. Detective Fahlteich passed away in 2023 and there is no deposition testimony from him in the record presented to this Court.

[10] Page references for this exhibit refer to the page numbers of the deposition transcript.

43–44. Chavious identified her signature on the various documents but does not remember a second trip to the police station or a photo array. *Id.* at 76. She has very little recollection of any of the documents or records in the case. *See generally id.* Chavious did recall that before the trial, Ricky Washington knocked on her door and threatened that Robinson "better keep his mouth shut." *Id.* at 85. The prosecutors moved them to a motel because of Ricky Washington's threats. *Id.* at 100–101. During the trial, someone threw a brick into Chavious's house. *Id.* at 103–04. She confirmed that Robinson never talked to her about his identification of Plaintiff, his recantation, or police coercion. *Id.* at 120–21. She denied ever having stored drugs in her home for Plaintiff, despite Plaintiff's deposition testimony (described below) that she had. *Id.* at 165–69.

Dorsey sat for deposition on May 5, 2022. ECF 166-20.[11] Prior to the deposition, Plaintiff arranged for a lawyer to represent Dorsey. *Id.* at 40, 264. Dorsey testified that about two years earlier, in 2020, an investigator for Plaintiff repeatedly came to her home to try to meet with her. *Id.* at 95–98. After about four or five visits from him "trying to get her to be a witness," she finally agreed to speak with him. *Id.* at 99. She told him that in 1987, she was on a playground blocks away when she heard gunshots and ran towards the shooting. *Id.* at 23. Dorsey does not remember many of the details of the day, although she remembers who she was playing with and that she ran to inform Bobo's cousin. *Id.* at 25–26, 31. Dorsey describes that she went to the homicide office on January 3, 1987, with her mother who was using drugs at the time. *Id.* at 59. In the car on the way to the police station the officer gave something to her mother, but she does not know what it was. *Id.* at 144–45. Once they arrived at the station, Dorsey's mother left the room for about 20 minutes with the officers but returned before the officers asked any questions. *Id.* at 62–63. Dorsey remembers going to the police station but does not otherwise remember talking to the officers. *Id.*

---

[11] Page references for this exhibit refer to the page numbers of the deposition transcript.

at 148–50. She does not remember being afraid of the police officers. *Id.* at 65 She does not remember if she picked a photo from the photo array, but she thinks she was asked whether anyone on the photo array was familiar. *Id.* at 74–75. Although she did not know Plaintiff at all, she recognized him from seeing him in the neighborhood. *Id.* at 76. Dorsey said she signed the written statement documenting her interview without reviewing it "because my mom was present." *Id.* at 174–75. She said she "didn't understand and didn't know some of the words" but signed because "my mother told me to." *Id.* While she says she signed the statement, she does not remember seeing it at the police station. *Id.* at 201. The police never told her what to say. *Id.* at 233. The only inaccuracy in the 2020 affidavit she gave Plaintiff's investigator is that she did not ever see the officer give money to her mother. *Id.* at 279.

Plaintiff sat for deposition on March 1, 2022. ECF 166-2.[12] He testified that he walked with a limp back when he was arrested for the murder in 1987, because he had been previously shot in the foot. *Id.* at 11. He testified he is happily married. *Id.* at 23. He is in good physical health with the exception of high blood pressure, *id.* at 135, has never been seen by a mental health professional, *id.* at 135-36, does not believe he has a mental illness, *id.* at 136-38, and is not claiming any impairment of his sexual relationship with his wife. *Id.* at 143. Plaintiff does suffer from sleep deprivation on some nights because he dreams about the way he was treated in prison. *Id.* at 136–37. Plaintiff began working full-time for a construction company shortly after his release from prison, but when the pandemic slowed construction work down, Plaintiff started attending school and has attended school ever since. *Id.* at 88–92. He also plays chess at a barber shop and on the computer, plays basketball occasionally, and attends church and goes out to eat with his wife every week. *Id.* at 132–33. He also testified that he had a dispute with Robinson's mother

---

[12] Page references for this exhibit refer to the page numbers of the deposition transcript.

prior to Ali's murder, because Robinson's mother was refusing to hold drugs for Plaintiff, who was dealing heroin. *Id.* at 30–33. Plaintiff believed that Robinson's mother "held that resentment against me." *Id.* at 34.

