**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 23-1566**

———————

GARY WASHINGTON,

Plaintiff - Appellant,

v.

THOMAS PELLEGRINI; OSCAR REQUER; HELEN FAHLTEICH, personal representative of Defendant Officer Richard Fahlteich's estate,

Defendants - Appellees,

and

BALTIMORE POLICE DEPARTMENT; JOHN TEWEY; FRED CERUTI; JOHN MACGILLIVARY; UNKNOWN EMPLOYEES OF THE BALTIMORE POLICE DEPARTMENT; MAYOR AND THE CITY COUNCIL OF BALTIMORE,

Defendants.

———————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Stephanie A. Gallagher, District Judge.  (1:19-cv-02473-SAG)

———————

Argued:  October 30, 2024                    Decided:  January 6, 2025

———————

Before NIEMEYER, THACKER, and QUATTLEBAUM, Circuit Judges.

———————

Reversed in part and affirmed in part by published opinion. Judge Thacker wrote the opinion in which Judge Quattlebaum joined. Judge Niemeyer wrote a separate opinion concurring in the judgment.

———————————

**ARGUED:** Renee Anne Spence, LOEVY & LOEVY, Chicago, Illinois, for Appellant. Michael Patrick Redmond, BALTIMORE CITY LAW DEPARTMENT, Baltimore, Maryland, for Appellees. **ON BRIEF:** Jon Loevy, Gayle Horn, Roshna Bala Keen, LOEVY & LOEVY, Chicago, Illinois, for Appellant. Ebony M. Thompson, City Solicitor, Kara K. Lynch, Jasmine England-Caesar, Office of Legal Affairs, CITY OF BALTIMORE LAW DEPARTMENT, Baltimore, Maryland, for Appellees.

———————————

THACKER, Circuit Judge:

In 2018, Gary Washington ("Appellant") was released from prison on a writ of actual innocence after serving 31 years of incarceration for murder.

In the civil lawsuit that is the subject of this appeal, Appellant accused the police officers who investigated the murder of coercing the prosecution's sole eyewitness into providing false testimony, which the witness later recanted. The district court granted the police officers' motion for summary judgment and dismissed Appellant's claims alleging violation of due process, malicious prosecution, detention without probable cause, failure to intervene, and intentional infliction of emotional distress. It found that Appellant was collaterally estopped from relying on the witness's recantation in this case because another state court had initially found that recantation incredible when denying Appellant's post-conviction petition for relief, despite the later in time state court ruling granting Appellant a writ of actual innocence. The district court independently dismissed Appellant's alternative due process *Brady* claim on the merits. It additionally dismissed Appellant's intentional infliction of emotional distress claim on the independent ground that Appellant failed to adduce sufficient evidence of severe emotional distress.

We hold that that the state court decision granting Appellant a writ of actual innocence was inconsistent with the prior post-conviction ruling that the recantation by the prosecution's sole eyewitness was incredible, thereby precluding the application of collateral estoppel. We additionally hold that applying collateral estoppel to prohibit Appellant from litigating the alleged misconduct that led to his now vacated convictions is incompatible with the equitable principles that underlie the doctrine. We agree with the

district court's disposition with respect to Appellant's alternative due process claim premised on a *Brady* violation. And, finally, we hold that the district court erred in determining that Appellant failed to adduce sufficient evidence of severe emotional distress.

Consequently, as detailed below, we reverse in part and affirm in part.

## I.

## A.

On December 27, 1986, at approximately 7:45 p.m., Faheem "Bobo" Ali, was shot and killed outside of Appellant's home in Baltimore, Maryland. In their investigation of the murder, police officers Thomas Pellegrini, Oscar Requer, and Helen Fahlteich ("Appellees") interviewed a 12 year old bystander, Otis Robinson, who had seen the shooting. Appellees obtained two statements from Robinson, signed by both him and his mother, wherein Robinson asserted that Appellant had shot Ali:

> I was walking up the street toward 24th Street, I heard [Appellant] and [Ali] arguing and [Appellant] asked about some money, and [Ali] said I'll get it when I'm ready to get it. Then [Appellant] hit [Ali] in his jaw then he drawed [sic] his gun, and shot [Ali] then [Ali] ran across the street tripped on the curb and fell on the sidewalk.

J.A. 192.[1]

On January 7, 1987, Robinson testified before a grand jury that he had seen Appellant shoot Ali:

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

> I saw [Appellant] and a boy named [Ali] arguing about some money and [Appellant] told him he better have his money and [Ali] say he will wait. And [Appellant] quickly hit him in his jaw and drawed [sic] a gun and he shot 'em. Then [Ali] ran across the street and tripped on a curb at 2311 and [Appellant] tossed the gun he shot [Ali] with up on the roof.