## II.   LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support an element of the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)). Finally, where a movant has met the initial burden of demonstrating to the court that there is no genuine issue of material fact, the non-moving party may not rest on the allegations averred in her pleadings. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Summary judgment shall therefore be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Casey v. Geek Squad*, 823 F. Supp. 2d at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex*, 477 U.S. at 322–23; *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## III.   ANALYSIS

### A.  Section 1983 Claims (Due Process)

42 U.S.C. § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999). To prove a § 1983 claim, a plaintiff must establish a violation of a right secured by the Constitution or laws of the United States by a "person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

In cases that allege unconstitutional action by an arm of the executive branch of government, "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" such that a substantive due process violation lies. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Specifically, the U.S. Supreme Court in *Lewis* reaffirmed that only official conduct that

"shocks the conscience" will give rise to a substantive due process violation. *Id.* at 846–47; *see also*, *e.g.*, *United States v. Salerno*, 481 U.S. 739, 746 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' or interferes with rights 'implicit in the concept of ordered liberty.'" (citations omitted)); *Temkin v. Frederick Cnty. Comm'rs*, 945 F.2d 716, 720 (4th Cir. 1991) ("[C]onduct which 'amount[s] to a brutal and inhumane abuse of official power literally shocking to the conscience,' violates the substantive guarantees of the Due Process Clause . . . ." (quoting *Hall v. Tawney*, 621 F.2d 607, 613 (4th Cir. 1980))). The "most likely" sort of conduct to "shock the conscience," the U.S. Supreme Court noted, was "conduct intended to injure in some way unjustifiable by any government interest." *Lewis*, 532 U.S. at 849 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986)).

Here, there is no dispute that the Officer Defendants were acting under the color of state law as members of the BPD. The question is whether the Officer Defendants infringed Plaintiff's due process rights in the ways addressed below.

### 1. Coercion/Evidence Fabrication Claims (Count I)

With respect to the statements by both Robinson and Dorsey identifying Plaintiff as the shooter, Plaintiff claims that the Officer Defendants denied him due process because they fabricated the evidence (in Robinson's case, through coercing him to give false testimony). The law recognizes "a due process right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity." *Massey v. Ojaniit*, 759 F.3d 343, 354 (4th Cir. 2014) (quoting *Washington v. Wilmore*, 407 F.3d 274, 282 (4th Cir. 2005) (internal quotation marks omitted)). The elements of a fabrication claim require a plaintiff to show "(1) the defendants fabricated evidence, and (2) the fabrication resulted in a deprivation of [Plaintiff's] liberty." *Martin v. Conner*, 882 F. Supp. 2d 820, 847 (D. Md. 2012) (internal quotation marks and citations omitted).

### i. Robinson

Plaintiff has introduced evidence, namely Robinson's various recantations from 1999 through present day, suggesting that his identifications of Plaintiff as the shooter in his police statements and sworn testimony were fabricated and coerced by the Officer Defendants. For their part, the Officer Defendants have denied ever engaging in such coercion or fabrication. While this situation would typically present a quintessential issue of fact for the factfinder, a legal wrinkle is present here due to this case's procedural history.

As described above, on December 10, 1999, Judge Schwait issued an opinion after hearing testimony from Robinson describing the alleged fabrication and coercion, including the fact that he originally insisted he did not see who committed the murder and the fact that the officers told him he would never see his mother again if he did not tell them what he knew. ECF 161-29 at 3. Judge Schwait concluded:

> Petitioner's allegation that his constitutional rights were violated because the Baltimore City Police coerced Mr. Robinson to testify that Petitioner had committed the crime must fail. First, the evidence presented to this Court is insufficient to support a finding that the Police did, in fact, coerce Mr. Robinson. Before and throughout Petitioner's trial, Mr. Robinson maintained that his statement that Petitioner was the one who committed the murder was true: Mr. Robinson gave that statement, which he and his mother signed, to the Police and repeated that statement as sworn testimony before the Grand Jury, during pretrial motions, and at Petitioner's trial. His identification of Petitioner as the one who committed the murder remained unchanged throughout the entire trial process. Only today, over thirteen years later, does Mr. Robinson change his story. This Court finds Mr. Robinson's testimony incredible. Therefore, Petitioner's allegation on this basis must fail.

ECF 161-29 at 3–4.