J.A. 204. On February 4, 1987, the grand jury indicted Appellant on charges of first degree murder and use of a handgun in the commission of a felony or a crime of violence.

A jury trial in the circuit court for Baltimore City began on June 5, 1987. Robinson testified at the trial that he had seen Appellant shoot Ali. The parties do not dispute that the prosecution's case rested entirely on Robinson, who was its sole eyewitness. No other witnesses corroborated Robinson's testimony, nor did the prosecution provide any physical or forensic evidence to connect Appellant to the crime.

In his defense, Appellant testified that he was inside his home at the time of the shooting. He called the following witnesses to corroborate his account: (i) Nathaniel Taylor, a neighbor, who testified that he saw Lawrence Thomas, and not Appellant, shoot the victim; (ii) Ronald Brady, Appellant's brother-in-law, who testified that he was with Appellant at Appellant's house before the shooting, but then proceeded outside of Appellant's house at which time Brady, like Taylor, saw Thomas shoot the victim; (iii) Sheila Brady, Appellant's sister, who testified that Appellant was in his home when the shooting occurred; and (iv) Tangela Washington, Appellant's other sister, who also testified that Appellant was in his house when the shooting occurred.[2]

---

[2] As disclosed in his opposition to Appellees' motion for summary judgment, Appellant testified in a 2022 deposition that he was in his home with Thomas and Brady
(Continued)

Crediting Robinson's testimony, the jury convicted Appellant of first degree murder and use of a handgun in the commission of a felony or a crime of violence. He was sentenced to life in prison for the murder conviction and a twenty year consecutive sentence for the handgun conviction.

### B.

On August 2, 1996 -- when Robinson was an adult -- he issued his first retraction of his testimony incriminating Appellant. He stated to a private investigator, hired by Appellant, that Appellant did not shoot Appellee, and that he had only testified as such because he was a "victim of Baltimore City Police Dep[artment]." J.A. 225. Robinson informed Appellant's investigator that he had provided false testimony because the Baltimore Police had "threatened to take [him] away from [his] mother forever." J.A. 226. He asserted that he had decided to come forward and provide this information now because "[he] couldn't live with [him]self." *Id.*

On February 24, 1997, Appellant filed a petition for post-conviction relief pursuant to Maryland's Uniform Post-Conviction Procedures Act, which entitles Maryland inmates to collaterally attack their state court convictions for constitutional violations and other enumerated errors. *See* Md. Code Ann., Crim. Proc. § 7-102. Appellant alleged, inter alia,

---

on the night of the shooting. The three were using drugs together in the basement. Appellant attests that Thomas had to leave, so Brady showed him out while Appellant remained in the basement. Appellant further testified that when he went upstairs to put his drugs away, he saw that Thomas and Brady had left the front door open. When he walked to the door, he saw Thomas and Brady standing outside with Ali. Appellant testified that he then saw Thomas pull out a gun, hit Ali, and shoot him, before fleeing.

that the state had violated his Fourteenth Amendment due process rights by coercing Robinson into providing false testimony. The reviewing Baltimore City circuit court held a hearing on Appellant's petition, where Robinson testified once again.

Consistent with his written recantation, Robinson asserted that his prior identification of Appellant as the person who shot Ali had been false. He asserted instead that on the night of the murder, he had seen "three guys standing across the street . . . [i]n front of [Appellant]'s house." J.A. 1623. As he was walking by them, Robinson heard a single gunshot. Contrary to his testimony at trial, Robinson informed the court that he did not recognize any of the individuals.

Robinson testified that after the shooting, Baltimore City police officers came to his home and took him and his mother to headquarters to be interviewed. There, Appellees interviewed the 12 year old boy without his mother present.[3] Alone, Robinson told Appellees that he had seen the shooting but could not identify any of the people he had seen on the street at the time. He asserted that Appellees wrote his initial statement down, but that he was never asked to sign it. Appellant alleges that this recorded but unsigned statement was never disclosed to the defense.

Robinson asserted that Appellees then asked him if he knew Appellant and, when Robinson confirmed that he did, asked him to identify Appellant based on a picture they provided. When Robinson declined to identify Appellant as the shooter, Appellees accused

---

[3] In a 2022 deposition, Appellant's mother testified that her son had been crying when Appellees asked her to leave the room, and was still crying when she came back in. J.A. 2220 ("He was still the same, crying. He just kept -- he just kept crying.").