Almost eighteen years later, Judge Peters held hearings in Plaintiff's criminal case to consider his Petition for Writ of Actual Innocence. ECF 161-32. Under the applicable standard,

Judge Peters had to determine whether Plaintiff showed "newly discovered evidence that supports a claim that petitioner is innocent of the crime of which he or she was convicted." ECF 161-32 at 2 (citing *Smith v. State*, 233 Md. App. 372, 410–11 (2017)). Judge Peters determined that Robinson's recantations constituted "newly discovered evidence" because based on the "strong and consistent" testimony and statements Robinson made at or near the time of trial, "the Petitioner would not have had any reason to believe Robinson would later recant." *Id.* at 3. Judge Peters went on to conclude that "had the jury in the petitioner's trial had the 'benefit' of Otis Robinson's recantations, there would have been a substantial possibility of a different result" because "[f]or all intents and purposes, Otis Robinson was the State's entire case." *Id.* at 4. Judge Peters did not assess the credibility of Robinson's recantations, the reasons for the recantations, or their contents, simply stating that Robinson had recanted the testimony "on at least three occasions," one of which he "traveled voluntarily from out of state to testify." *Id.* at 5. He also noted that Robinson "has never wavered in his 'formal withdrawal or renunciation of [his] prior testimony." *Id.* He thus reached "the inescapable conclusion that multiple recantations of the uncorroborated testimony by the sole eyewitness in Petitioner's case have to create a substantial possibility of a different result." *Id.* at 5–6.

The Officer Defendants argue that as a result of Judge Schwait's adverse credibility finding on the issue of police coercion, Plaintiff is collaterally estopped from arguing in this case that Robinson's statement was made as a result of that same fabrication or coercive action by the Officer Defendants.[13] ECF 161-1 at 23. "Collateral estoppel or issue preclusion forecloses the

---

[13] On this issue, as with others throughout this briefing, one side or the other contends that the other side "fails to address the substance of the argument" and that the point therefore should be treated as conceded or waived. *See, e.g.*, ECF 179 at 28 n.24; ECF 166 at 28. In each instance, that contention is wholly unpersuasive. Simple differences in the way in which each party frames clearly contested issues do not amount to "concessions" or waiver of the other party's framework,

relitigation of issues of fact or law that are identical to issues which have been actually determined and necessarily decided in prior litigation in which the party against whom issue preclusion is asserted had a full and fair opportunity to litigate." *Ramsay v. U.S.I.N.S.*, 14 F.3d 206, 210 (4th Cir. 1994) (quotation omitted) (alteration adopted).

Plaintiff asserts two arguments for why collateral estoppel does not apply here: that Judge Peters's ruling on the writ of actual innocence "overturned" Judge Schwait's earlier adverse credibility determination and that Judge Schwait's factual findings are no longer viable as part of Plaintiff's now-vacated criminal conviction. ECF 166 at 32–34. This Court is unpersuaded by those arguments.

First, close scrutiny of the two judicial opinions demonstrates that they do not contain contradictory rulings. Judge Schwait found Robinson's testimony incredible and therefore held there was no constitutional violation premised on coercion or fabrication of his trial testimony. Judge Peters did not reverse that adverse credibility finding. Judge Peters simply found that the recantation of the only eyewitness testimony, if presented to the jury, would create a substantial possibility of a different verdict. Judge Peters did not deem Robinson's recantation testimony to be credible or incredible, did not use the words "coercion" or "credibility" or "fabrication," and did not address the reasons motivating his recantation. Judge Peters's result would have been the same if Robinson's original testimony had been coerced by the police, if Robinson's mother had instructed him to implicate Plaintiff unbeknownst to the officers, or if Robinson had simply changed his mind about what he believed he saw on the night of the murder. Judge Peters simply acknowledged that the existence of Robinson's recantation (and the resulting elimination of the

---

particularly in an instance like here where the parties have been given multiple chances to respond to arguments raised by way of a hearing and supplemental filings.

only eyewitness identification of the Plaintiff as the shooter) dramatically changed the landscape of the evidence that would be presented at a trial. In short, Judge Peters addressed the effect of a recantation—truthful or untruthful—on a jury; whereas Judge Schwait addressed the truthfulness of that recantation in the context of whether the officers had committed a constitutional violation. This Court therefore does not find Judge Peters to have "overruled" or in any way contradicted Judge Schwait's adverse credibility finding about whether Robinson's identification and testimony was the product of police fabrication and coercion.