Robinson of lying: "[t]hat's when they stated I was lying, I knew everything about the murder, if I didn't cooperate with them that I would never see my mother again." J.A. 1630. Robinson protested to Appellees that he was telling the truth, but the officers "started getting louder," reiterating that Robinson was "lying." *Id.* at 1630, 1631. The officers told Robinson that "they knew [Appellant] did it and all they needed was my help." *Id.* at 1631.

Robinson asserted that the officers again showed him the picture of Appellant, and asked Robinson to confirm that he was the shooter. At this point, Robinson conceded that Appellant was the shooter. He testified to the Baltimore City circuit court that he changed his position at that time because he was "scared" and knew that Appellees would not "let [him] go unless [he] cooperated with them." J.A. 1633. He explained that Pellegrini and Fahlteich:

> made me feel uncomfortable when I wanted to leave. I told them what I seen, they wasn't trying to hear, and they just held me there against my will.

*Id.* at 1634.

On December 10, 1999, the circuit court for Baltimore City denied Appellant's petition to set aside his conviction (hereinafter referred to as the "Post-Conviction Decision"). The court dismissed Appellant's due process claim on the ground that Robinson's recantation was incredible:

> Before and throughout [Appellant]'s trial, Mr. Robinson maintained that his statement that [Appellant] was the one who committed the murder was true; Mr. Robinson gave that statement, which he and his mother signed, to the Police and repeated that statement as sworn testimony before the Grand Jury, during pretrial motions, and at [Appellant]'s trial. His identification of [Appellant] as the one who committed the

8

> murder remained unchanged throughout the entire trial
> process. Only today, over thirteen years later, does Mr.
> Robinson change his story.

J.A. 275–76.  The Post-Conviction Decision was affirmed on appeal.

### C.

Seventeen years later, on November 28, 2016, Appellant sought a writ of actual innocence pursuant to Section 8-301 of the Maryland Criminal Code, which permits defendants to petition a court to, among other things, set aside a verdict and grant a new trial based on newly discovered evidence.

Once again, the circuit court for Baltimore City held an evidentiary hearing.  And, once again, Robinson testified both that he did not see the person who shot Ali, J.A. 2101 ("Q: Did you see anyone actually shoot this victim?  A: No, sir."), and that his prior identification of Appellant was made under coercion and at the suggestion of Appellees. Robinson testified that when the Baltimore City Police Department first came looking for him as part of their investigation, they "told [his] mother if she didn't have [him] back at th[e] house within 24 hours [to speak with them], she wouldn't see [him] again."  *Id.* at 2106.  Robinson also reiterated that during the interview with Appellees he initially told them that he could not identify the shooter, which Appellees recorded in an unsigned and undisclosed statement.  Robinson testified that Appellees then started "getting loud" and threatened him:

> [H]e stated that I was with the victim before the shooting, and
> I would be charged with first degree murder if I didn't
> cooperate with him . . . At that point, I was shocked. I was
> shocked, and I was scared.

*Id.* at 2109. Appellees told Robinson that he would be "taken away from [his] mother," who "was [not] present in the room at that time." *Id.* at 2109–10 ("I mean, I'm 12 years old."). Feeling scared, and in response to Appellees' threats, Robinson identified Appellant as the shooter. *Id.* at 2121 ("It was out of fear . . . [fear of] [b]eing taken away from my mother, being possibly charged with this homicide, according to the Baltimore City Police Department.").

In opposition to Appellant's request for relief, the Government argued, inter alia, that Appellant was collaterally estopped from re-litigating the allegations decided in the Post-Conviction Decision. J.A. 374 ("In the [Post-Conviction Decision], [the court] found that 'Mr. Robinson's testimony was incredible' . . . [Appellant] essentially brings forth the same allegations in his Petition for Writ of Actual Innocence, which has already been fully and finally litigated.").

On August 20, 2018, the Baltimore City circuit court granted Appellant's petition for a writ of actual innocence (hereinafter referred to as the "Innocence Decision"). The Innocence Decision court determined that Robinson's recantation was newly discovered evidence and that there was a substantial or significant possibility that the jury would have ruled differently if it had been presented as evidence at trial. The court noted that Robinson was the "sole eyewitness" to the crime and amounted to "the State's entire case." J.A. 314. Indeed, "[n]o other witnesses corroborated Robinson's testimony . . . [Appellant] did not confess and there was no DNA or fingerprint evidence[], or any other forensic evidence introduced." *Id.* Thus, the court deemed that "it seem[ed] irrefutable that the outcome of

[Appellant]'s trial hinged completely on the credibility of 12 year old Otis Robinson." *Id.* at 315.