This Court also rejects Plaintiff's alternative position that Judge Peters's order vacating his conviction also vacated Judge Schwait's credibility determination. Judge Schwait's ruling did not constitute part of Plaintiff's criminal case but resolved a separately filed petition and was affirmed separately by the Maryland Court of Special Appeals. The distinction between a criminal proceeding and a later collateral post-conviction proceeding is well established in Maryland law. For example, a post-conviction proceeding does not suspend the finality of a conviction. *See e.g.*, *Waller v. Dir., Patuxent Inst.*, 244 Md. 229, 232 (1966) ("Moreover, since this post conviction proceeding is a collateral one, the filing of it did not have the effect of suspending the finality of the conviction for assault."). If a post-conviction proceeding does not suspend the underlying conviction's finality, logically the reversal of the conviction would not overturn the ruling in the post-conviction proceeding. In an unpublished opinion, the Maryland Court of Special Appeals recently described the relationship between the two proceedings:

> In Maryland, a postconviction proceeding "does not constitute a part of the original criminal cause, but is an independent and collateral civil inquiry into the validity of the conviction and sentence[.]" *Maryland State Bar Ass'n v. Kerr*, 272 Md. 687, 689–90, 326 A.2d 180 (1974) (emphasis added). As the Court of Appeals has explained: "A post-conviction proceeding, often called a 'collateral proceeding,' . . . is a collateral attack designed to address alleged constitutional, jurisdictional, or other fundamental violations that

25

occurred at trial." *Mosley v. State*, 378 Md. 548, 559–60, 836 A.2d 678 (2003) (citing *Perry v. State*, 357 Md. 37, 72, 741 A.2d 1162 (1999); *Davis v. State*, 285 Md. 19, 22, 400 A.2d 406 (1979)). In *Grandison v. State*, 425 Md. 34, 56, 38 A.3d 352 (2012), the Court of Appeals quoted from the United States Supreme Court's holding in *Pennsylvania v. Finley*, 481 U.S. 551, 555–57, 107 S. Ct. 1990, 95 L. Ed.2 d 539 (1987), which reinforced the view that, in Maryland's State courts, a postconviction proceeding is, indeed, a civil action:

> Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature. It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction.

*Calhoun-El v. State*, 2020 WL 2991786, at *14 (Md. Ct. Spec. App. June 4, 2020).

Thus, the vacation of Plaintiff's conviction and the eventual *nolle pros* did not alter the validity or finality of Judge Schwait's order denying post-conviction relief, or the factual determinations he made therein. And it is beyond dispute that, in the instant case, Plaintiff seeks to prove the same alleged coercion and falsification that Judge Schwait found to be "not credible" after hearing the evidence in 1999. Plaintiff had a full and fair opportunity to litigate the constitutional issue during his post-conviction proceedings.[14] Because the issue in this case is identical to that litigated and resolved before Judge Schwait and was critical and necessary to his judgment, Plaintiff is collaterally estopped from relitigating it in this proceeding.

At the motions hearing, Plaintiff took the position that some portions of his falsification claim could survive a finding of collateral estoppel. This Court disagrees. There is no dispute that Robinson made the statements and identifications that are well-documented in the various court

---

[14] As a practical matter, the opportunity to litigate the question in 1999 was fuller and fairer than it could be in 2023, when files have been destroyed, important witnesses have died, and memories have faded to a point where the facts will be near-impossible to ascertain.

transcripts and other records. The question is simply whether he made those statements of his own accord (which would mean no constitutional violation) or because he was coerced by the Officer Defendants to make false statements (which could potentially be the premise of a constitutional claim). Judge Schwait determined that Robinson's testimony about fabrication and coercion was incredible. Plaintiff's challenge to the validity of Robinson's underlying statements and identifications, then, is collaterally estopped, meaning that the evidence from Robinson is properly considered in any assessment of the probable cause the Officer Defendants had to charge or prosecute Plaintiff for the murder.

### ii. Dorsey

Of course, the collateral estoppel would not extend to any arguments Plaintiff might have about the Officer Defendants' alleged fabrication of Dorsey's statements and identification. Dorsey did not testify before Judge Schwait. But "to prove a due process violation, [plaintiff] must prove both but-for causation and proximate causation – in other words, that the alleged wrongful act(s) caused [his] loss of liberty and the loss of liberty was a reasonably foreseeable result of the act." *Gilliam v. Sealey*, 932 F.3d 216, 238 (4th Cir. 2019); *see also Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012) ("[C]onstitutional torts, like their common law brethren, require a demonstration of both but-for and proximate causation."); *Massey*, 759 F.3d at 354 ("Fabrication of evidence alone is insufficient to state a claim for a due process violation; a plaintiff must plead adequate facts to establish that the loss of liberty—*i.e.*, his conviction and subsequent incarceration—resulted from the fabrication.").