Additionally, the court highlighted the fact that Robinson had "recanted his trial testimony on at least three occasions": (i) when he was approximately 18 to 20 years old in a statement to an investigator; (ii) when he was 24 years old at Appellant's post-conviction hearing; and (iii) when he was 42 years old at Appellant's actual innocence hearing. J.A. 315. Once he became an adult, Robinson "never wavered in his formal withdrawal or renunciation of [his] prior testimony." *Id.* (quotation marks omitted). Accordingly, the court was "left with the inescapable conclusion that multiple recantations of the uncorroborated testimony by the sole eyewitness in [Appellant's] case have to create a substantial possibility of a different result." *Id.* at 315–16. "[B]ased on the Robinson recantations," the court vacated Appellant's convictions and ordered a new trial. *Id.* at 316.

Appellant was consequently released from prison after 31 years of incarceration. On January 15, 2019, the State of Maryland dismissed the charges against him. In the proceeding that is the subject of this appeal, Appellant testified that his treatment in prison had been "inhumane," and described such indignities as being subjected to strip searches, cavity searches, being confined to his cell for 24 hours, being screamed at and thrown against the wall by correction officers, and being housed with severely mentally ill inmates, in addition to the pain of being separated from his family and subjected to an unrelenting atmosphere of fear, distrust, and violence that attended his imprisonment. J.A. 621–27.

D.

On August 27, 2019, Appellant filed a civil lawsuit in federal district court against Appellees, the Baltimore Police Department ("BPD"), and the Mayor and City Council of Baltimore, in the district of Maryland.[4]

In the operative complaint, Appellant alleged (i) violation of due process pursuant to 42 U.S.C. § 1983; (ii) malicious prosecution pursuant to § 1983; (iii) detention without probable cause pursuant to § 1983; (iv) failure to intervene pursuant to § 1983; (v) violation of *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) pursuant to § 1983; (vi) malicious prosecution pursuant to state law; (vii) intentional infliction of emotional distress; (viii) state law constitutional claims; and (ix) indemnification. Appellant pled his due process claim in the alternative, alleging both a deprivation of liberty caused by fabrication of evidence by a government officer and suppression of evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87 (1963) (holding that suppression of material evidence favorable to the accused violates due process).

In addition to Robinson's prior recantations and testimony, Appellant now also proffered evidence that Appellees had fabricated another identifying statement by a 13-year-old witness, Rozetta Dorsey. Dorsey testified in a 2022 deposition that, on the night of the shooting, she had been at a playground a block-and-a-half away and heard multiple gunshots. Like Robinson, when Appellees brought Dorsey to headquarters for questioning,

---

[4] John MacGillivary is deceased and no longer a party to this lawsuit. Appellant abandoned his claims against Fred Ceruti and John Tewey. The BPD, and the Mayor and the City Council of Baltimore are not party to this appeal.

she told them that she could not identify the shooter. Nonetheless, when Appellees and Dorsey's mother told her to sign a statement that identified Appellant as the shooter, she did so at their direction without reading or understanding the statement. J.A. 2579 ("I didn't know how to read it . . . Didn't know how to read the statement, the words. I just didn't understand."). Dorsey recanted her statement before trial and was not called as a witness. Appellant asserts that Appellees' notes of Dorsey's original exculpatory statements were not disclosed to the defense.

After the close of discovery, Appellees moved for summary judgment and the district court granted their motion. It found that Appellant's claims were collaterally estopped by the Post-Conviction Decision and its factual finding that Robinson's recantation was incredible. In response to Appellant's argument that the Innocence Decision "overturned" the Post-Conviction Decision, the district court determined that the two opinions were not contradictory because they addressed different issues: "[the Innocence Decision] addressed the effect of a recantation—truthful or untruthful—on a jury; whereas [the Post-Conviction Decision] addressed the truthfulness of that recantation in the context of whether the officers had committed a constitutional violation." J.A. 3825. Moreover, the district court held that the Innocence Decision did not vacate any alleged credibility determination the Baltimore City court made in the Post-Conviction Decision regarding Robinson's recantation, because that collateral post-conviction action was a separate and independent proceeding.

Accordingly, the district court held that Appellant's "challenge to the validity of Robinson's underlying statements and identifications [at trial] is collaterally estopped,

meaning that the evidence from Robinson is properly considered in any assessment of the probable cause [Appellees] had to charge or prosecute [Appellant]." J.A. 3827. On this basis, the court dismissed Appellant's claims for fabrication of evidence, malicious prosecution, unlawful detention, failure to intervene, and intentional infliction of emotional distress because each claim relied on the predicate allegation that Appellees lacked probable cause. In the district court's view, those claims were precluded by Robinson's original (and recanted) testimony.

E.