With Robinson's statements, testimony, and identification intact, even if Dorsey's statements were stricken as the product of fabrication, the Officer Defendants had probable cause to arrest and prosecute Plaintiff. *See Bailey v. Town of Smithfield, Va.*, 19 F.3d 10, at *3, *6 (4th

Cir.1994) (unpublished decision) (finding that a single positive identification of the defendant as the robber from a photo array sufficed to establish probable cause); *Torchinsky v. Siwinski*, 942 F.2d 257, 262 (4th Cir. 1991) (reasoning that "[i]t is surely reasonable for a police officer to base his belief in probable cause on a victim's reliable identification of his attacker," as "it is difficult to imagine how a police officer could obtain better evidence of probable cause than an identification by name of assailants provided by a victim, unless, perchance, the officer were to witness the crime himself."); *United States v. Beckham*, 325 F. Supp. 2d 678, 687–88 (E.D. Va. 2004). Additionally, an identification or witness statement does not have to be "unfailingly consistent to provide probable cause." *Spiegel v. Cortese*, 196 F.3d 717, 725 (7th Cir. 1999). Dorsey's statement, then, did not cause Plaintiff's loss of liberty because probable cause for Plaintiff's arrest existed independent of that statement. *See Massey*, 759 F.3d at 356 (concluding plaintiff failed to plead facts to indicate that alleged fabrication of a photographic lineup caused his conviction when there were other witnesses identifying plaintiff near the crime scene); *Johnson v. City of Fayetteville*, 91 F. Supp. 3d 775, 807 (E.D.N.C. 2015) (concluding plaintiffs could not prove causation when the alleged fabrication occurred after a finding of probable cause). Moreover, Dorsey's statement played no role once the charges against Plaintiff were brought, as her identification or statement was not used at motions hearings or trial. *See e.g.*, *Patterson v. Miller*, 451 F. Supp. 3d 1125, 1148 (D. Ariz. 2020), *aff'd*, No. 20-15860, 2021 WL 3743863 (9th Cir. Aug. 24, 2021) (finding a lack of causation when there was no evidence the ruling court considered the alleged fabricated evidence); *cf. Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012) ("[I]n a trial where the fabricated evidence is the crux of the case . . . , a plaintiff could show that the fabrication was a but-for cause of his conviction."). Plaintiff therefore cannot make

the required "but-for" showing to premise a due process claim on any fabrication of Dorsey's statement identifying him as the shooter.

### 2. *Brady* Claim (Count I)

As an alternative basis for his due process claim, Plaintiff asserts that the Officer Defendants violated his due process rights by failing to produce exculpatory evidence in contravention of *Brady v. Maryland*, 373 U.S. 83 (1963). *Brady* held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. To establish a *Brady* violation, a plaintiff must prove that (1) the evidence in question was favorable to the defendant in a criminal proceeding; (2) the evidence was material to the defense; and (3) the prosecution possessed the evidence and failed to disclose it. *See Moore v. Illinois*, 408 U.S. 786, 794–95 (1972).

In the instant case, Plaintiff does not allege that the prosecuting attorney withheld evidence from the defense, but that the Officer Defendants did not produce certain exculpatory evidence to either the prosecutor or the defense attorney. Such conduct by officers is covered by *Brady*, which also "applies to 'evidence known only to police investigators and not to the prosecutor.'" *United States v. Blankenship*, 19 F. 4th 685, 692 (4th Cir. 2021) (quoting *Kyles v. Whitley*, 514 U.S. 419 (1995)). Accordingly, law enforcement officers who come into possession of material evidence favorable to a defendant have a duty to disclose that evidence to the prosecutor. *See Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846–47 (4th Cir. 1964); *Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 396–98 (4th Cir. 2014). However, a plaintiff's burden of proving a *Brady* claim premised on officer conduct is higher, because "[u]nlike prosecutors . . . police officers commit a constitutional violation only when they suppress exculpatory evidence in bad faith." *Gilliam*, 932 F.3d at 283. Bad faith can be inferred from evidence of, *inter alia*, fabrication

of evidence, the failure to disclose "the most relevant and exculpatory evidence in the case," or gross deviations from regular police practice. *See Gilliam*, 932 F.3d at 239–40; *Mellen v. Winn*, 900 F.3d 1085, 1104 (9th Cir. 2018).