On Appellant's alternative due process claim alleging a *Brady* violation, the district court independently granted summary judgment because, in the view of the district court, Appellant had adduced only speculative evidence that Appellant's trial counsel did not in fact receive the underlying *Brady* material. J.A. 3831–32. ("[Appellant] speculates that had the exculpatory information been produced, his defense attorney would have used that information as impeachment to question Robinson or [Appellees]. . . . However, he offers no evidence to that effect.").

As to Appellant's intentional infliction of emotional distress claim, the district court independently granted summary judgment, reasoning that Appellant had failed to "adduce[] sufficient evidence of severe emotional distress." J.A. 3836. And, the district court dismissed Appellant's state law constitutional claims as duplicative. *Id.*

In sum, the district court dismissed Appellant's claims of fabrication of evidence, malicious prosecution, unlawful detention, failure to intervene, and intentional infliction of emotional distress, based on its collateral estoppel ruling and the consequential

14

determination that Appellees had probable cause to arrest and prosecute Appellant. The district court dismissed Appellant's *Brady* claim on the merits, and it independently dismissed Appellant's intentional infliction of emotional distress on the merits. Last, the district court dismissed Appellant's state constitutional claims as duplicative.[5]

This timely appeal followed.

## II.

We review an award of summary judgment de novo. *T.H.E. Ins. Co. v. Davis*, 54 F.4th 805, 818 (4th Cir. 2022). To be granted summary judgment, movants must demonstrate that there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law. *Gilliam v. Sealey*, 932 F.3d 216, 229 (4th Cir. 2019) (citing Fed. R. Civ. P. 56(a)).

## III.

Pursuant to 28 U.S.C. § 1738, federal courts must give full faith and credit to state court judgments. *Gilliam v. Sealey*, 932 F.3d 216, 231 (4th Cir. 2019). Additionally, "Congress has specifically required all federal courts to give preclusive effect to state-court judgments whenever the courts of the State from which the judgments emerged would do so." *Id.* (quoting *Allen v. McCurry*, 449 U.S. 90, 96 (1980)). Accordingly, "[t]he doctrines of res judicata and collateral estoppel apply to § 1983 actions, and federal courts must afford preclusive effect to issues which have been decided by state courts when the courts of that state would do so." *Id.*

---

[5] Appellant abandons his state law constitutional claims on appeal.

Relevant here, Maryland courts have established a four-part test for invoking collateral estoppel when: (i) the issue decided in the prior adjudication is identical with the one presented in the action in question; (ii) there was a final judgment on the merits; (iii) the party against whom the plea is asserted is a party or in privity with a party to the prior adjudication; and (iv) the party against whom the plea is asserted was given a fair opportunity to be heard on the issue. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Fund for Animals, Inc.*, 153 A.3d 123, 142 (Md. 2017).

Among the varied exceptions to the collateral estoppel doctrine, it is black letter law that a determination will not have preclusive effect when it is "itself inconsistent with another determination of the same issue." Restatement (Second) of Judgments § 29. This rule has been adopted by Maryland courts. *See, e.g.*, *Rourke v. Amchem Products, Inc.*, 835 A.2d 193, 207 (Md. Ct. Spec. App. 2003). Moreover, as Maryland courts have recognized, the Supreme Court of Maryland "gives considerable, and at times, persuasive weight to the position taken by the American Law Institute in Restatement (Second) of Judgments." *Bryan v. State Farm Mut. Auto. Ins. Co.*, 45 A.3d 936, 945 (Md. Ct. Spec. App. 2012) (collecting cases). Therefore, in the application of the collateral estoppel doctrine pursuant to Maryland law, we find that the exception for prior conflicting opinions governs our disposition of this case.

Finally, as the Supreme Court of Maryland has recognized, the doctrine of collateral estoppel is "based on two principles: judicial economy and fairness." *Garrity v. Md. State Bd. of Plumbing*, 135 A.3d 452, 458 (Md. 2016). And as we have recognized, courts should not apply collateral estoppel where unfairness results. *See Swentek v. Usair, Inc.*, 830 F.2d

16

552, 561 (4th Cir. 1987) ("Collateral estoppel is appropriate where . . . preclusion does not work an unfairness in the second trial."). In the application of equitable doctrines such as collateral estoppel then, courts must be cautious to ensure against inequitable results.

A.

Here, the district court found that, under "close scrutiny," the determination by the court in the Post-Conviction Decision that Robinson's recantation was incredible was not inconsistent with the later determination by the court in the Innocence Decision that Robinson's recantation created a substantial or significant possibility that a jury would not convict Appellant. But both statements cannot rationally be true: if Robinson's recantation was incredible, no jury could have found differently than the one that convicted Appellant based solely on Robinson's testimony. By necessity, the court in the Innocence Decision must have found that Robinson's recantation had at least some degree of credibility.