Relevant here, Plaintiff contends that the Officer Defendants withheld exculpatory information, to include (1) the initial statements by Robinson and Dorsey in which they denied being able to identify the shooter and (2) information about the officers' alleged fabrication of Dorsey's statements implicating Plaintiff for the Ali homicide.[15] In other words, to bring their *Brady* claim, Plaintiff alleges fabrication, and then alleges suppression of that alleged fabrication. Although contested, for the purposes of analyzing this claim this Court assumes, in the light most favorable to Plaintiff, that those categories of exculpatory information actually existed and that they were favorable to Plaintiff. But even assuming such information existed, Plaintiff has not adduced non-speculative evidence to establish that the Defendant Officers failed to disclose it to the prosecutor.

"Genuine issues of material fact cannot be based on mere speculation or the building of one inference upon another." *Barwick v. Celotex Corp.*, 736 F.2d 946, 963 (4th Cir. 1984); *see also Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013) (noting that as the nonmoving party rebutting the lack of evidence in the record, a plaintiff "must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence."). While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence[,] [p]ermissible inferences must still be within the range of reasonable probability." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir. 1958), *cert.*

---

[15] Plaintiff's arguments about the alleged fabrication of Robinson's statements, of course, are barred by collateral estoppel in the *Brady* context as well.

*denied*, 358 U.S. 908, 79 S. Ct. 234, 3 L.Ed.2d 229 (1958). It is "the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.* "The court's role is especially crucial when, as here, the plaintiff's case, and therefore the defendant's liability, is based solely on circumstantial evidence." *Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105, 116 (3d Cir. 1980).

Here, Plaintiff would ask a jury to conclude Defendants withheld exculpatory evidence in bad faith—despite Defendants' own testimony to the contrary and an incomplete homicide file—on the sole basis that Plaintiff's trial defense counsel did not make an argument about such alleged evidence at trial. "Inferred factual conclusions based on circumstantial evidence are permitted only when, and to the extent that, human experience indicates a probability that certain consequences can and do follow from the basic circumstantial facts." *Edward J. Sweeney & Sons*, 637 F.2d at 116. The inferential leap that Plaintiff asks this Court to make is without factual basis or reason.

The relevant events in this case happened decades ago, and unsurprisingly most of the files and the relevant recollections no longer exist. The defense file is unavailable. ECF 161-20. The prosecutor's file is unavailable. ECF 161-21 at 1. The "bits and pieces" of the homicide file that have been recovered are provably incomplete. *See infra* at ECF 166-7; 179-10. The defense attorney has no recollection of what evidence he did or did not receive. ECF 161-20. The prosecutor has no recollection of the case at all, including what evidence she collected or produced. ECF 161-23. And the Officer Defendants, as recounted in the factual summary herein, have no specific recollection of their actions in this case, other than defaulting to their standard policies of producing their entire files to the prosecuting attorneys.

 Plaintiff speculates that had the exculpatory information been produced, his defense attorney would have used that information as impeachment to question Robinson or the Officer

Defendants at hearings or at trial.[16] However, he offers no evidence to that effect, such as deposition testimony from his counsel about his general practice or his litigation strategy in this case (which, to be fair, counsel has already indicated he does not recall). *Cf. Salter v. Olsen*, 605 F. Supp. 3d 987, 1005 (E.D. Mich. 2022) (concluding a reasonable jury could infer the evidence was withheld when plaintiff's habeas counsel received the trial defense attorney's file and she testified that the evidence was not part of that file, in combination with testimony from the trial defense attorney that possession of such evidence "would have allowed" him to take certain actions at trial). In contrast, Plaintiff here fails to provide any evidence and his unsupported conjecture does not amount to a genuine issue of material fact. The practical reality of this claim is that, due to the erosion of all pertinent evidence over time, Plaintiff cannot adduce non-speculative evidence that would allow a factfinder to reasonably conclude that exculpatory evidence was withheld. Even if such an inference were reasonable, Plaintiff fails to present any evidence aside from speculation that it was the Officer Defendants (as opposed to the prosecutor) who withheld such evidence. The mere fact that a defense attorney failed to ask certain questions nearly 40 years ago cannot support a *Brady* claim in a case like this one, when the record contains no supporting evidence regarding