Closer scrutiny underscores the implicit but necessary credibility determination underlying the adjudication of a petition for a writ of actual innocence. To obtain relief under Maryland's actual innocence statute, a petitioner must produce newly discovered evidence that: (i) speaks to their actual innocence; (ii) could not have been discovered in time to move for a new trial under Maryland Rule 4-331; and (iii) creates a substantial or significant possibility that the result may have been different.[6] *See Smith v. State*, 165 A.3d 561, 584 (Md. Ct. Spec. App. 2017).

---

[6] There is no filing deadline for petitions for a writ of actual innocence pursuant to Maryland's statute. *See Hunt v. State*, 252 A.3d 946, 956 (Md. 2021). Petitioners need (Continued)

As the Supreme Court of Maryland has explained, the substantial or significant possibility prong is simply a standard materiality analysis as is employed in *Strickland* or *Brady* jurisprudence.[7]  *See Hunt*, 252 A.3d at 961 ("Weighing the effect of newly discovered evidence in an actual innocence proceeding involves substantially the same inquiry as determining prejudice in the context of an ineffective assistance claim or assessing whether *Brady* evidence is material."); *Faulkner v. State*, 227 A.3d 584, 611 (Md. 2020) ("[T]he General Assembly intended courts to make actual innocence materiality determinations in the same way that courts had long made materiality determinations in other post-trial contexts.").  Accordingly, the test is whether, "if [the convicting] jury had the benefit of the newly discovered evidence as well as the evidence that was before them, would there be 'a substantial or significant possibility that the result would have been different[.]'"  *Smith*, 165 A.3d at 595 (citation omitted).

---

only rely on newly discovered evidence that could not have been discovered in time to move for a new trial pursuant to Maryland Rule 4-331.

[7] The *Strickland* and *Brady* doctrines were created by the United States Supreme Court to uphold Constitutional protections in criminal proceedings.  *See generally Strickland v. Washington*, 466 U.S. 688 (1984); *Brady v. Maryland*, 373 U.S. 83 (1963).  The *Strickland* doctrine entitles every criminal defendant to adequate legal representation at trial and in certain other criminal proceedings.  The *Brady* doctrine enforces a due process obligation upon the state to disclose favorable evidence to the accused.  Both doctrines include a materiality analysis as part of their tests for judicial enforcement.  In the *Strickland* context, a lawyer's deficient representation only creates a Constitutional error if there is a reasonable probability that their client would have received a different result, whether at trial or at the proceeding where *Strickland* attaches.  Likewise, the *Brady* doctrine only permits a remedy where there is a reasonable likelihood that the nondisclosed evidence could have affected the judgment of the jury at trial.

Appellees and the district court attempt to parse this line by reasoning that the Innocence Decision was not evaluating the credibility of Robinson's recantation, instead noting that if it had been presented to the jury at all there would have been a possibility of a different verdict. But the materiality requirement necessarily means that there could only have been a possibility of a different verdict if Robinson's recantation was sufficiently credible. Certainly, if the recantation of the prosecution's *sole eyewitness* was incredible, then there could have been no "substantial or significant" possibility of an alternative result at trial. This is especially true given that, as the Innocence Decision court found, Robinson's testimony amounted to "the State's entire case." J.A. 314.

This reasoning is consistent with the Innocence Decision analysis. Although the Innocence Decision court did not utter the phrase, "Robinson's recantation is credible," it did emphasize that Robinson had recanted his trial testimony "on at least three occasions" and had even "traveled voluntarily from out of State to testify" in the Innocence Decision proceedings. J.A. 315. Moreover, the court noted, Robinson "never wavered" in his formal renunciation of his prior testimony. *Id.* Clearly, the fact that Robinson's recantation was credible was the obvious, and necessary, thrust of these facts, employed to satisfy the writ of innocence materiality standard.

Thus, the straightforward conclusion is also the correct one. The Post-Conviction Decision and the Innocence Decision are inconsistent with respect to the credibility of Robinson's recantation. Accordingly, per the Restatement (Second) of Judgments § 29, which again Maryland courts have adopted, Appellees may not rely on the determination by the Post-Conviction Decision court that Robinson's recantation was incredible.

Consequently, Robinson's original testimony did not provide probable cause to arrest and prosecute Appellant. Thus, his civil claims against Appellees that rely on Robinson's recantation may proceed.

### B.

Significantly, an inconsistent prior judgment is not the only ground upon which we reverse the district court's decision.