---

[16] Although this Court's ruling is based on the lack of evidence to prove withholding of the evidence and the entirely speculative inference Plaintiff seeks, there is also a significant question about whether the exculpatory evidence is "materially favorable to the accused" under the circumstances of this case. The "Constitution is not violated every time the government fails or chooses not to disclose evidence that might be helpful to the defense." *United States v. Blankenship*, 19 F.4th 685, 692 (4th Cir. 2021). Dorsey was at no time used as, or even contemplated to be, a witness for the State in any of the court proceedings once she recanted her initial statement. Even the credibility of the officers was not particularly pertinent at trial. As Judge Peters observed, this trial turned on "uncorroborated testimony by [a] sole eyewitness," Robinson. ECF 166-3 at 5–6. In that context, it is not self-evident that raising issues about the officers' handling of Dorsey would have been a viable trial strategy. And even the alleged initial statement by Robinson that he had not seen anything likely fails to meet that "materially favorable" standard, in light of the repeated consistent statements he made under oath in 1987 recounting in detail what he observed on the night of the murder.

what was in the case files or what information was disclosed (or not disclosed) by the Officer

Defendants and the prosecutor. This claim, therefore, cannot survive summary judgment.

### 3. Malicious Prosecution (Counts II and VI) and Fourth Amendment Unlawful Detention (Count III)

Plaintiff's Complaint also asserts counts for malicious prosecution under both federal and

state law.[17] *See* Counts II and VI, respectively. Although Plaintiff's federal claim is asserted

pursuant to § 1983, the Fourth Circuit has held "there is no such thing as a '§ 1983 malicious

prosecution' claim." *Lambert v. Williams*, 223 F.3d 257, 262 (4th Cir. 2000), *cert. denied*, 531

U.S. 1130 (2001). Instead, a federal claim for malicious prosecution "is properly understood as a

Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the

common law tort." *Hupp v. Cook*, 931 F.3d 307, 323–24 (4th Cir. 2019) (quoting *Evans v.

Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)). In this vein, then, Plaintiff's malicious prosecution

claims overlap with his claim asserting unlawful detention under the Fourth Amendment, set forth

in Count III of his Complaint. This Court will therefore consider all three claims together.

A Fourth Amendment unlawful detention claim requires proof that a defendant "(1) caused

(2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3)

criminal proceedings terminated in the plaintiff's favor." *Humbert v. Mayor & City Council of

Baltimore City*, 866 F.3d 546, 555 (4th Cir. 2017), *as amended* (Aug. 22, 2017) (quoting *Evans*,

703 F.3d at 647). A Maryland state law claim for malicious prosecution also requires proof that

the defendant's acts were intentional. *See Caldor, Inc. v. Bowden*, 330 Md. 632, 657 (1993).

The crux of a malicious prosecution claim is the absence of probable cause, which "requires

only a probability or substantial chance of criminal activity, not an actual showing of such

---

[17] This Court will consider both malicious prosecution claims together although certain defenses, such as qualified immunity, would only be available as to the federal claim. *See Borzilleri v. Mosby*, 189 F. Supp. 3d 551, 50 n.4 (D. Md. 2016), *aff'd*, 874 F.3d 187 (4th Cir. 2017).

activity." *Illinois v. Gates*, 462 U.S. 213, 243–44, n.13 (1983). Probable cause is "not a high bar." *United States v. Bosyk*, 933 F.3d 319, 325 (4th Cir. 2019) (quoting *District of Columbia v. Wesby*, __ U.S. __, 138 S. Ct. 577, 586 (2018) (internal quotation marks omitted)). Instead, it "is a flexible standard that simply requires 'a reasonable ground for belief of guilt' and 'more than bare suspicion.'" *United States v. Ortiz*, 669 F.3d 439, 444 (4th Cir. 2011) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). "Reasonable ground for belief of guilt" requires a lesser showing than "the formal preponderance-of-the-evidence standard." *Ortiz*, 669 F.3d at 444–45 (citing *Gates*, 462 U.S. at 235). It is an objective standard, looking at the totality of the circumstances viewed from the perspective of "an objectively reasonable police officer" and not the beliefs of the particular arresting officers in the case. *Wesby*, 138 S. Ct. at 586 (citation omitted); *Gilliam*, 932 F.3d at 234.