Applying collateral estoppel in this case would impose an unfair and inequitable result that is inconsistent with the doctrine. Precluding Appellant from litigating his colorable claims for relief would bar him from taking even a single bite of the apple regarding Appellees' alleged misconduct. That misconduct has never been litigated in a civil case. And in the criminal corollary, the State of Maryland granted Appellant a writ of actual innocence and dismissed all charges against him. Restated, under the district court's decision, Appellant would be barred from ever obtaining a civil remedy for colorable claims premised upon convictions and a custodial sentence that the state has overturned. If we follow the state's lead and assume that Appellant has suffered an injury, then we must acknowledge that, per the district court's view, he is also left without any means of recourse for that harm, pursuant to the application of an equitable doctrine.

Moreover, the application of collateral estoppel on these specific facts confounds the purposes of the doctrine. Appellees have invoked non-mutual, defensive collateral estoppel, meaning that they are relying on a prior ruling they were not party to, as an affirmative defense in their own case. *See Shader v. Hampton Improvement Ass'n, Inc.*, 94 A.3d 224, 240 (Md. Ct. Spec. App. 2014) ("[D]efensive use of nonmutual collateral

estoppel occurs when a defendant seeks to prevent a plaintiff from relitigating an issue the plaintiff has previously litigated unsuccessfully in another action against a different party.") (citation omitted).

As Maryland courts have explained, nonmutual, defensive collateral estoppel incentivizes plaintiffs to join all potential defendants in the first action, if possible, to avoid repetitious lawsuits. *Shader*, 94 A.3d at 240 (citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329–30 (1979)). But here, Appellant could not possibly have joined Appellees -- or anyone for that matter -- in his first action because it was a post-conviction collateral attack on his criminal convictions. Put simply, Appellant could not bring a civil suit against Appellees while his underlying criminal convictions remained undisturbed.

Thus, the possibility of the current lawsuit did not materialize until after Appellee had obtained his writ of actual innocence. To permit nonmutual, defensive collateral estoppel in this specific context would prohibit a lawsuit from happening at all. Such a result would be a perverse inversion not only of equity, but also of the doctrinal incentives to join all available parties in order to prevent burdensome, "needless litigation." *See Garrity*, 135 A.3d at 458 (citing *Parklane*, 439 U.S. at 326).

Therefore, we also reverse on this basis.

## C.

Furthermore, in determining the preclusive effect of a state court judgment, federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel. *Gilliam*, 932 F.3d at 231. In undertaking this role, the function of the federal court is to place itself in the shoes of the state court and give preclusive effect to the

judgments of that state "when the courts of that state would do so." *Id.* Here, there are multiple indications that Maryland courts would not give preclusive effect to the conclusion of the Post-Conviction Decision that Robinson's recantation was incredible.

First, the government presented Appellees' collateral estoppel argument to the court adjudicating the Innocence Decision. There, the government argued that Appellant was collaterally estopped from relitigating Robinson's recantation because Appellant was given a fair opportunity to raise the issue, and it was adjudicated in a final judgment by the Post-Conviction Decision court. The court that rendered the Innocence Decision did not address this argument; nor did it consider itself to be bound by that finding or precluded from ruling that Robinson's recantation created a substantial or significant possibility that a jury would have ruled differently.

Second, that same court vacated Appellant's convictions and awarded him a writ of actual innocence. In doing so, the court ordered a new trial. The Innocence Decision court cannot possibly have intended that Appellant should be accorded a new trial, but collaterally estopped from litigating Robinson's recantation if the government chose to offer Robinson's prior testimony as direct evidence at that trial. *See Cook v. State*, 381 A.2d 671, 673 (Md. 1978) ("It is beyond question that the closely related doctrines of res judicata and collateral estoppel apply to criminal as well as civil causes."). This would be a more natural application of issue preclusion, within the context of one criminal proceeding -- yet the result is obviously inconsistent with the judgment issued in the Innocence Decision.

Third, the State of Maryland determined in an administrative proceeding that Appellant was factually innocent of murdering Ali, according to a clear and convincing standard of proof, and awarded him approximately $3 million in compensation. That decision, issued on January 2, 2024, was upheld upon judicial review by the circuit court for Baltimore City in a decision issued on April 5, 2024. Although the district court did not have the benefit of these decisions, we do.[8] These decisions leave no doubt about the treatment that Maryland courts have afforded to the findings rendered in the Post-Conviction Decision. To spell out the obvious: Appellant cannot be factually innocent of murdering Ali if Robinson's recantation was incredible.

These facts put to rest any ambiguity as to how Maryland courts would treat the Post-Conviction Decision with respect to collateral estoppel.

IV.