Again, Plaintiff's malicious prosecution claim is premised, in large part, on his estopped assertion that the police coerced and fabricated Robinson's statements inculpating Plaintiff. He also tries to argue that the coercion and fabrication of Dorsey's statements supports a malicious prosecution or unlawful detention claim. As noted above, however, even if Dorsey's identification and statement were to be excised, probable cause existed due to the eyewitness statement and identification from Robinson, along with Plaintiff's connection to the address where the homicide occurred. These three related claims, then, also fail under the summary judgment standard.

### 4. Failure to Intervene (Count IV)

Plaintiff has conceded that the failure to intervene claims should be dismissed against Defendants Tewey and Ceruti. As to the remaining three Officer Defendants, Requer, Pellegrini, and Fahlteich, the duty to intervene "attaches when an officer observes or has reason to know that a constitutional violation is being committed by other officers and possesses a realistic opportunity to intervene to prevent the harm from occurring." *Burley*, 422 F. Supp. 3d at 1030 (internal

citations and quotation marks omitted).  Here, as analyzed above, no constitutional violation was committed, and therefore summary judgment for all of the Officer Defendants is appropriate as to the failure to intervene claim.

### B.  State Law Claims

#### 1.  Intentional Infliction of Emotional Distress (Count VII)

Count VII alleges that the Officer Defendants intentionally inflicted emotional distress upon Plaintiff by falsifying and concealing evidence to procure his conviction. In order to plausibly allege intentional infliction of emotional distress ("IIED"), the alleged conduct must "be intentional or reckless; [t]he conduct must be extreme and outrageous; [t]here must be causal connection between the wrongful conduct and the emotional distress; [and] [t]he emotional distress must be severe." *Lee v. Pfeifer*, 916 F. Supp. 501, 506 (D. Md. 1996) (quoting *Harris v. Jones*, 281 Md. 560 (1977)). In addition, "[t]o be actionable, the conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* at 507. "The Maryland Court of Appeals has emphasized that 'the tort is to be used sparingly and only for opprobrious behavior that includes truly outrageous conduct.'" *Id.* at 507 (quoting *Kentucky Fried Chicken Nat'l Mgmt. Co. v. Weathersby*, 326 Md. 663 (1992)). As discussed above, because Plaintiff's coercion and fabrication claim is estopped by Judge Schwait's factual finding, Plaintiff cannot prove the requisite extreme and outrageous conduct to mount an IIED claim. And any coercion and fabrication pertaining to Dorsey's statement could not be the basis of an IIED claim, because her statement did not cause his lengthy incarceration. The Officer Defendants had probable cause to arrest him without her statement and her testimony, identification, or statements were not used, in any way, at Plaintiff's trial.

Additionally, and as an independent ground for summary judgment, Plaintiff has not adduced sufficient evidence of severe emotional distress. This Court does not discount the lengthy and difficult term of incarceration Plaintiff endured. But he emerged in what appears to be good mental health and is living a productive life. Although he has some nights of sleep deprivation, he has been able to go to school, work a job, and have happy marriage enjoying normal marital relations. He has not sought mental health treatment in or outside prison and does not believe he suffers from mental illness. ECF 166-2 at 136–137; 135:22–136:12; 137:3–138:18; 143:7–11. He has thus not proved that he suffered a "severely disabling emotional response to the defendant's conduct," *Harris*, 281 Md. at 570 , even had that conduct been proven to be sufficiently extreme and outrageous. Summary judgment on Count VII will be granted in favor of the Officer Defendants.

### 2. State Constitutional Claims (Count VIII)

Plaintiff's state constitutional claims are duplicative as they are brought pursuant to the state analogues of his federal constitutional claims. Thus, summary judgment is also warranted on those claims for the reasons addressed above.

## IV. CONCLUSION

For the reasons set forth above, the Officer Defendants' Motion for Summary Judgment, ECF 161, will be GRANTED.[18] Judgment will be entered in favor of Defendants Pellegrini, Requer, Fahlteich, Tewey, and Ceruti. A separate Order will be filed herewith, setting a teleconference to discuss the case's status.

Dated: April 12, 2023



/s/

Stephanie A. Gallagher
United States District Judge

---

[18] This Court declines to address the Officer Defendants' assertion of qualified immunity in light of the rulings made herein.