The district court dismissed Appellant's alternative *Brady* due process claim, which alleged that Appellees withheld: (i) exculpatory statements by Robinson and Dorsey asserting that they could not identify the shooter; and (ii) Appellees use of threats and other coercive tactics to extract their allegedly false identification. To succeed on his Brady claim, Appellant must show: (i) the non-disclosed evidence was favorable to him; and (ii) it was material to his defense. *See Moore v. Illinois*, 408 U.S. 786, 794–95 (1972). Then,

---

[8] And we take judicial notice of them. *See N.C. Ins. Guar. Ass'n v. Becerra*, 55 F.4th 428, 435 n.6 (4th Cir. 2022) (taking judicial notice of administrative appeal); *see also Colonial Penn Insurance v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989).

because his claim is against police officers rather than a prosecutor, Appellant must show the officers suppressed the evidence in bad faith. *See Gilliam*, 932 F.3d at 238.

The district court assumed that such evidence existed and that it favored Appellant. It then held that Appellant had failed to proffer non-speculative evidence in support of his claim that Appellees had failed to disclose evidence to the prosecution in Appellant's criminal trial. The district court noted that Appellant's only basis for inferring that Appellant's counsel did not receive the alleged *Brady* material was that he "did not make an argument about such alleged evidence at trial." J.A. 3831. Appellant presents no basis to disturb this ruling on appeal. *See, e.g.*, Appellant's Br. at 55 ("Further proof that the exculpatory evidence had not been produced comes from Washington's suppression hearing—because if his defense attorney Paul Polansky had it, he would have used it.").

As the parties recognize, the homicide file is incomplete and neither the prosecuting attorneys nor Appellant's own attorney could recall the details of this case so many decades later. While we are cognizant of the challenges of litigating old cases, those challenges do not create an independent basis to relax the summary judgment standard. Therefore, we affirm the district court's judgment as to this claim.[9]

## V.

Finally, the district court dismissed Appellant's intentional infliction of emotional distress claim for a failure to adduce "sufficient evidence of severe emotional distress."

---

[9] The dismissal of this claim has no bearing on Appellant's surviving due process fabrication claim. There is ample evidence in the record of both coercion and fabricated testimony.

J.A. 3836.  While this ruling makes sense on the district court's prior theory -- that Robinson's recantation was incredible and, therefore, Appellant was not wrongfully incarcerated for 31 years -- that theory rested on a faulty premise as discussed *supra*.  As it stands today, the State of Maryland has declared Appellant to be an innocent man.  Thus, if Appellant's theory of the case is true, and he was incarcerated for 31 years pursuant to Appellees' coercive attainment of fabricated testimony, his incarceration would certainly qualify as distress "so severe that no reasonable man could be expected to endure it." *Harris v. Jones*, 380 A.2d 611, 616 (Md. 1977); *see also Prince George's County v. Longtin*, 988 A.2d 20, 46 n.58 (Md. Ct. Spec. App. 2010) ("There is no doubt that wrongful incarceration can be actionable as an intentional infliction of emotional distress.") (citation omitted).

Yet, Appellees argue that Appellant cannot meet his evidentiary burden because the record evidence indicates that he now lives a healthy life as a free man.  This line of reasoning is offensive.  That Appellant should be subject to a "no harm no foul" rationale simply because he was able to overcome the damage inflicted upon him is not an argument that deserves countenance.

Accordingly, the district court's dismissal of Appellant's intentional infliction of emotional distress claim is reversed.

VI.

For the foregoing reasons, the grant of summary judgment to Appellees is

*REVERSED IN PART AND AFFIRMED IN PART.*

NIEMEYER, Circuit Judge, concurring in the judgment:

I am pleased to concur in the judgment.

In 1999, the state court considering Washington's petition for post-conviction relief concluded that Washington had failed to present sufficient evidence "to support a finding that the Police [had], in fact, coerce[d] Mr. Robinson," concluding that Robinson's testimony was "incredible." The 2018 actual-innocence factfinder found — in tension with the 1999 order, but not in conflict with it — that evidence of Robinson's recantation was sufficiently credible and pervasive to "create[] a substantial or significant *possibility* that the result [of Washington's criminal trial] may have been different" had such evidence been presented to the jury. Md. Code. Ann. Crim. Proc. § 8-301(a)(1)(i) (emphasis added). As a consequence, the 2018 actual-innocence order granted Washington a new trial, but it did not find him innocent.

Because of these circumstances, I would give controlling weight to the 2018 proceeding, not because it was in conflict with the 1999 post-conviction order but because the actual-innocence remedies were newly conferred on Washington by the Maryland General Assembly in 2009, giving him a range of new remedies, which he successfully invoked.